1  **TOWER LEGAL GROUP, P.C.**

2  James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)

3  Ariel A. Pytel (SBN 328917)

4  11335 Gold Express Drive, Ste. 105
Gold River, CA 95670

5  Telephone: (916) 361-6009

6  Facsimile: (916) 361-6019

7  Email: james.clark@towerlegalgroup.com
        renee.ortega@towerlegalgroup.com

8        ariel.pytel@towerlegalgroup.com

9  [Attorneys for Plaintiffs]

10                **UNITED STATES DISTRICT COURT**

11               **NORTHERN DISTRICT OF CALIFORNIA**

12

13  MARIA CARRILLO and ENRIQUE          Case No.
    CASTILLO and JENNIFER PETRI,
14  individually and as a representative of
15  a Putative Class of Participants and
    Beneficiaries, on behalf of all          **CLASS ACTION COMPLAINT**
16  similarly situated participants and
    beneficiaries on behalf of the Amy's
17  Kitchen Inc. 401(k) Retirement Plan,
18
19
            Plaintiffs,
20
        v.
21
    AMY'S KITCHEN INC.;
22  ADMINISTRATIVE COMMITTEE OF
    AMY'S KITCHEN INC. 401(K)
23  RETIREMENT PLAN, Both Individually
    And As The De Facto Administrative
24  Committee Members; ANDY BERLINER;
25  PETER WONG; CARMELITA A. LEWIS;
    and DOES 1-50,
26
27
            Defendants.
28

**OVERVIEW**

1.     Plaintiffs Maria Carrillo, Enrique Castillo, and Jennifer Petri (Collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the Amy's Kitchen Inc. 401(k) Retirement Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the Plan sponsor, Amy's Kitchen, Inc. (the "Company"), its delegates and de facto plan fiduciaries, the Administrative or Investment Committee of Amy's Kitchen Inc. 401(K) Retirement Plan, and Does 1-50 (collectively the "Defendants").

2.     This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds.  The 401k plan has become the dominant source of retirement savings for most Americans.  Unlike defined-benefit plans, which provide set payouts for life, 401(k) accounts are defined-contribution plans which rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.  This action is filed to recover millions of dollars of funds owed back to the plan on behalf of employees / participants / beneficiaries.  These retirement funds are significant to the welfare of the class.

3.     The importance of 401k defined contribution plans to the United States retirement system has become extremely pronounced as employer-provided defined benefit plans have become increasingly rare.  Management of the 401k plans therefore requires a fiduciary duty of prudence and loyalty that place the interests of the employees / participants / beneficiaries upmost.

4.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement through defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the

employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. ("ERISA"). Upon information and belief, none of the Defendants followed these rules.

5.     ERISA defines a "fiduciary" as a person (1) who exercises discretionary authority or control respecting management of the plan or management or disposition of plan assets; (2) who renders or has the authority or responsibility to render investment advice for compensation regarding money or property of the plan; or (3) who has discretionary authority or responsibility in the administration of the plan. 29 U.S.C. 1002(21)(A). Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted; [s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.

6.     The term "party in interest" includes, inter alia, any fiduciary, counsel, or employee of a plan; a person providing services to the plan; an employer or employee organization any of whose employees or members are covered by the plan; a corporation or other entity that is owned by such person; an employee, officer, or director of, or owner of a specified financial interest in, such a person; and a partner or joint venturer of such a person. 29 U.S.C. 1002(14).

7.     Based on government filings at www.efast.dol.gov., Amy's Kitchen Inc., (the "Company") serves as plan "Administrator" and sponsors Amy's Kitchen Inc. 401(k) Retirement Plan (hereinafter the "Plan"). Based on their chosen audit firm, Amy's Kitchen Inc., the Trust Settlor and Plan Sponsor of the Plan, was and remained the named fiduciary of the Plan under ERISA § 402(a)(2), the Plan administrator under ERISA § 3(16), a party in interest under ERISA § 3(14)(A), the de facto Administrative/Investment Committee of the Plan, and also a Plan fiduciary under ERISA § 3(21)(A) to the extent that it appointed Investment Managers for the Plan,

selected and monitored Investment Funds under the Plan, and otherwise exercised discretion or control over the administration and management of the Plan and Plan assets.

8.    During the Class Period, each of the Plan Fiduciaries was a fiduciary of the Plan, either as a named fiduciary or as a de facto fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets. Amy's Kitchen Inc. was also the de facto administrator or co-administrator of the Plan for purposes of the required disclosures under trust laws and ERISA.

9.    Regarding fiduciary status, in a law review article on the subject, the authors stated:

> . . . The term [fiduciary] includes anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary authority with regard to plan administration. The broadness of the definition is readily apparent. Plan officers, directors, and members of the investment or administrative committee are certainly fiduciaries since they exercise discretionary authority or control over plan management and asset disposition. Similarly, officers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee, or plan officers or directors. Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: . . . attorneys who counsel the employer, investment committee, or trustee with regard to an appropriate portfolio mix or with regard to specific investments and receive a fee for these services; . . . [and] . . . stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of these securities and receive a commission for their services. (Footnotes omitted.)

Little and Thrailkill, "Fiduciaries Under ERISA: A Narrow Path to Tread," 30 Vanderbilt L.Rev. 1, 4-5 (1977)).

10.    Wasting the trust's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7. Courts have quoted commentary to section 7 of the UPIA: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

## THE PARTIES

11.    As a defined contribution plan governed by ERISA and 26 U.S.C. § 401(k), the Plan enables eligible employees of Amy's Kitchen to make tax-deferred contributions from their salaries for retirement.  As of December 31, 2021, the Plan had 3,576 participants and over $140 million in assets.

12.    Defendant Amy's Kitchen Inc. ("Company") is the current sponsor and administrator of the Plan and maintains its principal place of business in Sonoma County, State of California. This entity is registered with the State of California and conducts business in the State of California. The investment adviser is CETERA ADVISORS LLC ("Cetera").

13.    Amy's Kitchen is a family-owned and operated natural and organic food company that was founded in 1987. The company is based in Petaluma, California and is best known for its line of vegetarian and vegan frozen meals, entrees, and snacks. Amy's Kitchen products are made with non-GMO ingredients, and many are certified organic. They offer a wide range of products, including gluten-free, dairy-free, and soy-free options, making it easier for people with dietary restrictions to find options that meet their needs. The company has a strong commitment to sustainability and uses environmentally-friendly packaging materials whenever possible.

14.    The Company Defendants, acting through its Board of the Directors of the appointed Retirement Plan Committee of the Amy's Kitchen Inc. 401(k) Retirement

Plan to control and manage the operation and the administration of the Plan. Accordingly, the Company (and named fiduciary) had a concomitant fiduciary duty to prudently select, monitor and supervise those appointees/delegates.

15.     Defendant "Does" or the names of the individuals on the Board of Directors and Committee during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

16.     Upon information and belief, Carmelita A. Lewis (Director Benefits, USA at Amy's Kitchen Inc.), certified to the U.S. Departments of Treasury and Labor all of the Company's 2015 to 2021 plan years' Annual Returns/Reports of Employee Benefit Plan (Forms 5500; at www.efast.dol.gov), and acted as a fiduciary.   In addition, CEO Andy Berliner and CFO Peter Wong acted as fiduciaries in selecting and retaining the administrative committee of the Amy's Kitchen 401k Retirement Plan, and selecting and retaining all Advisors and Recordkeepers, and approving payments to these providers.

17.     The Company failed to prudently investigate and monitor its covered service providers. For example, Cetera's median pay for every client since 2016 at www.efast.dol.gov, for every year from 2016 to 2021, was $42,640. This matches Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) hourly of $300 when performing about ten hours of labor each quarter running reporting for the Plan and Trust.

18.     However, as Form 5500 Signatory since 2016, Carmelita A. Lewis certified there were no excessive *trust* payments (from participants'/beneficiaries' bookkeeping accounts) to Cetera for those plan years (Schedule H, line 4d) even though Cetera was paid directly from the Plan and Trust assets (and participants'/beneficiaries' accounts) 300,759 dollars for each plan year ($1,722,856 in total taken from the trust and employees).

19.    The Committee members, in their capacity as officers of the corporation, had discretionary authority to control the operation, management, and administration of the Plan and should have followed the plan document's IRS Employee Plans Compliance Resolution System (EPCRS) and Voluntary Fiduciary Correction Program (VFCP) procedures and restored the trust back to the condition it would have been in but for the alienation of excessive compensation (from trust assets) to Cetera in violation of the plan's document and ERISA (and its foundation in common trust law).

20.    The Committee contracted with Cetera ("Cetera") to serve as the Plan's Fiduciary Financial Advisor as stated in the Defendants' Schedules C on their certified Forms 5500.

21.    The Company, and its Board of Directors, members of the Committee, the Directors and Officers, along with signatories to the IRS Form 5500, and Cetera are all fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or freeze or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their salary savings and provision of their retirement income.

22.    Amy's Kitchen Inc., EIN 68-0154899 is located at 1650 Corporate Cir Ste 200, Petaluma, CA, 94954 in Sonoma County, phone 707-871-7625, at website www.amys.com. Amy's Kitchen offers over 250 varieties of organic frozen and packaged foods in the U.S. as well as more than 30 other countries around the globe. Ms. Carmelita A. Lewis serves as Senior Director, People Shared Services and International HR Business Partner and certified and executed every Annual Return/Report of Employee Benefit Plan since 2016 to the U.S. Departments of Treasury and Labor. Andy and Rachel Berliner, owners of Amy's Kitchen Andy

Berliner, CEO, and Co-Founder of Amy's Kitchen President of Amy's Kitchen, Xavier Unkovic; Mr. Andrew Berliner, Chief Executive Officer/President, prior to May 2017, and from May 2021 to present; Mr. Peter Wong, Executive Vice President of Finance; Rachel Berliner, Owner/Vice President; Mr. Dave Gardiner, Executive Vice President of Operations; Amy's Kitchen, Inc. 401(k) Retirement Plan Signer of Form 5500, Ms. Carme Lewis; Mr. Xavier Unkovic, Chief Executive Officer, May 2017 - May 2021.

23.     The Board of Directors (BOD) appointed "authorized representatives" of Amy's Kitchen, including the Administrative Committee, as plan fiduciaries.

24.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Administrative Committee maintains its address at Amy's Kitchen's corporate headquarters in Sonoma County, State of California. The Administrative Committee and its members are appointed by the Chief Executive Officer to administer the Plan on Amy's Kitchen's behalf.

25.     Plaintiff Maria Carrillo is a former employee of Defendant Amy's Kitchen and current participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Carrillo was or still is a participant in the Plan under 29 U.S.C. § 1002(7) and maintained an investment in some or all the funds at issue in this action.  Specifically, Carrillo at minimum invested in the Plan through in the Vanguard Target Retirement 2045 Inv., and the Transamerica Stable Value Strategy Option. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct.  Carrillo is a resident of Sonoma County, State of California, and worked for Defendant Amy's Kitchen in this District.

26.     Plaintiff Enrique Castillo is a former employee of Defendant Amy's Kitchen and former participant in the Plan under 29 U.S.C. § 1002(7) during relevant

timeframes through October of 2022. During the Class Period, Castillo was or still is a participant in the Plan under 29 U.S.C. § 1002(7) and maintained an investment in some or all the funds at issue in this action.  Specifically, Castillo at minimum invested in the Plan through in the Vanguard Target Retirement 2030 Inv.  As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct.  Castillo is a resident of Santa Clara County, State of California, and worked for Defendant Amy's Kitchen in this District.

27.    Plaintiff Jennifer Pertri is a former employee of Defendant Amy's Kitchen and current participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Petri was or still is a participant in the Plan under 29 U.S.C. § 1002(7) and maintained an investment in some or all the funds at issue in this action.  Specifically, Castillo at minimum invested in the Plan through in the Vanguard Target Retirement 2035 Inv. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct.  Petri is a resident of Sonoma County, State of California, and worked for Defendant Amy's Kitchen in this District.

## **VENUE AND JURISDICTION**

28.    Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under the laws of the United States.

30.    This Court has personal jurisdiction over Defendants because, among other reasons, Defendants transact business in and have significant contacts with this District and ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

31.    Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Amy's Kitchen's principal place of business is in this District and the Plan is administered from this judicial district. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

32.    Plaintiffs have standing to bring this action. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court. In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

33.    Divisional Assignment. A substantial part of the events or omissions giving rise to the Claims occurred in Sonoma County.

## **STANDING**

34.    ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity

on behalf of the plan as a whole"). Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. See LaRue v. DeWolff, Boberg & Associates, Inc., 552 U.S. 248, 256 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

35.    For claims to redress a breach of the duty of loyalty, the historical tradition supporting Plaintiffs' standing is unassailable. Trust law developed a special rule—the "no further inquiry" rule—that held a trustee per se liable merely on proof that the trustee engaged in disloyal conduct. The beneficiary did not need to show any loss or the unfairness of the transaction; the disloyalty sufficed to permit suit. The beneficiary could then invoke the usual trust-law remedies: restoration of plan losses caused by the breach; recovery of the trustee's profits from the breach; and voiding the disloyal transaction. By dictating that trustees must obtain advance approval for any transaction from which the trustee stands to profit personally, the rule corrects for beneficiaries' inability to assess whether the trustee is conflicted with respect to any particular transaction.

36.    By requiring the trustee to explain to a court or to the beneficiary why the transaction is in the trust's best interests, it relieves the beneficiary of the need to have the same knowledge and expertise as the trustee. By allowing the beneficiary to state a claim upon a simple showing that the trustee sat on both sides of a transaction, it places the burden of production on the trustee. The no further inquiry rule also corrects for the lack of external pressures on the trustee. The rule's bright-line prohibition on self-dealing without advance approval, and the unusually harsh remedy it provides (disgorgement of all profits, even if the trust was not harmed), create appropriate disincentives to self-dealing. See RESTATEMENT (THIRD) OF TRUSTS § 78 cmt. b (Tentative Draft No. 4, 2005); Sitkoff, supra note 85, at 573-74.

37.    Plaintiffs' claims are explicitly authorized by 29 U.S.C. 1132(a)(2) and (a)(3), and Plaintiffs' Article III standing rests on firm ground: Plaintiffs have suffered a personal, de facto wrong from the breaches and the harm to plan assets in which they have an interest; for centuries common law permitted these kinds of suits; and Congress plainly identified Plaintiffs' injuries as meeting Article III's requirements.

38.    Plaintiffs' standing is first evident from the real harm that an ERISA participant suffers as a result of fiduciary breaches that impair plan assets. See, e.g., *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-342 (2016); *Sprint Communs. Co., L.P. v. APCC Servs.,* 554 U.S. 269, 285-286, 299, 304 n.2 (2008) (Roberts, C.J., dissenting). This concrete personal stake derives from two factors that reinforce each other: when a fiduciary breaches his duties, the breach (1) invades the participant's legally protected interest in having that fiduciary obligation fulfilled and (2) injures trust property in which the participant has a long-recognized equitable ownership interest.

39.    At all relevant times, Plaintiffs were common-law trust beneficiaries and represented the class. As the Department of Labor has explained across administrations, this private right of action is crucial to fulfilling ERISA's goals: "The Secretary of Labor depends on participant suits to enforce ERISA, because she lacks the resources to do so singlehandedly, and plan fiduciaries are commonly defendants in such cases." Amicus Br. of Sec'y of Labor at 12, *David v. Alphin*, No. 11-2181 (4th Cir. Dec. 28, 2011); see also, e.g., Amicus Br. of Sec'y of Labor at 1- 2, *Thole v. U.S. Bank*, No. 16-1928 (8th Cir. May 2, 2017).

40.    These enforcement mechanisms largely adopt the causes of action available to trust beneficiaries at common law, where it has long been established that a beneficiary could sue a breaching fiduciary to restore to the trust any loss caused by the breach, remove the trustee, and set aside unlawful transactions. Restatement (Second) of Trusts §§ 199, 205 (1959); Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, Scott & Ascher on Trusts §§ 24.3.5, 24.9 (5th ed. 2007).

41.     This case involves the Plaintiffs' Article III standing to assert claims under 29 U.S.C. 1132(a)(2) and (a)(3). Article III limits "[t]he judicial Power of the United States" to "Cases" and "Controversies." U.S. Const. Art. III. "'The purpose of the case-or-controversy requirement is to limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.'" *Sprint Comms. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 274 (2008) (citation omitted) (emphasis removed).

42.     The U.S. Supreme Court has found that various intangible injuries supply the concrete personal stake needed to confer standing. The trustee's discharge of its legal obligation is an independent, personal benefit that supports the trustee's standing to sue in federal court. The Court has also recognized that, in many circumstances, Article III countenances suits to vindicate harm suffered by another party. See, e.g., *Sprint*, 554 U.S. at 287-288 ("[F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth."). This is known as representational standing. See also *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773-774 (2000) (Article III permits representational suits by qui tam relators on behalf of the United States).

43.     This case brings all lines of authority together. Suits under 29 U.S.C. 1132(a)(2) are by their nature representational: A participant sues "in a representative capacity on behalf of the plan as a whole" to restore monetary losses to the plan. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985. Likewise, removal of the fiduciaries and setting aside statutorily prohibited transactions necessarily affect the plan as a whole. At the same time participants still retain a personal, intangible stake in this type of case that makes them the appropriate parties

to sue: the breach of fiduciary duty owed to them that affects their "interest * * * in the financial integrity of the plan." Ibid.

44.    First, in a representational-standing suit, the plaintiff must show some personal interest that distinguishes him from the general public and shows why the case poses the requisite adversity, even if the personal-interest requirement might be less demanding than in non-representational-standing cases. The U.S. Supreme Court has agreed that a wide variety of interests—monetary and non-monetary alike—suffice to demonstrate that necessary stake. See *Sprint*, 554 U.S. at 288, 304 n.2 (Roberts, C.J., dissenting) (trustee's "discharge of its legal obligation"); Vt. Agency, 529 U.S. at 772-773 (qui tam relator's monetary stake in recovery).

45.    Second, to determine whether the plaintiff satisfies Article III's requirements, "both history and the judgment of Congress play important roles." *Spokeo*, 578 U.S. at 340; see *Sprint*, 554 U.S. at 274 ("history and tradition offer a meaningful guide"); *Vt. Agency*, 529 U.S. at 774 ("history is particularly relevant to the constitutional standing inquiry"). Because standing doctrine is ultimately "grounded in historical practice," the Court "consider[s] whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S at 341; see *Vt. Agency*, 529 U.S. at 774 ("Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by the judicial process.'") Accordingly, a strong historical tradition of allowing suit signifies that the injury is sufficiently particularized and concrete.

46.    ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S. Ct.

3085  87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole").

## THE PLAN

47.    The Plan at issue is a defined contribution retirement plan or a 401(k) plan (profit- sharing type containing a cash or deferred arrangement), established on January 1, 1994, pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 3,576 participants and $140,987,462  in assets.

48.    The current plan sponsor is Amy's Kitchen Inc. All employees of the Company are eligible to participate in the Plan upon employment. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and certain provisions of the IRC.

49.    Based on the auditors' certified annual audits, BPM LLP, the "Company" is the administrator of the Plan and, as such, carries out the duties imposed by ERISA. The Company has delegated certain responsibilities for the operation and administration of the Plan. Custodial and recordkeeping services are provided by Transamerica Life Insurance Company ("Transamerica") and State Street Bank and Trust Company ("State Street").

50.    The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") as amended. The Plan is administered and overseen by Amy's Kitchen Inc. According to the auditors, the administrative committee is Amy's Kitchen Inc. (the "Company").

51.    According to the most recent audit, Plaintiffs note participants possess only a bookkeeping account at the recordkeeper and a beneficial interest in the trust—the trust is the legal owner of mutual fund assets and they are held in the nominee name of the Plan and Trust. Revenue-sharing and portfolio manager's compensation fees

reduce the gross asset values (GAV) of the trust's open-end management investment companies (mutual funds). The trust's holdings' resulting prices, or net asset values (NAVs), are allocated daily to participants.

52.     Each participant's account is credited with the participant's contributions, Company contributions, Plan earnings or losses, Plan service credits, and rollovers from other qualified plans. Plan earnings or losses are allocated based on each participant's account balance. Plan service credits are asset-based charges and allocated based on each participant's selected funds. Certain fees are charged to the fund investments and are offset against Plan investment income and loss as presented on the statement of changes in net assets available for benefits. Participants should refer to the prospectuses of these funds for details on the various types and amounts of investment fees charged to the Plan and their individual accounts.

53.     Participants in the Amy's Kitchen Inc. 401(k) Retirement Plan may only elect to invest their (1) deferred salary savings, (2) associated employer match and (3) reinvested dividends/interest among approximately fourteen investments chosen by the fiduciaries, de facto fiduciaries and the Administrative Committee (not counting default target date funds chosen for the workers who make no investment election). Amy's Kitchen's reckless decision-making was aided by and under the recommendations of Cetera Advisors, LLC and Cetera Advisor Networks, LLC ("Cetera"), who were compensated handsomely for poor recommendations in violation of ERISA and Restatement (Third) of Trusts. This firm breached its fiduciary duties to clients. The Company's Form 5500 for 2013 plan year showed the Company directed Transamerica to pay them indirect compensation of $25,359 for "insurance services" that the Company directed to take from participants' earnings—called revenue-sharing. Filings at the SEC and FINRA indicated conflicts of interest to the Company but they failed to read their ADV Parts one and two (adviserinfo.sec.gov and brokercheck.finra.org). Schedule C, page 3, part 2(b) indicated they acted as "Insurance agents and brokers" providing "Insurance services." If the Company's

certified Form 5500 is correct, they did not provide services "necessary for operation of the plan" in violation of ERISA. Ms. Carmelita A. Lewis signed as Plan Administrator and did not say "YES" to the line 4(d) question (Schedule H) that there were non-exempt transactions with a party-in-interest.

## INTRODUCTION

54. In its unanimous opinion in *Tibble v. Edison Int'l, 575 U.S. 523 (2015)*, the U.S. Supreme Court held that the common law of trusts was the underlying foundation from which the ERISA originates.

55. Where ERISA is silent, courts look to trust law. A trustee is obligated not only to make prudent investment decisions but also to monitor and review those investments "in a manner that is reasonable and appropriate to the particular investment action, and strategies involved." Restatement (Third) of Trusts, § 90, Comment b, p. 295 (2007).

56. The court observed: "We have often noted that an ERISA fiduciary's duty is 'derived from the common law of trusts…' In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." Loyalty is the most fundamental of rules borrowed from the common law of trusts, this duty is also known as the duty of care. Tibble v. Edison Int'l, 575 U.S. 523 (2015); Martinez v. Schlumberger, LTD., 338 F.3d 407, 411 (5th Cir. 2003). The standard is objective and therefore independent of a fiduciary's lack of bad faith. La Scala v. Scrufari, 479 F.3d 213, 219-20 (2d Cir. 2007).

57. The Supreme Court ruled that an employer has an ongoing duty to monitor plan investments and remove imprudent ones, even if they were initially selected more than six years before. *Tibble v. Edison Int'l*, 575 U.S. at 530.

58. Although it remains true that Section 404(c) protects employers from liability for losses attributable to an individual participant's imprudent direction or "allocation of investments" under a 401(k)-style plan (where participants choose from

a "menu" of options), "menu setting" by the employer remains a fiduciary function. *Difelice v. U.S. Airways*, 497 F.3d 410 (4th Cir. 2007).

59.     This action is brought by current and former participants/beneficiaries of the Plan to recover mismanaged 401k retirement funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall based on the plan fiduciaries' chosen menu of choices. Therefore, the proliferation of 401(k) plans has exposed workers to big drops in the funds the Company selects and retains. High-cost investments with built-in compensation expose the trust assets to conflicts of interest by the (1) recordkeeper (who seeds their proprietary funds), (2) broker who can command hard and soft dollar remuneration and (3) the Company who can receive revenue-sharing credits to be used to avoid invoicing for the plan they set up and sponsor.

60.     This action is filed to recover more than $10M in trust funds owed back to the Plan and Trust on behalf of participants/beneficiaries. These retirement funds are significant to the welfare of the class.

61.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

62.     Defendants (the Company and other de facto fiduciaries) chose to seek and accept the benefits of federal and state tax deductions from their employer contributions as well as for their employees via this 401(k) plan. The corporation, its

owners and its executives have benefitted financially for years from the same tax benefits. However, the Defendants have not followed their IRS—determination letter granting tax exemption as well as ERISA's standard of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

63.    The plan fiduciaries include, but are not limited to, the de facto fiduciaries and board members overseeing the Committee members. Amy's Kitchen controls the participants'/beneficiaries' investments (and their related growth; via an Investment Policy Statement (IPS) it failed to share upon written requests).

64.    Courts have ruled the Investment Policy Statement (IPS) is considered a governing plan document. Mathematics proves salary deferrals comprise about 30% of retirement wealth and compounded growth of open-end management investment companies and other trust assets add 70% to a participant's total retirement wealth. If plan fiduciaries fail to prudently select and monitor investments, participants' accounts suffer.

65.    Amy's Kitchen not only controls all compensation paid to their chosen funds' portfolio managers but also all plan relationships as well as their source and amounts of compensation (broker, recordkeeper, custodian, auditor, etc.).

66.    Amy's Kitchen Inc. has full discretion over compensation for the Plan's chosen and retained providers. Amy's Kitchen made few, if any, covered service provider changes over the past decade and very few mutual fund changes.

67.    Recordkeepers provide a commodity service and failures to periodically review and seek alternative recordkeeper services can allow overcharges to the trust.

68.    Failures to monitor Cetera—as in selecting other providers, in selecting investment managers like Cetera, the plan fiduciaries must reasonably conclude that the investment manager's practices in selecting investments are consistent with the principles articulated in common trust law and ERISA.

69.    These ERISA fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). In considering whether a fiduciary has breached the duties of prudence and loyalty, the court considers both the "merits of [the] transaction" as well as "the thoroughness of the investigation into the merits of [the] transaction." Bunch v. W.R. Grace & Co., 532 F. Supp. 2d 283, 288 (D. Mass. 2008), aff'd, 555 F.3d 1 (1st Cir. 2009) (quoting Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983). Therefore a defendant "cannot claim as a defense...that a great deal of time was spent reviewing" a decision when that decision was "tainted by the fact that he did not have all of the information he needed," rendering the decision "flawed from its inception." *Chao v. Hall Holding Co.*, 285 F.3d 415, 431 n.10 (6th Cir. 2002).

70.    The fiduciary must determine whether the investment "is reasonably designed, as part of the portfolio...to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

71.    Additionally, plan fiduciaries have a "duty to reevaluate the trust's investments periodically as conditions change." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, p. 146 (3d ed. 2009) (Bogert 3d).

> The duty to review trust investments should be performed by the collection of information currently as changes occur, and also by a systematic consideration of all the investments of the trust at <u>regular intervals, for example, once every six months</u>.

Bogert 3d § 684, at 147-48 (emphasis added).

72.     The duty of prudence, therefore, requires "prudent management of risk." Restatement (Third) of Trusts § 90 cmt. e(1) (explaining that the prudent investor rule's "requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks"). This does not require outright avoidance of risk, but instead limiting risks to those that are compensated through the improved potential for returns."

73.     ERISA Section 404(a)(1)(B) requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

74.     "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, §1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U. S. 409, 425 (2014).

75.     "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022).

76.      The legislative history of this section and the case law indicates that this fiduciary duty was taken from the prudent person standard developed through the common law of trusts. Subjective good faith is no defense; courts require procedural prudence, which requires plan fiduciaries to thoroughly investigate the merit of each decision affecting the plan.

77.     Plaintiffs searched   https://brokercheck.finra.org/firm/summary/13572 and found one of the highest number of disclosures of any broker in the USA. In fact, it led to a google search that disclosed even more concerns about the qualification of Cetera to serve under ERISA as an investment fiduciary.



**Figure 1**

78.    The article, "Study Slams Finra's BrokerCheck as 'Worthless' in Protecting Investors, Names 30 'Worst' Firms" by Jed Horowitz on April 29, 2016, Plaintiffs found Cetera under the "30 Firms Most Harmful to Investors*" noted that Cetera Advisors LLC was listed as number 28.

> Finra's own study and the one earlier this year from professors at the University of Chicago and the University of Minnesota concur that bad brokers are contagious. They find that "the risk of misconduct by a broker is significantly increased if he or she works with co-workers who have previously committed misconduct," the SLCG paper notes.

https://www.advisorhub.com/study-slams-finras-brokercheck-worthless-protecting-investors-names-30-worst-firms/

### SEC Lawsuit for Breach of Fiduciary Duties

79.     Because of Cetera's conflicts of interest, articles like "SEC Charges Cetera Advisors with Fraud in Fund Share-Class Sales" appeared in 2019 (August 30, 2019). "Cetera Advisors defrauded advisory account customers by selling them overpriced fund shares that generated almost $11 million in undisclosed 12b-1 and revenue-sharing fees from funds * * *." Furthermore (emphasis added):

> The Denver-based unit of independent brokerage empire Cetera Financial Group <u>violated its fiduciary duty</u> by having its investment adviser <u>representatives continuously recommend</u> and invest assets in funds "that <u>cost clients more when less expensive, identical investments were available" on its platform</u>, the regulator said in a lawsuit filed in federal court in the district of Colorado. The allegedly fraudulent sales, some of which occurred after the parent company removed more expensive share classes from its buy list, <u>occurred from September 2012 through December 2016</u>, according to the complaint.

> https://www.advisorhub.com/sec-charges-cetera-advisors-with-fraud-in-fund-share-class-sales/

> (Private equity firm Genstar Capital purchased Cetera last year for a reported $1.7 billion.)

80.     The U.S. Securities and Exchange Commission (SEC) filed a lawsuit in 2019 against Cetera. The SEC filed a lawsuit against the Defendants' chosen advisory firm, Cetera ("SEC Obtains Final Judgment Against Investment Advisers Charged with Defrauding Their Advisory Clients" (emphasis added) https://www.sec.gov/litigation/litreleases/2022/lr25564.htm):

> Litigation Release No. 25564 / October 24, 2022 Securities and Exchange Commission v. Cetera Advisors, LLC and Cetera Advisor Networks, LLC, Case No. 1:19-cv-02461 (D. Colo. filed August 29, 2019, amended April 29, 2020):

On October 13, 2022, the Securities and Exchange Commission obtained a final judgment against defendants Cetera Advisors, LLC and Cetera Advisor Networks, LLC, whom the SEC previously charged with defrauding their advisory clients by failing to disclose several sources of compensation. According to the SEC's amended complaint filed on October 11, 2019, in the United States District Court for the District of Colorado, the <u>Cetera defendants breached their fiduciary duty and defrauded retail advisory clients by, among other things, failing to properly disclose conflicts of interest related to the firms' receipt of compensation in the form of 12b-1 fees, revenue-sharing, administrative fees, and mark-ups</u>. The Cetera entities consented to entry of a final judgment permanently enjoining each of them from violations of Sections 206(2) and 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-7 thereunder; ordering them to pay disgorgement on a joint and several basis of $5,614,509, plus prejudgment interest of $990,961; and ordering each of them to pay a $1,000,000 civil money penalty. The final judgment resolves all of the SEC's claims asserted in the district court litigation.

### Amy's Kitchen Inc. repeatedly failed to monitor their funds' portfolio managers

81.     Plan fiduciaries must always "thoroughly investigate the merit of each decision affecting the plan." *Sweda v. University of Pa.*, 923 F.3d 320, 329, 2019 EBC 158780 (3d Cir. 2019), cert. denied, 206 L. Ed.2d 496 (2020); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346 (4th Cir. 2014); *Allison v. Bank One–Denver*, 289 F.3d 1223, 27 E BC 2746 (10th Cir. 2002); *Donovan v. Cunningham*, 716 F.2d 1455, 1467, 4 EBC 2329 (5th Cir. 1983).

82.     Use of revenue-sharing in Amy's Kitchen Inc. 401(k) reduced participants' balances daily more than the revenue-sharing credits can ever make up. Uniform fiduciary standards prohibit transactions that dissipate trust assets. The objectives of these provisions are to ". . . make applicable the law of trusts; . . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets, and to provide effective remedies for breaches of trust."

Statement of the Honorable Harrison A. Williams, Jr., 120 Cong. Rec. S-15737, August 22, 1974, Reprinted [1974] U.S. Code Cong. Admin. News, pp. 5177, 5186.

83.    The Company's repeated failures to perform periodic investigations into funds' revenue-sharing costs and portfolio managers caused great harm during initial selection and regular monitoring. Based on the Schedules of Assets certified to the U.S. Departments of Treasury and Labor, the Company instead spent a great deal of time on revenue-sharing credits. It made great efforts to focus on receiving revenue-sharing credits. It is important to note that the Company controlled the revenue-sharing ERISA budget spending account at all times via a services agreement with their recordkeeper.

> Overall, revenue-sharing plans are more expensive as higher expense ratios are not offset by lower direct fees or by superior performance. Rebates increase with the market power of the recordkeeper suggesting that third-party funds may revenue share to gain access to retirement assets.

Irina Stefanescu, Board of Governors of the Federal Reserve System; Veronika K. Pool, Vanderbilt University; Clemens Sialm, University of Texas at Austin; "Mutual Fund Revenue-sharing in 401(k) Plans," National Bureau Of Economic Research, December 2022, 5, ABSTRACT, 19; www.nber.org/papers/w30721; 5, abstract, 19.

84.    That means the Company decided what rebates were kept by providers and what was left to be credited to participants' accounts after three to six months from deductions (from participants'/beneficiaries' accounts).

85.    Restatement (Third) of Trusts § 93 (2003). "A fiduciary would have no reason not to switch to an identical share class fund." *Tibble v. Edison Int'l,* No. CV-07-5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

*The Company and its de facto fiduciaries failed to choose and monitor*
*fiduciary advisor, Cetera, prudently*

86.    Plaintiffs allege that the Company engaged in prohibited transactions in violation of 29 U. S. C. §§ 1106(a) and by retaining poor investment options in the Plan and engaging in excessive revenue-sharing agreements that benefitted themselves, other fiduciaries and parties-in-interest. Facts emphasize that the Company violated their fiduciary duty to bring legal action on behalf of the Plan, as they were required to by 29 U. S.C. §§ 1132(a)(3) and 1104(a)(1)(A) to obtain recourse for these prohibited transactions. U. S.C. § 1106(a) generally prohibits fiduciaries from knowingly causing a plan to engage in transactions that benefit a "party in interest." Congress adopted [§1106(a)] of ERISA to prevent plans from engaging in certain types of transactions that had been used in the past to benefit other parties at the expense of the plan's participants and beneficiaries. A "party in interest" is broadly defined and includes both fiduciaries and "person[s] providing services to such plan." See 29 U.S.C. § 1002(14)(A)-(B). Similarly, 29 U.S.C. § 1106(b) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest" or receiving "any consideration . . . from any party dealing with such plan" in a transaction involving Plan assets. See 29 U.S.C. § 1106(b)(1)—(3).

87.    Plaintiffs allege Cetera was defined as "investment managers" within the meaning of 29 U.S.C.§ 1002(38) because they had "the power to manage, acquire, or dispose of any asset of a plan." Based on their involvement in designing the investment platform to "steer" funds to certain "investment options," the Company effectively "funneled participants' retirement savings" into expensive investment products. They were improvident advisors being compensated with trust assets to service Amy's Kitchen Inc. 401(k) and charged excessive fees for services that were not necessary.

88.    A corporate officer who has the authority to appoint fiduciaries like Cetera may be a fiduciary to the extent of that power to appoint under Employee Retirement

Income Security Act of 1974, 29 C.F.R. §2509.75-8, Courts have held that "[t]he power to appoint fiduciaries is itself a fiduciary function."

89.    Plaintiffs allege throughout this complaint that the various expenses charged to Plan participants were not "reasonable," as required by the Company's Transamerica Plan documents.

90.    Second, Plaintiffs allege that the Company failed to ensure that chosen investment managers were properly qualified according to the Transamerica Plan document as well as 29 U.S.C. § 1002(38). Therefore, the Plaintiffs allege the Company violated 29 U.S.C. § 1104(a)(1)(D).

91.    Closely related to the duty of an appointing trustee to monitor the fiduciaries it appoints is the doctrine of respondeat superior. Where a company's board of directors exercises de facto control over the plan by means of the fiduciaries it appoints, courts may hold the employer liable. *Leigh v. Engle*, 727 F.2d 113, 4 EBC 2702 (7th Cir. 1984) (suggesting that liability could be assessed if de facto control was exercised); *Sommers Drug Emp. Profit Sharing Plan v. Corrigan Enters*., 793 F.2d 1456, 1459–60, 7 EBC 1782 (5th Cir. 1986).

92.    Courts observed, "[i]mplicit in this power is the duty to monitor." Where an appointed fiduciary fails to fulfill a fiduciary duty, the appointing party has a duty to take action. Thus, "the power to appoint" is a fiduciary function. Likewise, courts have ruled that the board of directors had fiduciary duties with respect to the pension plan to the extent that the directors appointed, retained, or removed members of the plan's investment committee. In *Whitfield v. Tomasso*, a district court ruled that a union was a fiduciary with respect to the plan "[b]y virtue of its authority to appoint and remove the union trustees, and by effectively controlling the selection of employer trustees." *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1305 (E.D.N.Y. 1988).

93.    Other courts have followed suit and have held that a person who has the power to retain and remove trustees is a fiduciary, which carries with it a duty to monitor the trustee fiduciaries. *Bennett v. Manufacturers & Traders*, 2005 WL

2896962, at *7, 36 EBC 1085 (N.D.N.Y. Nov. 2, 2005); In re JDS Uniphase Corp. ERISA Litig., 2005 WL 1662131, at *4 (N.D. Cal. July 14, 2005).

94.     Fiduciaries of ERISA-covered plans who retain service providers to assist in administering their plans are required to monitor their service providers on a regular basis to ensure that the Plans and their assets are being administered prudently, solely in the interest of the Plans' participants and beneficiaries, and in accordance with documents and instruments governing the Plans. See 29 U.S.C. § 1104(a)(1)(A), (B) and (D). Plan fiduciaries are prohibited from continuing to contract with service providers, which are parties in interest to ERISA-covered plans, unless the services are necessary for the operation of the Plans and the service provider's compensation is reasonable and disclosed. See 29 U.S.C. §§ 1002; 1106(a)(1)(C), 1108(b)(2). Plan fiduciaries can be held personally liable for any losses to the Plans resulting from the failure to comply with these fiduciary duties and may be subject to other equitable remedies. See 29 U.S.C. §§ 1152(a)(2), 1109(a). When service providers are also fiduciaries, plan fiduciaries can also be held liable for any losses caused by the service provider's fiduciary breaches if they knowingly participate in the breach, enable the breach, or have knowledge of the breach but fail to correct it. See 29 U.S.C. § 1105(a)(2).

## CAUSATION

95.     Plaintiffs infer that the Defendants' past decision-making processes, as evidenced by their (1) selection/retention of Cetera, (2) adding of imprudent, costly, undiversified and lower-yielding investments coupled with their (3) failures to review/remove imprudent investments, were some of the root causes of losses to the Plan and Trust.

96.     More specifically, the Company and Cetera:

a.      ignored probable trust income (yields) repeatedly over many years,

b.      ignored many types of extra costs that directly reduced participants'/beneficiaries' returns every business day,

c.    ignored their portfolio managers' concentrated and undiversified portfolios (causing additional trust variance and trust risks of losses),

d.    selected/retained novice, inexperienced portfolio managers who sold every position they bought two years earlier (because they either quit, were fired, or changed their minds).

97.    The Company and Cetera's actions, flawed reasoning and derelict trust investment management processes repeatedly harmed the Plan and Trust. The Company ignored Cetera's compensation amounts taken from the trust/participants'/beneficiaries' accounts and via earnings reductions on investments, Cetera helped choose (taken daily from every single one of Amy's Kitchen Inc. workers with a 401k account balance).

98.    Amy's Kitchen Inc. made repeated certifications that prove a violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D): the duty to act in accordance with the documents and instruments governing the plan ("Nonalienation of Benefits" section). They did this by directing $181,250 in cash (after directing trust asset sales) to be electronically transferred from the trust (and workers' 401k accounts). Plaintiffs noted the Company certified on 10/13/22 Part II Income and Expense Statement, Line 2i(3) "Expenses" section Investment advisory and management fees payment of $45,000. Similar certifications were made for 2020, 2019, 2018, and 2017 for 45000, 35250, 32000, and 24000. Cetera was paid from the trust (i.e., participants' accounts) from 2017 to 2021.

99.    The average hourly salary, per indeed.com, for Amy's full-time workers, was $14.23. Thus, full-time workers made $28,460 last year. The Company approved average pay to Cetera (working about twenty to forty hours per year) to take $36,250 from the trust each year from 2017 to 2021.

100.    To avoid violations of ERISA, using even the highest hourly rate for investment representatives at $300, Cetera advisors must have worked at least 121 hours per year to deserve this pay as "reasonable compensation" under ERISA. Cetera

made very few changes to the investment menu so the maximum hours worked per year should be 10hr/per quarter for quarterly monitoring (unless they were unskilled).

101. And this assumes that Amy's Kitchen Inc. complied with ERISA to ensure Cetera was "necessary for the operation of the plan." The facts presented here indicated that was not true for Amy's Kitchen Inc. Plan.

102. Moreover, the Sponsor, the BOD, the Committee, and individual delegates, along with their fiduciary advisory firm, breached their fiduciary duties of prudence and loyalty to the Plan by:

- Offering and maintaining higher cost share classes when identical lower cost class shares were available and could have been offered to participants;
- Overpaying an unnecessary advisory firm (Cetera) by alienating trust assets, which exceeded trust direct and indirect costs incurred by plans of similar size with similar services;
- Failure to prudently choose and monitor covered service providers and other plan fiduciaries;
- Other breaches of fiduciary duties.

103. Although not currently named here, the Plaintiffs reserve the right to name Cetera as a defendant. Amy's Kitchen Inc. and Cetera must: (l) conform to fundamental fiduciary duties of loyalty and impartiality; (2) act with prudence in deciding whether and how to delegate authority and in the selection and supervision of agents and (3) incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.

104. Based on information and belief, payments to Cetera, thousands of dollars each quarter for two meetings each year, they required written approval by either Andy Berliner, CEO or the firm's CFO, Peter Wong, or Rachel Berliner, owner of Amy's Kitchen.

105. Payments directed by the Company to Cetera must comply with 29 CFR § 2550.408b-2, which requires, in part, that the "service is necessary for the

establishment or operation of the plan" and the amounts for the necessary services are "reasonable." In this case, the services were not for the economic interests of the Plan and Trust and thus, no amount is considered reasonable (to avoid prohibited transactions for every occurrence and a requirement to restore the amounts to the trust—in accordance with the "Non-alienation" section of the plan's documents (in accordance with ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), the duty to act in accordance with the documents and instruments governing the plan).

106.    By proxy, Ms. Carmelita A. Lewis executed on behalf of the Company as well as Andy Berliner, CEO and Peter Wong, CFO, that these payments met these requirements above since 2013. This fact can be verified at www.efast.dol.gov by viewing Forms 5500 (Annual Return/Report of Employee Benefit Plan).

107.    Their behavior in choosing investments with diminished yields and high costs violated the Restatements (Trust, Second (1959) and Third (1992)). Both Second and Third conveyed a duty to avoid unreasonable or inappropriate costs that require particular attention to such matters as the fees of agents and advisors. See § 227 cmt. m and Reporter's Notes to that comment; Restatement Second, supra note 7, § 188 cmts. c, f.    " *** The objective is simply to require close attention by trustees/fiduciaries to the increasingly important investment applications of the more general and traditional duty to avoid unwarranted costs."

### Make-whole relief relevant to Amy's Kitchen's harmed workers

108.    "[T]he liability of a trustee who is sued and found to have committed a breach of trust is the amount required to restore the values of the trust estate and its distributions to what they would have been if the affected portion of the trust estate had been properly administered." (Restatement (Third) of Trusts § 100, cmt. b (2012); see also Restatement (Third) of Trusts: Prudent Investor Rule § 205 (1992); Restatement (Second) of Trusts § 205 (1959); Bogert, Trusts and Trustees § 862 (2d ed. rev. 1995)).

109.    Amy's Kitchen Inc. and Cetera's harm also impacted thousands of former and terminated workers from earlier plan years who had accounts that used

concentrated (undiversified) and expensive mutual funds with lower yields and, thus, lowers returns or economic benefits. This statement is based on Amy's Kitchen Inc.'s trust's audited financial statements. Plaintiffs' "harm" from payments to (1) Cetera and (2) portfolio manager's compensation was never addressed by Amy's Kitchen Inc., Andy Berliner, CEO, or Cetera.

110.    But for Amy's Kitchen Inc. and Cetera's actions, former workers' cash-out final payments would have been higher (if Defendants' processes were to buy higher-yielding, lower-cost share classes of the same funds). Former workers' prior accounts' distributions since at least 2009 were never "restored to the position they would have been had the Defendants' repeated breaches not occurred," as required by ERISA § 409 and common trust law. (Restatement (Third) of Trusts (2012).

111.    If the trustee improperly purchases investments for the trust estate, the beneficiaries: (a) may charge the trustee with the amount of trust funds expended in the purchase plus or minus the amount of a reasonably appropriate positive or negative total return thereon; or (b) may either affirm the purchase or, if the improperly purchased property has already been sold, require the trustee to account for the proceeds and return traceable to that property. Restatement (Third) of Trusts: Prudent Investor Rule § 210(1) (1992); see also Restatement (Third) of Trusts §§ 100, 100 cmt. b (2012); Restatement (Second) of Trusts §§ 210, 207(1) cmt. c (1959); Scott and Ascher on Trusts § 24.13 (5th ed. 2007); Bogert, Trusts and Trustees § 862 (2d ed. rev. 1995).

112.    Since 2017, harmed terminated former workers of Amy's Kitchen Inc. were paid 43M dollars in payments to participants (i.e., trust corpus (fund) liquidations) from the trust's depleted and impaired assets at the time of request (based on Amy's Kitchen Inc.'s Schedule H, line 2e(1)).

113.    Defendants chose/kept funds (1) with underperforming portfolio managers as well as (2) expensive share classes with depleted net asset values (NAVs; due to daily SEC Rule 12b-1 fees, sub-transfer agency fees, shareholder servicing fees,

or other types of fees) compared to identical related "sister" classes of funds. Consequently, former workers' payments were less than ERISA and Amy's Kitchen Inc.'s plan documents (and Summary Plan Descriptions (SPD)) stated and required under common trust law. An ERISA fiduciary who harms or abuses plan assets (e.g., by negligent investing) must make the plan whole by paying either damages or restitution. (ERISA § 409(a), 29 U.S.C. § 1109(a)).

114.    Plaintiffs cite *Armory v. Delamirie*, 93 Eng. Rep. 664 (1722) ("[U]nless the defendant ... produce the jewel, and shew it not to be of the finest water, [the jury] should ... make the value of the best jewels the measure of their damages.").

115.    This cardinal rule that uncertainties in fixing damages must be resolved against the breaching fiduciary long predates ERISA and, for that matter, the founding of the United States of America.

116.    The statement suggests that when determining the amount of damages resulting from a breach of fiduciary duty, any uncertainties or ambiguities should be resolved in favor of the party who suffered the breach. This is a longstanding principle that has existed for a long time, even before the establishment of the Employee Retirement Income Security Act (ERISA) and the United States itself. In other words, if there is any doubt about the amount of damages to be awarded, the breaching fiduciary should be held responsible and made to pay for any losses incurred by the other party. This principle is intended to provide a measure of protection for those who have been wronged by a fiduciary's breach of duty, ensuring that they are fairly compensated for any harm they have suffered.

117.    While "equitable restitution" is unique to trusts, the analogy that comes to mind quickest is shareholder derivative litigation—however, the trust-law roots of § 1132(a)(2) run far deeper. When a common-law trustee commits a breach of trust that results in a loss, any beneficiary whose beneficial interests were affected may sue to compel the trustee to make good on the loss. When the trustee does so, he restores money to the trust for the benefit of the plaintiff/beneficiary. Restatement (Second) of

Trusts § 214 & cmt. b (1959). See Austin W. Scott & William F. Fratcher, The Law of Trusts § 214 (4th ed. 1988); P.V. Baker & P. St. J. Langan, Snell's Equity 284 (29th ed. 1990) (citing *Bartlett & Others v. Barclay's Bank Tr. Co. Ltd*., [1980] Ch. 514, 543).

118.    The Uniform Trust Code's § 1002(a)(1) states: ". . .the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred."

119.    Thus, 29 U.S. Code § 1132(a)(2) merely codifies for ERISA participants and beneficiaries a classic trust-law process for recovering trust losses through a suit on behalf of the trust. The Supreme Court's decisions in 559 U.S. 590 (2011) and *LaRue v. DeWolf*, 552 U.S 248 (2008) affirm this fact.

120.    When combined with ERISA Section 409 requirements (ERISA section 409(a) imposes personal liability on fiduciaries that breach their fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails with the pure form of the continuing violations doctrine and each element here avoids giving the Defendants a "license" to perpetuate its misconduct.

121.    Plaintiffs believe "a continu[ous] series of events gives rise to a cumulative injury." That is the gravamen of our specific claims at issue— participants/beneficiaries seek the trustee/fiduciary to restore all trust damages under the laws of equity so that the Plaintiffs' accounts would reach the same levels as if the breaches never occurred. Such is analogous to treating the claim as continuing in nature. (See Kyle Graham, "The Continuing Violations Doctrine," Vol. 43 p 293, Gonzaga Law Review (2008)).

122.    Accordingly, as permitted under Section 409 of ERISA, Plaintiffs are entitled to the full range of equitable relief against the Company and the de facto Plan Fiduciaries, including, without limitation, requiring the Company to do the following: (a) disgorge any plan assets taken from the Plan and Trust that were not used to pay Plan participants and beneficiaries and (b) restore losses to the Plan resulting from the

Company and fiduciaries' imprudent practices of using plan assets to pay more than the reasonable rate to providers; (c) and provide "such other equitable or remedial relief as the court may deem appropriate, including removal of [the Company as an ERISA] fiduciary." 29 U.S.C. § 1109(a).

123.    ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

124.    Repeated imprudent monitoring was exhibited after selection and continuing into the limitations period (based on the fact that the Defendants never removed the imprudent fund after their initial selection).

125.    The Supreme Court held that the fiduciary duty identified in the Tibble case was continuing in nature, and that each new breach began a six-year limitations period under § 1113. The Court recognized the breach as "a fiduciary's allegedly imprudent retention of an investment" which results in a series of related breaches as the investment is retained over time. *Tibble IV*, 135 S.Ct. at 1826, 1828–29.

126.    As the Court made clear, only a "breach or violation," such as a fiduciary's failure to conduct its required regular review of Plan investments, need occur within the six-year statutory period; the initial investment need not be made within the statutory period. Id. at 1827–28.

# FACTUAL ALLEGATIONS

## *SECTION I*

### *The Company used careless monitoring processes to keep (1) providers and (2) investments in violation of 29 U.S.C. § 1104(a)(1)(B)*

127.    Similar to the "/" (slash) between the words "Return" and "Report" in the Treasury and Labor Form 5500 title "Annual Return/Report of Employee Benefit Plan" a slash is used in this complaint by Plaintiffs to note that there is a connection between the two words such as the phrase "selected/retained."

128.    ERISA states that "implicit in the fiduciary duties attaching to persons empowered to appoint and remove third parties is the duty to monitor appointees." Plaintiffs find both Amy's Kitchen Inc. (plan sponsor and named fiduciary) and its delegates (the board, the committees, the staff, etc., as well as "appointees"), "Defendants" violated their "duty of prudence. Their duties under the Restatement (Third) Trusts were to " * * * avoid incurring unnecessary expenses, broadly defined, when administering a trust."

129.    The Restatement (Third) of Trusts devoted considerable attention to this duty, clarifying and emphasizing that "cost-conscious management is fundamental to prudence in the investment function." (§ 90 cmt. b. See also § 227(c)(3) (AM. LAW INST. 1992) ("[T]he trustee must incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.").

130.    Defendants acted imprudently and failed to act by predominantly selecting/retaining (1) unnecessary and expensive service providers and (2) mutual funds with wasteful and unnecessary portfolio manager's compensation that caused additional trading and transaction costs. Based on the facts and circumstances, the Company's administrative and investment management processes were thoughtless and not "justified by a cost-benefit analysis that incorporates risks."

131.    Unless the Company's chosen funds can really "be expected to produce returns above their necessarily higher fees or provide a diversification benefit not

otherwise available" the Company violated ERISA and Restatement (Third) of Trusts (pt. 6, ch. 17, topic 3 intro. note; see also § 227 cmt. h).

132.    Prudent Investor Rule Restatement (Third) Trusts explained how any choice to "engage in active management must be justified by a cost-benefit analysis that incorporates risks."

133.    The Plaintiffs contacted the Company and attempted to find information about Amy's Kitchen Inc. 401(k) plan's non-publicly traded "Level 2 or Level 3" investments (from the independent auditor reporting for 2009 to 2021), but their requests for information were denied.

134.    Regarding investment choices, Plaintiffs have information and belief that Transamerica built and offered an "approved investment short-list" for the Company to choose from for Amy's Kitchen Inc. 401(k) "menu". If Plaintiffs were afforded meeting minutes for 2020, they might find the decision-making basis for adding the Western Asset Core Bond fund. Perhaps Transamerica and Cetera had this fund on their "approved list."

135.    "Approved lists" mean that the entity has formed a relationship with the fund's parent company for revenue-sharing and thus has a fund "selling agreement" specifying the asset amounts and related cut or percentage of the maximum revenue-sharing the fund collects.

136.    Facts indicate these assumptions fit the mold of other funds the Company added since the 2009 Form 5500 was filed at www.efast.dol.gov.

137.    The Western Asset Core Bond fund's prospectus gives color to an immediate conflict of interest for (1) the Company, (2) Transamerica and (3) Cetera (emphasis added):

> Revenue-sharing payments create an incentive for an intermediary or its employees or associated persons to recommend or sell shares of the fund to you. Contact your Service Agent for details about revenue-sharing payments it receives or may receive. Additional information about

revenue-sharing payments is available in the SAI. Revenue-sharing payments, as well as payments by the fund under the shareholder services and <u>distribution plan or for recordkeeping and/or shareholder services, also benefit the manager</u>, the Distributor and their affiliates to the extent the payments <u>result in more assets being invested in the fund on which fees are being charged</u>.

138.   Plaintiffs find many conflicts of interest in the 28 words from above: "<u>benefit</u> the <u>manager</u>, the <u>Distributor</u> and their <u>affiliates to the extent the payments result in more assets</u> being invested in the fund on <u>which fees are being charged</u>."

139.   For clarification, "intermediaries" includes Transamerica and Cetera. "Service Agent" means either Transamerica or Cetera.

140.   Finally, the phrase "extent the payments result in more assets being invested in the fund on which fees are being charged" means that the dollars taken from participants' accounts in the form of revenue-sharing doubles if the participants' accounts grow in size. These increased revenue-sharing payments from the trust's mutual funds, the Company picked, pay covered service providers more money but the same covered service providers do not add more value to the trust or provide more services to the trust or participants.

141.   For example, if an Amy's participant increased her biweekly wage deferral from 3% to 6%, these doubled dollars buying revenue-sharing investments mean she is also increasing her payment to Transamerica by simply saving more wages—without Transamerica doing any more work for her. If she rolls over money that is twice the size of her balance before, her revenue-sharing costs also double (but she gains nothing in exchange). Heads Transamerica wins, tails she loses.

142.   Recent industry facts show Transamerica has a usual and customary fee of about twenty-five basis points per annum for recordkeeper services. Continuing our examples, if Participant Jane had a $10,000 account in 2017 invested in the revenue-sharing mutual funds the Company added, Jane would pay 25 dollars for recordkeeping to Transamerica (0.25%) that year.

Class Action Complaint for Damages

143.   Based on the Company's past Forms 5500, Amy's participants' accounts doubled in size every four years (2017 to 2021). Hence, the recordkeeper fee for Jane would become 50 dollars in 2021.

144.   If Participant Jane rolled over $80,000 from another 401k into the Amy's Kitchen Inc. 401(k) in 2021, her $20,000 balance would grow to $100,000; thus, Transamerica's recordkeeper fee for Jane would climb to $250.

***The Company's Forms 5500 audit language never mentioned management sought bids from competing recordkeeper firms***

145.   Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007).

146.   It is well known that recordkeeper margins have been thin for decades and competition among recordkeeping firms created bidding wars for new business. Transamerica was listed on the Defendants' Forms 5500 as early as 1/1/2009 and as late as 12/31/2021.

147.   Plaintiffs sent Amy's Kitchen Inc.'s Forms 5500 to two recordkeepers for pricing based on facts normally used to custom price recordkeeper bids (i.e., contributions, distributions and rate of growth of employees and participation rates). These facts included Amy's Kitchen's actual plan's financial statements and certifications by Ms. Carmelita A. Lewis as well as independent audits.

148.   Plaintiffs received two recordkeeper quotes at $11/participant/quarter and $15/capita/qtr. These quotes were significantly less than Transamerica ($153,340) than the Company's Form 5500's explicit amounts charged by Transamerica (2021 Form 5500, Schedule C, line 2(d), $296,739).

149.   Also, Transamerica indicated on box 2(e) that they also received "indirect compensation" but they did not disclose how much. This was a pattern and practice by

Transamerica and should have been noted by the signer of all recent Forms 5500 (Ms. Carmelita A. Lewis).

150. Unlike Transamerica, the recordkeepers' quotes above were obtained over a weekend and were "all in"—no revenue-sharing since the independent recordkeepers had no broker-dealer or insurance company affiliations that allow receipt of "indirect compensation." Also, their pricing was noted that it would be expected to fall as most do over time. This decrease is because of the time-consuming first year of acquiring and running a new 401k client (including conversion and reconciliation costs from the old recordkeeper/custodian).

151. Here, based on Forms 5500, Transamerica's costs have only increased over the years from 2017 "direct compensation" dollars (based on the Company's tax-exempt trust's government filings).

152. The Plaintiffs were not provided the necessary information to accurately quote costs after the ERISA budget account credits but intend to amend should the trustees provide the information. The Company has been and remains in a superior position compared to the Plaintiffs.

*Transamerica and the Company hide the "peanut" cost*

153. Often companies like Transamerica and Amy's Kitchen Inc. do not want to have a participant see $250 in recordkeeper fees deducted from their account for the same level of service that cost one-tenth of that four years earlier. To avoid printing a $250 recordkeeper fee on a participant's statement, Transamerica works with the Company to ensure enough "revenue-sharing" funds are listed on the participants' menu of choices (like the Western Asset Core Bond fund).

154. In that case, Transamerica can instead get their fee directly from the participants' earnings, so their recordkeeper fee payment is mixed into the gain/loss amounts stated in that column on participants' statements.

155.    Plaintiffs review the Company's processes more fully later. Still, for now, Plaintiffs identified several of the Company's flawed methods on page one of a typical Transamerica monitoring report which probably was used by the Company.

156.    The selection and retention criteria can decide if the fund can stay in the plan. A good trust steward knows prudence mandates not exposing participants/beneficiaries to unknown risks when they can be avoided. Therefore, a replacement fund should be considered when an untested fund manager takes over, as 50% will do every four years, and 25% will do biennially. Based on the Defendants' governmental reports, there were very few upgrades of share classes and fund managers by the fiduciaries running this Plan and Trust.

157.    Mutual funds trading on the open market each day have mandatory disclosures accessible to all investors. However, some of the investment products selected by the Company are quite difficult to assess costs and performance (Transamerica's "level 2 and level 3" audited investments in the Company's Forms 5500). These documents were requested by the Plaintiffs but denied.

158.    From page 7 of the Compnay's audits (emphasis added):

The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). The three levels of the fair value hierarchy are described as follows: Level 1- Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access. Level 2- Inputs to the valuation methodology include quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in inactive markets; inputs other than quoted prices that are observable for the asset or liability; and inputs that are derived principally from or corroborated by observable market data by correlation or other

means. *** Level 3 – Inputs to the valuation methodology are unobservable and significant to the fair value measurement.***

Registered investment companies (mutual funds): Valued at the daily closing price as reported by the fund. Mutual funds held by the Plan are open-end mutual funds that are registered with the U.S. Securities and Exchange Commission. These funds are required to publish their daily net asset value (NAV) and to transact at that price. The mutual funds held by the Plan are deemed to be actively traded

159. Plaintiffs never had "actual knowledge" of the Company's breach. They never had a real awareness of it or the facts and circumstances surrounding their breaches. The Company did not share documents in years past; such as those requested on February 9th and still, to this day, they have not.

160. Plaintiffs believe such knowledge is only contained in the documents the Company still possesses. On February 9th the Plaintiffs requested over two dozen plan documents and related items.

161. The request was necessary to ascertain whether the plan fiduciaries complied with the legal, independent and objective investigation and evaluation requirement. Plaintiffs wanted electronic copies of materials, at a plan level, relied upon by the plan sponsor and associated with the plan, including reports, analyses, Investment Policy Statement (IPS), requests for proposal, and investment and provider monitoring information.

### *The Company's focus on peer comparisons went directly against SEC requirements*

162. Based on information and belief, the Company failed to follow SEC's 1996 fund benchmark requirements designed to show "whether the fund 'out-performed' or 'under-performed' the market, and not so much whether one fund 'out-performed' another."

163.    Earlier guidance on the meaning of an "appropriate broad-based securities market index" comes from SEC statements in 1972 regarding use in the context of Section 205(b) of the Investment Advisers Act of 1940. Specifically, the SEC stated (emphasis added):

> In determining whether an index is appropriate for a particular investment company, directors should consider factors such as the volatility, diversification of holdings, types of securities owned and objectives of the investment company. For example, <u>a broadly based market value weighted index of common stocks ordinarily would be an appropriate index</u>, but an index <u>based upon a relatively few large 'blue chip' stocks would not</u>. * * * Of course, if an investment company invests in a particular type of security <u>an index which measures the performance of another particular type of security would be inappropriate</u>.

164.    Plaintiffs were able to obtain a sample Investment Policy Statement (IPS) from Transamerica and a related sample "Investment Scorecard" monitoring report (despite the Company's refusals). Based on information and belief, Transamerica gives clients documents containing text like this "Transamerica Investment Scorecard" monitoring report's footnote:

> "This material provides information about investment choices using expenses for expense class 100 for investment choices available under a TFLIC group annuity contract. For any investment choices that do not currently have an expense class 100 separate account available, the information provided about those investment choices are based on expenses for expense class 110. The material provided prior to 12-31-18 was based on the expenses for expense class 110 for all investment choices. As of 03-31-2021, the investment choices in expense class 100 reflected total separate account expense ratios between 0.04% and 1.19% (The ranges exclude expenses for Cash Equivalent choices since those choices are not rated in this material). Other expense classes offered under the contracts charge higher fees with total separate account expense ratios ranging from 0.58% and 2.27% for expense class 110, 0.78% to 2.42% for expense class 120 and 0.93% to 2.57% for expense class 130.

Accordingly, your expenses would be higher than the amounts shown here if your plan invests in those expense classes. Please refer to your contract for more information about the expense classes your plan invests in and the associated fees and expenses for that expense class charged under the contract.

165. Taking investment fees for funds the Company selected since 2017, one percent per year from investors' returns for portfolio manager's compensation and fifty basis points in revenue-sharing, removes half of the expected real returns (before dividends). However, if the Company executed contracts with Transamerica for the separate insurance account expense class "120" (above), then fees of "0.78% to 2.42%" would have applied. That rate of fee erosion would easily eat half of the participants' expected annual return.

166. As Buffett stated in the link, three percent has been the average GDP rate and inflation has been 2% per year, so expected returns when combining the raw output of every publicly traded company is therefore 5% annually (real returns after inflation would be expected to be 3%/yr before dividends). (www.morningstar.com/articles/1009443/can-warren-buffett-forecast-the-stock-market).

167. The London Business School stated: "It's common knowledge that stocks return an average of 6% a year (at least going back to 1900). However, Elroy Dimson, Paul Marsh and Mike Staunton revealed that when you remove dividends, stocks' gains drop to a mere 1.7% a year. Even lower than Treasury bonds over the same period."

http://www.zerohedge.com/article/take-out-dividends-and-stocks-return-less-treasuries%E2%80%A6-1900

168. So one percent in fees for portfolio manager's compensation and one—half of one percent for revenue-sharing erodes expected future returns by 50% of the 3% expected real returns before dividends. However, expenses in the range of the

above footnote are alarming and Plaintiffs still need this information solely possessed by Transamerica and the Company.

### *Transamerica sample Investment Policy Statement (IPS) and monitoring*

169.    Transamerica monitoring reporting is generally offered to their clients like Amy's Kitchen Inc. Page 1, "SCORING BREAKDOWN" states the following:

> Score - 5.0  Investment choice's return outperformed the peer group average by at least 30% of the <u>peer group average</u> for the applicable period.

> The Transamerica Scorecard Methodology is Transamerica Retirement solutions' ("Transamerica") proprietary rating methodology. Transamerica reserves the right to modify, eliminate or add criteria at any time. Although the investment choices may meet the "significantly exceeds," "meets/exceeds," or "below" criteria, there are no guarantees of a profit and it is still possible to lose money from that investment choice. See the additional notes section of this report for a description of how the investment choices expense class may affect the performance measurement rating. Transamerica may close an investment choice to new investors: (1) If the mutual fund or underlying investment continuously fails to meet scoring criteria; (2) If the current investment manager of the mutual fund or underlying investment places a restriction on the investment where no new investors are allowed due to capacity issues; (3) If the mutual fund or underlying investment completely closes; (4) To offer a more competitive alternative; (5) If there is a lack of participant interest; (6) To streamline investment choices across product offerings; or (7) For other reasons at the discretion of the fund platform. Participants in plans which already included the investment choice are not treated as new investors. Transamerica performs investment selection and monitoring due diligence related to the investment choices on Transamerica's platform as a normal part of its business. Clients and other interested parties must consult and rely solely upon their own independent advisors regarding their particular situation. This is not meant to be construed as investment advice. Transamerica Retirement solutions does not provide investment advice. Nothing presented herein should be construed as a recommendation to purchase or sell a particular investment, product or follow any investment technique or strategy. Transamerica is not a fiduciary with respect to the plan as defined by ERISA including sections

3(21), 3(38) or 3(16), nor it is responsible for a plan's selection, monitoring or de-selection of investments.

**Figure 2**

| FEE & EXPENSES** | |
| --- | --- |
| **SCORING BREAKDOWN** | |
| Score – 5.0 | Investment choice's expense ratio is at most 80.0% of the relevant peer group average |
| Score – 4.0 | Investment choice's expense ratio is greater than 80.0% but at most 90.0% of the relevant peer group average |
| Score – 3.0 | Investment choice's expense ratio is greater than 90.0% but at most 110.0% of the relevant peer group average |
| Score – 2.0 | Investment choice's expense ratio is greater than 110.0% but at most 120.0% of the relevant peer group average |
| Score – 1.0 | Investment choice's expense ratio is greater than 120.0% of the relevant peer group average |
| Note: If the investment choice's expense ratio is not available from the investment choice's manager, the Scorecard will use the reported expense ratio from the firm's prospectus or investment fact sheet. | |

170. The figure above confirms that the scoring of investments does not meet the standards in trust law, the SEC and 29 CFR § 2550.404a-5. In rejecting the use of peer group comparisons for all funds, the SEC stated that (emphasis added) "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market, and not so much whether one fund 'out-performed' another." Disclosure of Mutual Fund Performance and Portfolio Managers, SEC Rel. No. IC-19832 (Apr. 6, 1993).

171. Facts indicate the Company's failures to remove investments cited throughout this complaint (flawed plan-wide decision-making affecting every fund and thus, every participant) were derived directly from careless selections/retention processes that Transamerica's monitoring criteria may have exacerbated.

172. Two flaws in the Company's monitoring process relate to the image above for scoring based on peers versus the SEC-prospectus benchmark on the participants' 29 CFR § 2550.404a-5 annual notice. Benchmark information like this is also found at www.sec.gov/edgar (the benchmark that determines a portfolio manager's

compensation). The second problem is stated in the remaining part of Transamerica's score—"Investment choice's Sharpe Ratio is at least 0.30 higher than the peer group average for the applicable period".

### *Transamerica's monitoring and, thus, the Company's monitoring were flawed*

173.   Plaintiffs dig deep into peer comparison, probably used by the Company, instead of benchmarks, and also lay the basis for why Sharpe ratio comparisons are also flawed when looking at cumulative losses. The use of this metric to evaluate investments ignores the fact that the median portfolio managers' tenure running a mutual fund is seven years. This methodology is also incomplete because of the calculation of the Sharpe ratio number.

174.   Nothing in trust law or ERISA discusses use of Sharpe's method for selecting/retaining investments. Plaintiffs note from Transamerica that the Sharpe statistic measures the risk-adjusted performance of an investment. The Sharpe measure is calculated by dividing the EXCESS return (return of that fund minus the <u>risk-free rate of return, the 90-day Treasury bill rate</u>) of a fund by its STANDARD DEVIATION.

175.   The "benchmark" under Sharpe is a Treasury rate and not (1) the benchmark in the portfolio managers' prospectus or (2) the 29 CFR § 2550.404a-5 annual notices sent to Amy's 401k participants (3) nor is it the Restatement (Third) Trusts best-fit index.

176.   Transamerica's reporting also ignores all of the SEC's investment performance math by ignoring the geometric mean or geometric average. That is the statistical measure used to calculate the average return of an investment over a certain period of time. It differs from the more commonly used arithmetic mean, or simple average, calculated by summing the returns and dividing by the number of observations.

177.   The geometric mean is the number found by participants opening their account statements each quarter, reading performance in a prospectus, looking online at every Morningstar ranking, looking in the Wall Street Journal for Lipper rankings, and found on every fund family website's fact sheets.

178.   The Geomean or geometric mean takes into account the compounding effect of returns over time and is typically used to calculate the average annualized return of an investment. It is calculated by multiplying the returns for each period and taking the nth root, where n is the number of periods.

179.   For example, if an investment had the following annual returns of 10%, 20%, and 15%, over a 3-year period. The average return is 15 %/year after dividing the sum of 45 by 3.  The geometric mean is 1.2% less per year at 13.8%. The math is $(1 + 0.10) \times (1 + 0.20) \times (1 + 0.15)^{\wedge}(1/3) - 1$.

180.   The geometric mean is used to comply with ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a). Under these laws, a defendant is personally liable to restore all plan-wide losses suffered by the Plan caused by its breach of the duty to monitor. The geometric mean is useful for calculating restoration and complying with facts necessary for comparing the performance of investments with different compounding periods and evaluating the performance of investments with volatile returns. It captures the fact that a -50% loss after starting a poker game needs a +100% return to break even (not 50%).

181.   It is explained better using "Mutual Fund Performance at Long Horizons" by Hendrik Bessembinder in the October 2022 edition of the Journal of Financial Economics (emphasis added):

> Sharpe ratios rely on <u>arithmetic mean returns in the numerator</u>. Alphas are conditional (on zero factor outcomes) arithmetic mean returns. More broadly, fitted values from OLS regressions implemented in monthly returns, including Fama-MacBeth regressions and factor model

regressions, deliver estimates of conditional (on explanatory variable outcomes) <u>arithmetic mean returns</u>.

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4096205

### *Transamerica's quarterly reporting and the Company's decision-making were not based on alpha (return v. benchmark)*

182.   Restatement (Third) of Trusts § 90 cmt. h(2) states the: "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks."  Also, Restatement (Third) requires trustees to <u>avoid any investment that is not reasonably expected to generate returns sufficient to cover its costs</u>.

183.   Normally, a defined benefit pension plan trustee cares about the performance of their selected managers because underperforming managers cost the company (if the plan's assumed rate of return is not met). Consequently, pension trustees monitor their trust's managers closely. If a trustee periodically reviewed the performance of a hedge fund or mutual fund manager and found these well-paid managers could not consistently beat their benchmark, the trustee would quickly stop paying their fee by firing the portfolio managers. Afterward, a trustee may buy the same benchmarks their managers tried to beat but could not.

184.   Based on the Transamerica Investment Scorecard that appears to be offered to its 401k clients (and dovetails with their sample Investment Policy Statement (IPS) selection/retention criteria), the reporting measures "negative alphas" of funds in the plan against peer funds' negative alphas.

185.   If the Company used Transamerica's IPS and monitoring, they essentially compared their own funds' negative alphas (over 3/5/10 years) to negative alphas from peers (not benchmarks). So if the Company's chosen funds performed "less bad" the Company kept the funds—even though they failed to meet the standards that would help the participants avoid paying for the portfolio manager's useless compensation.

186.   It also means that if the Company avoided comparing to the SEC-prospectus benchmark, they would never learn to stop the wasteful revenue-sharing and portfolio manager's compensation. The trust's harm from these useless and wasteful expenses on the trust and participants'/beneficiaries' accounts would continue forever.

187.   For example, the Company ignored that Fund A lagged 2% per year for ten years behind its appropriate broad-based securities market index (alpha equal to an average alpha over 10 years of minus two percent per annum).

188.   Instead, if Fund A's one hundred similar peer funds (with the same style (mid cap growth) of stocks) lost 2.5% per year on average over ten years (against their broad-based securities market index), the Company kept their earlier selection.

189.   That is illogical and unreasonable. Broad-based indexes like the S&P 500, or Russell 3,000 index match comparison factors mandated by the SEC. This is necessary for open-end management investment companies who seek approval of their pending registration ("of their new Disclosure of Mutual Fund Performance and Portfolio Managers" SEC Rel. No. IC-19832 (Apr. 6, 1993)).

190.   Benchmarks can never be "peers" or other mutual funds' manager's performance. Instead, the relevant benchmarks for awarding portfolio managers' compensation must be broad-based, widely used, and conflict-free.

191.   The SEC has stated that "[t]he purpose of including return information for a broad-based securities market index was to provide investors with a basis for evaluating a fund's performance and risks relative to the market."

192.   Such a definition also complies with (1) 29 CFR § 2550.404a-5 ("Fiduciary requirements for disclosure in participant-directed individual account plans") and (2) the Prudent Investor Rule Restatement (Third) Trusts.

193.   The Company effectively compared performance to other expensive and concentrated peers who held only 79 stocks (as of 1/1/2017).

194.   The SEC stated in their "Disclosure of Mutual Fund Performance and Portfolio Managers" (SEC Rel. No. IC-19832 (Apr. 6, 1993)) that it chose to require funds to use a broad-based index in place of peer group comparisons "to provide investors with a benchmark for evaluating fund performance that affords a greater basis for compatibility than a narrow index would afford."

195.   In rejecting the use of peer group comparisons for all funds, the SEC stated that (emphasis added) "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market, and not so much whether one fund 'out-performed' another." (Disclosure of Mutual Fund Performance and Portfolio Managers, SEC Rel. No. IC-19832 (Apr. 6, 1993)).

196.   For example, measuring quarterly Calvert Equity portfolio managers' "alpha" to other Large Growth funds' "alpha" means if other peer managers underperformed their benchmark by 1% per year, the Company's decision-making might be to leave the participants' underperforming portfolio manager (if she also underperformed at 1%/year). This argument ignores the basic definition of "alpha."

197.   Wikipedia states (emphasis added):

   a. "Alpha is a measure of the active return on an investment, the performance of that investment compared with a suitable market index."

   b. "An alpha of 1% means the investment's return on investment over a selected period of time was 1% better than the market during that same period; a negative alpha means the investment underperformed the market."

https://en.wikipedia.org/wiki/Alpha_(finance)

198.   Poorly made decisions may have caused the Company to continue to force participants' biweekly wages into an underperforming portfolio manager. If the

Company understood, they could phone Transamerica and direct them to remove the option so participants could buy the Russell 1000 Growth fund for four basis points.

199.    Ignoring participants' contributions, that sort of decision logically would benefit the trust and participants' accounts economically by making 1% more annually on an average account balance of ~$35K ($350/yr).

200.    Plaintiffs later demonstrate the flaws and conflicts of interest in choosing a "peer" to compare to instead of complying with the (1) SEC's Rel. No. IC-19832 (Apr. 6, 1993) and (2) 29 CFR § 2550.404a-5 (an appropriate broad-based securities market index).

201.    The Company paid Cetera from participants' accounts to babysit a dozen and a half poorly-selected investment options (for participants to save salaries into) from which portfolio manager's compensation was deducted from employees (but never "earned" over many years). Cetera and the portfolio managers were not necessary to operate the Amy's Kitchen Inc. 401(k) Retirement Plan in violation of ERISA.

202.    Section 408(b)(2) of the Employee Retirement Income Security Act of 1974 (the Act) exempts from the prohibitions of section 406(a) of the Act payment by a plan to a party in interest, including a fiduciary, for office space or any service (or a combination of services) if: *** (1) *** service is necessary for the establishment or operation of the plan; (2) *** service is furnished under a contract or arrangement which is reasonable; and (3) No more than reasonable compensation is paid for such office space or service.).

### *The Company's confirmation bias—a conclusion in search of facts*

203.    Plaintiffs have evidence that the Company was predisposed to choosing investments that forced participants to lose a portion of their daily returns for extra costs called (1) revenue-sharing and (2) portfolio manager's compensation. This evidence originated from thirteen years of certified and audited financials.

204.   Many examples of the Company's behavior to select and retain costly mutual funds sold by open-end management investment companies had a common denominator between almost all of their selections since 2009—revenue-sharing.

205.   Revenue-sharing is a cost, not a benefit, to the trust. Even if the Company could obtain the maximum revenue-sharing in the Transamerica fund selling agreements, the delay of restoring the credit to the affected participants means harm still occurred and the decision was imprudent.

206.   Based on SEC-prospectus' most, if not all, of the Company's fund companies' prospectuses stated they trade shares in an omnibus fashion (at a trust level), so the fund company will never know who at Amy's held a beneficial interest. When found companies wire revenue-sharing credits to Transamerica, they send a single dollar transfer representing that fund's revenue-sharing collections due Transamerica (that is pursuant to language in their specific selling agreement with Transamerica).

207.   But for the Company's failures to act to (1) obtain the cheaper share class as well as (2), the higher performance of the fund's benchmark for over a decade, the trust and participants suffered. The decisions made by the Company during every monitoring period since 2017 were to avoid obtaining economic and financial benefits of mathematical compounding from higher yields and higher capital gains.

### Lost compounding caused by the Company's revenue-sharing costs— American Funds Growth Fund of Amer R2E

208.   Plaintiffs' analysis focuses on the fiduciary's conduct in arriving at an investment decision, not on its results. A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346 , 356 (4th Cir. 2014).   Revenue-sharing costs and portfolio managers' compensation costs are built into the Company's mutual funds' prices at 4 pm daily (and net returns for the trust and participants). Plaintiffs demonstrate the revenue-sharing actual costs to participants and the trust below. To accurately evaluate the Company's 2019

monitoring circumstances, Plaintiffs used SEC-prospectus information as of 1/1/2019 (see table below).

209.    The Company selected the American Funds Growth Fund of America, class R2E (italics) before 2009, described in italics in the table below. The Company's fund's identical "sister" class of fund ("R6") cost 0.33 %/yr (column E), while the Company's chosen/retained R2E class cost 1.12 %/yr (column E). The difference is 0.79%. That difference (.79%) exceeds the maximum 12b-1 credit of 0.60% (F).

210.    The Company's thoughtless and negligent monitoring processes were derived from its flawed initial selection processes in 2009. These extra costs to choose the more expensive class eroded the trust's fund's price for R2E in column D.

**Table 1 (data as of 1/1/2019)**

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Name | Mgr Start Date | Assets ($mil) | Net-Asset Value | Expense Ratio | 12b-1 Fees | True No-Load | Phone Switch | Toll-Free # |
| *American Funds Growth Fund of Amer* **R2E** | *11/1993* | *163.1* | *41.95* | *1.12* | *0.60* | *N* | *Y* | *800 421-4225* |
| American Funds Growth Fund of Amer **R6** | 11/1993 | 27499.6 | 42.75 | 0.33 | | Y | Y | 800 421-4225 |

211.    Using the same circumstances prevailing at the time of the Company's conduct in 2019, Plaintiffs infer that more favorable factors for the "R6" class were ignored (columns C, E, F, J and K) because the Company had no experience and expertise and failed to act.

212.    Regarding the American Funds Growth Fund of Amer R6, the Plaintiffs restate the fund's website caveat "Purchase Restrictions: Class R-6 shares are available in certain employer-sponsored retirement plans. See the prospectus for details."

213.    This statement was taken directly from www.capitalgroup.com/individual/investments/fund/rgagx.

214.   Column C "Assets" reflects that only small retail investors typically buy the more expensive R2E class. Column G notes the implication that small retail investors cannot access the no-load or cheapest version. Yet, the Company failed to read this website warning that has been present over the past decade.

215.   Perhaps the logical reason for the Company's continued ignorance of critical economic and financial factors important to participants relates to their desire to find and force the participants to buy classes with revenue-sharing "kickbacks."

216.   To better define the "lure," Plaintiffs refer to "Mutual Fund Revenue-sharing in 401(k) Plans" to flesh out the attraction. As for Amy's Kitchen Inc. 401(k), revenue-sharing was not credited back precisely to the "payor" invested in the revenue-sharing class of funds. Plaintiffs explain (emphasis added):

> * * * revenue-sharing arrangements not only reflect a contractual agreement between the plan and the recordkeeper, but also between the recordkeeper and the third-party management companies.
>
> Some mutual fund families do not share revenues with the recordkeeper. The fact that some funds revenue share and some do not within the same plan raises the concern that <u>plan expenses are not fairly distributed across participants</u>. For instance, less sophisticated participants, who are more likely to invest in more expensive funds, may be <u>cross-subsidizing more sophisticated participants</u>.
>
> <u>Recordkeepers in DC pension plans are often paid indirectly in the form of revenue-sharing from third-party funds on the menu. We show that these arrangements affect the investment menu of 401(k) plans. Revenue-sharing funds are more likely to be added to the menu and are less likely to be deleted.</u> Overall, revenue-sharing plans are more expensive as higher expense ratios are not offset by lower direct fees or by superior performance. Rebates increase with the market power of the recordkeeper suggesting that third-party funds may revenue share to gain access to retirement assets.

Irina Stefanescu, Board of Governors of the Federal Reserve System; Veronika K. Pool, Vanderbilt University; Clemens Sialm, University of Texas at Austin; "Mutual Fund Revenue-sharing in 401(k) Plans," National Bureau Of Economic Research, December 2022, 5, ABSTRACT, 19; www.nber.org/papers/w30721.

217.    Consistent with this, a 2011 study on 401(k) plans by the Government Accountability Office (GAO) suggests that due to sponsors' and participants' lack of understanding of indirect fees, recordkeepers may not reduce direct fees sufficiently. If direct and indirect payments do not offset each other, recordkeepers may collect more revenue in the presence of indirect compensation and participants may pay higher fees in these plans. Additionally, if recordkeepers are better off when they receive compensation indirectly, they may influence 401(k) sponsors to include and subsequently keep funds on the menu that pay a higher rebate, even when these funds are <u>dominated by peer options</u>. Therefore revenue-sharing may also impose costs on participants through its effect on the menu design.

### *Portfolio Manager's Compensation costs linked with Revenue-Sharing costs*

218.    Typical open-end management investment companies' funds have expense ratios that are comprised chiefly of kickbacks to the portfolio managers. Of the roughly one percent in costs (expense ratio), about 60% to 80% is taken from the participants and investors to pay the portfolio managers. The other percentages are to pay for revenue-sharing, primarily. There are other nominal expenses for audits and SEC filing fees.

219.    As of 2017, there were 3,227 index funds and 28,491 (non-index) mutual funds with portfolio manager's compensation. Moreover, there were only five hundred twenty-three funds (523) that paid revenue-sharing (12b-1) but had zero portfolio manager's compensation on 1/1/2017.

220.    Thus, if the Company wanted revenue-sharing to avoid paying invoices (and participants seeing fees on their 401k statements), it would have to add another more significant layer of costs on the participants—portfolio manager's compensation.

221.   A portfolio manager's compensation costs are typically three or more times typical revenue-sharing costs. Specifically, total portfolio managers' trading costs, variance costs and portfolio managers' compensation costs consume over one-third of the expected returns of every stock or bond mutual fund. Therefore, close monitoring is required under Restatement (Third) Trusts and ERISA.

222.   The simple definition of the term variance is the spread between numbers in a data set. Variance is a statistical measurement used to determine how far each number is from the mean and from every other number in the set. You can calculate the variance by taking the difference between each point and the mean. Then square and average the results.

***The Largest Fund in the USA – out of 228,950 funds – had a variance of <0.25%***

223.   To better understand low variance risk, Plaintiffs point to an excellent comparator or "bogey." The largest fund (with the most assets: $181,513M on 1/1/2017 in the United States was the Vanguard S&P 500 index fund (VFIAX).  Plaintiffs' analysis shows it had a variance of less than half of one percent (0.24%).

224.   A bogey for understanding variance risk, the Vanguard S&P 500 index fund (VFIAX) had a variance of 0.24% per annum over the past 22 years. The Company's chosen funds below had an average variance risk of 69% (since inception).

225.   However, the Company's chosen funds below had an average variance risk of 69% (since their inception dates).

Calvert Small-Cap Fund; Calvert Equity Fund; Invesco Global Fund; Delaware Ivy Science and Technology Fund; Janus Henderson Global Technology and Innovation Fund; BlackRock High Yield Bond Portfolio; Templeton Foreign Fund; Nuveen Real Estate Securities Fund; Invesco Small Cap Growth Fund; Franklin Utilities Fund1; American Funds Washington Mutual Investors Fund; Loomis Sayles Investment Grade Bond Fund; American Funds AMCAP Fund®; Invesco Small Cap Growth Fund; Transamerica High Yield Bond; American Funds The

Growth Fund of America®; Western Asset Core Bond Fund; AB Large Cap Growth Fund; Transamerica Core Bond.

### *Fund Managers' Transaction Costs Defined*

226.    The Defendants selected mostly funds or investments that paid professional portfolio managers healthy compensation that was taken daily at 4 pm, not to mention a smaller portion of daily deductions for revenue-sharing. Equal to the portfolio manager's salary, these managers charged investors when they bought and sold stocks and bonds. These trade costs created rivaled the fee for portfolio manager's compensation.

227.    The Securities and Exchange Commission has identified four major types of transaction costs that fund managers incur:

(1) Commissions: Charges that a broker collects to act as an agent for a customer in the process of executing and clearing a trade.

(2) Spread Costs: Costs incurred when a fund buys a security from a dealer at the "asked" price (slightly above current value) or sells a security to a dealer at the "bid" price (slightly below market value). The difference between the bid price and the asked price is known as the "spread."

(3) Market Impact Costs: Costs incurred when the price of a security change as a result of the managers' effort to purchase or sell the security.

(4) Opportunity Costs: costs related to managers' missed or incomplete trades.

228.    Of these four types of transaction costs, only commissions are directly measured and disclosed by investment funds subject to the Investment Company Act of 1940. The remaining three costs are challenging to measure and remain undisclosed to investors and participants/beneficiaries.

**Table 2**

| | Commissions | Spread Costs | Market Impact/ Opportunity Costs | Total |
|---|---|---|---|---|
| SEC[vi] | 0.30% | 0.45% | 0.18-1% | 0.93-1.75% |
| Elkins McSherry /Plexus /Abel Noser[vii] | 0.15% | | 1.05% | 1.20% |
| Karceski/Livingston[viii] | 0.15% | 0.24% | | |
| Sharkansky | | | | 1.24% |

vi http://www.sec.gov/rules/concept/33-8349.htm;
vii http://www.iaim.ie/files/Best_Execution_3.pdf;
viii www.zeroalphagroup.com/news/Execution_CostsPaper_Nov_15_2004.pdf

### *American Funds—one of the top companies paying "kickbacks"*

229.   Plaintiffs did not get access to any mutual fund selling agreements. This document for American Funds would be helpful. News releases have stated that American Funds topped the list of the 25 most generous revenue-sharing arrangements out of 1,500 funds offered through a Schwab brokerage unit for third-party pension plan administrators (TPAs). Revenue-sharing payments ranged from zero to 95.5 basis points. Many American Funds paid an average of 81.5 basis points. The industry standard is usually five to eight basis points.

230.   Self-dealing and conflicts of interest seem to flourish for the Company, Cetera and Transamerica surrounding the Amy's Kitchen Inc. 401(k) Retirement Plan over the past decade. Based on SEC-prospectuses, the Company's chosen recordkeeper, Transamerica, has received kickbacks from American Funds Distributors for many years. The excerpt below is from the prospectus page 42 from their website at www.capitalgroup.com/individual/pdf/shareholder/MFGEPRX-005-579351.pdf. "Soft-dollar payments" below are in addition to the revenue-sharing and portfolio manager's compensation fees for American Fund's mutual funds.

**Figure 3**

American Funds Distributors pays the recordkeepers listed below up to $1 million annually for product services, platform consideration, participation at recordkeeper-sponsored events and co-branding and other marketing services. The amount of the payment is based on the level of services and the access provided by the recordkeeper.

| Empower (Great West Life & Annuity Insurance Company) | Transamerica |
|---|---|
| John Hancock | |

231.    Pertaining to that same public source's page 43 of 64, the statement below relates to another of the Company's chosen providers—Cetera: "American Funds Distributors also provides compensation for, among other things, data (including fees to obtain information on financial professionals to better tailor training and education opportunities), operational improvements, support for transaction fees, technology enhancements and specific training, education and marketing opportunities. The largest payments by American Funds Distributors in 2021 for these services are listed below."

| Cetera |
|---|
| Fidelity Investments |
| LPL Financial LLC |
| Morgan Stanley Wealth Management |
| Principal Life Insurance Company |
| UBS Financial Services Inc. |
| Wells Fargo Advisors |

**Figure 4**

### *The Company's repeated ignorance of fund yields and probable income*

232.    The Company has ignored monthly yields (probable trust income) since 2009. A plan fiduciary is *personally* liable to the trust or to the beneficiaries directly, depending upon the circumstances, for any loss or depreciation of the trust estate and loss of income resulting from his breach of trust, plus interest. A growing number of modern decisions have recognized "losses" in the trustee's failure, as a result of making

improper investments. This recovery for "lost profits" is expressed as restoring the trust to what it would have been "if properly administered." Prudent Investor Rule Restatement (Third) Trusts § 211(2).

233.    Restatement (Second) Trusts requires plan fiduciaries "…to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." Restatement Second of Trusts section 227.

234.    A trustee has a duty to make the trust property "productive." This term is usually used to refer to productivity of a reasonable amount of income (i.e., "yield"), but the duty in its broader, but less frequently used, sense includes total return; i.e., income plus other return, mainly in the form of appreciation in the market value of principal. A trustee who fails to make funds productive is liable to the adversely affected beneficiaries and to the trust.

235.    "A trustee is often under a duty to sell property that becomes unproductive or underproductive." Restatement Trusts Second § 241. Reasonable care and skill must be used to procure a reasonable rate of yield. This duty includes the duty to rid the trust of unproductive, underproductive, ("wasting") assets.

236.    Plaintiffs noticed that the two common elements in their selections and retentions by the Company across the trust, based on their certified Form 5500, was "revenue-sharing" and portfolio manager's compensation. More than any other selection or monitoring factors contained in Transamerica's sample IPS and monitoring reporting, the Company wanted the dollar credits from revenue-sharing and wanted to bet participants' wages on superior portfolio managers to win the performance horse race.

237.    If the Company had at least followed some of the main factors in the sample by Transamerica, they would have avoided adding many of the mutual funds they actually chose in the past.

238.   The three main factors taken from Transamerica's free monitoring reporting are below—few, if any, were followed with consistency. Nonetheless, the first, manager tenure, is important, of course. That is the first violation of their recordkeeper's sample Investment Policy Statement (IPS) Plaintiffs found in table 2. Plaintiffs also found a violation of numbers 2 and 3.

      1) "Investment manager tenure is at least 5 years"

      2) "Investment choice has a 3-year R2 of less than 55.0 with respect to a relevant category or style specific index"

      3) "Investment choice's expense ratio is at most 80.0% of the relevant peer group average"

**Table 3**

| Name | Manager Tenure (Years; data as of 1/1/2017) |
|---|---|
| Calvert Small Cap I | 1.16 |
| Calvert Equity I | 1.55 |
| Invesco Global Core Equity A | 2.67 |

### Reviewing the Company's past selections/retentions

239.   Pecuniary factors from Nobel prize winners and academic science since 1970, over fifty years, proved that (1) reduced trading costs help increase returns to investors and (2) reduced portfolio manager's compensation increases returns; (3) and zero revenue-sharing costs increase returns; while (4) more monthly yields grow terminal wealth; (5) and more holdings reduces the variance of prices and alphas.

240.   The Company chose this particular class (R2E) of the fund in the table below before 1/1/2014, and it was listed on the Company's 2021 Form 5500 filing to the DOL/IRS. Before 2014, it was wrapped inside a Transamerica insurance separate account in figure 2.

Table 4 (prospectus date as of 1/1/2019)

| A | B | C | D | E | F | G | J | K |
|---|---|---|---|---|---|---|---|---|
| Name | Star-Rating 3-Yr | Return Rating | Inception Date | 3-Yr Total | 5-Yr Total | 10-Yr Total | Yield 12-Mo | SEC 30-Day Yield |
| *American Funds Growth Fund of Amer R2E* | *3* | *C* | *8/29/2014* | *30.97* | | | *0.21* | *0.14* |
| American Funds Growth Fund of Amer R6 | 4 | B | 5/1/2009 | 34.08 | 55.42 | | 0.98 | 0.91 |
| Russell 1000 Growth TR USD | | A | 12/31/1978 | 37.32 | 64.00 | 314.87 | | |

**Figure 5**

| a | Name of MTIA, CCT, PSA, or 103-12 IE: | AMERICAN FUNDS GROWTH FUND OF AMERI | | |
|---|---|---|---|---|
| b | Name of sponsor of entity listed in (a): | TRANSAMERICA LIFE INSURANCE COMPANY | | |
| c | EIN-PN 39-0989781-015 | | d  Entity code     P | e  Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) |

### *Plaintiffs find questionable conduct—Oppenheimer Global A*

241.   Like many of the Company's selections, this fund was on its Form 5500 beginning 1/1/2009 and remained on the Company's Form 5500 report ending 12/31/2021. The Company and Cetera watched over a relatively stagnant menu for many years. Plaintiffs infer litigation forced some change in the IPS and/or decision-making activity in later years (with little logic supporting their changes).

242.   Plaintiffs noted during the periods below, the Company's Oppenheimer Global fund's managers kept putting more and more of the trust's money in only ten stocks. In 2017, 26.51% was in 10 stocks—at the end of 2022, the variance skyrocketed because the managers put 51% of the total investors' dollars in only 10 stocks. Variance equals risk because the Company cannot choose when a participant terminates and must cash out, low point in the alpha or high point. Risks must be mitigated when possible and it was possible for the Company to reduce variance by choosing its benchmark or another active fund with less concentrations.

**Table 5**

| SEC Data: | 12/31/2022 | Dec-21 | Jun-21 | Dec-20 | Jun-19 | Dec-18 | Sep-17 | Mar-16 | Mar-15 | Mar-14 | Dec-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Top-10 Holdings Percent | | | | | | | | | | | |
| Oppax | 50.99 | 51.68 | 46.17 | 45.83 | 35.92 | 31.19 | 26.51 | 24.25 | 22.02 | 22.45 | 22.5 |

243.    Part of the reason for the increased concentration appeared to be because the managers held less stocks over the years below. From 2013 to 2023, the stocks went from 87, 89, 88 and 90 (3/2016) but since June of 2021, the managers only managed 73 stocks. The Company could have read SEC-prospectus at www.sec.gov/edgar over the years and noted this fact every year. Based on information and belief, the fund remains today.

**Table 6**

| SEC Data: | 12/31/2022 | Dec-21 | Jun-21 | Dec-20 | Jun-19 | Dec-18 | Sep-17 | Mar-16 | Mar-15 | Mar-14 | Dec-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Holdings | | | | | | | | | | | |
| Oppax | 73 | 73 | 73 | 74 | 74 | 81 | 77 | 90 | 88 | 89 | 87 |

244.    Plaintiffs demonstrate what happened to this only global stock fund chosen and kept by the Company. The facts and circumstances prevailed at the time of the Company's conduct in 2017 (see table below). The Company never called 800.225.5677 and switched to the identically managed fund, "I" share class.

245.    If the Company had acted to do at least this, more returns to participants would have been received because of fewer costs to participants.

246.    This was their first mistake after selection since in column C, it became available in January 2012. The second more egregious mistake was never evaluating the manager's "skill" or "experience and expertise." If they had, they would have switched to the MSCI World benchmark and the economic interests of the trust would have been served mightily (columns D, E and F, below).

Table 7 (fund data as of 9/30/2017)

| A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|
| Name (data 1/1/2017) | Telephone Switch 800 225-5677 | Inception | 3-Year Total | 5-Year Total | 10-Year Total | Mgr Name | Mgr Start | Expense Ratio | 12b-1 | No-Load |
| *Oppenheimer Global A* | Y | *Dec-69* | *6.2* | *62.6* | *49.3* | *Bhaman* | *8/2004* | *1.15* | *0.25* | *N* |
| Oppenheimer Global I | Y | Jan-12 | 7.6 | | | Bhaman | 8/2004 | 0.71 | | Y |
| MSCI World GR USD | | Mar-86 | 13.7 | 68.8 | 54.0 | | | | | |

247.    Mathematics again show that column I and J (expense ratios) differ by more (0.44%) than the revenue-sharing credits (0.25%). The lost opportunity costs mattered, and the Company failed again. The measure of damages in cases where, as here, an ERISA fiduciary breached its duties is the "entire cost" of the failure to act.

248.    What's worse, maintaining these funds in the Plan cost all participants lost savings opportunities. Continuing to monitor and maintain these underperforming funds cost the participants more in advisory services to purportedly assist the Company in monitoring the performance and expense of these funds. Doing so would have removed the need for much of the advisory fees paid during the Class Period and would have kept those expenses in participants' accounts which would have compounded over time.

249.    A prudent fiduciary should have been aware of these better performing lower cost alternatives and switched to them at the beginning of the Class Period. Failure to do so clearly indicates that the Company lacked any prudent process for monitoring the cost and performance of the funds in the Plan.

250.    Facts facing the Company in the table above were present in the Company's 2017 plan year monitoring period. Plaintiffs reference the columns D, E, F, I, and J above to demonstrate why it is reasonable and logical for Plaintiffs to infer the Company failed to seek economic and monetary benefits for the trust, again.

251.   Instead, the Company's focus again on choosing and keeping the Oppenheimer Global A was found in the "kickbacks" column J (12b-1). Many future pieces of evidence here will show similar threads.

252.   Plaintiffs noted that no such factor was a part of the Transamerica IPS (or any Investment Policy Statement (IPS) from other firms).  Revenue-sharing or non-pecuniary benefits that benefited the Company and covered service providers are not a standard selection or retention factor in any Investment Policy Statement (IPS).

253.   Plaintiffs show this information to prove that the Company went "off script" and deviated from its plan document with Transamerica.  Using this revenue-sharing factor to choose a fund violates the Company's own policy.

254.   No responsible plan fiduciaries have an ERISA compliant investment policy containing revenue-sharing "kickbacks" as a factor to keeping a provider or a mutual fund.

255.   Instead, the Company's focus for choosing and keeping the Oppenheimer Global A is found in column J (12b-1). The research led to their decision-making to focus on revenue-sharing or non-pecuniary benefits that benefited the Company and covered service providers.

256.   Not only did the Company exhibit flawed reasoning by (1) ignoring negative alphas during the preceding three/five/ten year periods, the plan fiduciaries chose and (2) keep to this day the "A" share class—not the cheaper, identical "I" class of the fund. Three, five and ten years match Transamerica's methodology and that same look-back period was conceivably used by the Company.

257.   Important math to note, as similar mathematical facts erupt with every other fund with portfolio manager's compensation in the Plan, stems from the three-year total return of 6.2% for the Company's choice in italics.

258.   The cheaper, identical "I" class earned 7.6%. The difference per year equals 0.47 percent per year. Not only is the "delta" or difference between expense ratios greater than the revenue-sharing maximum potential credits of twenty-five basis

points (0.25%), the harm of the lost opportunity cost of forty-seven basis points by ignoring the cheaper version. In other words, the maximum potential revenue-sharing credit of the twenty-five basis points sought in column J by the Company is less than the harm caused by repeated failures to act to obtain the cheaper version.

259.   Of course, the larger of the two mistakes made in the Company's plan-wide decision-making affecting the trust and every trust beneficiary is to insist that participants keep buying and paying for the portfolio manager's compensation in either version of Oppenheimer Global, A or I.

260.   The purpose of paying for potential alpha is to generate positive alpha. Using the Company's experience and expertise to force participants to spend wages for potential enhancement of returns above the appropriate broad-based securities market index is allowed under the Prudent Investor Rule Restatement (Third) Trusts.

261.   Given the facts then and later, though, the Company's actions should have been to switch Oppenheimer Global for its index-equivalent fund. Base skill levels dictated that the Company stop the bleeding and burden on the trust's corpus by shedding the revenue-sharing and portfolio manager's compensation costs immediately.

262.   The 10-Year Total in column F of the table above shows the Transamerica methodology of looking back as long as ten years reflects the Company's choice in italics earned 49.3% over ten earlier years while an appropriate broad-based securities market index earned 54%. There was no alpha for the prior ten years but the Company's 2017 monitoring reports directed the Company to act and it and its plan fiduciaries failed to act in 2017, 2018, 2019, 2022, 2021.

263.   This evidence points over and over to behavior meeting the definition of a bias for picking mutual funds that take money daily from participants'/beneficiaries' returns in the form of portfolio manager's compensation. From Oxford, confirmation bias is "the tendency to interpret new evidence as confirmation of one's existing beliefs or theories."

*Transamerica's Services Agreement with the Company*

264.    Transamerica required the Company to execute a service agreement. Although the Company denied requests for this information, Plaintiffs could obtain template agreement language online. "Expected" was an operative word that helped prove the Company failed to adhere to its duty to act "solely and exclusively."

265.    For example, when deciding whether or not to select a fund that will pay twenty-five basis points in revenue-sharing credits to the Company, the Company can only estimate the future dollars they will receive from a newly added revenue-sharing class of the fund.

266.    Amy's Kitchen Inc. 401(k) Retirement Plan is participant-directed based on the Company's Forms 5500. That means participants decide when and where they send their salary dollars. They decide the amounts and which fund to send their dollars.

267.    Suppose a fund company's selling agreement is written to include a "90% crediting rate," based on the total revenue-sharing taken from participants. In that case, the "credit" available to the Company for choosing their fund is calculated over the next quarter (based on the actual dollars the participants save into the new fund).

268.    So 90% of 0.25%/yr or 0.225% of whatever dollars by the workers at Amy's will be the quarter's revenue-sharing collection available to the Company. Thus, the actual dollars the Company hopes to receive in credit is purely hypothetical at the point they decide to add a fund with revenue-sharing.

269.    However, the actual collection from participants' accounts starts the day the Company adds the fund and continues every day after that—that amount is not hypothetical. Consequently, basing fund selection on non-pecuniary factors like revenue-sharing is even more illogical when comparing actual versus assumed dollars.

270.    A registered investment company's fund selling agreement (and revenue-sharing) is based on the dollars Amy's participants save in their mutual funds. The more money flowing in from workers, the more dollars are taken in aggregate (because all mutual funds charge based on "percentage of assets"). A quarter of one percent,

twenty-five basis points, equals 25,000 revenue-sharing dollars on $10M in plan assets—$50K revenue-sharing for $20M in assets.

271.   The same math applies to participants' recordkeeper fees. Transamerica's compensation can only be based on "assets, " not flat *dollar* per capita or participant. The Company must, therefore, closely monitor the "asset-based" accounting charge to workers.

272.   If the worker raises her deferral from 3% to 6%, she will pay twice in recordkeeper fees to Transamerica. Therein lies the inherent conflict for both the Company and Transamerica. Keeping the underperforming fund may mean more revenue-sharing credits to utilize for the Company.

273.   Yet, future revenue-sharing "credits" are always contingent on meeting certain levels of assets being invested into the fund. The revenue-sharing dollars always fluctuate because of (1) contribution changes, (2) investment election changes, (3) rollovers and (4) distributions from the plan.

274.   It is insane to choose an investment based on pure conjecture when alternative methods like (1) obtaining higher yields, (2) reducing risks and (3) reducing cost being taken from workers daily are available to the Company at all times.

275.   The Amy's Kitchen plan is participant-directed. The participants' wage elections of where money goes and what amount is deposited are beyond the control of the Company.

276.   Salary deferrals can change daily, weekly or monthly. The Company was betting on credits from revenue-sharing using the participants' wages, in essence, not the Company's money. A services agreement found online has relevant text in the Company's agreement. The italic text relates to the inherent conflicts of interest (emphasis added):

> "The Expected Fund Revenue is the revenue received by TRSC from the Investment Options at the time the Agreement is prepared. Most of the listed funds and/or their affiliates pay the Expected Fund Revenue to TRSC and/or its affiliates or subcontractors in order to defray the fund company's

shareholder servicing costs through the recordkeeping, account maintenance and other services provided by TRSC. The listed funds and/or their *affiliates participate on TRSC's investment platform pursuant to contractual or other arrangements* with the subcontractors mentioned above. The *Expected Fund Revenue may not be the only compensation received by TRSC with respect to the Plan*, and any other form of expected compensation, such as any direct compensation from the Plan, is separately disclosed in the Fee Schedule herein. TRSC reserves the right to compensate its affiliates and/or subcontractors who assist TRSC in providing the services."

TRSC and/or its affiliates expect to receive certain indirect compensation from the Investment Options available within the Plan(s) or their respective affiliates ("Expected Fund Revenue"). The Expected Fund Revenue TRSC or its affiliates receive may include distribution (12b-1) fees, shareholder servicing fees, and/or sub-transfer agency fees. Expected Fund Revenue received by TRSC from the proprietary Diversified Investment Advisors Collective Trust, Transamerica Financial Life Insurance Company ("TFLIC") and Transamerica Partners investment funds (collectively, "Proprietary Funds") is defined as the expense ratio applied to fund assets less all investment expenses, such as sub-advisor, custody legal, printing and trading costs. The Investment Options Schedule illustrates the Investment Options to be included in the Plan(s) and the Expected Fund Revenue from each Investment Option. The Expected Fund Revenue is based on currently available information and may be changed at any time.

The Expected Fund Revenue for each of the Investment Options will be reviewed no less frequently than quarterly. *The frequency of such review will be determined by TRSC.* Any adjustments necessary to the amounts being credited to the Participants' Accounts will be made as soon as administratively feasible *following TRSC being notified of the change to the Expected Fund Revenue*. TRSC shall notify the Employer of any changes in the Expected Fund Revenue generated from the Investment Options. Any adjustments made to amounts being credited to Participant accounts will not necessitate an amendment to this Agreement.

Expense Bucket Account ("EBA"). The EBA is a plan level unallocated account that may be credited with Expected Fund Revenue in excess of the Required Revenue and/or amounts withdrawn from Participant accounts. The amount credited to the EBA will be accrued daily based on Participants' account balances in each of the Investment Options (excluding PCRA and

employer stock funds, if applicable) and will be credited with such amount as of the last business day of each month. The daily accrual on non-business days at the end of a month will roll into the following month and be credited on the last business day of such month. These amounts can be used to pay Plan-related expenses approved by the Employer or *can be allocated to Plan Participants at the end of the Year (or as soon as administratively feasible following the end of the Year), at the direction of the Employer.* Once each Plan Year quarter, the Employer may direct MSC in writing to reimburse the Employer from the EBA, or at the Employer's direction remit payment to a third party, for necessary and reasonable Plan-related expenses. Once per Plan Year quarter, TRSC will pay the authorized amounts directly to the Employer, or at the Employer's direction, a third party, provided there are sufficient funds in the ERA, following receipt of the Employer's authorization. *It is the Employer's sole responsibility to determine if the expenses that are being reimbursed qualify as necessary and reasonable Plan-related expenses in accordance with the Plan' (s) governing documents* and the DOL's guidance provided in Field Assistance Bulletin 2003-3 and Advisory Opinion No. 2001-0IA and in Internal Revenue Service Revenue Ruling 2004-10 and other guidance that may subsequently be issued. TRSC is not responsible for any determination regarding the appropriateness of such expenses for reimbursement. At the end of the Year, the Employer may direct TRSC to allocate the balance in the EBA to Participant accounts on a pro-rata or per capita basis based on Participant account balances.

## SECTION II

## CETERA ADVISORS, LLC ("CETERA")

## Amy's Kitchen's Andy Berliner, CEO, and Peter Wong, CFO repeatedly authorized the alienation of trust assets to be transferred to Cetera

277. Cetera failed for many quarters to follow the basics of Restatement (Second) of Agency by ensuring they complied with their duties of "full disclosure" and "loyalty" and "faithfulness to the principals."

278. Agency may be the most basic fiduciary relationship arising under the law. It serves as the basis for other, more specialized fiduciary relationships such as broker/customer and attorney/client. Agency results from "the manifestation of consent

by one person to another that the other shall act on his behalf and be subject to his control, and by the consent of the other so to act." Among the fiduciary duties imposed on agents as fiduciaries are the duty of full disclosure, loyalty, and faithfulness to the principals.

279.  Agents are subject to the directions of the principal and have duty to use reasonable efforts to give to principal information relevant to affairs entrusted to them). An agent owes a duty to his principal to act in good faith and in accordance with the agency agreement existing between the parties as well as duty to keep and render accounts to the principal of all financial affairs that the agent has handled on behalf of the principal. Once an agency relationship is established, fiduciary duties of loyalty and full disclosure flow as a consequence.

280.  The California Court of Appeals in *Duffy v. Cavalier* opined that the scope of a stockbroker's fiduciary duty to a customer depends on the specific facts and circumstances presented in a given case. "These in- clude the relative sophistication and experience of the customer; the customer's ability to evaluate the broker's recommendations and exercise an independent judgment thereon; the nature of the account, whether discretionary or nondiscretionary; and the actual financial situation and needs of the customer." See *Duffy v. Cavalier*, 264 Cal. Rptr. 740, 740 (Cal. Ct. App. 1989)

281.  Cetera billed the company, and the Company permitted Cetera to receive thousands of dollars each quarter from the trust while simultaneously damaging the trust.

282.  Repeated failures to act by both Cetera and the Company caused harm to the trust and participants. The Company, for a decade, violated its plan documents as well as trust law and ERISA's requirements to (1) prudently investigate the qualifications of the firm and (2) to periodically monitor the firm (to ensure that they bring value to the participants).

283. The anti-inurement or "exclusive benefit" policy of ERISA § 403(c) is intended to protect participants' financial expectations by precluding trustees/employers from diverting funds. See Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1506 (10th Cir. 1995).

284. *Resolution Trust Corp. v. Fin. Inst. Ret. Fund*, 71 F.3d 1553, 1557 (10th Cir. 1995) (citing Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm., 953 F.2d 587, 592 n.6 (11th Cir. 1992) states: "the exclusive benefit rule can be violated only if there has been a removal of plan assets for the benefit of the plan sponsor or anyone other than the plan participants."

285. To the extent that the Company is or was paying providers more than reasonable compensation, it is or was breaching its fiduciary duties of loyalty and prudence and not acting in accordance with the Plan documents and the agreements governing the Plans. To the extent that the Company approved and aided in alienating or diverting Plan and Trust assets designated for the payment to separated participants, the Company is and was violating the same requirements and is also self-dealing in violation of ERISA's prohibited transaction rules.

286. Based on information and belief, Carmelita A. Lewis certified annually that this was "true/correct/complete" even though the services under their services agreement for Cetera remained precisely the same each year. Advisors do not execute new advisory contracts each year. She certified this even though Cetera's services violated ERISA (since Cetera's services were "not necessary for operation" of the Amy's Kitchen Inc. 401(k) Retirement Plan). Cetera's "detrimental investment recommendations" of both (1) unskilled and costly portfolio managers along with (2) recommendations to buy higher cost share classes, when cheaper identical ones were readily available, harmed the trust and participants/beneficiaries repeatedly year after year for several years. The word "identical," when used contextually in a sentence about mutual funds, means the comparators are (1) managed under the same RIC (registered investment company), (2) using the same managers, who (3) bought the

exact same holdings with (4) the exact same cost basis, etc. The only difference lies with the fund class' expense ratio.

287.  Often defendants argue that "A" share classes and "R6" share classes are independent of one another—they have no shared or common characteristics. The words mutual fund "share" describes the fund's piece of the pie split with the "shareholders." The word "class" after "share" should be enough to explain to buyers of a fund that one "class" is spawned from an identical mutual fund "share" as another class.

288.  Furthermore, the governmental agency responsible for approving a new mutual fund's registration states the opposite:

> The SEC may file enforcement actions alleging violations of these provisions against investment advisers that fail to disclose to their client's conflicts of interest, including those conflicts associated with the receipt of 12b-1 fees for investing client funds in, or recommending that clients invest in, a 12b-1 fee paying share class when a lower-cost share class was available to clients for the same fund. * * * Each share class of a fund represents an interest in the same portfolio of securities.

www.sec.gov/news/press-release/2018-15

289. The Company failed to loyally and prudently select and monitor investments. In their 2015 unanimous Tibble v. Edison decision, the U.S. Supreme Court clarified that because a fiduciary has a continuing duty to monitor investments at *regular intervals* and remove imprudent ones, a plaintiff may allege that a fiduciary breached a duty of prudence. Such a claim is timely as long it is filed within six years of the *alleged breach* of *continuing* duty.

290. Also, the Company failed to loyally and prudently select and monitor covered service providers like Cetera and Transamerica. Cetera's compensation went to them for services that were unnecessary for plan operation and detrimental to the Trust's corpus.

291. Cetera was paid from trust assets to recommend buying high-cost share classes and untested portfolio managers (based on the SEC and the Company's certified annual government reporting to the U.S. Departments of Treasury and Labor).

292. "Cost-conscious management is fundamental to prudence * * * ." Restatement (Third) of Trusts, ch. 17, intro. note (2007); see Restatement (Third) of Trusts § 90 cmt. B (2007).

293. Cetera's quarterly compensation payments that alienated trust assets were not exempt under ERISA Section 408(b)(2). Cetera's services were "detrimental" (with no "benefit" to participants)—no value was created.

294. Cetera helped select/retain high-cost and lower-yielding investments while identical, cheaper and higher-yielding funds were readily available.

295. The Company and Cetera's reasoning and actions violated another unanimously decided U.S. Supreme Court case in 2022—this clarified earlier selection/retention responsibilities (from Tibble; emphasis added):

> Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, §1104(a)(1)(B), the appropriate inquiry will necessarily be context specific.* * * At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.

*Hughes v. Northwestern University*, No. 19-1401 (U.S. Jan. 24, 2022).

296. Plaintiffs lay out the facts and elements in the order of the Company's decision to (1) choose their recordkeeper, Transamerica, and (2) their investment fiduciary firm Cetera before (3) delving into the circumstances prevailing at the time of the conduct when the Company chose and kept investments. Because Transamerica provides (1) a sample Investment Policy Statements (IPS) and (2) investment monitoring at no cost to its recordkeeper clients, it is reasonable to conclude that Cetera and/or the Company's processes were somewhat based on Transamerica's monitoring

criteria Plaintiffs used here (in lieu of receiving the Company's actual IPS and monitoring reporting).

297. Plaintiffs use facts taken from Transamerica's opening section "METHODOLOGY," to show the three periods likely focused on by the Company.



**TRANSAMERICA INVESTMENT MONITOR**

**METHODOLOGY***

| PERFORMANCE MEASUREMENT** | | | | | | | |
|---|---|---|---|---|---|---|---|
| PERFORMANCE MEASUREMENT** (TRAILING RETURNS) — 50% WEIGHTING | | | | PERFORMANCE MEASUREMENT** (RISK-ADJUSTED RETURNS) — 50% WEIGHTING | | | |
| WEIGHTING OF SCORES BASED ON TRACK RECORD | | | | WEIGHTING OF SCORES BASED ON TRACK RECORD | | | |
| Performance | 10-Years | 5-Years | 3-Years | Performance | 10-Years | 5-Years | 3-Years |
| 10-Years | 33.3% | — | — | 10-Years | 33.3% | — | — |
| 5-Years | 33.3% | 50% | — | 5-Years | 33.3% | 50% | — |
| 3-Years | 33.3% | 50% | 100% | 3-Years | 33.3% | 50% | 100% |

**Figure 6**

298. From the Transamerica reporting above, Plaintiffs infer the Company measures performance at least by use of three/five/ten-year factors.

299. If the Company sought to follow this written process in selecting/retaining investments, they failed often. For example, during the first year of the putative Class Period, 2017, the table's factors and circumstances prevailing at the time of the conduct, notably the three/five/ten year numbers demanded attention—still, attention was not paid by the Company:

**Table 8**

| *Notes—1/1/17 | Name | Inception Date | 3-Year Total | 5-Year Total | 10-Year Total |
|---|---|---|---|---|---|
| *Defs' choice* | *Calvert Equity I* | *11/1/1999* | *19.37* | *81.89* | *102.49* |
| Prospectus | Russell 1000 Growth TR USD | 12/31/1978 | 27.91 | 96.80 | 122.58 |

300. The Company's choice in italics affects hundreds of participants in this way. Facts like those in the table above were found with every open-end management investment company chosen by the Company. Plaintiffs could not evaluate non-publicly traded insurance-based investments as they were not privy to contracts the Company executed with Transamerica.

301.    Plaintiffs and the Plan Fiduciaries at the Company are not securities licensed. Thus, without a security salesperson, the Company cannot receive revenue-sharing and has no reason to choose mutual funds that kick off revenue-sharing payments (mutual funds). However, based on reporting at Financial Industry Regulatory Authority (FINRA) and U.S. Securities and Exchange Commission (SEC), Cetera's and Transamerica's representatives held that license and the Company chose both of them many years ago.

302.    The Series 6 Securities Sales License is known more formally by FINRA as the Limited-Investment Securities License. It covers groups of securities that are sold together as a single unit. Examples of these types of securities are mutual funds, variable annuities, and indexed life insurance. Since the majority of life insurance products are grouped with securities, the Series 6 license is required for all insurance sales professionals throughout the United States who wish to sell those types of policies.

303.    The Company, Transamerica and Cetera had symbiotic and convenient relationships—for one another but not for the participants. Using either the broker-dealer of Cetera or Transamerica's broker-dealer platforms, the doorway to revenue-sharing was open for the Company always. Interestingly, the participants paid these dollars, not hypothetically, but actually (based on net returns) to the actual benefit (per Forms 5500) of the Company and its chosen providers (Cetera and Transamerica).

304.    However, participants shall *never* receive lost interest, nor the cheaper, identical class' improved yields and returns (nor the better performing "broad-based securities market index" returns and yields) from their first payment of excessive revenue-sharing and portfolio manager's compensation costs to this day.

305.    Richard H. Baker connected the "revenue-sharing dots" leading to investor deception when he said:

> "Revenue-sharing is generally not disclosed to investors, thus leaving investors unaware of the incentives a broker may have for recommending one fund over another."

Chairman of the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises.

306.   Mutual funds spin off the sort of revenue that can be shared but is conveniently rather opaque or "hidden" from participants' view, according to FINRA and the SEC. Some of it (12b-1) can be seen and understood via a deep dive into documents at www.sec.gov/edgar (prospectus, annual reports, etc.).

307.   To the best of the Plaintiffs' knowledge, Amy's Kitchen Inc. has no employees who are securities salespersons (Series 6 or 7 licensed). Therefore, they cannot be expected to understand or have actual knowledge of the number of dollars or how the funneling of revenue-sharing dollars or lost earnings from their investments occurred. They certainly cannot know to whom the revenue-sharing kickbacks were sent or to whom these dollars are being sent today. All written agreements relevant to these allegations are in possession of the Company and its providers.

308.   The revenue-sharing amounts paid from participants and later received by Cetera and Transamerica vary from one underlying investment option to another. The Company never disclosed these conflicts of interest on the employees' annual fee and performance notices (29 CFR § 2550.404a-5 "Fiduciary requirements for disclosure in participant-directed individual account plans").

309.   Regarding revenue-sharing, Plaintiffs are referring to all "other" parties—not the party paying each and every day (the participants) for the revenue-sharing costs. Parties that benefit from revenue-sharing are (1) the Company, (2) the advisory firm (Cetera) and (3) Transamerica (and its affiliates). Each has the ability to legally direct and receive:

1) SEC Rule 12b-1 fees,

2) subtransfer agency fees,

3) shareholder servicing fees,

4) commissions,

5) finder's (incentive) fees,

6) continuing education, software, trips, and other types of *indirect* fees.

310.  Plaintiffs and participants relied upon the Company to remove underperforming investments (that paid excessive fees, which caused negative alphas). Performance monitoring always rests on the Company because participants cannot add or remove investments from the 401k plan's menu. Periodic measurements of the performance of three/five/ten years mean the Company will replace underperforming funds promptly.

311.  The Company's, Cetera's and Transamerica's offerings must have appeared to outperform (benchmarks) because they continued to show up on the Company's Forms 5500 and their revenue-sharing costs continued to be paid by the trust and participants.

312.  Although the lawsuit is against the Company and its de facto plan fiduciaries, the Plaintiffs may amend and name other parties in interest.

### SECTION III
### THE COMPANY FAILED TO MONITOR INVESTMENTS PRUDENTLY
### *Derivation of Factual Allegations*

313.  This section is the most lengthy as it compares the vast majority of the Company's choices to the facts and circumstances prevailing during the first year of the limitations period (plan year 2017). To determine the consistency and persistence of the Company's actions, the Plaintiffs also compared earlier and later facts present when the Company acted to add/remove mutual funds (in plan years before and after 2017). Plaintiffs cannot access details of yields and rates, nor can Plaintiffs assess inherent conflicts and costs associated with proprietary investment products. Non-publicly traded investments like separate accounts, GICs, fixed annuities, and related

insurance and collective trusts are governed by the sponsor's contracts executed with Transamerica.

314. U.S. Securities and Exchange Commission (SEC) prospectus data indicates that portfolio managers' median tenure for operating a mutual fund is less than seven years. Thus, fifty percent (50%) of the Defendants' chosen funds' managers are fired or quit every three to four years. Tenure data was examined back to 2009.

315. On 1/1/2017, there were 30,294 share classes of mutual funds with portfolio managers. The median tenure, at the 15,147[th] position (median), equaled 6.7 years. Hence, it was not atypical for the Company's chosen portfolio managers to quit or be fired on or about 11/3/2015 (see three paragraphs below).

316. For example, a core holding of the Company from which the participants could build a "whole portfolio" was the Calvert Small Cap fund. Management tenure is important because it is hard to beat an appropriate broad-based securities market index without a human manager gaining "experience and expertise."

317. Appropriately, the Transamerica sample IPS and monitoring reports have a section called "Management Tenure" where the second highest score of "4" is predicated on "Investment manager tenure is at least 3-1/2 but less than 5 years."

318. The Prudent Investor Rule Restatement (Third) Trusts and courts have ruled consistently that participants' wages in their 401k should not be subjected to the risks of the Company's process to select/retain "untested" managers.

319. It would be illogical to search for human "alpha" if that whole decision ends with unproven humans that never have generated "alpha" consistently. Nevertheless, it seems what the Company did below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Table 9**

| Name | Prospectus data as of: | Dec-18 | Prospectus data as of: | Dec-18 | Prospectus data as of: | Mar-15 |
|---|---|---|---|---|---|---|
| | Manager Name | Manager Start Date | Manager Name | Manager Start Date | Manager Name | Manager Start Date |
| Calvert Small Cap | McLean/Noble | 12/31/16 | Huang/Madden/McLean/Noble | 11/3/15 | Trunow | 7/31/10 |

320.   The portfolio managers chosen by the Company changed a great deal above. New untested managers explain why alpha variance was high at 19 or 400% of the expected annual stock returns.

321.   Variance risks seem attributed to the fact that a human's ability to listen to quarterly earnings announcements is related to time and memory. This fund's manager, like most, held only a small quantity of stocks (not 2,000 like the benchmark).

322.   In 2017, portfolio managers put the entire fund's cash into 81 stocks (versus the 29 CFR § 2550.404a-5 "appropriate broad-based securities market index," the Russell 2000). As of 12/31/2022, the McLean/Nobel team held even less stocks (73). These were facts present and available to the Company for many years.

323.   Back to sources of information, modern trust law also allows investors to quantify risk by looking at the variance among the possible outcomes of a particular investment. This variance is generally stated in terms of the standard deviation—the greater the standard deviation, the greater the expected return must be to compensate the investor for taking the risk. The standard deviation is the square root of variance.

324.   Alpha and variance of the alpha calculations by the Plaintiffs (for all of the Company's chosen funds with managers (on their Form 5500 for 2017)), indicated the (1) median and the (2) average number of years necessary to determine that the Company's chosen fund's managers have skill is 81 and 120 years.

325.   This simple variance test has been used since 1908. Not only is it used by the largest defined benefit plans but today, this test is being applied in modern finance

everywhere to determine if a series of historical returns is reliably superior—i.e., showing a t-statistic of 2 or higher—to a risk-equivalent benchmark.

326.    Thus, one can determine whether alpha (any return above the benchmark return) is due to luck or skill. Once each year, for each manager, the Company sets up an Excel file and (1) enters the excess returns each manager earned above an appropriate benchmark. Next, the plan fiduciaries (2) determine the *regularity* of the excess returns by calculating the variance of those returns.

327.    Based on these two numbers, the Company can immediately calculate how many years it needs to support the manager's claims.

328.    For example, let's say that in a sample with 80 fund managers who had positive excess returns, the average excess return was 0.84% and the square root of variance was 5.64. To estimate the years needed for statistical significance, they find the intersection of the average excess return (about 0.8%) and the square root of the variance (about 5.6%) and they would see that 180 years of returns data are needed to establish skill as the reason for the higher returns.

329.    Plaintiffs allege the Company never did this exercise because they were disloyally motivated to search less for improving the economic interests of the participants.

330.    The Company searched for and kept mutual funds with collateral, and non-pecuniary benefits, called revenue-sharing for over a decade.

331.    Hence, the mutual fund's "portfolio manager's return-reducing compensation" significantly reduced the Company's funds' gross asset values (GAVs) and these wasted costs affected all past and future returns of participants (and reduced recurring dividends/interest).

332.    These reductions to the values of the trust's assets as well as the Company-authorized trust deductions to Cetera, were unnecessary. These deductions against trust values began after Cetera's hire in 2013 and before when the Company initially selected each mutual fund with portfolio manager's compensation.

333.    From the www.SEC.gov site: "Management fees are fees that are paid out of fund assets to the fund's investment adviser (or its affiliates) for managing the fund's investment portfolio."

334.    Plaintiffs are without the revenue-sharing information of what, if any credits went to the Plaintiffs or other participants. But because revenue-sharing cost are typically only one-third or less of the percent attributable to the portfolio manager's compensation, this complaint ignores revenue-sharing expenses.

335.    The Company failed to provide, upon written request, 1) each mutual fund's "selling agreements," and 2) Transamerica's "ERISA budget account's" cash flows receipts and distributions. Defendants often respond to complaints like this one that fund expenses such as (1) SEC Rule 12b-1 fees and (2) sub-transfer agency fees are not per se imprudent. They also often say that all revenue-sharing taken from participants' funds was used to benefit the participants'/beneficiaries' accounts. They say this as a fact when they have never asked for or received the trust's ERISA budget account.

### The Company's Calvert Small Cap fund

336.    The conundrum of which portfolio manager serviced the Calvert Small Cap fund's roughly 75 stock holdings for the benefit of the trust cannot be accurately measured because the managers changed so frequently.

337.    Therefore, Plaintiffs found that using all possible alphas (the oldest class' performance back to 2005) was a more prudent test of the Company's 2017 Calvert Small Cap fund monitoring decision.

338.    The average alpha for every manager against the Russell 2000 TR USD was a negative 1.32 %/year. All portfolio managers consistently lost 1.32% versus this broad-based and widely used benchmark.

339.    Against another broad-based and widely used benchmark for small cap funds, the S&P SmallCap 600 TR USD, the portfolio managers lost twice as much each year at 2.6%/yr.

340.   Going back to the first year of 2012, one year prior to Cetera helping the Company, the results were twice as bad for the Russell 2000 at an average annual lost rate over eight years of 2.73% per annum.

341.   Bottom line, Plaintiffs have no idea whether the Company's (1) overwhelming self-interest caused them to have this fund today. Or whether the (2) Company was apathetic and did not want to spend an hour updating alphas in a spreadsheet each year.

342.   It is irrelevant why the Company did what it did here and in many other places because under Restatement (Third) of Trusts § 90 the Company must carefully investigate the portfolio manager's compensation fee drag and the number of holdings (concentration) that may potentially affect returns.

343.   Next time, the Company must reduce variance and portfolio manager's compensation to increase the trust and participants' financial interests. It is easily done by buying an exchange-traded fund (i.e., iShares Russell 2000 ETF (ticker: IWM) or the Vanguard Russell 2000 Index mutual fund (VRTIX)).

### The Calvert Small-Cap Fund again

344.   Plaintiffs also note that their meaningful benchmark approach follows the Modern Portfolio Theory (MPT) "best-fit" index. The Prudent Investor Rule (Restatement (Third) Trusts) "best-fit" index carries a high correlation to the actual holdings chosen by the fund's manager. The Company must be cognizant that some portfolio managers "switch" their "chosen benchmark" in SEC-prospectus to weaker benchmarks ( "switcheroo" problem of managers changing to weaker benchmarks)

345.   Thus, the Plaintiffs often also compared the fund's prospectus to the Restatement (Third) Trust's "best-fit" index, which carries a higher correlation to the actual holdings chosen by the fund's manager.

> From "Understanding Best-Fit Versus Standard Indexes" the best-fit index for a fund is calculated in-house at Morningstar by comparing the fund's portfolio to a number of different indexes to find the one that has the highest R-squared with the fund's portfolio during the last 36 months.

Investors should seek a benchmark with the highest degree of correlation (R-squared) with the fund because the reliability of a fund's Modern Portfolio Theory (MPT) statistics is contingent upon the strength of the relationship between the fund and its benchmark. A higher R-squared generally ensures a more reliable beta and alpha figure. (https://www.morningstar.com/articles/372237/understanding-best-fit-versus- standard-indexes). Modern Portfolio Theory is the theory currently guiding the Prudent Investor Rule (Restatement (Third) Trusts) for trust administration by the trustee. https://www.law.cornell.edu/wex/modern_portfolio_theory).

346. Regarding the "switcheroo" problem mentioned above, Mr. Jason Zweig wrote for the Wall Street Journal on Aug. 19, 2022, about this concern:

How to Beat the Stock Market Without Even Lying--Stock funds have been pulling a switcheroo to make their returns look better: When they don't measure up, they change how they measure. Prospectuses always warn that past performance is no guarantee of future results. Turns out it's no guarantee of past results, either.

347. It continues (emphasis added):

Fund managers can easily beat the market. All they have to do is <u>change the market they're trying to beat</u>. * * * New study found that b/w 2006-2018, 37% of all US stock mutual funds switched benchmarks…"* * * In as many as two-thirds of the cases, <u>funds made past returns look better by changing the benchmarks they compared themselves to</u>. <u>More than half the time, funds chose a new index that wasn't even a good match for their strategy</u>.

348. Fiduciaries should have known that the risk of the trust's variance for offering the Calvert Small-Cap Fund would be high. In 2017, the data at www.sec.gov/edgar state that this fund manager only bought 73 stocks. This fund first appeared in the Defendants' 2014 Form 5500 filed with DOL/IRS—it held 71 stocks then, with ten of the stocks constituting 31% of the total of investors' assets (this metric

called "Top-10 Holdings Percent" is calculated by the SEC to mean all dollars "across all share classes").

349.   In 2017, the Company had these and other prospectus facts in full view:

| Name | 5-Year Total | 10-Year Total |
|---|---|---|
| 1 ▶ S&P SmallCap 600 TR USD | 115.71 | 137.39 |
| 2 ▶ Calvert Small Cap A | 106.26 | 88.07 |

**Figure 7**

350.   Since the median tenure for portfolio managers is only seven years, Plaintiffs' key question surrounds the process that would induce the Company to ignore the disparity in the 10-year total return difference (49.32% above (137.39 minus 88.07)). Such long-term negative "alpha" calls into question why the benchmark (S&P SmallCap 600) had so much success over such a long period.

351.   The Company should have inferred that the benchmark carried several favorable advantages such as: (1) no management fee and (2) 600 stocks.

352.   A solid monitoring process must prevent (1) unproven portfolio managers from taking fees from Amy's workers' biweekly salary savings while (2) simultaneously concentrating these dollars into relatively few holdings.

353.   To better understand the Company's initial selection processes, Plaintiffs explore relevant facts presented to the Company (although outside of the limitations period). Investigations during initial investment selections are often the more thorough of the two facets of investment administration—selection versus monitoring.

354.   Immediately before the Company's and Cetera's decision to add this trust asset to the participants' limited menu of choices, Plaintiffs explore the returns and styles of the portfolio managers surrounding their use and application of "experience and expertise." The Company should have noted at the time that their pending choice, Calvert Small Cap fund, had a total return as of the end of the year 2013 that was much less (67% v. 139.35%) than not only the benchmark but lower "peer" standard of as

well (Small Company peer/average annual returns). Per year 6% versus 9% annually, since the inception of this oldest class, flashed a yellow light too.

355.   The portfolio manager was named "Trunow" (started on 7/31/2010) when the Company chose this fund (tacitly agreeing to permit participants' returns to fall in order to pay his 0.92% annual compensation then). The total dollars invested in the fund was only ~$200M, but that would still be $1,840,000 in compensation to run this Calvert Small Cap fund.



**Figure 8**

356.   The duty of fiduciaries is to (1) select, monitor, and remove individual investments prudently, in addition to (2) consider the funds in the menu/portfolio as one part of a whole portfolio.

357.   Often portfolio managers choose their fund's name to reflect their fund's orientation of the fund's underlying holdings. The name Calvert *Equity* means it is an equity fund, not a bond fund; Vanguard 500 means it holds 500 S&P blue chip stocks; Fidelity Low-Priced Stock fund means the holdings are "low priced" or "value" stocks, etc.

358.    Plaintiffs refer to the Prudent Investor Rule (emphasis added):

Restatement (Third) of Trusts § 90, comment h states that a trustee's duty to diversify trust investments requires the trustee to <u>evaluate the risks and returns associated with the trust as a whole,</u> rather than evaluating each investment in isolation. The trustee should consider the purpose, terms, and other circumstances of the trust, as well as general economic conditions and the <u>role that each investment plays in the overall portfolio</u>. The trustee should also <u>periodically review and adjust the trust's investments as necessary to ensure that they remain consistent</u> with the <u>purposes of the trust and the best interests of the beneficiaries</u>.

359.    The Company placed the Calvert Small Cap "value" fund in the participants' menu in 2014 (and participants bought this small-cap "value" fund per the Company's Form 5500 in 2014).

360.    The Transamerica sample IPS and monitoring reporting measures "Investment choice has a 3-year R2 of at least 75.0 but less than 85.0 with respect to a relevant category or style specific index."

361.    Participants are rarely ever offered monitoring reporting. In fact, on the cover, Plaintiffs included the figure below to show why:



**Figure 9**

362.    The "For Plan Sponsor and Financial Advisor use only" explains why Plaintiffs were never informed about the portfolio managers' style of stocks. Accordingly, participants' asset allocation strategies suffered from this style misalignment. Morningstar® stated then that this fund's peer category was a "blend" of growth and value, like its Russell 2000 benchmark.

363.   The median tenure in 2017 equaled 6.7 years. Hence, it was not atypical for the Company's chosen portfolio manager, Trunow, to quit or be fired on or about 11/3/2015 (when "Huang/Linder/Madden/Moeller" took over).

364.   The Calvert Small Cap fund prospectus shows interesting changes immediately before the first limitation year. These new portfolio managers decided to change the 73 stock holdings and stop buying cheaper "value" stocks—they bought non-dividend paying "growth" stocks instead. The portfolio managers still struggled to beat their peers. Participants likely were unaware that they needed to adjust their portfolio as a whole again due to this radical, 180-degree shift in stock-picking style.

365.   Amy's Kitchen Inc. 401(k) average *participant* tenure runs almost ten years, so many investors likely still held the fund in 2017 when this change occurred. Yet, based on information and belief, they were not informed of this material information again. The portfolio managers' returns lagged behind even their peers.



**Figure 10**

366.   New Calvert Small Cap fund managers arrived when the Company's 2017 monitoring period arrived. New portfolio managers "McLean/Noble" decided to make

another portfolio "style" shift in stocks held by participants—to medium-size stocks ("mid-cap growth") for their 71 holdings.



**Figure 11**

367.    The Company only had one portfolio manager in the small stock *blend* area to choose—Invesco Small Cap *Growth*. It is logical to infer from Invesco's name and Calvert's Small Cap name in the prospectus that a participant could accidentally build extra variance into their accounts by unknowingly overweighting the growth style (the more volatile style, anyway). The Company held it before and after 2017. The Company reported it on their 12/31/2021 Form 5500 to Labor and Treasury.

| | |
|---|---|
| Calvert | Equity I |
| Calvert | Small Cap I |
| Franklin Templeton | Franklin Utilities Adv |
| Invesco | Small Cap Growth |

**Figure 12**

368.    The    portfolio    manager's    compensation    costs    to    the participants'/beneficiaries' accounts were wasted—thirteen years of portfolio manager's compensation was taken from participants but never deserved. When portfolio managers cannot beat the benchmark, the Company should fire the portfolio managers and allow participants to buy that more diversified and cheaper option.

-90-
Class Action Complaint for Damages

*The Company's selections favored one fund family—American Funds*

369.   Closet indexing is a strategy used to describe funds that claim to actively purchase investments but wind up with a portfolio not much different from the benchmark. By doing so, portfolio managers achieve returns similar to an underlying benchmark, like the S&P 500, without exactly replicating the index.

370.   The Company uses many funds from this fund's parent (Capital Research and Management Company). Closet indexing metrics were available to the Company when viewing prospectus information after 1/1/2017.

| | |
|---|---|
| American Century | Government Bond Institutional |
| American Funds | AMCAP |
| American Funds | Balanced |
| American Funds | Growth Fund of America |
| American Funds | Washington Mutual |

**Figure 13.**

371.   Used by the Company since its first electronic government filing (Form 5500, plan year 2009), specifically the Company class (R2E) of "American Funds" was one of the most prolific families for the Company's asset list in 2017.

372.   Unfortunately for participants' accounts, the Company chose one of the most expensive classes of the American Funds Growth Fund of Amer ("R2E") for their 401k plan. The American Funds Growth Fund of Amer is one of the parent company's largest funds (most assets).

373.   Plaintiffs found that 2017 facts and circumstances prevailing at the time of the conduct of the Company to review this holding—the American Funds Growth Fund of America—touted itself not as a growth stocks style or value stock style but like the mainstream S&P 500 index (a blend). In fact, that is the only benchmark

mentioned in the prospectus or on fact sheets (S&P 500). The important point is that investors can buy the S&P 500 benchmark index for almost nothing (four basis points or less), so advertising that it is an equivalent offering is misleading.

374. That is because the Company's class R2E cost in 2017 was 1.13 %/yr. Large stocks' expected return is only 5 %/year for hundreds of years.

375. Plaintiffs have reason to believe that such a benchmark (S&P 500) was the benchmark on participants' 29 CFR § 2550.404a-5 annual disclosures. Nonetheless, Morningstar's website shows the portfolio managers are wrong for every class of the American Funds Growth Fund of America—it showed the fund's "Investment Style" as "Large Growth" consistently for many years.

376. News about American Funds' "closet index" allegations came out about five years ago in InvestmentNews, "13 active fund managers agree to reveal closet indexing, New York's attorney general says funds already show 'active share' information to institutions." (April 6, 2018). In summary:

> The investigation's findings are contained in a report, "Mutual Fund Fees and Active Share." The firms that have agreed to publish active share information are: AllianceBernstein, BlackRock, Dreyfus, The Capital Group (American Funds), * * OppenheimerFunds, Nuveen, * * and Vanguard. Each of the firms will post on their websites the active share of the relevant funds on a quarterly basis. Most of the firms will do so beginning this spring, the release said.

377. The Company's process to prudently "investigate" or contemplate choosing but, more importantly, keeping any of the American Funds should be questioned. Thanks to the Company's selection processes, that fund family holds more of the Plan and Trust and participants' assets than any fund families with revenue-sharing and portfolio manager's compensation.

378.   Using facts presented in 2017, the Plaintiffs analyze the Company's conduct in arriving at an investment decision, not its results. A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

379.   We see using facts in 2017 when the Company forced participants to continue to save biweekly into the "R2E" class of the American Funds Growth Fund of America, even though the fund's class launched only 2.33 years earlier. The A, R5 and R6 (cheaper versions) started 43.08, 14.62, and 7.66 years earlier.

380.   The Company choice of the class of share was the R2E (italics)—at an annual cost to participants of 1.13% (column D). In column E, Plaintiffs note the Company chose the 12b-1 revenue-sharing "type" (used for marketing this class of share to outside investors but in this case participants paid the 12b-1 to "sell" the class to themselves).

381.   The 12b-1, at sixty basis points was enormously high. The oldest class paid 0.24% for the class that started in 1973 and had the most assets (column F) and the next to the highest NAV (column G).

> "Cost-conscious management is fundamental to prudence * * * ."
> Restatement (Third) of Trusts, ch. 17, intro. note (2007); see also
> Restatement (Third) of Trusts § 90 cmt. B (2007).*

382.   Plaintiffs note why the assertion of "closet indexing" was made. This is the equity fund family with the most holdings of any in the entire universe of almost 28,000 funds (column C).

383.   The prospectus showed the "Manager Start Date" (for all classes of course), was 11/1/1993. Plaintiffs found, most notably, that the American Funds Growth Fund of Amer managers' chosen benchmark, the S&P 500, was not growth

stock oriented; it only had 25% in large growth stocks (in 2017). The Russell 1000 <u>Growth</u> had > 41% (like American Growth Fund of Amer R2E in column H below).

**Table 10**

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Name | Top-10 Securities | # of Holdings | Expense Ratio | 12b-1 | Assets ($millions) | Net-Asset Value | Style Large-Cap Growth | 12-Mo Return |
| American Funds Growth Fund of Amer A | Amazon | 370 | 0.66 | 0.24 | 74183.4 | 42.04 | 43.79 | 8.46 |
| *American Funds Growth Fund of Amer R2E* | *Amazon* | *370* | *1.13* | *0.6* | *44.3* | *41.48* | *43.79* | *7.99* |
| American Funds Growth Fund of Amer R5 | Amazon | 370 | 0.39 | | 3401.8 | 42 | 43.79 | 8.75 |
| American Funds Growth Fund of Amer R6 | Amazon | 370 | 0.33 | | 16622.8 | 42.05 | 43.79 | 8.82 |

384.   Viewing performance as of 2017, Plaintiffs now understand why the portfolio managers changed their benchmark.

**Table 11**

| Name | 10-Year Total |
|---|---|
| American Funds Growth Fund of Amer A | 95.61 |
| *American Funds Growth Fund of Amer R2E* | *Na* |
| American Funds Growth Fund of Amer R5 | 101.55 |
| American Funds Growth Fund of Amer R6 | Na |
| Russell 1000 Growth TR USD | 122.58 |
| S&P 500 TR USD | 95.8 |

385.    Plaintiffs found the Company ignored the "meaningful benchmark" approach—or, as the SEC states, "widely-used, broad-based benchmark"—by choosing and keeping the American Funds Growth Fund of Amer R2E.

386.    To prudently evaluate the portfolio managers, the Company must measure the performance as Plaintiffs did in tables called "Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data."

387.    Plaintiffs measured the portfolio managers' alpha versus an *appropriate* broad-based securities market index and noted managers' alpha dispersion or variance of alphas was 76%. The Growth Fund of America managers' alphas were measured from 2017 back 44 years. However, the managers started on 11/1/1993 (24 years from 2017).

388.    To determine skill, the Company needed to monitor portfolio managers for 39 years in 2017. Part of the variance was caused by holding 38.52% of the entire class's total assets in only ten stocks.

389.    To perform this measurement, Plaintiffs used the Russell 1000 Growth benchmark to comply with what is called the Modern Portfolio Theory (MPT) "best-fit" index requirement.

390.   The Prudent Investor Rule (Restatement (Third) Trusts) "best-fit" index carries a high correlation to the actual holdings chosen by the fund's manager.

391.   The Company must be cognizant that some portfolio managers "switch" their "chosen benchmark" in SEC-prospectus to weaker benchmarks (called the "switcheroo" problem). Mr. Jason Zweig wrote for the Wall Street Journal on Aug. 19, 2022, about this concern in his article: "How to Beat the Stock Market Without Even Lying--Stock funds have been pulling a switcheroo to make their returns look better: When they don't measure up, they change how they measure." He said: "Prospectuses always warn that past performance is no guarantee of future results. Turns out it's no guarantee of past results, either."

392.   Mr. Zweig went on: "All they have to do is change the market they're trying to beat. * * * New study found that b/w 2006-2018, 37% of all US stock mutual funds switched benchmarks…"

393.   Unfortunately for managers of the American Funds Growth Fund of Amer R2E, the actual holdings and fees catch up eventually. As of 1/31/2023, the facts are:

| Name | *Notes | 3-Year Total | 5-Year Total |
|---|---|---|---|
| American Funds Growth Fund of Amer R2E | Defs' choice | 22.23 | 40.45 |
| Russell 1000 Growth TR USD | Best-fit | 32.70 | 70.18 |
| S&P 500 TR USD | Prospectus | 32.66 | 57.71 |

**Figure 13**

394.   The base metrics that the Company could have used to support decision-making in 2017 was to investigate the portfolio managers' facts:

**Table 12**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Name | Per mo Mean 10-yr | Per mo Std. Deviation 10-yr | Annualized Std. Deviation 10-yr | % Positive Months 10-yr | Annualized Std. Deviation 15-yr | Skewness 15-yr | Kurtosis 15-yr |
| American Funds Growth Fd | 0.66 | 4.46 | 15.47 | 57.5 | 14.72 | -0.69 | 1.53 |
| Russell 1000 Growth | 0.77 | 4.49 | 15.54 | 58.33 | 14.77 | -0.66 | 1.67 |

395. The primary source of information in most monitoring reports (including Transamerica's monitoring reporting) is Morningstar. Their metrics are sourced 171 times in the sample monitoring reporting Plaintiffs obtained.

396. Thus, Plaintiffs used the same information available to the Company (table above) to determine if the Company's selection should have been measured against the Russell 1000 Growth or S&P 500 index.

397. In column B, Plaintiffs note the monthly mean returns are close—the Company's class pays a portfolio manager's compensation and revenue-sharing fee while the index has neither. Column D is quite close, as well as E and F.

398. Columns G and H are the most important factors the Company could use to know if they and the participants are getting what they intended. This measurement considers 180 monthly data points over 15 years. The skewness and kurtosis statistics determine whether returns are normally distributed. Skewness reflects the degree of asymmetry of a distribution. If the distribution has a longer left tail, the function has negative skewness. Otherwise, it has positive skewness. A normal distribution is symmetric with skewness 0. In lognormal case, the curve has a long right tail so the skewness is positive.

399. Kurtosis provides an idea of whether dispersions in returns are mostly due to moderate deviations or are driven by outliers. Kurtosis indicates the peakedness of a distribution. For normal distribution, Kurtosis is 0.

400.   The numbers are within about two standard deviations from one another, meaning there is a high probability it was not caused by coincidence.

401.   In other words, this table helps prove that the correct benchmark is the Russell 1000 and not the S&P 500 as the American Fund's website stated.

### Loomis Bond fund—another example of imprudence

402.   Plaintiffs note that the Loomis Sayles Investment Grade Bond Fund Class A was on the Company's 2021 Form 5500 with almost $900,000 of participants' dollars. It was also on the Company's 2009 reporting (~$90,000 in participants' dollars). The Company needs to read their chosen funds' prospectuses and monitor these funds with portfolio manager's compensation closely. To make particular funds' costs look attractive, especially bond mutual funds, parent companies issue "voluntary fee waivers." The Company's Loomis Sayles Investment Grade Bond fund's prospectus heading broadcasts this at the top of costs (emphasis added):

LOOMIS SAYLES INVESTMENT GRADE BOND FUND
(the "Fund")
Effective July 1, 2022, Loomis, Sayles & Company, L.P. ("Loomis Sayles" or the "Adviser") has given a binding contractual undertaking to the Fund to limit the amount of the Fund's total annual fund operating expenses to 0.74% * * * of the Fund's average daily net assets for Class A, * * * exclusive of brokerage expenses, interest expense, taxes, acquired fund fees and expenses, organizational and extraordinary expenses, such as litigation and indemnification expenses. This undertaking is in effect through April 30, 2024.

| Table 13 (data as of 9/30/2017) | Class A | Class N | Class Y |
|---|---|---|---|
| Management fees | 0.40% | 0.40% | 0.40% |
| Distribution and/or service (12b-1) fees | 0.25% | 0.00% | 0.00% |
| Other expenses | 0.14% | 0.07% | 0.14% |
| Total annual fund operating expenses | 0.79% | 0.47% | 0.54% |
| Fee waiver and/or expense reimbursement' | 0.05 % | 0.03 % | 0.05 % |
| Total annual fund operating expenses after fee waiver and/or expense reimbursement | 0.74% | 0.44% | 0.49% |

https://www.im.natixis.com/us/mutual-funds/loomis-sayles-investment-grade-bond-fund/LIGRX

403.  Plaintiffs demonstrate in the table above the inherent conflicts and self-interest of the Company while operating the participants' limited menu of choices over the years. This fund's unique higher-quality bond style was the only choice of bond fund the Company had offered in the past. It is tailored to older participants at the Company. Contents of the table were extracted from page 6 of the most recent SEC-prospectus.

404.  Plaintiffs noted that all share classes had the same management fees (forty basis points). However, of all fund classes, N was the least expensive at 0.44%.

405.  The Table below shows that the Company's choice of "A" share class (row 1) has fewer assets because large institutional investors avoid an identical but more costly version. Large institutional investors do not want to invite litigation—they know cheaper is better for their pensions and shareholders.

406.  Other than inception dates, each share class is the same—same managers with the same holdings, same weightings of holdings, trading in aggregate across all share classes. The only material columns affecting participants' accounts are columns

F and G. SEC rule 12b-1 fees in G cause the expense ratio to rise commensurately—thus, the Company's choice cannot be deemed "No Load" (H).

**Table 14 (data as of 9/30/2017)**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Defs' = A Row 1 | Inception Date | Manager Name | Manager Start Date | Assets ($millions) | Expense Ratio | 12b-1 Fees | True No-Load |
| *Loomis Inv Grade A* | *12/31/1996* | *Fuss/Eagan/Stokes/Kennedy* | *12/31/1996* | *903* | *0.80* | *0.25* | *N* |
| Loomis Inv Grade N | 2/1/2013 | Fuss/Eagan/Stokes/Kennedy | 12/31/1996 | 1202.8 | 0.47 | - | Y |
| Loomis Inv Grade Y | 12/31/1996 | Fuss/Eagan/Stokes/Kennedy | 12/31/1996 | 3451.3 | 0.55 | - | Y |

407.    From the 2017 data, Plaintiffs note in the table above that the Company's "loaded" (column H) choice of "A" class was rated worse in columns J, K, and L (table below). The Company's row 1 total returns in columns M through O were also the worst. That is because the Company chose the most expensive class.

408.    Defendants in cases like this often file a motion to dismiss, stating that the revenue-sharing "washed" out the stain of the participants' lost returns. Arguments like this are misleading.  This fact can be easily proven by (1) taking the prospectus revenue sharing information in column O below and (2) comparing that "cost" to the "benefit" (missed total returns in the alternative, identical, cheaper class). The math is the same in every prospectus.   The prospectus uses geometric mean average numbers (compounded) for every share class.

409.    Column O also explains why Albert Einstein said, "The most powerful force in the Universe is compound interest."

**Table 15**

| I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|
| Defs' = A Row 1 | Star-Rating 3-year | Return Rating | Risk Adjusted Rating | 3-Year Total | 5-Year Total | 10-Year Total | Expense Ratio | 12b-1 Fees |
| *Loomis Inv Grade A* | *2* | *D* | *E* | *6.97* | *14.92* | *69.68* | *0.80* | *0.25* |
| Loomis Inv Grade N | 3 | C | E | 8.19 | | | 0.47 | - |
| Loomis Inv Grade Y | 3 | C | E | 7.78 | 16.43 | 74.08 | 0.55 | - |

410. The difference between the "A" class chosen by the Company and the "Y" class is 4.4% over ten years. Dividing by 10 equals 0.44% per year. That 0.44% is higher than the revenue-sharing in column Q.

411. Thus, even if (1) precise allocations that must go to affected participants' accounts were tracked by Loomis (the prospectus states it is not) and (2) Transamerica and Cetera took zero, the maximum 0.25% back to affected participants is still less than the 0.44% difference.

412. Such deference to the Company also assumes the Transamerica selling agreements with Loomis had stated that Loomis would collect the maximum revenue-sharing from the entire classes' investors but keep absolutely none of their collected revenue-sharing (related to Amy's Kitchen Inc. 401(k)). Improbable, but the assumptions in favor of the Company prove the Plaintiffs' mathematical point.

413. We know those assumptions are flawed because of the next section entitled "Revenue-sharing was and is (1) Not Uniform and (2) Not Equitable." Transamerica's template agreement stated that all revenue-sharing payments were made to Transamerica through affiliates or subcontractors called National Financial Services, LLC, and Mid-Atlantic Capital Corporation. Both took a cut of the Expected Fund Revenue for their trading and settlement services.

414. The Company's A-class Loomis Bond fund first appeared on the Company's 2009 plan year certified reporting to the government. It remains today.

***Loomis is a bond fund—bonds are not bought for capital appreciation reasons***

415.  Most absurdly, critical evidence of the Company's reckless and thoughtless processes is evident in this section.

416.  The yields the Company could view in the prospectus (in 2017) were:

    a) A class 2.9%/yr (the Company's choice)

    b) N class 3.22%/yr

    c) Y class 3.17%/yr

417.  Today, as of 1/31/2023, the Company's harm by ignoring bond interest became worse—due to historical increases in interest rates by the Federal Reserve.

| Name | SEC 30-Day Yield |
|---|---|
| Loomis Sayles Investment Grade Bond A | 4.03 |
| Loomis Sayles Investment Grade Bond N | 4.51 |
| Loomis Sayles Investment Grade Bond Y | 4.47 |

**Figure 15**

418.  Once again, evidence in the figure above proves why Plaintiffs infer the motivation of the Company was to receive the revenue-sharing credits taken from participants' accounts.

419.  "Since indirect compensation is more opaque, intermediaries may be able to overcharge some of their customers as discussed by Stoughton et al. (2011) and Inderst and Ottaviani (2012)." Irina Stefanescu, Board of Governors of the Federal Reserve System; Veronika K. Pool, Vanderbilt University; Clemens Sialm, University

of Texas at Austin; "Mutual Fund Revenue-sharing in 401(k) Plans," National Bureau Of Economic Research, December 2022, 5, ABSTRACT, 19; www.nber.org/papers/w30721; 5, abstract, 19.

### *Revenue-sharing was and is (1) Not Uniform and (2) Not Equitable*

420.  Plaintiffs cite additional evidence from the Company's annual reporting. Even with the Company ignoring Plaintiffs' request for information, Plaintiffs can see the Company's focus on non-pecuniary benefits—called revenue-sharing. It has bled through the vast majority of the Company 5500 reporting for over a decade.

421.  The Company's 2020 Form 5500 (and others) had a header called "Schedule C, line 2(h))" that demonstrates a lack of uniformity that violates (1) the plan document and (2) what Congress intended when on August 22, 1974:

> * * * uniform fiduciary standards to prevent transactions which dissipate * * * The objectives of these provisions are to make applicable the law of trusts; * * * to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust.

Statement of the Honorable Harrison A. Williams, Jr., 120 Cong. Rec. S-15737, August 22, 1974, Reprinted [1974] U.S. Code Cong. Admin. News, pp. 5177, 5186.

422.  Revenue-sharing payments are made to Transamerica through affiliates or subcontractors called National Financial Services, LLC, Mid-Atlantic Capital Corporation. Each of these firms receives the following percentage of the gross Expected Fund Revenue for their services:

| Fund Name | Revenue to National Financial Services | Revenue to Mid Atlantic Capital Corporation |
|---|---|---|
| AMERICAN CENTURY GOVT BOND R5 | 0.140 | |
| AMERICAN FUNDS AMCAP R5 | 0.140 | |
| AMERICAN FUNDS GROWTH FUND OF AMERICA R2E | 2.240 | |
| AMERICAN WASHINGTON MUTUAL | 0.140 | |
| CALVERT EQUITY I | 0.280 | |
| CALVERT SMALL CAP I | 0.280 | |
| FRANKLIN UTILITIES ADV | | 0.938 |
| FRANKLIN UTILITIES ADV | 0.700 | |
| TEMPLETON FOREIGN ADV | | 0.938 |
| TEMPLETON FOREIGN ADV | 0.700 | |
| INVESCO GLOBAL A | 1.400 | |
| INVESCO SMALL CAP GROWTH FD | 0.980 | |
| JANUS HENDERSON GLOBAL TECH AND INNOVATION T | 0.980 | |
| LOOMIS SAY INVEST GRADE BND, A | 1.260 | |
| NUVEEN REAL EST SEC I | 0.700 | |

**Figure 16**

423.    One of the most prominent ERISA attorneys discussed this matter almost ten years ago:

> * * * not all recordkeepers can allocate revenue-sharing in an equitable, return of concessions, manner. As a result, committees and their advisors need to be aware of the capabilities of recordkeepers when selecting providers.

C. Frederick Reish, Drinker Biddle, "The Equitable Allocation of Revenue-sharing," https://benefitslink.com/news/index.cgi/view/20140414-113148 Apr 14, 2014.

424.    He commented on the DOL's statements that the revenue-sharing credit back or "money should be allocated to the accounts of the participants who had suffered losses."

425.    Mr. Reish said most plan documents do not specify how to use revenue-sharing and "committees must make prudent decisions about the allocation." Mr. Reish said the "first step in that process is for plan committees to consider the revenue-sharing paid to, and kept by, their plan recordkeepers . . and then to determine: if the

recordkeeper's total compensation is reasonable; and if the arrangement for the recordkeeper to keep the revenue-sharing is acceptable."

426.    His comments below apply to Amy's Kitchen Inc. 401(k) Retirement Plan (emphasis added):

> The amount of revenue-sharing varies from fund to fund. Some investments - including company stock investments and self-directed brokerage accounts, and some mutual fund share classes — make no revenue-sharing payments at all. Thus, participants whose accounts are invested in funds that pay revenue-sharing are subsidizing the administrative costs for participants who have invested in the investments that pay little or no revenue-sharing. That raises the obvious question of whether it is fair - or even legal - to place the financial burden of a plan on some participants . . . while others pay little or nothing for the cost of running the plan. Plan committees need to understand those facts and their consequences - and then make prudent decisions about them. (A "prudent" decision is one that is informed and reasoned. "Informed" means that the committee understood and evaluated the relevant information. "Reasoned" means that the committee reached a rational decision based on their analysis.)

427.    ERISA does not prohibit revenue-sharing, and courts have stated that revenue-sharing is not imprudent "per se." However, deciding on a method for compensating a provider is a fiduciary decision that requires plan fiduciaries to act prudently and in the best interest of plan participants. The U.S. Department of Labor explains this matter (emphasis added):

> When the plan documents are silent or ambiguous on this issue, fiduciaries must select the method or methods for allocating plan expenses. A plan fiduciary must be prudent in the selection of the method of allocation. Prudence in such instances would, at a minimum, require a process by which the fiduciary weighs the competing interests of various classes of the plan's participants and the effects of various allocation methods on those interests. In addition to a deliberative process, a fiduciary's decision must satisfy the "solely in the interest of participants" standard. In this

regard, a method of allocating expenses would not fail to be "solely in the interest of participants" merely because the selected method disfavors one class of participants, provided that a rational basis exists for the selected method. On the other hand, <u>if a method of allocation has no reasonable relationship to the services furnished or available to an individual account, a case might be made that the fiduciary breached his fiduciary duties to act prudently and "solely in the interest of participants" in selecting the allocation method.</u>

428.    Plaintiffs find that "While revenue-sharing itself is not illegal, it becomes extremely problematic when fund assets are used to pay for distribution." —Stan Wilson [2007], quoting SEC's Andrew Donohue (Andrew J. Donohue, https://www.sec.gov was named the Securities and Exchange Commission's Chief of Staff in May 2015).

429.    Plaintiffs have information and believe that sub-ta and SEC Rule 12b-1 revenue-sharing payments are distribution costs that conflict with their interests and reduce mutual fund assets and returns.

430.    Plaintiffs offer "Issues in Mutual Fund Revenue-sharing Payments," The Journal of Index Investing 2012.3.1:52-57, JOHN A HASLEM, professor emeritus of finance, University of Maryland, on 05/26/12)) (emphasis added):

Salisbury [2009] reports many company sponsors of 401(k) plans are unaware of plan administrative costs charged to plan participant accounts in mutual funds. * * * Through collection of revenue-sharing sub-transfer agency fees in fund expense ratios, plan participants may not realize they are paying for plan "back office" costs, as well as for investment management. The <u>problem is made more obscure because 401(k) plan administrative costs are not charged equally to plan funds</u>. Only about one in eight plans includes all plan funds in paying administrative costs. High-cost (and more profitable) <u>actively managed funds pay a higher percentage of plan administrative costs than do basic plan options, such as index funds</u>. Actively managed funds typically direct annual fees of some 0.35% of plan participant assets toward costs of large plans. For

smaller plans, funds may direct 0.06% of plan participant assets toward costs. Although plan participants find it difficult to determine how much they are paying for plan administrative costs, these costs may be approximated by the size of fund 12b-1 fees in each plan. St. Goar [2004] reports that many 401(k) plan sponsors are unaware of the range of plan administrator charges. Some sponsors do not even know which charges pay for what services. Worse, <u>some plan sponsors have paid multiple times for the same services</u>. Further, <u>subtransfer agency fees do not have to be disclosed separately in the prospectuses of plan funds,</u> and neither plan funds nor administrators are required to disclose these fees to plan sponsors.

431.    Plaintiffs provide John A. Haslem's "An Idea Whose Time Has Come: Should the SEC Rid Mutual Fund Investors of 12b-1 Fees?" Journal of Indexes, Vol. 11, No. 3 (May/June 2008), pp. 42-45, 47:

Siggelkow's (1999) empirical analysis identifies 12b-1 plans as representing abusive conflicts of interest. Finally, Cox (SEC Chairman) concludes that the current regulation of 12b-1 plans falls "tragically short" of meeting the needs of mutual fund shareholders: The use of fund assets to market the fund leads to an inherent conflict of interest between fund advisers and shareholders. Fund advisers earn fees based on assets under management. Asset growth increases the fees collected by the adviser. Thus, while current shareholders incur the costs to grow the fund, it may be that the adviser is the primary beneficiary of the resulting growth.

432.    In another source, "Issues in Mutual Fund Distribution," John A. Haslem, Professor Emeritus of Finance in the Robert H. Smith School of Business at the University of Maryland in College Park, jhaslem@rhsmith.umd.edu notes: "* * * payments reduce current fund NAVs [net asset values] and shareholder returns; and provide major agency conflicts with shareholder interests and returns. * * * Unsophisticated mutual fund shareholders pay higher 12b-1 fees (and other expenses

and loads) than do sophisticated shareholders whose behavior is consistent with the rationality paradigm.* * *"

433.    Rule 12b-1 fees, unlike sales loads, are paid on every dollar invested: salary savings, reinvested interest, reinvested capital gains, rollovers, and employer matching dollars. They are not paid directly by the investor in connection with a transaction but are deducted from the fund's assets daily. Thus, in effect, participants as current shareholders bear the cost of attracting new fund shareholders.

434.    Revenue-sharing results in inequality because those participants who invest in funds that share revenue pay more to the TPA than those participants who invest in funds that do not share revenue. To illustrate, the chief executive officer of a company could have his or her entire 401(k) plan account invested in funds that do not share revenue, while his or her assistant could be invested exclusively in funds that share revenue. The result is that the assistant is subsidizing the cost of plan administration while the CEO is not.

435.    Plaintiffs reference Mark E. Bokert and Alan Hahn, Davis & Gilbert LLP, "Revenue-sharing: Risks, Rewards, and Reality for Plan Fiduciaries," Employee Relations Law Journal, Spring 2017 (emphasis added):

> Another issue with revenue-sharing, but more well known, is that as plan assets increase, revenue-sharing increases and, therefore, the compensation received by the TPA increases. As ERISA requires plan fiduciaries to ensure that fees paid to the TPA are reasonable, they will need to monitor on a periodic basis the total compensation received by the TPA inclusive of revenue-sharing to ensure that the TPA's fees remain reasonable despite the increase in compensation.

436.    As this Plan's independent audits and prospectuses convey, the trust's assets are held and traded in nominee name, omnibus, and thus, the open-end management investment companies taking participants' earnings daily (for revenue-

sharing), know not from whom (a particular participant) the revenue-sharing was taken. It is taken from every participant in the plan with a balance at 4 pm on that particular day. Participants can change investments daily and take money from the mutual funds via hardship or loan, or in-service withdrawal.

437.  Each SEC-prospectus at www.sec.gov/edgar for the Defendants' chosen and retained funds listed on the Company's Forms 5500 stated the funds receive omnibus buy and sell orders, and thus, they have no participant level information. They trade omnibus at the trust level—that explains why this plan's recordkeeper does not precisely credit back revenue-sharing if credits ever occurred.

***All of the Company's Annual Return/Report of Employee Benefit Plan (Form 5500) indicated negligent fund and provider selection/retention actions***

438.  Portfolio manager's compensation is the same amount between related share classes (as the SEC-prospectus indicated earlier), but it can differ dramatically between mutual funds.

439.  ERISA accordingly holds fiduciaries "to a high standard of care and diligence" regarding fees paid to an advisor like Cetera:

> Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices."

U.S. DOL, EBSA, *A Look at 401(k) Plan Fees*, pp. 1-2 (Aug. 2013), Employee Benefits Sec. Admin., U.S. Dep't of Labor, Meeting Your Fiduciary Responsibilities 5 (Sept. 2020), https://go.usa.gov/xARbV.

440.  Restatement (Second) of Trusts Section 171 cmt. a, a trustee "stands in a fiduciary relationship to the beneficiaries of the trust and therefore is under a duty

personally to perform the responsibilities of the trusteeship except as it would be prudent, under the circumstances, to delegate to agents the making of decisions or the performance of acts of administration."

441.    The duties of a trustee arising out of this fiduciary relationship flow from "the special nature of the relation between trustee and beneficiary" and not from contract law. Restatement (Second) of Trusts Section 169 cmt. c, "Although the trustee by accepting the office of trustee subjects himself to the duties of administration, his duties are not contractual in nature."

442.    In regards to choosing or keeping revenue-sharing versions of mutual funds as in this case, the Supreme Court unanimously held in the context of ERISA retirement plans that such interests must be understood to refer to "financial" rather than "nonpecuniary" benefits. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014).

443.    The Department of Labor has stated that when assembling, choosing, or modifying an investment menu for participants' investment choices, a fiduciary must evaluate the investment alternatives on the menu *based solely on pecuniary factors*, not subordinate the interests of participants to unrelated objectives, and not sacrifice investment return or take on additional investment risk to promote non-pecuniary objectives or goals. This is exactly what the Company in this case did—they repeatedly sought more expensive investment options when higher yielding, less costly identical share classes were available at the time of their conduct based on their own "certified under penalties of perjury" submissions during the thirteen years of 2009 to 2021 (to the U.S. Departments of Treasury and Labor).

444.    If a fiduciary makes an investment decision based on non-pecuniary factors, the fiduciary always remains subject to ERISA's general loyalty obligation and must act in a manner that is consistent with the interests of participants and beneficiaries in their retirement income or financial benefits. Plaintiffs demonstrated

here precisely when and what fund was added that had revenue-sharing, but that same fund's total return and yields were depleted by *more than the revenue-sharing credits* the Defendants' acted to obtain. That is, the lost opportunity costs were much greater than the short-term misguided goals of the Company. Mathematical reasoning was seldom used by the Company and its plan fiduciaries.

### *The Company failed to inform about lower-cost, higher-yielding classes of the same funds*

445. Plaintiffs argue that the Company misrepresented material facts to participants that would have induced them (a reasonable person) to ultimately invest in and rely upon the less comprehensive and misleading information. Plaintiffs believe the Company committed (1) failures to inform participants (on their annual fee disclosures) and (2) purposefully hid potentially higher trust income from cheaper classes. The Company repeatedly limited the menu so much it forced participants to invest salaries into more costly, lower returning and lower yielding classes. Information about the cheaper, higher yielding share classes with identical stocks/bonds managed by identical managers caused participants' future contributions (and reinvested dividends/interest (referred to as "probable income" under Restatement (Third) of Trusts)) to be invested in identical but more costly investments. This is a material breach.

446. "A misrepresentation is only actionable if it is material. A misrepresentation is material if the statement would induce a reasonable person to rely upon it." *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–23 (2d Cir. 1997).

447. Plaintiffs note *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) stated that information is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled."

*The Company's monitoring processes were deficient because evidence
indicates they used "Peer" performance measurements*

448.   The periodic "performance hurdle" for the Company's retained funds is much lower when compared to "peers." It can be explained because peers hold less than 100 stocks while benchmarks have hundreds or thousands. Thus, lower risk and variance ("risk" in common trust law) exists for "widely used broad-based indexes" but not so much when comparing peers. Peers are much more concentrated and have a much higher variance. These facts form the basis for the Transamerica monitoring report (sample) below:

| SCORING BREAKDOWN | |
| --- | --- |
| Score – 5.0 | Investment choice's return outperformed the peer group average by at least 30% of the peer group average for the applicable period |
| Score – 4.0 | Investment choice's return outperformed the peer group average by less than 30% but at least 10% of the peer group average for the applicable period |

**Figure 14**

449.   Transamerica's scoring criteria for selecting investment options and retaining funds and portfolio managers was based on how the managers did against "peers."  It did not factor in "widely-used, broad-based benchmarks" mandated by the SEC (and contained in the fund's SEC-prospectuses at www.sec.gov/edgar).

450.   It was also not based on the Prudent Investor Rule Restatement (Third) Trust's "widely-used, broad-based benchmark" requirements. Lastly, it was not based on the regulations implemented on 7/1/2012 called 29 CFR § 2550.404a-5 (declaring a fiduciary must use "an appropriate broad-based securities market index").

451.   The reason is simple and not uncommon. The Prudent Investor Rule (Restatement (Third) Trusts) states (emphasis added):

> The total return approach to damages […] can be carried out by referring to the performance of all or a relevant portion of the proper investments of the trust in question, to the performance of all or part of the portfolios of comparable trusts, or to the _performance of some suitable securities index_ * * *.

Restatement (Third) Trusts: Prudent Investor Rule, Reporter's Notes to Sections 205 and 208-211 (1992); Restatement (Third) Trusts §100, cmt. b(1) (2012); see also Loring and Rounds, A Trustee's Handbook, § 7.2.3.2 (2012).

452.    New 29 CFR § 2550.404a-5 rules implemented on 7/1/2012 altered the "four corners" of most Investment Policy Statements (IPS) and often replaced the more desired but much less rigorous "peer comparison" standard. The DOL fought against Wall Street's requests for "peer comparisons" when seeking commentary about pending 29 CFR § 2550.404a-5 rules.

453.    In fact, regarding the new rules promulgated in 2012, the DOL followed the SEC's 1970s guidance verbatim about avoiding peer comparisons and applying "appropriate benchmark" requirements.

454.    Plaintiffs show why peer hurdles are easier to surpass. A similar inference can be drawn from each of the Company's chosen funds with portfolio managers:

**Figure 15**

| | *Notes | Name | 5-Year Average | 5-Year Total |
|---|---|---|---|---|
| 1 | A-1/1/17 | Transamerica High Yield Bond A | 6.95 | 39.93 |
| 2 | Bmk | BBgBarc Global High Yield TR USD | 7.37 | 42.70 |
| 3 | Bmk | BBgBarc US Corporate High Yield TR USD | 7.36 | 42.63 |
| 4 | Peers | Corporate Bond - High Yield Average | 6.00 | 33.84 |
| 5 | Peers | High Yield Bond Average | 6.33 | 35.89 |

455.    Row 1 fund is the Company's chosen high-yield bond that earned a five-year average of 6.95% from 1/1/2017 back 60 months—it also made 39.93% in total

over the same period. The "broad-based securities market index" (from SEC, trust law, and 29 CFR § 2550.404a-5), rows 2 and 3, earned more than row 1.

456.    In the figure above, the "appropriate broad-based securities market index" is the BBg US Corporate High Yield (SEC-prospectus at www.sec.gov/edgar). It *had* a much higher 5-Year total return of 42.70% than the Company's fund (39.93%).

457.    An investor researching long-term negative alphas (against an unbiased widely-used, broad-based benchmark) is not using hindsight for future selections. It is doing what the SEC explained in their "Disclosure of Mutual Fund Performance and Portfolio Managers" (SEC Rel. No. IC-19832 (Apr. 6, 1993)). It chose to require funds to use a broad-based index in lieu of peer group comparisons "to provide investors with a benchmark for evaluating fund performance that affords a greater basis for compatibility than a narrow index would afford."

458.    However, returns for peers in rows 4 and 5 above prove the Plaintiffs' argument. Cetera and Transamerica prefer a lower bar—peers.

459.    It should be self-evident why the Company and Cetera wanted to monitor performance using the imprudent, lower bar ("peer" standard). The bottom line to fund changes is that removals and additions go on the audited and certified Forms 5500. Still, more critically, all the beneficial owners (participants) must be given a heads-up at least 30 days from removal in a notice under Sarbanes-Oxley.

460.    Changing funds in a participant-directed 401k required Sarbanes Oxley disclosures after Enron's collapse. But too many fund changes will irritate participants who own or "owned" the replaced fund. Naturally, participants worry when someone sells their old mutual fund's shares and puts their cash into another investment. The more it happens, the more participants will question the Company's experience and expertise. The Company basically chose the "Cleanest shirt in the dirty laundry basket."

461.    Plaintiffs looked at similar data for the Company's monitoring of the Transamerica High Yield Bond in 2012. This was the first year of the revised

requirements for fee and performance disclosures. Plaintiffs used data and information prevailing at the time of the Company's conduct *five years earlier*—as of 1/1/2012. The 2012 facts below were facing the Company's selection of the Transamerica High Yield Bond fund (listed on the 2012 Form 5500; and 2009 too):

- Massive Variance, 25.60;

- Untested Manager hired less than six years earlier—8/1/2006;

- The Average Alpha of the portfolio manager was negative. His loss v. benchmark was -1.11% considering all available data since inception (26 years).

462. The Company kept this fund and left participants unaware, so their wages kept funding the Transamerica High Yield Bond every other week since then.

463. This fund should never have been chosen. The Company's monitoring processes then and now convey very little proof of skill or "experience and expertise" (*Hughes v. Northwestern University*, No. 19-1401 (U.S. Jan. 24, 2022)).

### *The Company finally realized what the Plaintiffs discussed above*

464. For some reason, the Company finally came to its senses and figured out they must sell the shares in the Transamerica High Yield Bond class R4 and direct the resulting cash into BlackRock High Yield Bond in 2021. Unlike all the proprietary Transamerica funds in the figure immediately below, the BlackRock class had none.

465. The Company never applied its newfound knowledge that cheaper classes are better to seek older, existing revenue-sharing funds and modify them to the cheapest class.

Transamerica High Yield Bond R4
Transamerica Intermed Bond R4
Transamerica Mid Cap Value Opportunities R4

**Figure 16**

466.   It could have been a coincidence. Perhaps the Company used FINRA's new FundAnalyzer below. Similar to Morningstar or Lipper, when someone starts to type a fund's name, they will see what FINRA's free Fundanalyzer shows below:



**Figure 17**

467.   The FINRA research site is robust and will display different versions or classes when someone starts to type the fund's name.

468.   Then the free tool allows for side-by-side comparisons like the one below, where it shows "Total Cost" of the Company's choice on the left compared to the cheapest class, R6:



**Figure 18**

469.   The Company could have taken incremental steps to improve its monitoring process by switching to a cheaper but identical fund, but with fewer costs.

470.   Continuing with the replacement, Plaintiffs remind that bonds are typically safer and carry less variance than stock investments. High-yield or junk bond funds have about 50% less variance than the S&P 500.

471.   Plaintiffs were never afforded decision-making documents upon request that could shed light on the mental calculations here again. Thus, they are forced to view facts that presented themselves at the time of the Company's conduct.

Class Action Complaint for Damages

472.   The Company directed all participants' cash in Transamerica High Yield Bond, via their corporate resolution to Transamerica, to be placed into the BlackRock High Yield in 2021. However, the old Transamerica High Yield Bond R4 had half of the concentration of the BlackRock High Yield (6.6% versus 14%).

473.   The years of monitoring to ensure skill (because the expense ratio is fifty-one basis points annually) for the new portfolio managers was sixty (60) years. This was largely due to portfolio managers' variance of alpha. Management started running the BlackRock High Yield fund in 2008.

474.   Plaintiffs infer the Company's basis for adding this fund was related to their page 4-1 on their 2021 Form 5500 Schedule C below under "(e) Describe the indirect compensation * * *" "REVENUE-SHARING SEE ATTACHMENT . . ."

| (d) Enter name and EIN (address) of source of indirect compensation | (e) Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| BLACKROCK          40 EAST 52ND ST<br>NEW YORK, NY 10022 | REVENUE SHARING SEE ATTACHMENT TO LINE 2(H) |

475.   Most forms of revenue-sharing that Plaintiffs pay are not contained in the SEC-prospectus. Transamerica's total dollars needed to serve as recordkeeper are established and they then ask the Company how that dollar amount will be paid.

476.   To avoid a ~ $100/yr/capita bill, Transamerica provides a shortlist of "approved" mutual funds. The word "approved" relates not to a "quality review" of the fund, but the word refers to the fact that Transamerica has a selling agreement with that management investment company.

477.   Suppose the Company does not want its participants to see these triple-digit fees on their statements; Transamerica can make them disappear. In essence, no visible hard dollar charge, and (2) no transaction history information will ever appear on participants' statements in the future.

478.   By "selling the revenue-sharing fund class" to the Company, they can sit back and watch a quarter or two of the participants' behavior by measuring employee elections of current balances and the new contributions of wages.

479.   Hope is the glue that holds all revenue-sharing schemes together for all parties. Revenue-sharing dollars the Company hoped to receive are based on (1) the applicable fund's parent's "revenue-sharing agreement" with Transamerica; (2) the amount of money participants eventually direct to the fund in the future and thus, (3) the revenue-sharing received varies both (4) over time and (5) from one underlying investment option to another.

480.   The bad news for Plaintiffs and participants is Transamerica will always get paid their dollars one way or the other. They custody the money, they choose the trading entities, they can send a bill to the Company and demand a higher cost share class to make the bill disappear. However, as a non-discretionary party, all risks lie in the Company's lap as the discretionary "responsible plan fiduciaries."

481.   Another source of knowledge warning about the use of "peers" was the 1990 Nobel Laureate William F. Sharpe. Mr. Sharpe, a Stanford professor, explained the importance of avoiding peer group comparisons in "The Arithmetic of Active Management" (The Financial Analysts' Journal (Vol. 47, No. 1, January/February 1991. pp. 7-9; and (2) 7)):

> 'Peer group' comparisons are dangerous. Because the capitalization-weighted average performance of active managers will be inferior….

482.   Choosing investments requires only basic math. Plaintiffs refer to a short article entitled "Arithmetic of Active Management" by 1990 Nobel Laureate William F. Sharpe (The Financial Analysts' Journal Vol. 47, No. 1, January/February 1991. pp.

7-9, Copyright, 1991, Association for Investment Management and Research Charlottesville, VA.

483.    Mr. Sharpe states:

> (1) before costs, the return on the average actively managed dollar will equal the return on the average passively managed dollar and (2) after costs, the return on the average actively managed dollar will be less than the return on the average passively managed dollar. These assertions will hold for any time period. Moreover, they depend only on the laws of addition, subtraction, multiplication and division. Nothing else is required.* * *

484.    A mirror image of knowledge the Company should have at least considered was issued from the summer 2021 reporting by S&P Dow Jones Indices LLC's "SPIVA Scorecard" (by Berlinda Liu, CFA Director Global Research & Design, berlinda.liu@spglobal.com and Gaurav Sinha, Managing Director Global Research & Design, gaurav.sinha@spglobal.com, data as of June 30, 2021):

> Past performance is no guarantee of future results. Of the 31 distinct benchmarks tracked by this report, 27 finished with a positive return over the year; the exceptions were among longer-term fixed income indices. The positive market performance broadly translated into good absolute returns for active fund managers. But relative returns continued to disappoint; in 15 out of 18 categories of domestic equity funds, the majority of actively managed funds underperformed their benchmarks. The performance was particularly underwhelming in the small-cap space, as 78% of all small-cap funds lagged the S&P SmallCap 600® (see Report 1a)."

> Over any specified time period, the market return will be a weighted average of the returns on the securities within the market, using beginning market values as weights. Each passive manager will obtain precisely the market return, before costs. From this, it follows (as the night from the day) that the return on the average actively managed dollar must equal the

market return. Why? Because the market return must equal a weighted average of the returns on the passive and active segments of the market. If the first two returns are the same, the third must be also. This proves assertion number 1. Note that only simple principles of arithmetic were used in the process. To be sure, we have seriously belabored the obvious, but the ubiquity of statements such as those quoted earlier suggests that such labor is not in vain.

To prove assertion number 2, we need only rely on the fact that the costs of actively managing a given number of dollars will exceed those of passive management. Active managers must pay for more research and must pay more for trading. Security analysis (e.g. the graduates of prestigious business schools) must eat, and so must brokers, traders, specialists and other market-makers. Because active and passive returns are equal before cost, and because active managers bear greater costs, it follows that the after-cost return from active management must be lower than that from passive management. This proves assertion number 2. Once again, the proof is embarrassingly simple and uses only the most rudimentary notions of simple arithmetic. * * *

485.    The amount of revenue-sharing received varies from one underlying investment option to another. The Plaintiffs now examine the Company's chosen and mostly retained mutual funds appearing on their certified government annual reports for the plan year 2017 (within the limitations period). Because there were only a couple of investment changes within the last six years, investment evaluations here use the facts available at the time of the Company's *monitoring* processes in 2017.

486.    Investment fiduciaries have a duty to "initially determine and continue to monitor the prudence of each investment option available to plan participants." Bunch, 532 F. Supp. 2d at 289.

487.    Plan fiduciaries have a duty to make the trust productive. A trustee normally has a duty promptly and continuously make trust property productive. Reasonable care and skill must be used to procure a reasonable rate of yield. This duty

includes the duty to rid the trust of unproductive and underproductive ("wasting") assets.

488.   Based on the U.S. Supreme Court's unanimous Tibble v. Edison ruling, fiduciaries must "systematic[ally] conside[r] all the investments of the trust at regular intervals to ensure that they are appropriate." Tibble II, 135 S. Ct. at 1828.

### ERISA plan fiduciaries may not subordinate investment returns or increase risks to promote non-pecuniary objectives

489.   Trustees must focus solely on "financial" rather than "nonpecuniary" benefits. The "benefits" to be pursued by ERISA fiduciaries as their "exclusive purpose" does not include "nonpecuniary benefits." (see *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014)).

490.   The U.S. Department of Labor's (DOL) longstanding and consistent position is that when making decisions on investments and investment courses of action, plan fiduciaries must be focused solely on the plan's financial returns and the interests of plan participants and beneficiaries in their benefits must be paramount.

491.   Since 1994, the Department's emphasis on the primacy of plan participants' economic interests has stayed constant. The DOL has consistently stated that the paramount focus of plan fiduciaries must be the plan's financial returns and providing promised benefits to participants and beneficiaries. The DOL has explained that a fiduciary act prudently if she determines that an investment is appropriate based solely on economic considerations.

492.   However, ERISA covers pension plans and other benefit plans stating that prudent management with an "eye single" to maximize the funds available to pay benefits under the plan. *Donovan v. Bierwirth*, 680 F.2d at 271.

493.   ERISA plan fiduciaries may not subordinate investment returns or increase risks to promote non-pecuniary objectives. The duty of loyalty—a bedrock

principle of ERISA with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries. See Unif. Prudent Inv. Act section 5 cmt. (1995) ("The duty of loyalty is perhaps the most characteristic rule of trust law."); see also Susan N. Gary, George G. Bogert, & George T. Bogert, The Law of Trusts and Trustees: A Treatise Covering the Law Relating to Trusts and Allied Subjects Affecting Trust Creation and Administration section 543 (3d ed. 2019).

> . . . [a] trustee is held to something stricter than morals of the market place. . . . Uncompromising rigidity has been the attitude of the courts of equity when petitioned to undermine the rule of undivided loyalty.

Justice Cardozo's classic statement in *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928).

494.   The duty of prudence prevents a fiduciary from choosing an investment alternative that is financially less beneficial than reasonably available alternatives. These fiduciary standards are the same, no matter the investment vehicle or category.

495.   The fundamental principle is that an ERISA fiduciary's evaluation of plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the plan's funding policy and investment policy objectives.

496.   The corollary principle is that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

497.   Investment course of action means any series or program of investments or actions related to a fiduciary's performance of the fiduciary's investment duties and includes the selection of an investment fund as a plan investment. ERISA Section 404(a)(1)(A) prohibits fiduciaries from subordinating the interests of participants to

unrelated objectives and bars them from sacrificing investment return or taking on additional investment risk to promote non-pecuniary goals.

498.    As many courts have required, Plaintiffs consistently compared the Defendants' fund's underperformance to a "meaningful benchmark" under the facts and "circumstances prevailing at the time of the conduct."

499.    ERISA requires that a fiduciary "discharge his duties . . . in accordance with the documents and instrument governing the plan[.]" 29 U.S.C. § 1104(a)(1)(D). Plaintiffs allege that the Company and its de facto delegates and fiduciaries violated 29 U.S.C. § 1104(a)(1)(D) by failing to adhere to the terms of the Plan.

500.    Specifically, based on information and belief, Plaintiffs allege the Company failed to (1) make sure Plan expenses were reasonable and (2) ensure that each investment manager was qualified.

501.    For example, seeking higher yields (or "probable income") was disregarded, although it is an excellent way to add "economic benefits" and enhance future returns. Seeking lower portfolio managers' costs and trading costs of mutual funds is also a perfect way.

502.    The Company knew loading revenue-sharing expenses on top of the portfolio manager's compensation expenses was no different than "a high-risk bet" using participants' wages that the portfolio managers would beat their benchmarks over time.

503.    The bet was more like betting on a 185lb jockey against an 85lb jockey. More practical guidance for all interested plan fiduciaries came out over three decades ago when William F. Sharpe stated:

> The key issue is that past performance is a thin reed for how to predict future performance. Expense ratios and turnover are generally better predictors.

504.   SEC Rule 156: "Past performance is no guarantee of future results." Rule 156 requires mutual funds to tell investors never to base their expectations of future results on past performance before they invest. Rule 156 under the Securities Act of 1933 governs the use of sales literature by investment companies that offer their securities to the public.

505.   In isolation, looking at short-term returns or performance adds no value to understanding the skills of a portfolio manager. Compared to an appropriate broad-based securities market index, the skill of a portfolio manager's strategy can be measured with enough data when relating to a meaningful benchmark.

506.   However, on information and belief, the Company repeatedly used short-term performance in isolation and against an unproven and inappropriate "benchmark" called "peers" to choose investments in violation of 17 CFR § 230.156.

507.   Past performance can be influenced by various factors, some of which may not be relevant in the future. Additionally, past performance can be affected by market conditions that have nothing to do with the portfolio managers and their related daily expenses.

508.   Expense ratios and turnover are indeed better predictors of future performance because they provide insight into the operational efficiency of an investment and the level of activity within the investment. A low expense ratio indicates that an investment is relatively cheap to operate, which can be beneficial for investors over the long term. High turnover, on the other hand, can indicate that investments are being frequently sold and bought, which can result in higher trading costs and potentially lower returns for investors.

509.   As the district court explained in Tussey v. ABB,

* * * there [were] too many coincidences to make the beneficial outcome for ABB serendipitous, particularly considering the powerful draw of self-

interest when transactions are occurring out of sight and are unlikely to ever be discovered.

Tussey v. ABB Inc., No. 2:06-cv-04305, 2017 WL 6343803 (W.D. Mo. Dec. 12, 2017).

510.    A fiduciary can abuse their discretion and breach their duties by acting on improper motives, even if one acting for the right reasons might have ended up in the same place. Cf. Metro. Life Ins. Co. v. Glenn, 554 U.S. 15, 117 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008); id. at 123 (Roberts, C.J., concurring in part and concurring in the judgment); id. at 131 (Scalia, J., dissenting).

511.    Although the Plaintiffs evaluated separate funds and separate monitor periods, they also reviewed performance history to calculate the proper inclusion or exclusion of portfolio managers. Plaintiffs included the good years also in measuring the variances and alphas in this complaint.

512.    Loring and Rounds: A Trustee's Handbook states that "It is black-letter law that "[a] trustee who is liable for a loss caused by a breach of trust may not reduce the amount of the liability by deducting the amount of profit that accrued through another and distinct breach of trust. This is known as the anti-netting rule."

> Without the anti-netting rule, trustees under certain circumstances might be inclined to commit multiple breaches of trust. For example, the trustee whose misconduct has caused a loss may take improper risks in pursuit of extra profits if those profits may serve to eliminate or reduce the amount of expected surcharge.

### American Balanced Fund

513.    Plaintiffs calculated that participants lost at least $461,379 in wasted portfolio manager's compensation/fees (2017 to 2021) in the Company's American Balanced fund. The American Balanced Fund is the largest in the plan (30% of Plan and Trust assets on 12/31/21).

514.   Based on the Company's governmental filings for plan year 2017, Plaintiffs provide a summary table of selection and retention factors relevant to the Plan's largest fund.

515.   The Company's choice on its Form 5500 is in italics. Plaintiffs infer the oldest balanced fund, Dodge & Cox Balanced, was ignored because of John P. Freeman, The Mutual Fund Distribution Expense Mess, 6/28/2007, The Journal of Corporation Law:

> Dodge & Cox funds carry no 12b-1 fees. Dodge & Cox's Stock and Balanced Funds zoomed in value from around $10 billion in 2000 to over $75 billion five years later without any boost from 12b-1-financed marketing expenditures. Clearly, marketing success in the fund industry does not necessitate charging 12b-1 fees. On its web site, Dodge & Cox equates the non-assessment of 12b-1 fees with superior shareholder service: Dodge & Cox's strategy has always been to focus on servicing our current clients well, and to achieve a steady, controlled growth of assets under management and client relationships. Therefore, we have not advertised, employed sales people, or paid 12b-1 fees to brokers for distribution as a way of increasing the Funds' asset base.

516.   Or perhaps the motivation was because their government reports showed the Company chose these funds in the Los Angeles Times article: "Broker Got $82 Million to Push Funds," BY JOSH FRIEDMAN, JAN. 14, 2005 12 AM Plan and Trust:

> Los Angeles-based American Funds and six other mutual fund companies paid a total of $82.4 million to brokerage Edward Jones & Co. for selling their products through the first 11 months of last year, according to records disclosed Thursday. American Century Investments and American Funds topped the list of the 25 most generous revenue sharing arrangements out of 1,500 funds

www.latimes.com/archives/la-xpm-2005-jan-14-fi-jones14-story.html

517.   166.165.   A more prudent way to choose between the oldest and your newer balanced fund can be found below:

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| *Notes (data 1/1/2017) | Name | Years Since Inception | Category Rank 20-Year | Yield 12-Month | Capture-Ratio Upside 5-year | Capture-Ratio Upside 10-year | Capture-Ratio Upside 15-year |
| *Company* | *American Funds American Balanced R6* | 7.66 | 10 | 2.02 | 72.19 | 70.95 | 72.22 |
| Better | Dodge & Cox Balanced | 85.5 | 4 | 2.18 | 85.88 | 85.59 | 84.25 |

518.  Plaintiffs check first the yields because half of the assets (inferred by the name "balanced") are invested in bonds that yield interest payments every month (column E above). Next look at the other half of assets (stocks) and know that since stocks go up 67% of the time, how much is the portfolio manager "capturing" of that rise. In columns F, G, and H, we see the more seasoned "managed" balanced fund wins.

519.  On January 1, 2017, Plaintiffs measured this fund's portfolio manager using a common metric that assesses the probability of enhanced returns 67% of the time. For over 20 years, stocks have gone up 67% of the time, so a fund's "participation rate" or "capture ratio" (when the equity markets are rising) is important to incorporate into the selection and retention of portfolio managers.

520.  Portfolio managers argue that they can shine or protect investors during bear stock markets (due to idle cash they maintain as a buffer). But when the stock markets go up, and they do as the Plaintiffs demonstrate below, idle cash hinders growth.

| | Name | %Positive Months 20-year |
|---|---|---|
| 1 ▶ | DJ Utilities Average TR USD | 66.25 |
| 2 ▶ | Russell 3000 TR USD | 67.08 |
| 3 ▶ | S&P 1500 TR | 67.92 |
| 4 ▶ | S&P 500 TR USD | 67.92 |
| 5 ▶ | Wilshire 5000 Total Mkt TR USD | 67.08 |

**Figure 19**

521. Plaintiffs employed this common Investment Policy Statement (IPS) manager-related performance metric to the facts of selections/retentions by both Cetera and the Company. This common metric helps look at added value by the manager to deserve their portfolio manager's compensation (https://www.investopedia.com/terms/u/up-market-capture-ratio.asp).

   a. The up-market capture ratio is the statistical measure of an investment manager's overall performance in up-markets. It is used to evaluate how well an investment manager performed relative to an index during periods when that index has risen.

   b. The up-market capture ratio measures an investment manager's relative performance during bull markets.

   c. The ratio is calculated by comparing the manager's returns in up-markets with that of a benchmark index.

522. The 2017 information below displays this retention criterion seeking to ensure a "balanced" fund (60% large-cap stocks and 40% bonds), typically bought by older participants (120-age=percent of money in stocks). The fund's 3-year capture ratio was 68.85%, which means it only captured about 69% of the bond and stock trend upward over 36 months. Over 10 years before 2017, it caught 70.95%, while the oldest balanced fund in the USA (Dodge & Cox Balanced), formed on June 26, 1931, had an 85.59% capture ratio.

523.   Measures like this help explain why column one ("5—Year Total") is a lower number for the Company's choice (69.80%). The oldest balanced fund, Dodge & Cox, earned a five-year total of 87.20%.

| | 5-Year Total | *Notes | Capture-Ratio Upside 1-year | Capture-Ratio Upside 3-year | Capture-Ratio Upside 5-year | Capture-Ratio Upside 10-year | Name |
|---|---|---|---|---|---|---|---|
| 1 ▶ | 71.95 | | 79.02 | 81.05 | 84.89 | 87.19 | Westwood Low Volatility Equity Inst |
| 2 ▶ | 87.20 | 6/26/1931 | 112.17 | 80.93 | 85.88 | 85.59 | Dodge & Cox Balanced |
| 3 ▶ | 79.80 | | 64.58 | 72.18 | 72.45 | 78.07 | T. Rowe Price Capital Appreciation |
| 4 ▶ | 62.23 | | 72.42 | 70.36 | 70.77 | 73.03 | Fidelity® Balanced K |
| 5 ▶ | 69.80 | | 64.19 | 68.85 | 72.19 | 70.95 | American Funds American Balanced R6 |

**Figure 20**

524.   Fast forward five years to December 2022, Plaintiffs provide facts that support the relative capture ratios were worse. The American Balanced Fund appeared on the Company's 2009 Form 5500 when it held only $113K in assets.

525.   Based on information and belief, Plaintiffs and the putative class were never provided information related to how the Company made decisions and what materials they may have used for their actions and judgments. Meeting minutes, Investment Policy Statements (IPS), monitoring reporting, and corporate resolutions adding and removing funds are a few items that go towards fulfilling objectives stated in plan documents like the Funding Policy.

| | 5-Year Total | Capture-Ratio Upside 3-year | Capture-Ratio Upside 5-year | Capture-Ratio Upside 10-year | Capture-Ratio Upside 15-year | Name |
|---|---|---|---|---|---|---|
| 1 ▶ | 48.64 | 114.76 | 126.67 | 129.92 | 128.99 | Westwood Total Return Inst |
| 2 ▶ | 36.11 | 128.32 | 126.15 | 127.33 | 129.63 | Dodge & Cox Balanced I |
| 3 ▶ | 42.03 | 132.24 | 132.92 | 125.99 | 120.26 | Fidelity® Balanced K |
| 4 ▶ | 55.49 | 122.54 | 123.89 | 121.15 | 120.97 | T. Rowe Price Capital Appreciation I |
| 5 ▶ | 38.43 | 122.79 | 123.64 | 120.02 | 116.18 | Fidelity® Puritan® K |
| 6 ▶ | 38.69 | 112.20 | 115.69 | 112.82 | 106.39 | Janus Henderson Balanced N |
| 7 ▶ | 40.85 | 111.99 | 116.23 | 112.48 | 110.56 | Value Line Asset Allocation Instl |
| 8 ▶ | 32.82 | 107.13 | 107.62 | 112.33 | 109.41 | American Funds American Balanced R6 |

**Figure 21**

526.   Plaintiffs     find     that     Defendants     failed     to     inform     the participants/beneficiaries of higher risk, cheaper, higher yielding, substantially identical investment options on their annual 29 CFR § 2550.404a-5 notices ("Fiduciary requirements for disclosure in participant-directed individual account plans.)"

527.   A fiduciary's duty "includes the responsibility to inform the beneficiaries fully of all facts which would aid them in protecting their interests." *Allard v. Pac. Nat'l Bank*, 99 Wash.2d 394, 404, 663 P.2d 104 (1983) (citing *Esmieu*, 88 Wash.2d at 498, 563 P.2d 203).

528.   Plaintiffs measure the portfolio managers more specifically now. These are the humans who deduct their compensation each day at 4 pm. This directly reduces the participants' fund's returns commensurately (whether or not managers have experience and expertise). The portfolio managers choose the stocks and bonds for the American Balanced Fund.

529.   The Company's "strategy should be justifiable in terms of…a realistically evaluated prospect of enhanced return [from the strategy]. (Edward C. Halbach, Jr., the Reporter for the Restatement and Walter Perry Johnson, professor of law emeritus at the University of California law school, in "Trust Investment Law in the Third Restatement," Real Property, Probate and Trust Journal, Volume 27, Fall 1992, pages 407-65; see Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment f, page 25).

530.   Evaluation of any manager's skill is not difficult—it is not very time-consuming to do one alpha calculation per fund twice a year or so. It is fundamental to choose a portfolio manager who shall definitely reduce the trust's returns daily (hoping to beat the benchmarks sometime).

531.   Plan fiduciaries only have to measure one number, alpha. Since the Company's action of primarily choosing funds with these portfolio managers' compensation costs embedded—trust calls them "enhanced strategies"—it is important

to remember the results of spending that money daily is wholly predicated on the portfolio managers' or humans' skills. Thus, before hiring, plan fiduciaries should watch them demonstrate skills; when they cannot, fire them and stop the trust's bleeding from unnecessary portfolio manager's compensation.

532.    Plaintiffs did just that by looking back forty-two years, four decades, for the American Balanced Fund's managers—the average alpha was 0.47%/yr. Yet, the variance of the alpha was high at 20.44% for a "balanced fund." Balanced funds only have about half the money in the risky asset area (stocks) and bond prices do not change much over weeks or months. Thus, the variance should be low.

533.    Before target date funds, balanced funds were the "default" fund—especially after the Pension Protection Act of 2006. The plan fiduciaries put workers' biweekly salary savings in this "default fund" (balanced fund) when they did not elect an investment after hire. That is likely why the American Balanced Fund exists today in the Amy's Kitchen Inc. 401(k).

534.    Risk-wise, the Company is asking investors contemplating the American Balanced Fund to risk losing twenty bucks of their wages with the chance to make fifty cents. Notably, the Company has been offering this fund at least since 2009—it is the only "balanced fund" on the Company's managed menu of investments.

535.    Consequently, to ensure the American Balanced Fund portfolio managers had skills, the Company divides the managers' average alpha of 0.47% into the variance's square root (at a 95% confidence level that means two standard deviations) and the results indicate that the Company must observe the managers for 370 years to know they had skill before adding and having participants' accounts pay them.

536.    Alternatively, the Company can use Excel or Google websites that help:

> In calculating the t-stat, the first step is to determine the excess returns the manager earned above an appropriate benchmark. Then, we determine the

regularity of the excess returns by calculating the standard deviation of those returns.

Based on these two numbers, we can calculate how many years we need to support the manager's claims. For example, let's say that in a sample with 80 fund managers who had positive excess returns, the average excess return was 0.84% and the standard deviation was 5.64%.To estimate the years needed for statistical significance * * * you can see that 180 years of returns data are needed to establish skill as the reason for the higher returns. Also worth noting: The calculator below the chart provides the exact number of years needed. Obviously, no manager has ever managed a fund for 180 years. Therefore, we are unable to accept any of these manager's claims. Alas, managers are mere mortals.

https://www.ifa.com/articles/calculations_for_t_statistics

### *Calvert Equity Fund was added in 2011—held today*

537.   The plaintiffs looked back at the initial selection in 2011 to establish whether, at the time of the most scrutiny of adding a brand new trust investment, the Company's actions were prudent based on the facts and circumstances prevailing at the time of the conduct. Critical facts presented in 2011 proved this fund should have never seen its first participant salary dollar. Specifically:

1.   The managers were hired on 7/31/2006 so they had about four years running the fund (new ones arrived on 6/16/2015) and,

2.   There were 101 stocks chosen by the managers while their benchmark held 1,000 stocks;

3.   The managers put 34% of the 1,750M in total assets into ten names like CVS with 4.5% of all the assets, followed by Apple with 4.3% and Google at 3.89%, etc.

4.   The managers and predecessors had a variance of 156% and,

5.   The portfolio managers' alpha on average was a negative -2.3% per year over 24 years of existence.

538.   The excess return of an investment relative to the return of a benchmark index is the portfolio managers' alpha. Alpha may be positive or negative and is the result of the active buying and selling of stocks and bonds. Trading costs are unseen and become evident after portfolio managers' net returns are compared to benchmarks.

539.   The expense for buying and selling are better understood by the chart that illustrates the three areas of trading costs most portfolio managers engage in daily. The totals rival the costs of the portfolio manager's compensation and revenue-sharing: 0.93-1.75% per annum.

540.   Based on Company's government filings, the average participant tenure in Amy's Kitchen Inc. 401(k) Retirement Plan is about ten (10) years. Thus, potentially hundreds of participants bought the Company's core equity mutual fund called "Calvert Equity Fund" before and during 2017. The portfolio manager started on 6/16/2015—two years before the Company's 2017 monitoring processes began.

541.   A registered investment company's (RIC) ability to attract new talent (new portfolio managers) is vital to running a successful fund. Therefore, using the oldest class that the company operates allows for the most alpha data to calculate their skill at getting good talent. The Plaintiffs analyzed alpha using the most senior class.

542.   During the prior thirty years (all of the Calvert Equity portfolio managers' performance), from 1988 to 2017, the fund's team had posted an average alpha of negative -2.34% per year (versus their SEC-prospectus benchmark (Russell 1000 Growth TR USD)).

**Table 16**

| Manager Start (as of 2017) | Observed # All Mgrs' Yrs by Plaintiffs | All Managers' alpha | The variance of All Managers | # Holdings | Top-10 Holdings % |
|---|---|---|---|---|---|
| 6/16/2015 | 30 | (2.3) | 126 | 100 | 36 |

543.   One leading cause of the two percent plus loss per year was the alpha variance of 126%. Another cause of variance was holding only 100 stocks in 2017 (76 stocks as of 1/31/2023). The portfolio managers' benchmark held 1,000 stocks. Naturally, with the high variance, the manager's performance will vary or go up and down more than the benchmark due to less diversification and more concentration.

544.   The portfolio managers put over 40% of the investors' total assets into ten stocks in 2017 (33% in 2013 and 40% today). This additional type of concentration also causes variance risk and harms terminated workers in a down year.

545.   Because the Company does not know exactly when everyone quits or is fired, it is not prudent to argue, "We did not replace the fund after several bad years. Because our participants can wait it out and hope the portfolio manager does better in the future."

546.   An unreal loss (unrealized) becomes "real" or realized when a participant's hardship withdrawal is necessary for funeral expenses.

547.   If Plaintiffs apply trust law's anti-netting rules and look solely at the failure to monitor breach by plan year, participants investing a 10,000 dollar investment at the start of 2017 would have declined by 4.4% or 440 dollars by the end of 2017 versus the 29 CFR § 2550.404a-5 benchmark. In 2020 alone, they would have declined by another -14.2% in that one year ($1,420).

548.   However, even looking at cumulative returns from 2017 through 2020, giving credit for the two positive years of the "lucky" portfolio manager, the oldest share class lost -4.4% in 2017 versus the portfolio managers' chosen "broad-based securities market index." In 2018 it earned 6.6% above its appropriate benchmark. In 2019 it earned 0.1% over its benchmark, but in 2020, it lost -14.2% versus its benchmark.

549.   The amount to restore a worker in the fund over these years equals 3.3% per year. If a participant invested $10,000 from 2017 to 2020, they would need $1,760.08 to be restored versus simply using a virtually zero-cost mutual fund that

mimicked the actual benchmark. That benchmark qualifies for both the 29 CFR § 2550.404a-5 ("appropriate broad-based securities market index") and the Prudent Investor Rule's (Restatement (Third) Trusts) benchmark (the Russell 1000 Growth).

550.    Adding the 2021 year of 1.3% means the average for 2017-2021 is a loss to the benchmark of -2.4% per year. A participant in the Calvert Equity fund from 2017 to 2021 would need $507.82 to be put back to the condition they would have been but for the company's derelict and flawed investment management processes.

551.    Courts have ruled against fiduciaries who have selected untested portfolio managers. Although the Plaintiffs cannot test the recent manager because they have so little performance to test, they did assess the skills of all predecessor portfolio managers back to the fund's inception and data at www.sec.gov/edgar.

552.    Trust law also allows investors to quantify risk by looking at the variance. The greater the variance, the greater the expected return must be in order to compensate the participant for taking the risk.

553.    A portfolio's volatility is reduced by increasing the number of securities held and by their tendencies to react differently to economic events ("negative variance correlation"). However, the average return expectation of the portfolio is not adversely affected by a reduction of diversifiable or nonmarket risk, often somewhat less precisely called "specific" or "unique" risk. Accordingly, pricing rewards only the market (or "systemic" or "systematic") element of risk, which cannot be diversified away. Still, the marketplace offers no compensation for the specific risk that results simply from failure to diversify.

554.    Section 409(a) makes fiduciaries liable for breach of these duties and specifies that each fiduciary must personally "make good to the plan any losses to the plan resulting from each such breach" and "restore to the plan any profits of such fiduciary [that] have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

555.   While the ERISA statute does not define "losses," courts have generally applied the law of trusts to find that a loss occurs when there is a difference between the current value of the Plan compared to what the Plan would have been worth had the breach not occurred. Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1466 (4th Cir. 1996).

556.   As explained by Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2nd Cir. 1985), a loss should be measured in light of trust law. In 1990, Section 205 of Restatement Second, renumbered as Section 100, and integrated into the Restatement (Third) of Trusts, adopted, and promulgated states: § Liability of Trustee for Breach of Trust: (emphasis added):

> A trustee who commits a breach of trust is chargeable with
> (a)    the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or
> (b)    the amount of any benefit to the trustee personally as a result of the breach.

557.   Funds with revenue-sharing formed the predominance of fund types selected by the Company from 2009 to 2021. The Company sought funds that offered them the hope and the opportunity to receive revenue-sharing credits to avoid invoicing. Some revenue-sharing funds the Company chose had administered, on behalf of participants (since at least 2009) had ten basis points of revenue-sharing credits for use by the Company, while others the Company selected and kept had three or four times that amount at its disposal.

558.   Revenue-sharing expenses levied on the trust's assets' daily returns were not uniform (per the plan document) and imposed more costs on some participants over others.

559.   Omissions of fact like that were material information not disclosed to participants on the participants' 29 CFR § 2550.404a-5 annual disclosures. "In the

context of this case, materiality turns on the effect information would have on a reasonable participant's decisions about how to allocate his or her investments among the options in the Plan." Edgar v. Avaya, Inc., 503 F.3d 340, 350 (3d Cir. 2007).

560.  Due to the negative compounding effects of daily revenue-sharing expenses (hopefully credited in some form or fashion months later), *maximum* revenue-sharing credits (maximum means the amounts collected by the RIC for the year) can be proven mathematically to equate to be less than the missed opportunity costs gained by the cheaper, identical fund's class.

561.  Debits in this illustration represent monies paid out of a particular participant's daily fund prices due to revenue-sharing costs for a particular fund. Credits represent money being paid into that same affected participant's account.

### Company's Calvert Equity Fund selection/retention problems continue

562.  Plaintiffs now demonstrate a deep dive into the facts and circumstances facing the Defendants and their monitoring conduct in 2017. These were the prospectus facts facing the Company and Cetera during their 2017 monitoring. Plaintiffs infer they failed to recognize the 1.55-year tenure (C) and focused on the 15-year total of 165.27% (H) versus the SEC-prospectus at www.sec.gov/edgar benchmark at 154.30%. They should have noted that only 1.5 years of the 15 years were under the current manager. A successful manager often strives to move to a larger fund company for a higher salary/bonus after a successful run at a smaller fund. At the time of their review in 2017, this manager oversaw 506 million in assets. That is barely enough to land on the radar screen of large defined benefit plans. Both managers England and Marshall (Richard B. England, CFA, Managing Director – Growth Equities, and Principal Paul J. Marshall, CFA, Vice President and Principal) left after their stellar run.

**Table 17**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Name | Manager Tenure (Years) | Capture-Ratio Upside 1-year | Capture-Ratio Upside 5-year | Top-10 Holdings % | 5-Year Total | 15-Year Total |
| *Defs' choice* | *Calvert Equity I* | *1.55* | *55.32* | *88.60* | *35.92* | *81.89* | *165.27* |
| Benchmark | Russell 1000 Growth TR | | 81.54 | 99.05 | 0 | 96.80 | 154.30 |

563. Plaintiffs illustrated above that the Defendants' choice's five-year "capture ratio" fell from 88.6% (E) to 55.32% (D) and the managers, like most, could only oversee 100 stocks. Further, they concentrated over one-third of investors' dollars into 10 stocks (35.92%). Risk is great for such a concentrated fund and requires strict monitoring to protect the participants.

564. Looking at the impact of the Company's earlier decision-making surrounding the Calvert Equity fund (the Company's class I, italics), Plaintiffs display the results of their actions (as of January 31, 2023) in the tables below. First, there was a cheaper class ("R6") offered on in the first limitation year and the Company ignored that fact (10/3/2017). Second, the "yield 12 month" was 42% higher for the R6 class (0.27% per year versus the Company's choice "I" in italics at 0.19% (column N)).

565. As often happens with more expensive classes, yields and total returns are reduced by more than the expense ratio difference or the revenue-sharing credits. In this case, the yield difference exceeds the six basis point difference between "Expense Ratios" in column 6. Finally, the Company could have called 800 368-2745 and switched anytime to the identical but cheaper R6 class—they did not.

> "A fiduciary would have no reason not to switch to an identical share class fund." See Braden, 588 F.3d at 596 (finding inference of flawed review process where specific identical institutional shares were available).

Tibble v. Edison Int'l, 07 cv 5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

**Table 18 (data as of 1/1/2017 to 12/31/2022)**

| I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|
| Name | Inception Date | 10-Year Total | 15-Year Total | Yield 12-Month | Expense Ratio | Telephone Switch | Toll-Free # |
| Calvert Equity R6 | 10/3/2017 | | | 0.26 | 0.60 | Y | 800 368-2745 |
| *Calvert Equity I* | *11/1/1999* | *281.59* | *401.60* | *0.19* | *0.66* | Y | *800 368-2745* |
| Russell 1000 Growth | 1/1/1987 | 288.32 | 412.52 | | | | |
| Large Growth Cat. Avg | | 224.25 | 312.85 | 0.31 | | | |

566.    In the table below,  the poor decisions from the past continued and thus became the cause of harm later. First, column 3 shows part of the problem with choosing this core stock investment fund—portfolio managers could only manage 76 stocks versus  (column S), (1) more at 118 (column S) for their peers (Large Growth Cat. Avg), (2) versus 513 stocks for the SEC-prospectus benchmark (column S). Like peers, however, they put 40% of the investors' money into ten stocks (column T). Typically, in column U Plaintiffs note tenure is close to the seven-year median. Finally, the 20-year total (column V) for the Company's choice in italics was less than the portfolio managers' chosen benchmark.

**Table 19 (data as of 1/1/2017 – 12/31/2022)**

| Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|
| Name | Expense Ratio | # Holdings | Top-10 Holdings % | Mgr Tenure (Yrs) | 20-Year Total | Manager Name |
| *Calvert Equity I* | *0.66* | *76* | *40* | *8* | *725.33* | *Garrison/Hudepohl/Miller* |
| Calvert Equity R6 | 0.60 | 76 | 40 | 8 | | Garrison/Hudepohl/Miller |
| Large Growth Cat. Avg | 0.78 | 118 | 45 | 9 | 632.26 | |
| Russell 1000 Growth TR USD | | 513 | | | 757.09 | |

### *Invesco Global A (previously Oppenheimer Global)*

567.    This fund was in the 2009 Form 5500 under its original name (Oppenheimer Global). Like most funds chosen by the Company, the fact (not amount or formula) that this fund's parent company sends some amount of revenue-sharing at the direction of the Company (on the Company's Schedule C—formula missing).

568.    Plaintiffs explore one of two grievous errors repeatedly made by the Company's selection and monitoring processes. The italic/bolded text marks the Company's choice at the first showing in the Plan. One error, the Company chose—the more costly "A" share class.  It remains and holds $1.65M of participants' wages.

569.    Next, the Plaintiffs use the table below to prove that the Company's experience and expertise were lacking in the 2017 monitoring period. Plaintiffs can infer that the Company's interests were not aligned with the participants' interests.

570.    There was a cheaper share class of the identical fund that the Company ignored.

    a)    The Company chose and retained the lower yielding class "A" (bold *italics*) in column D, 0.69 %/yr. v. 1.14%/yr.

    b)    The Company bought the share class at column F (1.15% v. 0.71%).

    c)    The Company could have called 800.225.5677 (column J) and requested a change to the cheaper fund anytime.

**Table 20**

| A<br>1/1/17<br>data | B<br>Name | D<br>Yield 12-<br>Month | E<br>Manager<br>Name | F<br>Expense<br>Ratio | G<br>12b-1<br>Fees | H<br>True<br>No-<br>Load | I<br>Phone<br>Switch | J<br>Toll-<br>Free # |
|---|---|---|---|---|---|---|---|---|
| *Company* | *Oppenheimer Global A* | *0.69* | *Bhaman\** | *1.15* | *0.25* | *N* | *Y* | *800 225-5677* |
| Cheaper | Oppenheimer Global I | 1.14 | Bhaman\* | 0.71 | | Y | Y | 800 225-5677 |

*\*Since 8/2/2004, Bhaman ran the fund's 90 stocks but was fired or quit between 2018 and 2019. A new manager named Delano started running the fund after Bhaman.*

571.    Negative compounding (from losses, fees, reduced bond interest or stock dividends, etc.) always harms future growth more than its arithmetic positive equivalent.

572.    As of 1/31/2023, Plaintiffs now demonstrate the harm to Plaintiffs and mathematical impact of Invesco Global A's twenty-five basis points (1/365[th] taken daily from gross fund class price). The Company has received and redirected these dollars since 2009 (or before). Plaintiffs were never provided the Company's copy of their Invesco parent's revenue-sharing agreement for this fund. Thus, Plaintiffs are unaware if the Company received and redirected the full twenty-five basis points taken from participants' earnings every 12 months.

573.    Plaintiffs cannot know if Transamerica's selling agreements with every RIC (registered investment company) selected by the Company were negotiated at the maximum possible revenue-sharing amount (the amount certainly taken from participants (per board of directors for each fund's parent)).

574.    The following analysis conservatively assumes the Company did receive (1) that amount of prospectus revenue-sharing taken from workers and (2)

1   Transamerica credits the entire amount to those affected workers (3) immediately so
2   the revenue-sharing dollars could compound.

| | Expense Ratio | 5-Year Total | *Notes | Name | Manager Name |
|---|---|---|---|---|---|
| 1 | 1.030 | 16.27 | Defs'; 1/1/23 | Invesco Global A | Delano |
| 2 | 0.660 | 18.48 | 0.442/yr | Invesco Global R6 | Delano |

**Figure 22 (SEC edgar data as of 1/31/23)**

575.   The reason the Company made flawed decisions to use revenue-sharing globally is in the figure above. The Company must have never performed this subtraction when administering the Plan.

576.   First, the 5-year total yearly difference is 0.442% (18.48 minus 16.27 divided by five) from the Company's chosen versus the cheapest class). The lost opportunity cost to participants exceeds the maximum possible revenue-sharing credit.

577.   Second, the "delta" or difference in harm increases exponentially as the length of time increases. One can infer that these mathematical absurdities of the Company's actions and failures to act over the years confirm flawed reasoning and decision processes that affect not only the Plaintiffs investing in these funds but every fund the Company had responsibilities to manage.

578.   Finally, subtracting the 1.03 (percent in column 1) expense ratio for row 1 from 0.66 in row two of the figure above results in a difference of 0.37 percent. In the table earlier (table 17 above), column G showed that this fund kicked back 0.25%/year for use by the Company since at least 2009.

579.   Thus, the twenty-five basis points credit maximum to workers to offset administrative costs is less in one year than if the Company had chosen R6 class. The U.S. Supreme Court reminded the Company of this fact on 5/18/2015 (Tibble v. Edison).

580.   The compounded revenue-sharing loss/cost will always hurt more than the arithmetic revenue-sharing credit/gain can give to participants. The premise is rudimentary. Growth factors depend on the asset's present value. Consequently, reducing any asset's initial price (by any cost/fee/expense), means that the future values must be less and, thus, future interest "credits."

581.   The more the fee is applied, the greater the harm. Revenue-sharing costs happen daily, unlike the front-end loads that revenue-sharing replaced in 1980.

582.   Plaintiffs can easily demonstrate this fact below over six years. This calculation's results would be more harmful if the Plaintiffs included participants' biweekly contributions.

1. $10,000 = Year 1 present value in the Company's class A choice and the cheaper class R6.

2. 10% = Annual growth rate of fund manager's chosen stocks.

3. 9.75% = participants' *net annual* growth rate in class A (after revenue-sharing deduction of twenty-five basis points each year).

4. $17,715.61 = future value of R6

5. $17,475.40 = future value of A ($240.21 less)

6. FV(10%,6,,-10000) v. FV(9.75%,6,,-10000)

Revenue-sharing is more harmful to bondholders and fixed-income participants

583.   Harm exists even at half this rate of return (5% v. 4.75%). The harm is not relative to investment amounts but relative to total expected returns. Lesser returns, with the same revenue-sharing fee of 0.25%, are more problematic. Thus, revenue-sharing hurts bondholders more—and will hurt stockholders more in this inflationary environment.

**Table 21**

| | |
|---|---|
| $17,715.61 | $13,400.96 |
| $17,475.40 | $13,210.65 |
| $(240.21) | $(190.31) |
| -2.4% | -1.9% |

584.   Recurring revenue-sharing fees and portfolio manager's compensation fees (taken daily) are even more insidious. A mathematical proof is an inferential argument for a mathematical statement, showing that the stated assumptions logically guarantee the reasoning. Plaintiffs offer (1) FV(5%,6,,-10000) versus (2) FV(4.75%,6,,-10000) in the table. The same reasoning holds for any time period and any fee amount.

585.   Richard Allen Posner is an American jurist and legal scholar who served as a federal appellate judge on the U.S. Court of Appeals for the Seventh Circuit from 1981 to 2017. When he was a law professor, Judge Posner wrote The Economic Analysis of the Law, the 1972 edition. Judge Posner spoke about the math above as "diminished earning capacity."

586.   Plaintiffs cite a 2007 SEC General Counsel speech referencing Judge Posner, called "The Future of Securities Regulation." Mr. Brian G. Cartwright, General Counsel, U.S. Securities and Exchange Commission, spoke at the University of Pennsylvania Law School Institute for Law and Economics in Philadelphia, Pennsylvania, on October 24, 2007 (emphasis added), saying:

> Judge Posner, in his lecture here last year, noted this and referred to <u>one failing in particular: the tendency to see patterns where they don't exist</u>. * * * When evaluating a manager's past performance, however, this tendency to see patterns where none exist leads to the <u>irrational expectation that streaks will persist</u>. As Judge Posner pointed out, <u>people are very poor at intuiting probabilities</u>. We don't really need sturdy academic studies to tell us this; we know it from our own experience. But sturdy academic studies there are. And they inform us that, just as <u>many</u>

gamblers erroneously believe in "hot streaks" and "cold dice," many investors believe a mutual fund that shows past performance better than an appropriate benchmark index is much more likely to continue to outperform in the future. Countless academic studies, however, have shown that very often such outperformance fails to persist.

587.    However, plan fiduciaries do not need any special knowledge, skills, or experience to know that fees have an insatiable hunger that eats up future growth.  As time goes on, progressively larger "positive returns" are needed to prevent the participants' excess fee harm.  This simple mathematical cost comparison was accurate ten years ago, is accurate now, and the negative fee calculation will be accurate over the next decade.

588.    Back to facts about the Company's Invesco Global fund and the Company's conduct. In 2017, the fund prospectus showed:

1.  76 stocks were managed by portfolio manager "Bhaman" since 8/2/2004 and he concentrated 27.35% of the cash into ten stocks. He managed 6,056 million and charged 1.15% in expense ratio on those dollars.

2.  At the end of 2018, "Bhaman" was gone. Portfolio manager "Delano" was hired on 3/31/2017 to manage "Bhaman's" previously chosen 74 stocks. Delano put 52% of the investor's total cash into ten stocks (this number is the same regardless of share class—This factor is measured across all share classes).

589.     The moral of the story—the Company's flawed reasoning and processes for choosing the (1) wrong share class and the (2) unskilled manager(s) caused direct harm to the Plaintiffs and participants due to compounding fees for both recurring types of costs.

590.    The introductory commentary to the Restatement (Third) states that "active management strategies involve investigation expenses and other transaction

costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) Trusts pt. 6, ch. 17, topic 3 intro. (American Law Institute).

591.    Allowing the trust and participants to pay portfolio managers for risks and alpha over the benchmark requires the Company to look at some proof of skill. Skills emanating from past *positive alpha* (not fund returns in isolation) by thoroughly investigating the manager(s). As managers quit, a reevaluation of skills should occur.

592.    Section 7 of the Uniform Prudent Investor Act states: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

593.    Still, the Company compounded its first flawed process by wasting even more money on unskilled and costly portfolio managers who lost participants' salary deferrals daily. ERISA and trust laws state that the Company can authorize fees to be taken from their Plan and Trust *only* if the trust and participants benefit.

594.    The participants would have been better off saving their wages in a banker's box under their beds instead of investing in Amy's Kitchen Inc. 401(k).

595.    This fact pattern above matches at least 75% of the company's mutual fund options in 2017. Their errors in 2017 affected reinvested dividends and interest and also "future" salary dollars deposited from workers in 2021 back to 2017, respectively:

- 16,506,149.00
- 13,730,399.00
- 13,527,547.00
- 11,958,784.00
- 10,784,752.00

596.    Cetera and the Company departed from a more prudent, diverse, less costly strategy required under the Prudent Investor Rule (Restatement (Third) Trusts). The Company's choices forced participants to pay the portfolio manager's

compensation whether or not the respective manager enhanced returns to the trust and participants.

597.  The Company should not think Cetera's "conflicted" advice cleanses their sins (i.e., provides "evidence of a thorough investigation)." Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996)).

598.  The Company cannot use Cetera's recommendations or Transamerica's Investment Policy Statement (IPS)/monitoring reporting as a "whitewash." Donovan v. Bierwith, 680 F.2d 263, 272 (2d Cir. 1982) and Chesemore v. Alliance Holdings, Inc., 886 F. Supp. 2d 1007, 1042 (W.D. Wis. 2012).

> Employing a financial advisor is evidence of adequate investigation, but reliance on experts is not a shield—it is 'but a single factor to be weighed in determining whether a fiduciary has breached her duty. The fiduciary must still evaluate the advice given and exercise his own judgment about the transaction.

### *"Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data"*

599.  Exploring the seven columns in table "Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data" Plaintiffs list the manager present prior to the 2017 monitoring period. Plaintiffs counted alphas from as many of the managers' observable plan years for their alpha results. For the first of the Company's choice, the Calvert Small Cap fund, Plaintiffs looked as far back as possible (13 years as of 2017).

600.  For the Calvert Small Cap fund's managers, Plaintiffs found the average alpha during that period was negative or less than the benchmark. Marking "BAD" indicates the fund's manager was "bad" or lacked skill (and thus, should not have been paid any further by participants) and should have been removed in 2017.

601.  Poor alpha is marked as "BAD." Negative alphas are typically caused by (1) the portfolio manager's compensation deductions (from fund pricing (gross asset values) or taken from a fund's gross daily returns) and (2) daily revenue-sharing

expenses (they reduce fund prices too). Finally, (3) daily pricing declines and variance from related benchmarks find footing when portfolio managers choose to invest in only a few companies (i.e., holding much of investors' cash in only ten companies is a metric referred to as a fund's "Top-10 Holdings Percent").

602.    Low-cost mutual funds began to mimic the most widely used benchmark indexes like the S&P 500, Russell 1000, 2000, 3000 and others in the 1970s.

603.    Nineteen percent (19%) was the variance for the first manager, Calvert Small Cap, around their 29 CFR § 2550.404a-5 "appropriate broad-based securities market index." A manager started on 11/3/2015 and was quickly gone as another manager was hired a year and a month later (12/31/2016).

604.    The "# Hldgs" means that these managers held only 81 stocks (as of 1/1/2017, there were 73 stocks on 12/31/2022). Lastly, the "Top-10 %" means that the managers concentrated all investors' cash into only ten names (like many prospectuses and annual reports at www.sec.gov, financial statements' contents are aggregated and relate to every share class; per the prospectus, managers trade omnibus and know not about individual participants' holdings). That is why funds in this plan waived the initial purchase minimums for "omnibus trusts"—the Company can buy the cheapest share class regardless of dollars invested in the more expensive share classes.

605.    The number "80.81" in column four (# Yrs @ 95%) for Invesco Global Fund (third of the Company's chosen funds) means the portfolio managers' returns varied so much from the benchmark's return that it requires 81 years of monitoring to know (with 95% confidence) that the manager earned his portfolio manager's compensation.

606.    The portfolio managers' decision to limit holdings helped raise the risk or variance to 239% versus an appropriate broad-based securities market index. A variance of 200% means participants who separate from service may take with them realized losses when cashing out. The managers struggled against their peers. Since 2017, the managers have lagged their peers by (2.25%) each year.

607. This analysis helps ascertain the quality of the Company's selection processes of their chosen portfolio managers and the strategies to remove and replace portfolio managers (thoroughness of investigative procedures used by Cetera and the Company to oversee the participants' limited menu of choices).

608. The median and average observable years of existence and ability to measure all of the relevant funds' managers' performance were 22 and 27 years, correspondingly. Thus, all of the fees paid to the Company's chosen fund portfolio managers were wasted and in violation of trust laws and ERISA because:

    a. Ten of the Company's chosen funds' managers provided negative alphas and, thus, were imprudently kept on or after the 2017 plan year;

    b. Thirteen of the Company's chosen funds' managers provided positive alphas; the median years necessary to observe their experience was 81 years (average 120 years). Thus, these managers had no experience or skill (untested) and yet were paid (they hurt participants' returns).

609. Restatement (Third) of Trusts § 90 cmt. e(1) states that: "Failure...to reduce uncompensated risk is ordinarily a violation of both the duty of caution and the duties of care and skill…"

> Failure...to reduce uncompensated risk is ordinarily a violation of both the duty of caution and the duties of care and skill. Because market pricing cannot be expected to recognize and reward a particular investor's failure to diversify, a trustee's acceptance of this type of risk cannot, without more, be justified on grounds of enhancing expected return.

Restatement (Third) of Trusts § 90 cmt. e(1)

610. The Company, therefore, limited the menu of choices so much that participants were forced into investments with uncompensated risks. The Company's investment choices were largely untested, imprudently selected, and retained. The

same overall results were obtained from the additional analysis of periods after 2017 and before.

611. The table below, entitled "Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data" shows the Company's investment choices that had negative alphas in 2017 (under the column with header "# Yrs @ 95%" marked as "BAD") and should have been removed during the Company's systematic and regular reviews:

> Calvert Small-Cap Fund, Calvert Equity Fund, Templeton Foreign Fund, Franklin Utilities Fund, Transamerica High Yield Bond, Western Asset Core Bond Fund, Transamerica Mid Cap Value Opportunities, AB Large Cap Growth Fund, and Transamerica Core Bond.

**Table 22 Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data**

| Name of Defendants' Fund | Manager Start (as of 2017) | Observed Yrs by Plaintiffs | # Yrs @ 95% | Variance of All Mgrs | Manager Start as of Dec 22 | # Hldgs '17 ('22) | Top-10 % '17 ('22) |
|---|---|---|---|---|---|---|---|
| Calvert Small-Cap Fund | 11/3/2015 | 13 | BAD | 19 | 12/31/2016 | 81 (73) | 20.67 (25) |
| Calvert Equity Fund | 6/16/2015 | 30 | BAD | 126 | 6/16/2015 | 100 (76 in '22) | 35.92 (40.4) |
| Invesco Global Fund | 8/2/2004 | 17 | 80.81 | 239 | 3/31/2017 | 76 | 27 (51) |
| Delaware Ivy Science and Technology Fund | 2/9/2001 | 18 | 371.32 | 179.51 | 10/1/2016 | 64 (42) | 43 (45) |
| Janus Henderson Global Technology and Innovation Fund | 1/12/2016 | 20 | 73.39 | 822 | 1/12/2016 | 84 (59) | 38 (53) |
| BlackRock High Yield Bond Portfolio | 12/31/2007 | 22 | 60.37 | 5 | 12/31/2007 | 1581 | 13.97 |
| Templeton Foreign Fund | 8/1/2007 | 17 | BAD | 50 | 9/30/2017 | 98 (53) | 24 (32) |

Class Action Complaint for Damages

| Name of Defendants' Fund | Manager Start (as of 2017) | Observed Yrs by Plaintiffs | # Yrs @ 95% | Variance of All Mgrs | Manager Start as of Dec 22 | # Hldgs '17 ('22) | Top-10 % '17 ('22) |
|---|---|---|---|---|---|---|---|
| Nuveen Real Estate Securities Fund | 5/30/2005 | 22 | 24.60 | 11 | 5/30/2005 | 106 (70) | 39 (43) |
| Invesco Small Cap Growth Fund | 9/8/2004 | 22 | 129.95 | 94 | 9/8/2004 | 122 (118) | 13 (17) |
| Franklin Utilities Fund1 | 12/31/1998 | 26 | BAD | 22 | 12/31/1998 | 53 (47) | 44 (47) |
| American Funds Washington Mutual Investors Fund | 7/1/1997 | 47 | 361.37 | 44 | 7/1/1997 | 218 (191) | 31 (30) |
| Loomis Sayles Investment Grade Bond Fund | 12/31/1996 | 21 | 42.46 | 55 | 9/30/2006 | 329 (733) | 27 (30) |
| American Funds AMCAP Fund® | 5/1/1996 | 47 | 123.52 | 80 | 5/1/2011 | 258 (193) | 21 (30) |
| Invesco Small Cap Growth Fund | 9/8/2004 | 22 | 129.95 | 94 | 9/8/2004 | 122 (118) | 13 (17) |
| Transamerica High Yield Bond | 8/1/2006 | 31 | BAD | 8 | 8/1/2006 | 387 (458) | 10 (7) |
| American Funds The Growth Fund of America® | 11/1/1993 | 44 | 39.41 | 76 | 11/1/1993 | 373 | 38.52 |
| Western Asset Core Bond Fund | 12/30/1994 | 44 | BAD | 69 | 12/29/2006 | 2663 | 9.54 |
| AB Large Cap Growth Fund | 2/16/2012 | 28 | BAD | 115 | 2/16/2012 | 56 (51) | 42 (46) |
| Transamerica Core Bond | 5/1/2014 | 20 | BAD | 6 | 5/1/2014 | 2184 (496) | 10 (25) |

612.    The Measurement of Alpha is often the first selection and retention "principle" in Investment Policy Statement (IPS) templates from Fidelity, T. Rowe, Vanguard, and other firms.

613.    Negative alpha has several causes but usually results from unskilled and inexperienced portfolio managers. Other factors exacerbating negative alpha results stem from (1) the portfolio manager's compensation (expense) drag, (2) the revenue-sharing costs, (3) and finally, the turnover or trading cost drag from portfolio managers who sell the stocks bought in the past 12 months. All these expenses are netted out no later than when returns are allocated to participants each evening.

614.    Funds above that had positive alphas are also listed below. Monitoring periods to calculate alphas were not arbitrary or random and are listed after the name of the fund.

615.    Exposing the trust to untested, unskilled portfolio managers (failure to monitor a fund long enough) is analogous to forcing the participants' accounts to pay expenses for portfolio managers' compensation that may or may not result in "enhanced returns."

> Invesco Global Fund, 80.81 years; Delaware Ivy Science and Technology Fund, 371.32 years; Janus Henderson Global Technology and Innovation Fund, 73.39 years; BlackRock High Yield Bond Portfolio, 60.37 years; Nuveen Real Estate Securities Fund, 24.6 years; Invesco Small Cap Growth Fund, 129.95 years; American Funds Washington Mutual Investors Fund, 361.37 years; Loomis Sayles Investment Grade Bond Fund, 42.46 years; American Funds AMCAP Fund®, 123.52 years; American Funds The Growth Fund of America®, 39.41 years; Western Asset Core Bond Fund, 113.65 years.

616.    From the annual alpha analysis of the Invesco Global Fund, the third fund in the table, Plaintiffs found 81 years (in column three) were needed to ascertain the skill of every manager hired (since inception; at a 95% confidence level). In 2017, one

of the managers had enough years of management to know, at a 95% confidence level, that they had experience and expertise or "skill" under ERISA. Thus, overall, fund selection and monitoring processes were a mathematical gamble made by the Company using other people's money. The Company imprudently administered these funds.

617.    ERISA also requires that the Company's fiduciaries use "* * * care, skill * * " under § 1104(a)(1)(B). They must have "employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983); see also Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 716 (2nd Cir. 2013) (prudence analysis focuses on a fiduciary's "conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment").

618.    Open-end management investment companies' fund managers make an average of $436,500 annually. However, top-performing fund managers can earn much more—compensation packages reaching millions of dollars.

619.    Legal but arguably unfair in the realm of trusts, fund managers (and plan fiduciaries choosing these same managers) play a daily game of "Heads I win, tails you lose." Their portfolio manager's compensation fees are taken from holders of record irrespective of whether the managers' performance exceeds benchmarks.

620.    But, expense ratios for funds using portfolio managers have been declining due to pressures of similarly situated, cheaper, and more diverse index funds.

621.    For example, the largest fund in the plan chosen by the Company, American Balanced, had fee compression (down 17%) affect their portfolio manager's compensation. On 1/1/2014, the cheapest American Balanced Fund version cost 0.30%/year; 0.29% on 4/1/2015; 0.28% on 1/1/2019; and 0.25% on 2/1/2023.

622.    The Company recently added a new fund, AB Large Growth, with an expense ratio of 52 basis points on 1/31/23. However, on 4/1/2015, the annual expense ratio was 90 basis points but fell to 57 on 1/1/2019.

623.    In the Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data table, the average variance of the alpha for the Company's chosen investments was 117%. The median variance of the alpha for the Company's selected funds was 72.5%. A variance this high forces participants to experience wild swings in performance versus a widely-used, broad-based benchmark.

624.    To explain the impact of these numbers on participants whose investment horizons are unknown to the Company in advance of fund selection and monitoring (because they can separate from service anytime, make an investment change anytime, liquidate a fund for a hardship withdrawal or cash out for a loan, etc.).

625.    So, plan fiduciaries claiming that a manager may do well in the future as justification for keeping an underperforming manager is unfaithful to establishing defined contribution plans.

626.    The only part of the 401k that is *defined* is the salary contribution. A participant's total account grows two-thirds more by compounded investment growth (by way of well-performing portfolio managers). Prudently chosen managers are predicated on the processes employed by Company.

627.    The Company should have developed solid principles for selections/retentions in 1994 when asking for tax-exempt status from the IRS. This plan document, required to be submitted to the Internal Revenue Service when seeking tax-exempt status, was not provided upon request.

### Economic benefits dependent on the Company's "experience and expertise"

628.    Data illustrating Restatements' "variance" concept is contained in the table immediately below. The table helps convey variance using only one variance

number and ten periods of that same variance (i.e., investors can use days, weeks, months, etc.). For example, when a participant experiences a ten percent swing ("% chg") for each of the ten periods, the "Arithmetic Loss" is zero.

629.    However, the actual geometric dollar loss for the participant's $1,000 account is a negative 4.9% (down 49 bucks). Linear relationships do not exist when comparing (1) investment fees and (2) investment losses.

630.    Doubling variance to 20% causes the harm or damages to rise exponentially (19% loss from 5%). Participants with that 20% variance are out $184.63.

631.    Over time the variance risk problem increases. The Janus Henderson Global Technology, one of the recently selected and largest positions, has an 822% variance (fifth fund in the table below).

**Table 23**

| Period: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | _Dollar Loss_ | Arithmetic Loss | Real Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % chg: | -10 | 10 | -10 | 10 | -10 | 10 | -10 | 10 | -10 | 10 | | | |
| $1,000 | $900 | $990 | $891 | $980 | $882 | $970 | $873 | $961 | $865 | $951 | -$49 | 0% | -4.9% |

| Period: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Dollar Loss | Arithmetic Loss | Real Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start $ | -20% | 20% | -20% | 20% | -20% | 20% | -20% | 20% | -20% | 20% | | | |
| $1,000 | $800 | $960 | $768 | $922 | $737 | $885 | $708 | $849 | $679 | $815 | -$184 | 0% | -19% |

632.    Plaintiffs include the table called "Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data" again for quick reference. The table conveys the same investment risk and reward information available to the Company's plan fiduciaries in 2017.

**Table 24 Analysis of Company's Fund Offerings to Participants, 2017 Prospectus Data**

| Name of Defendants' Fund | Manager Start (as of 2017) | Observed Yrs by Plaintiffs | # Yrs @ 95% | Variance of All Mgrs | Manager Start as of Dec 22 | # Hldgs '17 ('22) | Top-10 % '17 ('22) |
|---|---|---|---|---|---|---|---|
| Calvert Small-Cap Fund | 11/3/2015 | 13 | BAD | 19 | 12/31/2016 | 81 (73) | 20.67 (25) |
| Calvert Equity Fund | 6/16/2015 | 30 | BAD | 126 | 6/16/2015 | 100 (76 in '22) | 35.92 (40.4) |
| Invesco Global Fund | 8/2/2004 | 17 | 80.81 | 239 | 3/31/2017 | 76 | 27 (51) |
| Delaware Ivy Science and Technology Fund | 2/9/2001 | 18 | 371.32 | 179.51 | 10/1/2016 | 64 (42) | 43 (45) |
| Janus Henderson Global Technology and Innovation Fund | 1/12/2016 | 20 | 73.39 | 822 | 1/12/2016 | 84 (59) | 38 (53) |
| BlackRock High Yield Bond Portfolio | 12/31/2007 | 22 | 60.37 | 5 | 12/31/2007 | 1581 | 13.97 |
| Templeton Foreign Fund | 8/1/2007 | 17 | BAD | 50 | 9/30/2017 | 98 (53) | 24 (32) |
| Nuveen Real Estate Securities Fund | 5/30/2005 | 22 | 24.60 | 11 | 5/30/2005 | 106 (70) | 39 (43) |
| Invesco Small Cap Growth Fund | 9/8/2004 | 22 | 129.95 | 94 | 9/8/2004 | 122 (118) | 13 (17) |
| Franklin Utilities Fund1 | 12/31/1998 | 26 | BAD | 22 | 12/31/1998 | 53 (47) | 44 (47) |
| American Funds Washington Mutual Investors Fund | 7/1/1997 | 47 | 361.37 | 44 | 7/1/1997 | 218 (191) | 31 (30) |
| Loomis Sayles Investment Grade Bond Fund | 12/31/1996 | 21 | 42.46 | 55 | 9/30/2006 | 329 (733) | 27 (30) |
| American Funds AMCAP Fund® | 5/1/1996 | 47 | 123.52 | 80 | 5/1/2011 | 258 (193) | 21 (30) |

| Name of Defendants' Fund | Manager Start (as of 2017) | Observed Yrs by Plaintiffs | # Yrs @ 95% | Variance of All Mgrs | Manager Start as of Dec 22 | # Hldgs '17 ('22) | Top-10 % '17 ('22) |
|---|---|---|---|---|---|---|---|
| Invesco Small Cap Growth Fund | 9/8/2004 | 22 | 129.95 | 94 | 9/8/2004 | 122 (118) | 13 (17) |
| Transamerica High Yield Bond | 8/1/2006 | 31 | **BAD** | 8 | 8/1/2006 | 387 (458) | 10 (7) |
| American Funds The Growth Fund of America® | 11/1/1993 | 44 | **39.41** | 76 | 11/1/1993 | 373 | 38.52 |
| Western Asset Core Bond Fund | 12/30/1994 | 44 | **BAD** | 69 | 12/29/2006 | 2663 | 9.54 |
| AB Large Cap Growth Fund | 2/16/2012 | 28 | **BAD** | 115 | 2/16/2012 | 56 (51) | 42 (46) |
| Transamerica Core Bond | 5/1/2014 | 20 | **BAD** | 6 | 5/1/2014 | 2184 (496) | 10 (25) |

### *Line chart examples of the Company's imprudently monitored funds*

633.   Plaintiffs use bar charts to help explain alpha variance for three of the Company's chosen funds. This chart uses only one variable—the manager's performance versus his appropriate benchmark (alpha). Benchmarks match the underlying holdings and correlate to the benchmarks required by (1) SEC, (2) 29 CFR § 2550.404a-5 ("appropriate broad-based securities market index") and (3) Prudent Investor Rule Restatement (Third) Trusts.

634.   On August 11, 2016, Amy Miller commented on the 1972 paper called *Factors to be Considered in Connection with Investment Advisory Contracts Containing Incentive Fee Arrangements*,

> This language, although from a "dated" release, is still the standard with respect to defining an "appropriate securities index" under Section 205(b)

and is quoted at length by both the SEC Staff and no-action letter applicants.

Division of Investment Management, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549) wrote SEC Rel. No. IA-315, IC-7113 (Apr. 18, 1972)

635.    The SEC explained in their "Disclosure of Mutual Fund Performance and Portfolio Managers" (SEC Rel. No. IC-19832 (Apr. 6, 1993)) that it chose to require funds to use a broad-based index (instead of peer group comparisons) "to provide investors with a benchmark for evaluating fund performance that affords a greater basis for compatibility than a narrow index would afford."

636.    In rejecting the use of peer group comparisons for all funds, the SEC stated that "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market, and not so much whether one fund 'out-performed' another." ("Disclosure of Mutual Fund Performance and Portfolio Managers" SEC Rel. No. IC-19832 (Apr. 6, 1993)).

637.    The SEC has stated that "[t]he purpose of including return information for a broad-based securities market index was to provide investors with a basis for evaluating a fund's performance and risks relative to the market."

638.    SEC Rule 156 requires mutual funds to tell investors not to base their expectations of future results on past performance before they invest. The SEC requires firms comparing returns to (1) avoid conflicts of interest and (2) use a broad-based securities market index to be selected that is closely aligned with the Fund's principal investment strategies.

639. Notably, the index must be calculated and administered by an organization unaffiliated with the Fund, its investment adviser and its principal underwriter.

> Specifically: "To prevent a conflict of interest from arising, the index must be created and administered by an organization that is not an affiliated person of the fund, its adviser or principal underwriter…." Disclosure of Mutual Fund Performance and Portfolio Managers, Investment Company Act Rel. No. 19382 (Apr. 6, 1993) (citing potential conflicts of interest as the primary reason for requiring a broad-based securities market index to be administered by an unaffiliated third party, unless the index is widely recognized and used, in which case the potential for conflict is diminished because the index is used for purposes other than as a benchmark against which to measure fund performance).

### *"Peer group" comparisons are dangerous.*

640. Warnings about peer comparisons came decades ago from 1990 Nobel Laureate William F. Sharpe in "The Arithmetic of Active Management" excerpted below [emphasis added]:

> * * * "Peer group" comparisons are dangerous. Because the capitalization-weighted average performance of active managers will be inferior to that of a index/passive alternative, the former constitutes a poor measure for decision-making purposes. And because most peer-group averages are not capitalization-weighted, they are subject to additional biases. Moreover, investing equal amounts with many managers is not a practical alternative. Nor, a fortiori, is investing with the "median" manager (whose identity is not even known in advance). The best way to measure a manager's performance is to compare his or her return with that of a comparable passive alternative. The latter -- often termed a "benchmark" or "normal portfolio" -- should be a feasible alternative identified in advance of the period over which performance is measured. Only when this type of measurement is in place can an active manager (or one who hires active managers) know whether he or she is in the minority of those who have beaten viable passive alternatives.

641.   To demonstrate the paragraph more succinctly, Plaintiffs offer this figure below. Many advisory firms like Fidelity pushed back on the new performance disclosure rules launched on 7/1/2012 because they preferred to compare their portfolio managers' performance to peers and between similar offerings at Fidelity. To show why the three "affiliated" Foreign Large Growth funds by Fidelity are listed below their "Best-Fix Index" called Morningstar Gbl Allocation Tr USD. Looking backward from 12/31/22 for over five years, the bottom fund manager's loss (Fidelity International Discovery) of -1.44% does not look as bad against Fidelity Overseas' manager's 1.31 return total. But comparing any of the Foreign Large Growth funds to the index makes them look unappealing to plan fiduciaries.

| | Name | 5-Year Total | Best-Fit Index | Category | Objective |
|---|---|---|---|---|---|
| 1▶ | Morningstar Gbl Allocation TR USD | 11.06 | | Index | Index |
| 2▶ | Fidelity® Diversified International K | 2.02 | Morningstar Gbl Allocation TR USD | Foreign Large Growth | Foreign Stock |
| 3▶ | Fidelity® Overseas | 1.31 | Morningstar Gbl Allocation TR USD | Foreign Large Growth | Foreign Stock |
| 4▶ | Fidelity® International Discovery | -1.44 | Morningstar Gbl Allocation TR USD | Foreign Large Growth | Foreign Stock |

**Figure 23**

### Chart for Templeton Foreign Fund

642.   These charts illustrate how hard it is for the human eye to ascertain compounded loss numbers and "appropriate relief under section 409 of " ERISA (29 U.S.C. 1132(a)(2)). Using charts, the eye can see the extreme risks participants must endure due to costs and concentration.

643.   The information below shows swings during the limitations period. Participants endured two sets of portfolio managers—Arnett/Peel/Moeschter- hired on 9/30/17 (replacing the terminated managers Scott/Harper/Boersma/Arnold). In 2022, the new managers were lucky and beat their benchmark, finally.

644.   Netting all years, and looking precisely at the dollars necessary to restore the account to the level it would have been if invested in the benchmark, requires a

1.4% per year restitution in returns. The average participant balance at the beginning of the period was $35,135. Most participants hold three funds.

645.   The future value of one-third of that (11,712 dollars) at the difference of 2%/yr versus 3.4%/yr (1.4%, ignoring new biweekly contributions) equals $13,212 in future value from 2017 to 2022 for the Company's chosen Templeton fund.

646.   But the benchmark (MSCI ACWI Ex USA Value NR USD) grew to $14,327.96—a ($1,115.43) difference.



**Figure 24**

647.   Section 1132(a)(2) states: "A civil action may be brought by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1109 states (emphasis added): "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter <u>shall be personally liable to make good to such plan any losses to the plan resulting from each such breach</u>, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the

plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

### *The Company added the Janus Technology fund to their 2018 Form 5500*

648.    Plaintiffs have direct evidence that the Company imprudently selected the Janus Technology fund and AB Large Cap Growth (see table below). Plaintiffs explain this fact using the Company's chosen portfolio managers' handling of Janus' assets..

649.    Regarding the Janus Henderson Global Technology fund, the Company directed the entire omnibus trust position in Ivy Technology to be sold for the participant's resulting cash to "seed" the Janus Henderson Global Technology in 2018. Ivy Technology was one of the most significant 401(k) positions.

650.    Plaintiffs examined the portfolio manager's alpha at the time of the Company's initial decision to add this fund. First, Plaintiffs analyzed facts about the alpha using the Prudent Investor Rule Restatement (Third) Trust's "best-fit" index (the Morningstar US Technology Sector TR).

651.    The Janus Tech fund's managers' required skill years of 73 are directly derived from the variance of the managers' alpha over the prior two decades before the Company added this fund (performance data back to inception in 1999).

652.    Some of the variances can be seen in the chart below using only ten years before selection (2018 back to 2009). The square root of the variance is called the standard deviation. That number for two decades was 29%. The number 29 times 29 (for two standard deviations to arrive at a 95% confidence) equals 841. This is a quick way to calculate variance by hand.

653.    The Prudent Investor Rule helps protect participants/beneficiaries from an unskilled and disloyal trustee or fiduciary. When a person is given control over another's assets, they must make investment decisions that a person of *reasonable*

*intelligence*, *discretion*, and *prudence* could be expected to make. That means choosing investments that do not increase the risk of loss or give up probable yield.

654.    The "Trust Examination Manual" goes further and stipulates that fiduciaries invest in trust assets as if they were their own and avoid excessively risky assets that may result in a steep drop in value. Federal Deposit Insurance Corporation.

655.    In 1830, Judge Samuel Putnam formulated the Prudent Man Rule. He wrote as a judgment in the Harvard v. Amory case (emphasis added):

> "Do what you will, the capital is at hazard...All that can be required of a trustee to invest is that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion, and intelligence manage their own affairs...<u>considering the probable income, as well as the probable safety of the capital to be invested</u>."

656.    Consequently, watching the wild swings in alpha for over two decades in 2018, the Company, if they had taken the time, could have known that adding that fund and its portfolio managers did nothing to link to the standards of care under the Restatement (Third) Trusts.

657.    This analysis applied to the portfolio managers hired in 2016 and those who quit or were fired. The Company's duty of prudence requires that the portfolio managers' "strategy should be justifiable in terms of…a realistically evaluated prospect of enhanced return [from the strategy]" before they are included in the menu. Edward C. Halbach, Jr., the Reporter for the Restatement and Walter Perry Johnson professor of law emeritus at the University of California law school, in "Trust Investment Law in the Third Restatement," Real Property, Probate and Trust Journal, Volume 27, Fall 1992, pages 407-65; see Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment f, page 25.

658.   The cause of the high variances was evident in SEC prospectuses at the time of investigation by the Company. All the plan fiduciaries must do is look closely at the prospectus bar charts showing the applicable fund's bar compared to the appropriate benchmark's returns for the year. Essentially, the Company directed the participants' earlier wages deposited in Ivy Technology shares to transfer to Janus (they had saved into Ivy since 2009 or before).

659.   Based on prospectus factors at the time, this chosen fund was:

(1) an undiversified technology fund holding only 59 stocks and,

(2) under new managers (who started in 2016) and,

(3) these untested portfolio managers decided to concentrate 53% of all investors' cash,

(4) into only ten (10) tech stocks.

660.   The replaced Ivy fund's managers' alpha was negative for most years (7 of 9). However, its portfolio managers' alpha variance was much less than Janus at 180%. Janus' portfolio managers' variance was >800% or 450% greater than Ivy's portfolio managers' variance risk. One year of high variance, like a variance of 40% downward, requires workers in that year to have a 67% recovery to break even.



**Figure 25**



**Figure 26**

661.    Plaintiffs looked at 20 years of the performance history of every manager of this fund to find that their alphas averaged 6.7 %/year. However, because the variance was an incredible 823% from its average benchmark's return, plan fiduciaries need over seven decades of observation to know the skill is present.

662.    The risk of variance for Janus was evident at the time by the portfolio managers' overconcentration into only 84 tech stocks. The managers forced over 34% of the participants' previously deferred wages into only ten stocks.

663.    On 3/28/2018, the Company directed the Ivy Technology fund's shares to be sold, and they redirected the resulting cash into the Janus Technology fund. Based on information and belief, participants were never informed of the heightened risk this new tech fund's managers were bringing.

664.    Yes, the Ivy fund's managers were also untested as they started running the fund on 1/12/2016, but the Janus managers began only about two years earlier. Nevertheless, the Janus fund's managers' variance was over five times greater than the replaced Ivy tech fund's managers.

| Manager Start (as of 2018) | Manager Tenure (2018) | Observed # All Mgrs' Yrs by Plaintiffs | All Managers' alpha | Variance of All Managers | Required Skill Years @ 95% Conf (2sd) |
|---|---|---|---|---|---|
| 1/12/2016 | 2 | 20 | 6.7 | 822 | 73 |

665.    Based on information and belief, Plaintiffs were never afforded pertinent information about the risks and rewards of the Company's decision-making facets while maintaining the participants' menu of investment offerings.

666.    Information is material if there is a substantial likelihood that nondisclosure "would mislead a reasonable employee in the process of making an adequately informed decision regarding benefits to which she might be entitled." Kalda, 481 F.3d at 644 (quoting Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 551 (6th

Cir. 1999)). "In the context of this case, <u>materiality turns on the effect information would have on a reasonable participant's decisions about how to allocate his or her investments among the options in the Plan</u>." See Edgar v. Avaya, Inc., 503 F.3d 340, 350 (3d Cir. 2007).

### Invesco Small Cap Growth Fund

667.    This fund was listed on the Company's 2021 Form 5500 back to 2010. Plaintiffs expand their discussion to a second kind of mistake often made by the Company in selecting/retaining investments for the Plan and Trust. As the U.S. Securities and Exchange Commission (SEC) has stated publicly in several press releases, an R5 share class uses the same portfolio managers, and the same humans manage identical holdings for a cheaper R6 share class. They warn that conflicted brokers like Cetera often recommend the more expensive share classes because of the soft dollar and hard dollar compensation they can reap every year they meet their sales goals. That is the case here.

668.    From "Trusts" by Edward C. Halbach, Jr., University of California, Berkeley, Reporter for the Restatement (Third) of Trusts, Thirteenth Edition:

> In considering the duty to invest and make the trust property productive, do not overlook the duties to diversify and to consider a suitable risk-reward level * * *.
> Also look for improper delegation of duties (consider, e.g., whether and how a reasonably prudent person would delegate) and for failure to segregate or earmark trust property.

669.    Using data from 1/1/2017, the first monitoring year in the Class Period, the Company reviewed and retained the R5 class (present on the Company's 2021 report). They disregard the trust law's "probable income" (yield) by keeping, since 2009, the lower yielding version. As of 2017, their R5 version yielded 0.33% when an identical version was available with a phone call to the fund at 800.959.4246. The SEC-

prospectus at www.sec.gov/edgar indicates they could switch immediately as all minimum purchases were waived for qualified retirement plans (QRP) and "omnibus trusts."

| | Name | Expense Ratio | Yield 12-Month | 3-Year Total | Manager Name | Manager Start Date |
|---|---|---|---|---|---|---|
| 1 | Invesco Small Cap Growth R5 | 0.820 | 0.33 | 19.00 | Ellis/Hartsfield/Manley | 9/8/2004 |
| 2 | Invesco Small Cap Growth R6 | 0.730 | 0.42 | 19.37 | Ellis/Hartsfield/Manley | 9/8/2004 |

**Figure 27**

670.    After observing all available data, Plaintiffs found over 22 years that the portfolio managers created a variance of 94 percent (which requires 130 years of monitoring before adding this fund to the plan). This risk directly results from the 118 small stocks the portfolio managers oversaw.

671.    The information above explains negative compounding. Twelve basis points are the annual drag—nine basis points cost above (19.37 minus 19).

672.    Not the only time the Company was interested in choosing more expensive share classes; its selection/retention processes were the same before 2017.

| | |
|---|---|
| Transamerica Capital, Inc. | Transamerica High Yield Bond R4 |
| Transamerica Capital, Inc. | Transamerica Intermed Bond R4 |
| Transamerica Capital, Inc. | Transamerica Mid Cap Value Opportunities R4 |

**Figure 28**

673.    However, from the Company's 5500, Plaintiffs also noted more opaque Transamerica *proprietary* versions of SEC-registered mutual funds (i.e., separate accounts, collective trusts ("CCT") in the 2009 Form 5500 and later.

### *American Funds Washington Mutual*

674.    Plaintiffs demonstrate more revenue-sharing motivation by the Company. This time Plaintiffs are using a fund (R5, italics) chosen by the Company in 2009 and still in the plan on 1/1/2022:

| Remarks | Name | SEC 30-Day Yield | Expense Ratio | 5-Year Total |
|---|---|---|---|---|
| *Defendants* | *American Funds Washington Mutual R5* | *2.21* | *0.35* | *89.27* |
| Cheaper, identical | American Funds Washington Mutual R6 | 2.26 | 0.30 | 89.69 |

675.    The yield difference, like the expense ratio difference, is the revenue-sharing deductions that are not explained or provided to the participants.

676.    The identical cheaper R6 version earned forty-two basis points (0.42%) more over five years. That is 8.4 basis points (per year) more than the R5 (or 3.4 basis points more than the five basis points in revenue-sharing (68% more)).

677.    Again, the R5 class cost workers 68% of lost opportunity costs. But as time progresses, the "delta" or spread increases as expected in the non-linear behavior of investment gains/losses.

### The Company's preference for classes with both (1) portfolio manager's compensation and (2) revenue-sharing compensation

678.    Over 80% of the time, Amy's Kitchen Inc. sought funds with revenue-sharing and portfolio manager's compensation. Plaintiffs infer that they believed extra expenses for the portfolio managers would bring excess returns even though the gamble used their workers' deferred salaries (not the Company's money).

679.    As the Prudent Investor Rule mandates, the further the Defendants acted to seek funds with these extra portfolio managers' fees, the higher the burden of care for both "justification" [for selecting an active investment strategy] and also of "continuous monitoring" [of it]. Reporter's General Note on Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comments e through h, page 79.

680.    Based on information and belief, Plaintiffs were never informed about lower cost, identical share classes in violation of ERISA. Courts have refused to dismiss duty-to-monitor claims in the past for this, noting that fiduciaries never

reviewed the disclosures required by law or the regulation. *Moitoso v. FMR LLC*, 2020 BL 115227, 18, 2020 U.S. Dist. LEXIS 53656 (D. Mass. Mar. 27, 2020); *Santomenno v. Transamerica Life Ins. Co.,* 2013 BL 45042, at *12, 55 EBC 1266, 2013 WL 603901 (C.D. Cal. Feb. 19, 2013).

681.    Courts have also ruled that "fiduciaries should be vigilant in "negotiation of the specific formula and methodology" by which fee payments such as "revenue-sharing will be credited to the plan and paid back to the plan or to plan service providers" See, e.g., *Sweda v. University of Pa*., 923 F.3d 320, 2019 EBC 158780 (3d Cir. 2019).

### *Transamerica Mid Cap Value*

682.    Taking the last fund above, this one fund frames the totality of the Plaintiffs' allegations against Andy Berliner, CEO and Amy's Kitchen Inc. (the "Company" responsible for oversight per management's independent plan audits).

683.    Self-dealing is defined at Investopedia as "when a fiduciary acts in their own best interest in a transaction, rather than in the best interest of their clients." Here, to avoid invoices from Transamerica (the custodian and recordkeeper the Company kept repeatedly selecting/retaining since 2009), the Company kept acting to avoid cheaper, better-yielding versions of the same investments in order to benefit from various forms of revenue-sharing offered by the specific funds listed at www.efast.dol.gov.

684.    Looking at the first year of the putative Class Period, 2017, Plaintiffs find examples that this Amy's Kitchen Inc. 401(k) Retirement Plan is replete with. Column 2, row 2 is the fund chosen by the Company. Row 2 is the same fund, more expensive, less economical class managed by the same managers at the last columns.

685.    The fourth column is the focal point for the Company's self-interest. Over and over, Plaintiffs find examples like this where the Company and its fiduciary

delegates cared not for columns three or five (yield and costs) that relate to pecuniary and economics that benefit the Plaintiffs and Plan and Trust. This manager in the number of holdings (3rd from last column) is representative of the other funds' managers chosen by the Company. Inexperience and lack of skills noted by the last column also frame the selection of the Company's managers in this plan for workers to save into using their deferred wages.

| | *Notes | Name | Yield 12-Month | 12b-1 Fees | Expense Ratio | 12-Month Return | Year Incorporated | Number of Holdings | Manager Name | Manager Start Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Defs' choice | Transamerica Mid Cap Value Opps R4 | | 0.250 | 0.900 | | 2017 | 73 | Hawkins | 4/30/2014 |
| 2 | Cheaper, same | Transamerica Mid Cap Value Opps R6 | 0.47 | | 0.790 | 8.18 | 2016 | 73 | Hawkins | 4/30/2014 |
| 3 | | Russell Mid Cap Value TR USD | | | | 13.37 | 1985 | 587 | | |
| 4 | | S&P MidCap 400 Value TR USD | | | | 17.04 | 1997 | 288 | | |

**Figure 29**

686.    Expanding on the facts present and available to the Company in 2017, Plaintiffs see in row 1 of the figure below that the average for mid-cap value funds like the Company's chosen fund here had over twice the manager tenure. Since median manager tenure runs seven to eight years, this was not unexpected. The 2017 SEC-prospectus at www.sec.gov/edgar depicted 3.42 years of experience for the fund here (both classes, R4 and R6).

| | *Notes | Manager Tenure (Years) | Assets ($millions) | Name | Yield 12-Month | 12-Month Return | Number of Holdings |
|---|---|---|---|---|---|---|---|
| 1 | | 7.92 | 1,317.6 | Mid-Cap Value Average | 1.21 | 14.93 | 169 |
| 2 | Defs' choice | 3.42 | 440.7 | Transamerica Mid Cap Value Opps R4 | | | 73 |
| 3 | Cheaper, same | 3.42 | 17.0 | Transamerica Mid Cap Value Opps R6 | 0.47 | 8.18 | 73 |

**Figure 30**

687.    But for the Company's processes to select and monitor their choices, participants could have bought a higher yielding value stock fund like the "average" in row 1 displayed above (1.21%/year versus zero for row 2, the R4).

688.   Cause and effect now come into play. Advancing to the results of the Company's self-interest and misconduct, 12/31/2022, Plaintiffs contend that the rest of the invested public found little to benefit other 401k plans, and the assets in column 3 prove the allegation. The R4 choice's yield was much less than the ignored identical fund, class R6, and they ignored 414 other mid-cap value funds too.

| | *Notes | Name | Assets ($millions) | SEC 30-Day Yield | SEC-Yield Effective Date |
|---|---|---|---|---|---|
| 1 | | Mid-Cap Value Cat. Avg | 1,470.7 | 1.87 | |
| 2 | Defs' choice | Transamerica Mid Cap Value Opps R4 | 81.5 | 0.93 | 11/30/2022 |
| 3 | Same | Transamerica Mid Cap Value Opps R6 | 216.2 | 5.39 | 11/30/2022 |

**Figure 31**

689.   The Company was predisposed towards specific share classes offering SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees, commissions, finder's (incentive) fees or other types of fees.

690.   The problem is that the revenue-sharing deductions of participants' earnings compound daily and consume more than the credits can ever equal, mathematically speaking. R4 fund above takes a quarter of a percent (twenty-five basis points) annually (split into $1/365^{th}$) and the negative fee compounds negatively as column 5 proves. The SEC-prospectus at www.sec.gov/edgar reported there was no yield for the R4 version in 2017. Yet the Company chose it.

691.   Participants' contributions from 2021 back to 2017 were $66,507,631— or $3,058 per worker per year.

692.   The math is not including irrelevant and wasteful non-pecuniary selection/retention processes' impact on *old money* (previously deposited salaries the participants have saved in earlier years). Based on the Defendants' Forms 5500 balance sheets, the "Investments: Value of Interest in Mutual Funds" were $125,051,238 for 2021 and respectively back to 2017: $102285246, $92027688, $70445306, and

$70738366. That total is $1,151,369.61 annually, on average, in wasted expenses for the portfolio manager's compensation and revenue-sharing (that can benefit Amy's Kitchen Inc. and CEO).

693.    This damage or harm amount does not include impact on reinvested interest as well as the impact on participants' reinvested investment growth (*new money*) below:

> Income:
> > Investment Gain from Mutual Fund Dividends" of 2130818 dollars in 2021 and 1578961 dollars, 1856533 dollars, 1578710 dollars and 1295417 dollars (for '20-'17).

694.    Investment fiduciaries have a duty to "initially determine and continue to monitor the prudence of each investment option available to plan participants." Bunch, 532 F. Supp. 2d at 289. In so doing, for a particular investment, the fiduciary must determine whether the investment "is reasonably designed, as part of the portfolio...to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

695.    Based on information and belief, Cetera researched and recommended, numerous times to the Company, what fund should be selected and kept. The Company directed the custodian to change investments based on Cetera's recommendation. This statement is logical because the Company kept paying Cetera for their quarterly recommendations starting in 2013. Both firms were trying to choose a revenue-sharing class of a mutual fund in 2017 without knowledge of (1) how much money the participants will contribute to the new fund in the future and (2) without the knowledge of what the RIC (registered investment company) will "share"—because sharing is

always dependent on future funding. Thus, the Company continually sought non-pecuniary benefits at the expense of the trust and participants' accounts.

The declining costs of recordkeeping

696.    Given Amazon's cloud storage and deflation of technology costs over the past decades, Plaintiffs experts contacted independent recordkeeper providers (not tied to proprietary investment offerings like Transamerica (Amy's Kitchen Inc. selection) and found the per quarter per head fee was $10 and $15. That means since the plan has 3,074 participants (line 4g of each 5500 for 2021 back to 2017), the annual cost would be four times 30742 up to four times $46,113. Thus, the flat per capita annual recordkeeper costs are between $122,968 and 184,452 dollars. However, not counting revenue-sharing indirect compensation, actual "direct" payments to Transamerica on their 10/13/22 certifications were:

"Enter direct compensation paid by the plan. If none, enter -0-. TRANSAMERICA RETIREMENT SOLUTIONS, EIN 13-3689044, **$296,739**

***Demonstration of revenue-sharing scheme for paying recordkeeper costs***

697.    The Defendants' failure to be loyal and skilled caused repeated harm to participants'/beneficiaries' accounts for over a decade. Each of the fund's portfolio managers (1) charged the participants for their compensation and (2) also traded their stocks and bonds regularly and (3) they quit or were fired every year (median tenure is less than eight years), requiring the Company (Amy's Kitchen Inc.) to reevaluate their selections regularly).

698.    The Company's Schedule C is extracted below (specifically "3. (d) Enter name and EIN (address) of the source of indirect compensation"). It was taken from Amy's Kitchen Inc.'s public reporting to the U.S. Departments of Treasury and Labor.

Amy's Kitchen should have known these cumulative revenue-sharing costs hurt the trust and their own employees paid, on average, only $14 an hour.

| Schedule C (Form 5500) 2017 | |
|---|---|
| Part IService Provider Information (continued) | |
| 3. (a) Enter service provider name as it appears on line 2 | |
| TRANSAMERICA RETIREMENT SOLUTIONS | |
| 3. (d) Enter name and EIN (address) of source of **indirect compensation** | |
| AMERICAN CENTURYPO BOX 419200, KANSAS CITY, MO 64141 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| AMERICAN FUNDS 5300 ROBIN HOOD ROAD, NORFOLK, VA 23513 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| CALVERT4550 MONTGOMERY AVE, SUITE 1000N, BETHESDA, MD 20814 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| FRANKLIN100 FOUNTAIN PARKWAY, SUITE 1100, ST. PETERSBURG, FL 33716 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| INVESCO11 GREENWAY PLAZA, SUITE 100, HOUSTON, TX 77046 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| IVYPO BOX 29217,SUITE S-710,SHAWNEE MISSION, KS 66201 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| LOOMIS SAYLESONE FINANCIAL CENTER, SUITE 204, BOSTON, MA 02111 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| NEUBERGER BERMAN605 THIRD AVENUE,36TH FLOOR, NEW YORK, NY 10158 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| NUVEEN333 W. WACKER DR., SUITE 101, CHICAGO, IL 60606 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| TRANSAMERICAPO BOX 9012, CLEARWATER, FL 33758 | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |
| OPPENHEIMER | REVENUE-SHARING SEE ATTACHMENT TO LINE 2(H) |

### *Disloyalty and Imprudence—Lack of Care and Skill by the Company and Cetera*

699.    Cetera was appointed by the Company almost a decade ago. Based on retention and high compensation amounts (both direct from the trust and participants' accounts) as well as from investments, they recommended to the Company. and should have checked FINRA and the SEC as part of their periodic monitoring—but they did not. Both sites would have had information about conflicts and run-ins with regulators.

Plaintiffs note 22 mandatory disclosures at https://brokercheck.finra.org/firm/summary/10299 consisting of:

      a.  Fourteen "regulatory events"

      b.  One civil event and

      c.  Seven arbitrations

700.  Page 64 serves as a symbol of behavior under "CIVIL FINAL" disclosure one:

AUGUST 29, 2019, SEC COMPLAINT FILED: PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") ALLEGES AS FOLLOWS AGAINST DEFENDANT CETERA ADVISORS LLC ("CETERA"). CETERA, A SEC-REGISTERED INVESTMENT ADVISER, BREACHED ITS FIDUCIARY DUTY AND REGULARLY AND REPEATEDLY PUT ITS FINANCIAL INTERESTS AHEAD OF ITS CLIENTS. CETERA RECEIVED MORE THAN $10 MILLION FROM BREACHING ITS FIDUCIARY DUTY AND DEFRAUDING ITS CLIENTS. INVESTORS PAID CETERA TO SELECT AND MANAGE THEIR INVESTMENTS IN A MANNER CONSISTENT WITH CETERA'S FIDUCIARY DUTY, BUT CETERA CONTINUOUSLY RECOMMENDED AND INVESTED CLIENT ASSETS IN INVESTMENTS THAT COST CLIENTS MORE WHEN LESS EXPENSIVE, IDENTICAL INVESTMENTS WERE AVAILABLE. CETERA ALSO FAILED TO DISCLOSE THAT IT HAD NUMEROUS, MATERIAL CONFLICTS OF INTEREST IN PROVIDING INVESTMENT ADVICE TO ITS CLIENTS, INCLUDING THAT SOME INVESTMENT CHOICES GENERATED MILLIONS OF DOLLARS OF ADDITIONAL REVENUE FOR CETERA, WHILE OTHER INVESTMENT CHOICES WOULD HAVE GENERATED MUCH LESS OR NO ADDITIONAL REVENUE.

### *Plaintiffs question how the Company decided upon the Vanguard Target Funds*

701.  Because a portfolio manager's compensation/fee is removed from the "basis" of every related investment payment (like dividends and interest), future

invested dollars grow slower (called negative compounding). Amy's Kitchen Inc.'s choice for the default funds (funds that participants' salaries are deposited automatically if no election is made) is the Vanguard Target Retirement series. The annual "Yield" for their choice is 2.19%. A larger yield from substantially identical target date funds was available at all times of the Class Period. Over time the lack of focus on the trust law's "probable income" affects total returns (column 2 below).

| *Notes | 5-Year Total | Yield 12-Month | Name |
|---|---|---|---|
| | 20.79 | 4.27 | Empower Lifetime 2025 Instl |
| | 21.72 | 2.74 | State Street Target Retirement 2025 I |
| | 21.31 | 2.52 | JHancock Multi-Index 2025 Lifetime R6 |
| | 25.76 | 2.45 | American Funds 2025 Trgt Date Retire R6 |
| | 20.62 | 2.29 | Principal LifeTime 2025 Institutional |
| | 24.26 | 2.29 | T. Rowe Price Retirement I 2025 I |
| Defs' choice | 19.23 | 2.19 | Vanguard Target Retirement 2025 Fund |

**Figure 32**

702.    The defendants failed to use what Prudent Investor Rule and ERISA's requirements that a "skilled" fiduciary should know how to seek pecuniary and economic benefits for Amy's Kitchen Inc. 401(k) Retirement Plan. The Defendants' lack of "experience and expertise" (Hughes v. Northwestern University, No. 19-1401 (U.S. Jan. 24, 2022)) dramatically slowed the trust's growth and returns of individuals. Professors Benjamin Graham and David Dodd of Columbia Business School published the first widely known book on dividends and investing in 1934.

703.    Based on information and belief, Amy's Kitchen Inc. rubber-stamped their advisory firm's recommendations and never did their own independent investigation. For over thirteen years, they used non-pecuniary motivations (seeking revenue-sharing and indirect compensation so (1) Amy's Kitchen Inc. had the use of the credits for steering to their preferred providers as well as (2) the power to keep the

trust's costs hidden). These actions contradicted the lawful requirements to seek "economically beneficial investments" using selection and retention criteria that would continuously and probably aid in the growth of participants' accounts.

704.    Clearly, the Company's certifications of investment choices convey (since 2009) a predilection for choosing funds with the portfolio manager's fees/compensation. Of the 25 funds listed on the Company's 1/1/2017 list of investment choices for the participants, 21 choices or 84% have been selected by the Company that takes portfolio managers' fees every day the markets are open (accrued for weekends and holidays).

705.    Thus, the Company believes (Cetera via recommendations and the Company via their board resolutions to Transamerica to implement same) that their process to select/retain funds with managers is effective.

706.    Diversification and avoiding concentration are also excellent ways to avoid performance variances that can impact everyone. Over the past years, $43M left the plan due to terminations and separations. From 2021 back to 2017, participants cashed out their beneficial ownership of funds: $11,424,978.00, $13,755,694.00, $7,956,187.00, $5,831,341.00 and $3,691,329.00.

## CLASS ACTION ALLEGATIONS

707.    Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows: All participants in or beneficiaries of the Amy's Kitchen Inc. 401(k) Retirement Plan from January 1, 2017 through the date of judgment, (the "Relevant Time Period or Class Period").

708.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

709.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class include over 3,000 members and are so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries

regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

710.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties logically to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

711.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2020, the Plan had over 30,256 participants with account balances.

712.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, inter alia:

(a) whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached fiduciary duties of loyalty and prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plan;

(e) the proper form of equitable and injunctive relief; and

(f) the proper measure of monetary relief.

713.    Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

714.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches.

715.    Plaintiffs have no interests that conflict with those of the Class.

716.    Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

717.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties conceivably to be encountered in the management of this matter as a class action.

718.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final, injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**

**Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105**

**(Liability for breach of co-fiduciary; Duty of Prudence)**

719.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

720.  ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

721.  In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity....... ERISA requires fiduciaries to employ appropriate methods to investigate the merits of the investment and to structure the investment as well as to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). *Accord Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

722.  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. To satisfy its duties under ERISA, a fiduciary simply may not argue that other funds, in combination, theoretically create a prudent portfolio. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)."

723.  At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

724.    At all relevant times during the Class Period, The Company (and its delegates), along with Cetera, imprudently engaged in selecting and retaining the flawed investment lineup, deciding which funds to populate the limited Plan's menu of choices for workers, and retaining covered service providers, were ERISA fiduciaries.

725.    At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

726.    At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to Transamerica and Defendant Investment Fiduciaries, was an ERISA fiduciary.

727.    As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of prudence.

728.    Defendants breached this fiduciary duty in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for administrative services. Moreover, Defendants failed to investigate the competence of and periodically monitor covered service providers which they had selected to provide services to the Plan and Plan participants.

729.    Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Plan Fiduciaries failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriately and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; (c) ensured all parties-in-interest were competent and free from self-interest; (d) and that Plan expenses were reasonable and necessary; and (e) they placed the interests of Plan participants and beneficiaries over the interests of hired covered service providers, and themselves.

730.    At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

731.    The United States Supreme Court held in Tibble that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." 575 U.S. at 529. "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." Id.

732.    Thus, to discharge this duty, Plan Fiduciaries must have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments. As set forth below, this the Plan Fiduciaries here did not have.

733.    Plan fiduciaries are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the of level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. See A Look at Fee, supra.

734.    Prudence requires plan fiduciaries to monitor both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

735.    Likewise, Plan Fiduciaries must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees from any plan service provider, including the plan fiduciaries themselves.

736.    Plan Fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select investment options for the plan which include a remittance of a fee to the Plan sponsor, administrator, or investment advisor, or another party otherwise affiliated with the Plan sponsor.

737.    Given the vulnerability of plan participants, who are dependent on the retirement income earned by their Defendants' chosen plan investment choices, Plan Fiduciaries also must be particularly vigilant about evaluating whether lower-expense share classes are available to participants.

738.    Plan Fiduciaries had a fiduciary duty to monitor and evaluate the performance of the Plan's investments they selected and retained, and to remove and replace imprudent investments.

739.    Plan Fiduciaries did not have a prudent process for monitoring and evaluating the performance of the Plan's investments.

740.    At all relevant times during the Class Period, the Plan's mutual funds significantly underperformed their meaningful benchmarks.

741.    If Plan Fiduciaries had monitored and evaluated the performance of the Plan's mutual funds, it would have known that those funds were consistently underperforming both their SEC-prospectus benchmarks and benchmarks under 29

CFR § 2550.404a-5. Plan Fiduciaries did not know about, did not correct, and did not prevent, the resulting losses to Plan participants.

742.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

743.    Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

744.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

745.    In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

746.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

747.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## <u>SECOND CAUSE OF ACTION</u>

### Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105

### (Liability for breach of Duty of Loyalty)

748.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

749.    ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." Id. at 224 (quotation marks and citations omitted).

750.    Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

751.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

752.    At all relevant times during the Class Period, the Defendants and the Committees, and its individual members, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited menu of choices, and keeping covered service providers rather than soliciting requests for proposal, were ERISA fiduciaries.

753.    At all relevant times during the Class Period, Cetera for valuable consideration, and in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

754.    At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to covered service providers, was an ERISA fiduciary.

755.    As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of loyalty.

756.    Defendants breached their fiduciary duty of loyalty in multiple respects as discussed throughout. At all relevant times during the Class Period, Cetera made investment decisions and/or provided investment advice while tainted with self-interest.

757.    At all relevant times during the Class Period, Plan Fiduciaries put their interests ahead of those of the Plan and Plan participants by choosing investment products and services which generated substantial revenues at great costs to the Plan and Plan participants.

758.    Investment fund options chosen for a plan should not favor the fund provider and a party-in-interest over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries endorsed Transamerica's and Cetera's selling agreements with investment funds in the Plan, revenue-sharing agreements between Transamerica, Cetera and Amy's Kitchen, in their own self interest. As a result, Plan participants were unaware of the excessive and unreasonable fees secretly charged to their accounts because of the Defendants.

759.   As a result of their conflicts of interest, Plan Fiduciaries selected and retained in the Plan many investment funds that were more expensive than necessary and otherwise were not justified on the basis of their managers and historical performance. Plan Fiduciaries, moreover, hid these facts and the conflicts of interest from the DOL, IRS, and Plan participants and beneficiaries.

760.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

761.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the plan's providers.

762.   In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

763.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

764.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## **THIRD CAUSE OF ACTION**

### **Failure to Monitor Other Plan Fiduciaries**

765.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

766.    Amy's Kitchen had the authority to appoint and remove members of the Committees.

767.    Defendants also each had the authority to select service providers for the Plan. In light of this authority, Defendants each were a fiduciary of the Plan.

768.    As the appointing/selecting fiduciaries, Amy's Kitchen and its board had a duty to monitor their appointees and providers they selected to ensure that they were adequately performing their fiduciary and non-fiduciary obligations and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

769.    Amy's Kitchen also had a duty to ensure that their appointees and Plan service providers they selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

770.    Amy's Kitchen and its members breached their fiduciary monitoring duties by, among other things:

> a. Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions;
>
> b. Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate the availability of lower-cost separate account and collective trust vehicles; and
>
> c. Failing to remove Committee members and service providers who were incompetent, who charged excessive fees, and/or whose performance was inadequate.

771.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

772.  Had Amy's Kitchen and its members complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

773.  Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to monitor.

774.  In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

775.  ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

776.  Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty by Omission

777.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

778.  As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

779.   Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

780.   As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

781.   Each of them either knew (because they were parties to the transaction) or, through a proper review would have discovered that Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

782.   Defendants did not take any action, including any legal action, or exercise any other authority under the Plan or the Trust Agreement, to properly manage this choice in action.

783.   By failing to remedy these prohibited transactions on behalf of the Plan, including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

784.   Because their fiduciary duties included employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration of their specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

785.   As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

786.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the other Defendants.

787.   Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

788.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

789.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**FIFTH CAUSE OF ACTION**

**Refusal to Supply Requested Information**

790.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

791.   This Count alleges violations against Amy's Kitchen Inc. (and its delegates and de facto "Plan Committee" members).

792.   A claim for breach of fiduciary duty under 29 U.S.C. §1132(a)(3) may be simultaneously pled with a 29 U.S.C. § 1132(c)(1)(B) claim for failure to disclose Plan information, as they provide separate and distinct remedies. *See, e.g., Poole v. Life Ins.Co. of N.A.*, 984 F. Supp. 2d 1179 (M.D. Ala. 2013).

793.    As the Plan Administrator, the Plan Committee is obligated "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4). If the Plan Committee fails to provide the material requested within 30 days, the court may assess a penalty against it in favor of the participant in the amount of $110 a day from the date of such failure or refusal. 29 U.S.C. §1132(c)(1); 29 U.S.C. §2575.502c-1.

794.    On February 14, 2023, Counsel for Plaintiff Castillo mailed, via FedEx Overnight Business Mail with Delivery Confirmation, a a request for Plan information described above under 29 U.S.C. §1024(b).  The request was directed to the 401k Plan Administrator and IRS Form 5500 signatory Carme Lewis at 1650 Corporate Circle, Petaluma, CA 94954. Delivery confirmation was obtained by FedEx.

795.    On March 13, 2022, Carme Lewis responded on behalf of Defendant and the Plan, acknowledging Plaintiff Castillo was a participant of the Plan, but refused to provide any requested documentation.

796.    Based on the Committee's refusal to comply with request for information, the Committee violated its statutory obligations under 29 U.S.C. 1024(b)(4).

797.    The Plan Committee is liable for its violations under 29 U.S.C. 1024(b)(4) as alleged in this count.

## ENTITLEMENT TO RELIEF

798.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

799.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to redress the wrongs described above.

800.    Plaintiffs allege a "cumulative" harm which implicates the pure form of the continuing violations doctrine. The injury claimed by each plaintiff repeats daily when mutual fund pricing is calculated. Thus, resulting from the cumulative impact of daily negative compounding over months and years of the Defendants' repeated flawed selection and monitoring processes. Participants/beneficiaries charge precisely the sort of continuous conduct accreting retirement account injury that justifies characterization as a continuing violation.

801.    The concept of "make-whole" relief under laws of equity are clear. Where a beneficiary claims to recover trust property, the fixed limitation period shall not apply. No limits of recovery of lost benefits to recover from the trustee apply if a timely claim is filed. The reason for this exception under laws of equity is that the possession of the property by a plan fiduciary or trustee is never by virtue of any right of his own but is acquired initially for and on behalf of the beneficiaries. The trustee's ownership or possession is representative of the beneficiary's interest.

802.    The effect is that time does not run in the trustee's favor and against the property beneficiary. ERISA grants full damages and restitution to redress a fiduciary breach involving plan assets. Three remedies are the workhorses of ERISA litigation, although ERISA does grant less important remedies to enforce statutory penalties and the like. Together, they make up what the Supreme Court described as a "carefully integrated interlocking, interrelated, and interdependent remedial scheme, which is . . . part of a 'comprehensive and reticulated statute."

803.    Professor Dobbs, "[j]udicial remedies usually fall in one of four major categories: (1) Damages remedies, (2) Restitutionary remedies, (3) Coercive remedies . . . or (4) Declaratory remedies."

804.   ERISA clearly grants declaratory and coercive remedies, as an employee can bring an action "to clarify his rights to future benefits under the terms of the plan" and the court can "enjoin any act or practice which violates [ERISA] or the terms of the plan." The provisions also grant the ability to enforce the payment of promised benefits.

805.   Limiting our Plaintiffs to harms "suffered within the limitations period prior to suit would render their claims unintelligible and nugatory" for the injuries inflicted upon the plaintiff within the limitations period could only be understood and evaluated by reference to activity occurring outside of the period. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43, p 289, Gonzaga Law Review (2008))

806.   Injuries stemmed from the cumulative impact of years of breaches for (1) lack of loyalty and (2) lack of care or skill (1104). Lost opportunity costs to have their ten years of average tenure at Amy's Kitchen to accrue growth faster (from more interest, dividends, etc. as well as less burdens from fees such as manager fees and their related trading costs) is precisely the sort of continuous conduct accreting injuries that justifies characterization as a continuing violation. (See Highland Indus. Park, Inc. v. BEI Def. Sys. Co., 357 F.3d 794, 797 (8th Cir. 2004) ("[W]e know of no state whatever in which an injured party must know the full extent of the damages that it may recover before the statute of limitations begins to run on its claim."); WOOD, supra note 57, § 179 ("[i]n actions from injuries resulting from the negligence or unskillfulness of another, the statute [oflimitations] attaches and begins to run from the time when the injury was first inflicted, and.not from the time when the full extent of the damages sustained has been ascertained"). But see 54 C.J.S. Limitation of Actions § 204 (2005) ("Where a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last date of the tortious conduct.").

807.    "[W]hen the acts or conduct are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature, then prescription does not commence until the last act occurs or the conduct is abated." *Rodrique v. Olin Employees Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005); *see also Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir. 2002); *Landman v. Royster,* 354 F. Supp. 1302, 1315 (E.D. Va. 1973); *Bustamento v. Tucker*, 607 So. 2d 532, 542 (La. 1992)

808.    Our claims build upon a factual foundation laid outside of the limitations period prior to suit. Courts have ruled that it would be unfair to allow the plaintiff to recover only for the incremental worsening of his condition (lack of growth of her salary savings) within the limitations period.

809.    Referring to the Supreme Court's *Amara v. Cigna* (2011) and *LaRue v. DeWolf* (2008) decisions, the Defendants' violations are supported by the Court's "make-whole" references. When combined with ERISA Section 409 requirements (ERISA section 409(a) imposes personal liability on fiduciaries that breach their fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails with the pure form of the continuing violations doctrine and each element here avoids giving the Defendants a "license" to perpetuate its misconduct.

810.    The Defendants' continuing violations we refer to here are "a continu[ous] series of events gives rise to a cumulative injury." That is the gravamen of our specific claims at issue—participants/beneficiaries seek the trustee/fiduciary to restore under the laws of equity all trust damages so that the Plaintiffs' accounts would reach the same levels as if the breaches never occurred. This is analogous to treating the claim as continuing in nature. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43 p 293, Gonzaga Law Review (2008)).

## JURY TRIAL DEMANDED

811.    Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

812.   Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Tower Legal Group, P.C. as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

- Impose a Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

**<u>PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE</u>**

**<u>BY LAW.</u>**

Dated: March 22, 2023                    **TOWER LEGAL GROUP, P.C.**


By: _____

JAMES A. CLARK
RENEE P. ORTEGA
Attorneys for Plaintiffs