**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
Ariel A. Pytel (SBN 328917)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
        renee.ortega@towerlegalgroup.com
        ariel.pytel@towerlegalgroup.com

[Attorneys for Plaintiffs]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA CARRILLO and ENRIQUE CASTILLO and JENNIFER PETRI, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of all similarly situated participants and beneficiaries on behalf of the Amy's Kitchen Inc. 401(k) Retirement Plan,<br><br>        Plaintiffs,<br><br>    v.<br>AMY'S KITCHEN INC.; ADMINISTRATIVE COMMITTEE OF AMY'S KITCHEN INC. 401(K) RETIREMENT PLAN, Both Individually And As The De Facto Administrative Committee Members; ANDY BERLINER; PETER WONG; CARMELITA A. LEWIS; and DOES 1-50,<br><br>        Defendants. | Case No. 4:23-cv-01359-JST<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

I. OVERVIEW ……………………………………………………………...…. 1

II. THE PARTIES …………………………………………………….…..... 4

III. JURISDICTION AND VENUE…………………………………......……... 8

IV. STANDING ……………………………………………………….….. 9

IV. THE PLAN ……………………………………………………...…. 14

V. INTRODUCTON …………………………………………………….….. 16

V. FACTUAL ALLLEGATIONS & CAUSATION ……...…………….………….. 21

    A. Amy's Kitchen Inc. Repeatedly Failed To Monitor Their Funds And
        Their Portfolio Managers …...…………………………….….. 21

    B. The Company And Its De Facto Fiduciaries Failed To Choose And
        Monitor Fiduciary Advisor, Cetera, Prudently ……………….……...…… 23

    C. Causation ………………………………………………….…..….. 25

    D. Make-Whole Relief Relevant To Harmed Workers ……………………... 29

    E. Demonstrations Of Defendants' Flawed And Disloyal Decision Process… 33

        1) Fund Number One, the Transamerica high yield bond fund ………….. 37

        2) Fund Number Two, The Transamerica Mid Cap Value Opportunity … 39

        3) Fund Number Three, The Transamerica High Yield Bond …………… 39

        4) Fund Number Four, The Oppenheimer Global ……………………….. 40

        5) Fund Number Five, The Loomis Sayles Investment Grade Bond ……. 41

        6) Fund Number Six, Nuveen Real Estate ……………………………… 44

        7) Fund Number Seven, The American Funds Washington Mutual ……. 45

        8) Fund Number Eight, The Calvert Equity …………………….....… 47

        9) Fund Number Nine, The Invesco Small Cap Growth ……………….. 48

        10) Fund Number Ten, The Neuberger Berman Socially Resp. Fund ….. 48

        11) Fund Number Eleven, The American Funds Amcap Fund ………… 51

12) Fund Number Twelve, The Franklin Utilities Fund …….………….. 51

13) Fund Number Thirteen, The American Funds Growth Fund Of Am. . 52

14) Fund Number Fourteen, The Calvert Small Cap ………….……… 53

15) Fund Number Fifteen, The Janus Henderson Global Tech Fund …… 56

16) Fund Number Sixteen, American Century Government Bond ……... 56

17) Fund Number Seventeen, The Oppenheimer Global ……………... 57

F.　Imprudent Selection of Fund Managers ………………………….… 58

G. Imprudent and Disloyal Selection, Monitoring and Retention of Funds … 59

H. No "experience and expertise" was exhibited by the Defendants ……..… 62

I. Defendants Failed To Inform and Select Lower-Cost, Higher-

Yielding Classes Of The Same Funds ………………………………….. 62

J. The Company's Monitoring Processes Were Deficient Because Evidence

Indicates They Used Only "Peer" Performance Measurements ………… 63

K. ERISA Plan Fiduciaries May Not Subordinate Investment Returns Or

Increase Risks To Promote Non-Pecuniary Objectives ………………… 66

VI. CLASS ACTION ALLEGATIONS ……………………….….……… 70

FIRST CAUSE OF ACTION ………………….…………………….…... 73

SECOND CAUSE OF ACTION ……………………….……………….… 78

THIRD CAUSE OF ACTION ……………….………………………….… 81

FOURTH CAUSE OF ACTION ………………….……………………… 82

ENTITLEMENT TO RELIEF .. …………………………………….…..… 84

JURY TRIAL DEMANDED …………………….……………............... 87

PRAYER FOR RELIEF …………………….……………………..… 88

# OVERVIEW

1.    Plaintiffs Maria Carrillo, Enrique Castillo, and Jennifer Petri (Collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the Amy's Kitchen Inc. 401(k) Retirement Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the Plan sponsor, Amy's Kitchen, Inc. (the "Company"), its delegates and de facto plan fiduciaries, the Administrative or Investment Committee of Amy's Kitchen Inc. 401(K) Retirement Plan, and Does 1-50 (collectively the "Defendants").

2.    This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds.  The 401k plan has become the dominant source of retirement savings for most Americans.  Unlike defined-benefit plans, which provide set payouts for life, 401(k) accounts are defined-contribution plans which rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.  This action is filed to recover millions of dollars of funds owed back to the plan on behalf of employees / participants / beneficiaries.  These retirement funds are significant to the welfare of the class.

3.    The importance of 401k defined contribution plans to the United States retirement system has become extremely pronounced as employer-provided defined benefit plans have become increasingly rare.  Management of the 401k plans therefore requires a fiduciary duty of prudence and loyalty that place the interests of the employees / participants / beneficiaries upmost.

4.    Federal law affords employers the privilege of enticing and retaining employees by setting up retirement through defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the

employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. ("ERISA"). Upon information and belief, none of the Defendants followed these rules.

5. ERISA defines a "fiduciary" as a person (1) who exercises discretionary authority or control respecting management of the plan or management or disposition of plan assets; (2) who renders or has the authority or responsibility to render investment advice for compensation regarding money or property of the plan; or (3) who has discretionary authority or responsibility in the administration of the plan. 29 U.S.C. 1002(21)(A). Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted; [s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.

6. The term "party in interest" includes, inter alia, any fiduciary, counsel, or employee of a plan; a person providing services to the plan; an employer or employee organization any of whose employees or members are covered by the plan; a corporation or other entity that is owned by such a person; an employee, officer, or director of, or owner of a specified financial interest in, such a person; and a partner or joint venturer of such a person. 29 U.S.C. 1002(14).

7. Based on government filings at www.efast.dol.gov., Amy's Kitchen Inc., (the "Company") serves as plan "Administrator" and sponsors Amy's Kitchen Inc. 401(k) Retirement Plan (hereinafter the "Plan"). Based on their chosen audit firm, Amy's Kitchen Inc., the Trust Settlor and Plan Sponsor of the Plan, was and remained the named fiduciary of the Plan under ERISA § 402(a)(2), the Plan administrator under ERISA § 3(16), a party in interest under ERISA § 3(14)(A), the de facto Administrative/Investment Committee of the Plan, and also a Plan fiduciary under ERISA § 3(21)(A) to the extent that it appointed Investment Managers for the Plan,

selected and monitored Investment Funds under the Plan, and otherwise exercised discretion or control over the administration and management of the Plan and Plan assets.

8.    During the Class Period, each of the Plan Fiduciaries was a fiduciary of the Plan, either as a named fiduciary or as a de facto fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets. Amy's Kitchen Inc. was also the de facto administrator or co-administrator of the Plan for purposes of the required disclosures under trust laws and ERISA.

9.    Regarding fiduciary status, in a law review article on the subject, the authors stated:

> . . . The term [fiduciary] includes anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary authority with regard to plan administration. The broadness of the definition is readily apparent. Plan officers, directors, and members of the investment or administrative committee are certainly fiduciaries since they exercise discretionary authority or control over plan management and asset disposition. Similarly, officers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee, or plan officers or directors. Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: . . . attorneys who counsel the employer, investment committee, or trustee with regard to an appropriate portfolio mix or with regard to specific investments and receive a fee for these services; . . . [and] . . . stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of these securities and receive a commission for their services. (Footnotes omitted.)

Little and Thrailkill, "Fiduciaries Under ERISA: A Narrow Path to Tread," 30 Vanderbilt L.Rev. 1, 4-5 (1977)).

10.    Wasting the trust's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7. Courts have quoted commentary to section 7 of the UPIA: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

## THE PARTIES

11.    As a defined contribution plan governed by ERISA and 26 U.S.C. § 401(k), the Plan enables eligible employees of Amy's Kitchen to make tax-deferred contributions from their salaries for retirement.  As of December 31, 2021, the Plan had 3,576 participants and over $140 million in assets.

12.    Defendant Amy's Kitchen Inc. ("Company") is the current sponsor and administrator of the Plan and maintains its principal place of business in Sonoma County, State of California. This entity is registered with the State of California and conducts business in the State of California. The investment adviser is CETERA ADVISORS LLC ("Cetera").

13.    Amy's Kitchen is a family-owned and operated natural and organic food company that was founded in 1987. The company is based in Petaluma, California and is best known for its line of vegetarian and vegan frozen meals, entrees, and snacks. Amy's Kitchen products are made with non-GMO ingredients, and many are certified organic. They offer a wide range of products, including gluten-free, dairy-free, and soy-free options, making it easier for people with dietary restrictions to find options that meet their needs. The company has a strong commitment to sustainability and uses environmentally-friendly packaging materials whenever possible.

14.    The Company Defendants, acting through its Board of the Directors of the appointed Retirement Plan Committee of the Amy's Kitchen Inc. 401(k) Retirement Plan to control and manage the operation and the administration of the Plan.

Accordingly, the Company (and named fiduciary) had a concomitant fiduciary duty to prudently select, monitor and supervise those appointees/delegates.

15. Defendant "Does" or the names of the individuals on the Board of Directors and Committee during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

16. Upon information and belief, Carmelita A. Lewis (Director Benefits, USA at Amy's Kitchen Inc.), certified to the U.S. Departments of Treasury and Labor all of the Company's 2015 to 2021 plan years' Annual Returns/Reports of Employee Benefit Plan (Forms 5500; at www.efast.dol.gov), and acted as a fiduciary.   In addition, CEO Andy Berliner and CFO Peter Wong acted as fiduciaries in selecting and retaining the administrative committee of the Amy's Kitchen 401k Retirement Plan, and selecting and retaining all Advisors and Recordkeepers, and approving payments to these providers.

17. The Company failed to prudently investigate and monitor its covered service providers. For example, Cetera's median pay for every client since 2016 at www.efast.dol.gov, for every year from 2016 to 2021, was $42,640. This matches Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) hourly of $300 when performing about ten hours of labor each quarter running reporting for the Plan and Trust.

18. However, as Form 5500 Signatory since 2016, Carmelita A. Lewis certified there were no excessive *trust* payments (from participants'/beneficiaries' bookkeeping accounts) to Cetera for those plan years (Schedule H, line 4d) even though Cetera was paid directly from the Plan and Trust assets (and participants'/beneficiaries' accounts) 300,759 dollars for each plan year ($1,722,856 in total taken from the trust and employees).

19. The Committee members, in their capacity as officers of the corporation, had discretionary authority to control the operation, management, and administration

First Amended Class Action Complaint for Damages  -  Case No. 4:23-cv-01359-JST

of the Plan and should have followed the plan document's IRS Employee Plans Compliance Resolution System (EPCRS) and Voluntary Fiduciary Correction Program (VFCP) procedures and restored the trust back to the condition it would have been in but for the alienation of excessive compensation (from trust assets) to Cetera in violation of the plan's document and ERISA (and its foundation in common trust law).

20. The Committee contracted with Cetera ("Cetera") to serve as the Plan's Fiduciary Financial Advisor as stated in the Defendants' Schedules C on their certified Forms 5500.

21. The Company, and its Board of Directors, members of the Committee, the Directors and Officers, along with signatories to the IRS Form 5500, and Cetera are all fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or freeze or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their salary savings and provision of their retirement income.

22. Amy's Kitchen Inc., EIN 68-0154899 is located at 1650 Corporate Cir Ste 200, Petaluma, CA, 94954 in Sonoma County, phone 707-871-7625, at website www.amys.com. Amy's Kitchen offers over 250 varieties of organic frozen and packaged foods in the U.S. as well as more than 30 other countries around the globe. Ms. Carmelita A. Lewis serves as Senior Director, People Shared Services and International HR Business Partner and certified and executed every Annual Return/Report of Employee Benefit Plan since 2016 to the U.S. Departments of Treasury and Labor. Andy and Rachel Berliner, owners of Amy's Kitchen Andy Berliner, CEO, and Co-Founder of Amy's Kitchen President of Amy's Kitchen, Xavier Unkovic; Mr. Andrew Berliner, Chief Executive Officer/President, prior to May 2017, and from May 2021 to present; Mr. Peter Wong, Executive Vice President of Finance;

Rachel Berliner, Owner/Vice President; Mr. Dave Gardiner, Executive Vice President of Operations; Amy's Kitchen, Inc. 401(k) Retirement Plan Signer of Form 5500, Ms. Carme Lewis; Mr. Xavier Unkovic, Chief Executive Officer, May 2017 - May 2021.

23. The Board of Directors (BOD) appointed "authorized representatives" of Amy's Kitchen, including the Administrative Committee, as plan fiduciaries.

24. The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Administrative Committee maintains its address at Amy's Kitchen's corporate headquarters in Sonoma County, State of California. The Administrative Committee and its members are appointed by the Chief Executive Officer to administer the Plan on Amy's Kitchen's behalf.

25. Plaintiff Maria Carrillo is a former employee of Defendant Amy's Kitchen and current participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Carrillo was or still is a participant in the Plan under 29 U.S.C. § 1002(7) and maintained an investment in some or all the funds at issue in this action. Specifically, Carrillo at minimum invested in the Plan through in the Vanguard Target Retirement 2045 Inv., and the Transamerica Stable Value Strategy Option. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Carrillo is a resident of Sonoma County, State of California, and worked for Defendant Amy's Kitchen in this District.

26. Plaintiff Enrique Castillo is a former employee of Defendant Amy's Kitchen and former participant in the Plan under 29 U.S.C. § 1002(7) during relevant timeframes through October of 2022. During the Class Period, Castillo was or still is a participant in the Plan under 29 U.S.C. § 1002(7) and maintained an investment in some or all the funds at issue in this action. Specifically, Castillo at minimum invested

in the Plan through in the Vanguard Target Retirement 2030 Inv. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Castillo is a resident of Santa Clara County, State of California, and worked for Defendant Amy's Kitchen in this District.

27. Plaintiff Jennifer Pertri is a former employee of Defendant Amy's Kitchen and current participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Petri was or still is a participant in the Plan under 29 U.S.C. § 1002(7) and maintained an investment in some or all the funds at issue in this action. Specifically, Castillo at minimum invested in the Plan through in the Vanguard Target Retirement 2035 Inv. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Petri is a resident of Sonoma County, State of California, and worked for Defendant Amy's Kitchen in this District.

## VENUE AND JURISDICTION

28. Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132

29. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under the laws of the United States.

30. This Court has personal jurisdiction over Defendants because, among other reasons, Defendants transact business in and have significant contacts with this District and ERISA provides for nationwide service of process pursuant to ERISA §

502(e)(2), 29 U.S.C. § 1132(e)(2).

31.     Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Amy's Kitchen's principal place of business is in this District and the Plan is administered from this judicial district. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

32.     Plaintiffs have standing to bring this action. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court. In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

33.     Divisional Assignment. A substantial part of the events or omissions giving rise to the Claims occurred in Sonoma County.

## STANDING

34.     ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole"). Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. See *LaRue*

*v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

35.     For claims to redress a breach of the duty of loyalty, the historical tradition supporting Plaintiffs' standing is unassailable. Trust law developed a special rule—the "no further inquiry" rule—that held a trustee per se liable merely on proof that the trustee engaged in disloyal conduct. The beneficiary did not need to show any loss or the unfairness of the transaction; the disloyalty sufficed to permit suit. The beneficiary could then invoke the usual trust-law remedies: restoration of plan losses caused by the breach; recovery of the trustee's profits from the breach; and voiding the disloyal transaction. By dictating that trustees must obtain advance approval for any transaction from which the trustee stands to profit personally, the rule corrects for beneficiaries' inability to assess whether the trustee is conflicted with respect to any particular transaction.

36.     By requiring the trustee to explain to a court or to the beneficiary why the transaction is in the trust's best interests, it relieves the beneficiary of the need to have the same knowledge and expertise as the trustee. By allowing the beneficiary to state a claim upon a simple showing that the trustee sat on both sides of a transaction, it places the burden of production on the trustee. The no further inquiry rule also corrects for the lack of external pressures on the trustee. The rule's bright-line prohibition on self-dealing without advance approval, and the unusually harsh remedy it provides (disgorgement of all profits, even if the trust was not harmed), create appropriate disincentives to self-dealing. See RESTATEMENT (THIRD) OF TRUSTS § 78 cmt. b (Tentative Draft No. 4, 2005); Sitkoff, supra note 85, at 573-74.

37.     Plaintiffs' claims are explicitly authorized by 29 U.S.C. 1132(a)(2) and (a)(3), and Plaintiffs' Article III standing rests on firm ground: Plaintiffs have suffered a personal, de facto wrong from the breaches and the harm to plan assets in which they have an interest; for centuries common law permitted these kinds of suits; and Congress

plainly identified Plaintiffs' injuries as meeting Article III's requirements.

38. Plaintiffs' standing is first evident from the real harm that an ERISA participant suffers as a result of fiduciary breaches that impair plan assets. See, e.g., *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-342 (2016); *Sprint Communs. Co., L.P. v. APCC Servs.,* 554 U.S. 269, 285-286, 299, 304 n.2 (2008) (Roberts, C.J., dissenting). This concrete personal stake derives from two factors that reinforce each other: when a fiduciary breaches his duties, the breach (1) invades the participant's legally protected interest in having that fiduciary obligation fulfilled and (2) injures trust property in which the participant has a long-recognized equitable ownership interest.

39. At all relevant times, Plaintiffs were common-law trust beneficiaries and represented the class. As the Department of Labor has explained across administrations, this private right of action is crucial to fulfilling ERISA's goals: "The Secretary of Labor depends on participant suits to enforce ERISA, because she lacks the resources to do so singlehandedly, and plan fiduciaries are commonly defendants in such cases." Amicus Br. of Sec'y of Labor at 12, *David v. Alphin*, No. 11-2181 (4th Cir. Dec. 28, 2011); see also, e.g., Amicus Br. of Sec'y of Labor at 1- 2, *Thole v. U.S. Bank*, No. 16-1928 (8th Cir. May 2, 2017).

40. These enforcement mechanisms largely adopt the causes of action available to trust beneficiaries at common law, where it has long been established that a beneficiary could sue a breaching fiduciary to restore to the trust any loss caused by the breach, remove the trustee, and set aside unlawful transactions. Restatement (Second) of Trusts §§ 199, 205 (1959); Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, Scott & Ascher on Trusts §§ 24.3.5, 24.9 (5th ed. 2007).

41. This case involves the Plaintiffs' Article III standing to assert claims under 29 U.S.C. 1132(a)(2) and (a)(3). Article III limits "[t]he judicial Power of the United States" to "Cases" and "Controversies." U.S. Const. Art. III. "'The purpose of the case-or-controversy requirement is to limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as

capable of resolution through the judicial process.'" *Sprint Comms. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 274 (2008) (citation omitted) (emphasis removed).

42.    The U.S. Supreme Court has found that various intangible injuries supply the concrete personal stake needed to confer standing. The trustee's discharge of its legal obligation is an independent, personal benefit that supports the trustee's standing to sue in federal court. The Court has also recognized that, in many circumstances, Article III countenances suits to vindicate harm suffered by another party. See, e.g., *Sprint*, 554 U.S. at 287-288 ("[F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth."). This is known as representational standing. See also *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773-774 (2000) (Article III permits representational suits by qui tam relators on behalf of the United States).

43.    This case brings all lines of authority together. Suits under 29 U.S.C. 1132(a)(2) are by their nature representational: A participant sues "in a representative capacity on behalf of the plan as a whole" to restore monetary losses to the plan. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985. Likewise, removal of the fiduciaries and setting aside statutorily prohibited transactions necessarily affect the plan as a whole. At the same time participants still retain a personal, intangible stake in this type of case that makes them the appropriate parties to sue: the breach of fiduciary duty owed to them that affects their "interest * * * in the financial integrity of the plan." Ibid.

44.    First, in a representational-standing suit, the plaintiff must show some personal interest that distinguishes him from the general public and shows why the case poses the requisite adversity, even if the personal-interest requirement might be less demanding than in non-representational-standing cases. The U.S. Supreme Court has

agreed that a wide variety of interests—monetary and non-monetary alike—suffice to demonstrate that necessary stake. See *Sprint*, 554 U.S. at 288, 304 n.2 (Roberts, C.J., dissenting) (trustee's "discharge of its legal obligation"); Vt. Agency, 529 U.S. at 772-773 (qui tam relator's monetary stake in recovery).

45.    Second, to determine whether the plaintiff satisfies Article III's requirements, "both history and the judgment of Congress play important roles." *Spokeo*, 578 U.S. at 340; see *Sprint*, 554 U.S. at 274 ("history and tradition offer a meaningful guide"); *Vt. Agency*, 529 U.S. at 774 ("history is particularly relevant to the constitutional standing inquiry"). Because standing doctrine is ultimately "grounded in historical practice," the Court "consider[s] whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S at 341; see *Vt. Agency*, 529 U.S. at 774 ("Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by the judicial process.'") Accordingly, a strong historical tradition of allowing suit signifies that the injury is sufficiently particularized and concrete.

46.    ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S. Ct. 3085  87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole").

47.    Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. See *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248  256, 128 S. Ct. 1020  169 L. Ed. 2d 847 (2008)

(recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

## THE PLAN

48.    The Plan at issue is a defined contribution retirement plan or a 401(k) plan (profit- sharing type containing a cash or deferred arrangement), established on January 1, 1994, pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 3,576 participants and $140,987,462 in assets.

49.    The current plan sponsor is Amy's Kitchen Inc. All employees of the Company are eligible to participate in the Plan upon employment. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and certain provisions of the IRC.

50.    Based on the auditors' certified annual audits, BPM LLP, the "Company" is the administrator of the Plan and, as such, carries out the duties imposed by ERISA. The Company has delegated certain responsibilities for the operation and administration of the Plan. Custodial and recordkeeping services are provided by Transamerica Life Insurance Company ("Transamerica") and State Street Bank and Trust Company ("State Street").

51.    The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") as amended. The Plan is administered and overseen by Amy's Kitchen Inc. According to the auditors, the administrative committee is Amy's Kitchen Inc. (the "Company").

52.    According to the most recent audit, Plaintiffs note participants possess only a bookkeeping account at the recordkeeper and a beneficial interest in the trust—the trust is the legal owner of mutual fund assets and they are held in the nominee name of the Plan and Trust. Revenue-sharing and portfolio manager's compensation fees reduce the gross asset values (GAV) of the trust's open-end management investment companies (mutual funds). The trust's holdings' resulting prices, or net asset values

(NAVs), are allocated daily to participants.

53.    Each participant's account is credited with the participant's contributions, Company contributions, Plan earnings or losses, Plan service credits, and rollovers from other qualified plans. Plan earnings or losses are allocated based on each participant's account balance. Plan service credits are asset-based charges and allocated based on each participant's selected funds. Certain fees are charged to the fund investments and are offset against Plan investment income and loss as presented on the statement of changes in net assets available for benefits. Participants should refer to the prospectuses of these funds for details on the various types and amounts of investment fees charged to the Plan and their individual accounts.

54.    Participants in the Amy's Kitchen Inc. 401(k) Retirement Plan may only elect to invest their (1) deferred salary savings, (2) associated employer match and (3) reinvested dividends/interest among approximately fourteen investments chosen by the fiduciaries, de facto fiduciaries and the Administrative Committee (not counting default target date funds chosen for the workers who make no investment election). Amy's Kitchen's reckless decision-making was aided by and under the recommendations of Cetera Advisors, LLC and Cetera Advisor Networks, LLC ("Cetera"), who were compensated handsomely for poor recommendations in violation of ERISA and Restatement (Third) of Trusts. This firm breached its fiduciary duties to clients. The Company's Form 5500 for 2013 plan year showed the Company directed Transamerica to pay them indirect compensation of $25,359 for "insurance services" that the Company directed to take from participants' earnings—called revenue-sharing. Filings at the SEC and FINRA indicated conflicts of interest to the Company but they failed to read their ADV Parts one and two (adviserinfo.sec.gov and brokercheck.finra.org). Schedule C, page 3, part 2(b) indicated they acted as "Insurance agents and brokers" providing "Insurance services." If the Company's certified Form 5500 is correct, they did not provide services "necessary for operation of the plan" in violation of ERISA. Ms. Carmelita A. Lewis signed as Plan

Administrator and did not say "YES" to the line 4(d) question (Schedule H) that there were non-exempt transactions with a party-in-interest.

**INTRODUCTION**

55.    In its unanimous opinion in *Tibble v. Edison Int'l, 575 U.S. 523 (2015)*, the U.S. Supreme Court held that the common law of trusts was the underlying foundation from which the ERISA originates.

56.    Where ERISA is silent, courts look to trust law. A trustee is obligated not only to make prudent investment decisions but also to monitor and review those investments "in a manner that is reasonable and appropriate to the particular investment action, and strategies involved." Restatement (Third) of Trusts, § 90, Comment b, p. 295 (2007).

57.    The court observed: "We have often noted that an ERISA fiduciary's duty is 'derived from the common law of trusts…' In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." Loyalty is the most fundamental of rules borrowed from the common law of trusts, this duty is also known as the duty of care. Tibble v. Edison Int'l, 575 U.S. 523 (2015); Martinez v. Schlumberger, LTD., 338 F.3d 407, 411 (5th Cir. 2003). The standard is objective and therefore independent of a fiduciary's lack of bad faith. La Scala v. Scrufari, 479 F.3d 213, 219-20 (2d Cir. 2007).

58.    The Supreme Court ruled that an employer has an ongoing duty to monitor plan investments and remove imprudent ones, even if they were initially selected more than six years before. *Tibble v. Edison Int'l*, 575 U.S. at 530.

59.    Although it remains true that Section 404(c) protects employers from liability for losses attributable to an individual participant's imprudent direction or "allocation of investments" under a 401(k)-style plan (where participants choose from a "menu" of options), "menu setting" by the employer remains a fiduciary function. *Difelice v. U.S. Airways*, 497 F.3d 410 (4th Cir. 2007).

60.    The plan fiduciaries are presumed to be liable for any loss caused by his breach of duty, unless they can prove that the loss would have occurred even if they had performed his duty. This means that the plan fiduciaries have a high burden of proof to avoid liability for failing to collect income and gains owed to the trust.

61.    Under trust law, "when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100 cmt. f (2012) (Third Restatement); see, e.g., George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 871 (rev. 2d ed. 1995) (Bogert) ("If the beneficiary makes a prima facie case, the burden of contradicting it or showing a defense will shift to the trustee.").

62.    James Barr Ames, from "A Selection of Cases on the Law of Trusts with Notes and Citations" 494 n.1 (2d ed. 1893):

> When the [beneficiary] has shown that the trustee has made default in the performance of his duty, and when the money which was the subject of the trust is not forthcoming, the [beneficiary] has made out * * * a prima facie case of liability upon the trustee, and if the trustee desire to repel that by saying that if he had done his duty no good would have flowed from it, the burden of sustaining that argument is plainly upon the trustee.

63.    Put another way, when a trustee has breached his duties and a related loss to the plan has occurred, "he has a defense to the extent that a loss would have occurred even though he had complied with the terms of the trust." Restatement (Second) of Trusts § 212(4) (1959) (Second Restatement).

64.    This action is brought by current and former participants/beneficiaries of the Plan to recover mismanaged 401k retirement funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall based on the plan fiduciaries' chosen menu of choices. Therefore, the proliferation of 401(k) plans

has exposed workers to big drops in the funds the Company selects and retains. High-cost investments with built-in compensation expose the trust assets to conflicts of interest by the (1) recordkeeper (who seeds their proprietary funds), (2) broker who can command hard and soft dollar remuneration and (3) the Company who can receive revenue-sharing credits to be used to avoid invoicing for the plan they set up and sponsor.

65.     This action is filed to recover more than $10M in trust funds owed back to the Plan and Trust on behalf of participants/beneficiaries. These retirement funds are significant to the welfare of the class.

66.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

67.     Defendants (the Company and other de facto fiduciaries) chose to seek and accept the benefits of federal and state tax deductions from their employer contributions as well as for their employees via this 401(k) plan. The corporation, its owners and its executives have benefitted financially for years from the same tax benefits. However, the Defendants have not followed their IRS—determination letter granting tax exemption as well as ERISA's standard of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

68.     The plan fiduciaries include, but are not limited to, the de facto fiduciaries and board members overseeing the Committee members. Amy's Kitchen controls the

participants'/beneficiaries' investments (and their related growth; via an Investment Policy Statement (IPS)).

69.     Courts have ruled the Investment Policy Statement (IPS) is considered a governing plan document. Mathematics proves salary deferrals comprise about 30% of retirement wealth and compounded growth of open-end management investment companies and other trust assets add 70% to a participant's total retirement wealth. If plan fiduciaries fail to prudently select and monitor investments, participants' accounts suffer.

70.     Amy's Kitchen not only controls all compensation paid to their chosen funds' portfolio managers but also all plan relationships as well as their source and amounts of compensation (broker, recordkeeper, custodian, auditor, etc.).

71.     Amy's Kitchen Inc. has full discretion over compensation for the Plan's chosen and retained providers. Amy's Kitchen made few, if any, covered service provider changes over the past decade and very few mutual fund changes.

72.     Recordkeepers provide a commodity service and failures to periodically review and seek alternative recordkeeper services can allow overcharges to the trust.

73.     Failures to monitor Cetera—as in selecting other providers, in selecting investment managers like Cetera, the plan fiduciaries must reasonably conclude that the investment manager's practices in selecting investments are consistent with the principles articulated in common trust law and ERISA.

74.     These ERISA fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). In considering whether a fiduciary has breached the duties of prudence and loyalty, the court considers both the "merits of [the] transaction" as well as "the thoroughness of the investigation into the merits of [the] transaction." Bunch v. W.R. Grace & Co., 532 F. Supp. 2d 283, 288 (D. Mass. 2008), aff'd, 555 F.3d 1 (1st Cir. 2009) (quoting Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996)). Mere "subjective good faith" in executing these duties is not a defense: "a

pure heart and an empty head are not enough." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983). Therefore a defendant "cannot claim as a defense...that a great deal of time was spent reviewing" a decision when that decision was "tainted by the fact that he did not have all of the information he needed," rendering the decision "flawed from its inception." *Chao v. Hall Holding Co*., 285 F.3d 415, 431 n.10 (6th Cir. 2002).

75.    The fiduciary must determine whether the investment "is reasonably designed, as part of the portfolio...to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

76.    Additionally, plan fiduciaries have a "duty to reevaluate the trust's investments periodically as conditions change." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, p. 146 (3d ed. 2009) (Bogert 3d).

> The duty to review trust investments should be performed by the collection of information currently as changes occur, and also by a systematic consideration of all the investments of the trust at <u>regular intervals, for example, once every six months</u>.

Bogert 3d § 684, at 147-48 (emphasis added).

77.    The duty of prudence, therefore, requires "prudent management of risk." Restatement (Third) of Trusts § 90 cmt. e(1) (explaining that the prudent investor rule's "requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks"). This does not require outright avoidance of risk, but instead limiting risks to those that are compensated through the improved potential for returns."

78.    ERISA Section 404(a)(1)(B) requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

79.    "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, §1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U. S. 409, 425 (2014).

80.    "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022).

81.    The legislative history of this section and the case law indicates that this fiduciary duty was taken from the prudent person standard developed through the common law of trusts. Subjective good faith is no defense; courts require procedural prudence, which requires plan fiduciaries to thoroughly investigate the merit of each decision affecting the plan. (See Sweda v. University of Pa., 923 F.3d 320, 329, 2019 EBC 158780 (3d Cir. 2019), cert. denied, 206 L. Ed.2d 496 (2020); Tatum, 761 F.3d 346; Allison v. Bank One–Denver, 289 F.3d 1223, 27 E BC 2746 (10th Cir. 2002); Donovan v. Cunningham, 716 F.2d 1455, 1467, 4 EBC 2329 (5th Cir. 1983)).

## V.    FACTUAL ALLEGATIONS

### A. Amy's Kitchen Inc. Repeatedly failed to monitor their funds and their portfolio managers

82.    Based on the Defendants' actions and certified reporting to the U.S. Departments of Treasury and Labor over the past decade never demonstrated that the responsible plan fiduciaries acted to "thoroughly investigate the merit of each decision affecting the plan." Sweda v. University of Pa., 923 F.3d 320, 329, 2019 EBC 158780 (3d Cir. 2019), cert. denied, 206 L. Ed.2d 496 (2020); Tatum, 761 F.3d 346; Allison v. Bank One–Denver, 289 F.3d 1223, 27 E BC 2746 (10th Cir. 2002); Donovan v. Cunningham, 716 F.2d 1455, 1467, 4 EBC 2329 (5th Cir. 1983).

83. Use of revenue-sharing in Amy's Kitchen Inc. 401(k) reduced participants' balances daily by decreased NAV pricing that cost participants more than the revenue-sharing credits could ever make up. Uniform fiduciary standards prohibit transactions that dissipate trust assets. The objectives of these provisions of uniform fiduciary standards are to ". . . make applicable the law of trusts; . . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets, and to provide effective remedies for breaches of trust." Statement of the Honorable Harrison A. Williams, Jr., 120 Cong. Rec. S-15737, August 22, 1974, Reprinted [1974] U.S. Code Cong. Admin. News, pp. 5177, 5186.

84. The Company's repeated failures to perform periodic investigations into funds' revenue-sharing costs and portfolio managers caused great harm during initial selection and regular monitoring. Based on the Schedules of Assets certified to the U.S. Departments of Treasury and Labor, the Company instead spent a great deal of time on revenue-sharing credits. It made great efforts to focus on receiving revenue-sharing credits. It is important to note that the Company controlled the revenue-sharing ERISA budget spending account at all times via a services agreement with their recordkeeper.

"Overall, revenue-sharing plans are more expensive as higher expense ratios are not offset by lower direct fees or by superior performance. Rebates increase with the market power of the recordkeeper suggesting that third-party funds may revenue share to gain access to retirement assets." Irina Stefanescu, Board of Governors of the Federal Reserve System; Veronika K. Pool, Vanderbilt University; Clemens Sialm, University of Texas at Austin; "Mutual Fund Revenue-sharing in 401(k) Plans," National Bureau Of Economic Research, December 2022, 5, ABSTRACT, 19; www.nber.org/papers/w30721; 5, abstract, 19.

85. That means the Company repeatedly set their own compensation (in violation of ERISA) when they decided what rebates were kept by providers and what was left to be credited to participants' accounts after three to six months from the initial

daily price deductions for each mutual fund (and allocated each evening to participants'/beneficiaries' accounts).

86.   Defendant Amy's Kitchen, Inc. violated Restatement (Third) of Trusts § 93 (2003). Specifically, Amy's Kitchen, Inc. had "no reason not to switch to an identical share class fund." *Tibble v. Edison Int'l*, 07 cv 5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

**B.    The Company And Its De Facto Fiduciaries Failed To Choose And Monitor Fiduciary Advisor, Cetera, Prudently**

87.   Plaintiffs allege that the Company engaged in prohibited transactions in violation of 29 U. S. C. §§ 1106(a) and by retaining poor investment options in the Plan and engaging in excessive revenue-sharing agreements that benefitted themselves, other fiduciaries and parties-in-interest. Facts emphasize that the Company violated their fiduciary duty to bring legal action on behalf of the Plan, as they were required to by 29 U. S.C. §§ 1132(a)(3) and 1104(a)(1)(A) to obtain recourse for these prohibited transactions. U. S.C. § 1106(a) generally prohibits fiduciaries from knowingly causing a plan to engage in transactions that benefit a "party in interest." Congress adopted [§1106(a)] of ERISA to prevent plans from engaging in certain types of transactions that had been used in the past to benefit other parties at the expense of the plan's participants and beneficiaries. A "party in interest" is broadly defined and includes both fiduciaries and "person[s] providing services to such plan." See 29 U.S.C. § 1002(14)(A)-(B). Similarly, 29 U.S.C. § 1106(b) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest" or receiving "any consideration . . . from any party dealing with such plan" in a transaction involving Plan assets. See 29 U.S.C. § 1106(b)(1)—(3).

88.   Plaintiffs allege Cetera was defined as "investment manager" within the meaning of 29 U.S.C.§ 1002(38) because they had "the power to manage, acquire, or dispose of any asset of a plan." Based on their involvement in designing the investment

platform to "steer" funds to certain "investment options," the Company effectively "funneled participants' retirement savings" into expensive investment products. They were improvident advisors being compensated with trust assets to service Amy's Kitchen Inc. 401(k) and charged excessive fees for services that were not necessary.

89. A corporate officer who has the authority to appoint fiduciaries like Cetera may be a fiduciary to the extent of that power to appoint under Employee Retirement Income Security Act of 1974, 29 C.F.R. §2509.75-8, Courts have held that "[t]he power to appoint fiduciaries is itself a fiduciary function."

90. Plaintiffs allege throughout this complaint that the various expenses charged to Plan participants were not "reasonable," as required by the Company's Transamerica Plan documents.

91. Second, Plaintiffs allege that the Company failed to ensure that chosen investment managers were properly qualified according to their Transamerica Plan document as well as 29 U.S.C. § 1002(38). Therefore, the Plaintiffs allege the Company violated 29 U.S.C. § 1104(a)(1)(D).

92. Closely related to the duty of an appointing trustee to monitor the fiduciaries it appoints is the doctrine of respondeat superior. Where a company's board of directors exercises de facto control over the plan by means of the fiduciaries it appoints, courts may hold the employer liable. Leigh v. Engle, 727 F.2d 113, 4 EBC 2702 (7th Cir. 1984) (suggesting that liability could be assessed if de facto control was exercised); Sommers Drug Emp. Profit Sharing Plan v. Corrigan Enters., 793 F.2d 1456, 1459–60, 7 EBC 1782 (5th Cir. 1986).

93. Courts observed, "[i]mplicit in this power is the duty to monitor." Where an appointed fiduciary fails to fulfill a fiduciary duty, the appointing party has a duty to take action. Thus, "the power to appoint" is a fiduciary function. Likewise, courts have ruled that the board of directors had fiduciary duties with respect to the pension plan to the extent that the directors appointed, retained, or removed members of the plan's investment committee. In Whitfield v. Tomasso, a district court ruled that a

union was a fiduciary with respect to the plan "[b]y virtue of its authority to appoint and remove the union trustees, and by effectively controlling the selection of employer trustees." *Whitfield*, 682 F. Supp. at 1305.

94.    Other courts have followed suit and have held that a person who has the power to retain and remove trustees is a fiduciary, which carries with it a duty to monitor the trustee fiduciaries. *Bennett v. Manufacturers & Traders*, 2005 WL 2896962, at \*7, 36 EBC 1085 (N.D.N.Y. Nov. 2, 2005); *In re JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131, at \*4 (N.D. Cal. July 14, 2005).

95.    Fiduciaries of ERISA-covered plans who retain service providers to assist in administering their plans are required to monitor their service providers on a regular basis to ensure that the Plans and their assets are being administered prudently, solely in the interest of the Plans' participants and beneficiaries, and in accordance with documents and instruments governing the Plans. See 29 U.S.C. § 1104(a)(1)(A), (B) and (D). Plan fiduciaries are prohibited from continuing to contract with service providers, which are parties in interest to ERISA-covered plans, unless the services are necessary for the operation of the Plans and the service provider's compensation is reasonable and disclosed. See 29 U.S.C. §§ 1002; 1106(a)(1)(C), 1108(b)(2). Plan fiduciaries can be held personally liable for any losses to the Plans resulting from the failure to comply with these fiduciary duties and may be subject to other equitable remedies. See 29 U.S.C. §§ 1152(a)(2), 1109(a). When service providers are also fiduciaries, plan fiduciaries can also be held liable for any losses caused by the service provider's fiduciary breaches if they knowingly participate in the breach, enable the breach, or have knowledge of the breach but fail to correct it. See 29 U.S.C. § 1105(a)(2).

## C.  CAUSATION

96.    Plaintiffs infer that the Defendants' past decision-making processes, as evidenced by their (1) selection/retention of Cetera, (2) adding of imprudent, costly, undiversified and lower-yielding investments coupled with their (3) failures to

review/remove imprudent investments, were some of the root causes of losses to the Plan and Trust.

97.    More specifically, the Company and Cetera:

a.  ignored probable trust income (yields) repeatedly over many years,

b.  ignored many types of extra costs that directly reduced participants'/beneficiaries' returns every business day,

c.  ignored their portfolio managers' concentrated and undiversified portfolios (causing additional trust variance and trust risks of losses),

d.  selected/retained novice, inexperienced portfolio managers who sold every position they bought two years earlier (because they either quit, were fired, or changed their minds.

98.    The Company and Cetera's actions, flawed reasoning and derelict trust investment management processes repeatedly harmed the Plan and Trust. The Company ignored Cetera's compensation amounts taken from the trust/participants'/beneficiaries' accounts and via earnings reductions on investments, Cetera helped choose (taken daily from every single one of Amy's Kitchen Inc. workers with a 401k account balance).

99.    Amy's Kitchen Inc. made repeated certifications that prove a violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D): the duty to act in accordance with the documents and instruments governing the plan ("Nonalienation of Benefits" section). They did this by directing $181,250 in cash (after directing trust asset sales) to be electronically transferred from the trust (and workers' 401k accounts). Plaintiffs noted the Company certified on 10/13/22 Part II Income and Expense Statement, Line 2i(3) "Expenses" section Investment advisory and management fees payment of $45,000. Similar certifications were made for 2020, 2019, 2018, and 2017 for 45000, 35250, 32000, and 24000. Cetera was paid from the trust (i.e., participants' accounts) from 2017 to 2021.

100.  The average hourly salary, per indeed.com, for Amy's full-time workers, was $14.23. Thus, full-time workers made $28,460 last year. The Company approved average pay to Cetera (working about twenty to forty hours per year) to take $36,250 from the trust each year from 2017 to 2021.

101.  To avoid violations of ERISA, using even the highest hourly rate for investment representatives at $300, Cetera advisors must have worked at least 121 hours per year to deserve this pay as "reasonable compensation" under ERISA. Cetera made very few changes to the investment menu so the maximum hours worked per year should be 10hr/per quarter for quarterly monitoring (unless they were unskilled).

102.  And this assumes that Amy's Kitchen Inc. complied with ERISA to ensure Cetera was "necessary for the operation of the plan." The facts presented here indicated that was not true for Amy's Kitchen Inc. Plan.

103.  Moreover, the Sponsor, the BOD, the Committee, and individual delegates, along with their fiduciary advisory firm, breached their fiduciary duties of prudence and loyalty to the Plan by:

- Offering and maintaining higher cost share classes when identical lower cost class shares were available and could have been offered to participants;
- Overpaying an unnecessary advisory firm (Cetera) by alienating trust assets, which exceeded trust direct and indirect costs incurred by plans of similar size with similar services;
- Failure to prudently choose and monitor covered service providers and other plan fiduciaries;
- Other breaches of fiduciary duties.

104.  Although not currently named here, the Plaintiffs reserve the right to name Cetera as a defendant. Amy's Kitchen Inc. and Cetera must: (l) conform to fundamental

fiduciary duties of loyalty (§ 170) and impartiality (§ 183); (2) act with prudence in deciding whether and how to delegate authority and in the selection and supervision of agents (§ 171) and (3) incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship (§ 188).

105.    Based on information and belief, payments to Cetera, thousands of dollars each quarter for two meetings each year, required written approval by either Andy Berliner, CEO or the firm's CFO, Peter Wong, or Rachel Berliner, owner of Amy's Kitchen.

106.    Payments directed by the Company to Cetera must comply with 29 CFR § 2550.408b-2, which requires, in part, that the "service is necessary for the establishment or operation of the plan" and the amounts for the necessary services are "reasonable." In this case, the services were not for the economic interests of the Plan and Trust and thus, no amount is considered reasonable (to avoid prohibited transactions for every occurrence and a requirement to restore the amounts to the trust—in accordance with the "Non-alienation" section of the plan's documents (in accordance with ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), the duty to act in accordance with the documents and instruments governing the plan).

107.    By proxy, Ms. Carmelita A. Lewis executed on behalf of the Company as well as Andy Berliner, CEO and Peter Wong, CFO, that these payments met these requirements above since 2013. This fact can be verified at www.efast.dol.gov by viewing Forms 5500 (Annual Return/Report of Employee Benefit Plan).

108.    Their behavior in choosing investments with diminished yields and high costs violated the Restatements (Trust, Second (1959) and Third (1992)). Both Second and Third conveyed a duty to avoid unreasonable or inappropriate costs that require particular attention to such matters as the fees of agents and advisors. See § 227 cmt. m and Reporter's Notes to that comment; Restatement Second, supra note 7, § 188 cmts. c, f.   "  ***  The objective is simply to require close attention by

trustees/fiduciaries to the increasingly important investment applications of the more general and traditional duty to avoid unwarranted costs."

D.    **Make-whole relief relevant to Amy's Kitchen's harmed workers**

109.   "[T]he liability of a trustee who is sued and found to have committed a breach of trust is the amount required to restore the values of the trust estate and its distributions to what they would have been if the affected portion of the trust estate had been properly administered." (Restatement (Third) of Trusts § 100, cmt. b (2012); see also Restatement (Third) of Trusts: Prudent Investor Rule § 205 (1992); Restatement (Second) of Trusts § 205 (1959); Bogert, Trusts and Trustees § 862 (2d ed. rev. 1995)).

110.   Amy's Kitchen Inc. and Cetera's harm also impacted thousands of former and terminated workers from earlier plan years who had accounts that used concentrated (undiversified) and expensive mutual funds with lower yields and, thus, lowers returns or economic benefits. This statement is based on Amy's Kitchen Inc.'s trust's audited financial statements. Plaintiffs' "harm" from payments to (1) Cetera and (2) portfolio manager's compensation was never addressed by Amy's Kitchen Inc., Andy Berliner, CEO, or Cetera.

111.   But for Amy's Kitchen Inc. and Cetera's actions, former workers' cash-out final payments would have been higher (if Defendants' processes were to buy higher-yielding, lower-cost share classes of the same funds). Former workers' prior accounts' distributions since at least 2009 were never "restored to the position they would have been had the Defendants' repeated breaches not occurred," as required by ERISA § 409 and common trust law. (Restatement (Third) of Trusts (2012).

112.   If the trustee improperly purchases investments for the trust estate, the beneficiaries: (a) may charge the trustee with the amount of trust funds expended in the purchase plus or minus the amount of a reasonably appropriate positive or negative total return thereon; or (b) may either affirm the purchase or, if the improperly purchased property has already been sold, require the trustee to account for the proceeds and return traceable to that property. Restatement (Third) of Trusts: Prudent

Investor Rule § 210(1) (1992); see also Restatement (Third) of Trusts §§ 100, 100 cmt. b (2012); Restatement (Second) of Trusts §§ 210, 207(1) cmt. c (1959); Scott and Ascher on Trusts § 24.13 (5th ed. 2007); Bogert, Trusts and Trustees § 862 (2d ed. rev. 1995).

113. Since 2017, harmed terminated former workers of Amy's Kitchen Inc. were paid 43M dollars in payments to participants (i.e., trust corpus (fund) liquidations) from the trust's depleted and impaired assets at the time of request (based on Amy's Kitchen Inc.'s Schedule H, line 2e(1)).

114. Defendants chose/kept funds (1) with underperforming portfolio managers as well as (2) expensive share classes with depleted net asset values (NAVs; due to daily SEC Rule 12b-1 fees, sub-transfer agency fees, shareholder servicing fees, or other types of fees) compared to identical related "sister" classes of funds. Consequently, former workers' payments were less than ERISA and Amy's Kitchen Inc.'s plan documents (and Summary Plan Descriptions (SPD)) stated and required under common trust law. An ERISA fiduciary who harms or abuses plan assets (e.g., by negligent investing) must make the plan whole by paying either damages or restitution. (ERISA § 409(a), 29 U.S.C. § 1109(a)).

115. Plaintiffs cite Armory v. Delamirie, 93 Eng. Rep. 664 (1722) ("[U]nless the defendant ... produce the jewel, and shew it not to be of the finest water, [the jury] should ... make the value of the best jewels the measure of their damages.").

116. This cardinal rule that uncertainties in fixing damages must be resolved against the breaching fiduciary long predates ERISA and, for that matter, the founding of the United States of America.

117. The statement suggests that when determining the amount of damages resulting from a breach of fiduciary duty, any uncertainties or ambiguities should be resolved in favor of the party who suffered the breach. This is a longstanding principle that has existed for a long time, even before the establishment of the Employee Retirement Income Security Act (ERISA) and the United States itself. In other words,

if there is any doubt about the amount of damages to be awarded, the breaching fiduciary should be held responsible and made to pay for any losses incurred by the other party. This principle is intended to provide a measure of protection for those who have been wronged by a fiduciary's breach of duty, ensuring that they are fairly compensated for any harm they have suffered.

118.   While "equitable restitution" is unique to trusts, the analogy that comes to mind quickest is shareholder derivative litigation—however, the trust-law roots of § 1132(a)(2) run far deeper. When a common-law trustee commits a breach of trust that results in a loss, any beneficiary whose beneficial interests were affected may sue to compel the trustee to make good on the loss. When the trustee does so, he restores money to the trust for the benefit of the plaintiff/beneficiary. Restatement (Second) of Trusts § 214 & cmt. b (1959). See Austin W. Scott & William F. Fratcher, The Law of Trusts § 214 (4th ed. 1988); P.V. Baker & P. St. J. Langan, Snell's Equity 284 (29th ed. 1990) (citing Bartlett & Others v. Barclay's Bank Tr. Co. Ltd., [1980] Ch. 514, 543).

119.   The Uniform Trust Code's § 1002(a)(1) states: ". . .the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred."

120.   Thus, 29 U.S. Code § 1132(a)(2) merely codifies for ERISA participants and beneficiaries a classic trust-law process for recovering trust losses through a suit on behalf of the trust. The Supreme Court's *Amara v. Cigna* (2011) and *LaRue v. DeWolf* (2008) decisions affirm this fact.

121.   When combined with ERISA Section 409 requirements (ERISA section 409(a) imposes personal liability on fiduciaries that breach their fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails with the pure form of the continuing violations doctrine and each element here avoids giving the Defendants a "license" to perpetuate its misconduct.

122. Plaintiffs believe "a continu[ous] series of events gives rise to a cumulative injury." That is the gravamen of our specific claims at issue— participants/beneficiaries seek the trustee/fiduciary to restore all trust damages under the laws of equity so that the Plaintiffs' accounts would reach the same levels as if the breaches never occurred. Such is analogous to treating the claim as continuing in nature. (See Kyle Graham, "The Continuing Violations Doctrine," Vol. 43 p 293, Gonzaga Law Review (2008)).

123. Accordingly, as permitted under Section 409 of ERISA, Plaintiffs are entitled to the full range of equitable relief against the Company And the Committee (and members), including, without limitation, requiring the Company to do the following: (a) disgorge any plan assets taken from the Plan and Trust that were not used to pay Plan participants and beneficiaries and (b) restore losses to the Plan resulting from the Company and fiduciaries' imprudent practices of using plan assets to pay more than the reasonable rate to providers; (c) and provide "such other equitable or remedial relief as the court may deem appropriate, including removal of [the Company as an ERISA] fiduciary." 29 U.S.C. § 1109(a).

124. ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

125. Repeated imprudent monitoring was exhibited after selection and continuing into the limitations period (based on the fact that the Defendants never removed the imprudent fund after their initial selection).

126.   The Supreme Court held that the fiduciary duty identified in the Tibble case was continuing in nature, and that each new breach began a six-year limitations period under § 1113. The Court recognized the breach as "a fiduciary's allegedly imprudent retention of an investment" which results in a series of related breaches as the investment is retained over time. *Tibble IV*, 135 S.Ct. at 1826, 1828–29.

127.   As the Court made clear, only a "breach or violation," such as a fiduciary's failure to conduct its required regular review of Plan investments, need occur within the six-year statutory period; the initial investment need not be made within the statutory period. Id. at 1827–28.

## E.  DEMONSTRATIONS OF DEFENDANTS' FLAWED AND DISLOYAL DECISION MAKING PROCESS

128.   Plaintiffs noted concerns about this fund and many others in text comprising over twice as many pages in the initial complaint. That analysis in March was performed before the Defendants supplied their Investment Policy Statement (IPS) and now Plaintiffs are basing these assertions on the actual text in the Defendants' IPS.

129.   The Defendants' investment policy states (emphasis added):

Retirement Plan Oversight Committee: As fiduciaries under the Plan, the primary responsibilities of the Committee are to: Maintain procedural decision-making processes that operate *free from conflicts of interest*, *ensuring that fees are reasonable*, and *decisions are made exclusively for the benefit of Plan participants*.

130.   The following paragraphs illuminate how the selections were not (1) free from conflicts, nor (2) did they possess reasonable "fees" because (3) the decisions were made not "for the benefit of the Plan participants." Each of the funds listed on the 2017 Form 5500 that was chosen by the Defendants engaged in "active management strategies" and thus, involved extra "expenses." The introductory commentary to the Restatement (Third) states that "active management strategies involve investigation expenses and other transaction costs ... that must be considered, realistically, in relation

to the likelihood of increased return from such strategies." Restatement (Third) Trusts pt. 6, ch. 17, topic 3 intro. (American Law Institute).

    a. "Cost-conscious management is fundamental to prudence * * * ." Restatement (Third) of Trusts, ch. 17, intro. note (2007), Restatement (Third) of Trusts § 90 cmt. B (2007).

    b. Wasting the trust's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1).

    c. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

    d. Courts have quoted commentary to section 7 of the Uniform Prudent Investor Act: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

131. Many of the funds listed on the 2017 Form 5500 Schedule of Assets at www.efast.dol.gov proves that the Defendants' selections/retentions, more often than not, were share classes that paid kickbacks in the form of revenue-sharing for the Defendants' benefits (not the participants). Also, more often than not, the classes of funds had extra fees taken from participants' accounts every business day when the Defendants' actions could have been to choose the cheaper version of the exact same mutual fund that employed the same fund managers and the same holdings. As the U.S. Securities and Exchange Commission (SEC) has stated repeatedly, the different classes of funds use the exact same management and managed products (stocks or bonds). They stated, "Each share class of a fund represents an interest in the same portfolio of securities." (www.sec.gov/news/press-release/2018-15).

132. Richard H. Baker connected the "revenue-sharing dots" leading to investor deception when he said: "Revenue-sharing is generally not disclosed to

investors, thus leaving investors unaware of the incentives a broker may have for recommending one fund over another." Chairman of the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises.

133. Notably, the IPS states, "The selection of the Plan's investment options is among the most important responsibilities of the Committee."

134. To add emphasis from the Defendants' policy: "The Committee will utilize the criteria identified in Appendix A when selecting the specific investment options."

135. The IPS criteria is very limited and narrow, even omitting entirely the word "benchmark" and the word "index" which are two of the main words in the Defendants' annual 29 CFR § 2550.404a-5 ("Fiduciary requirements for disclosure in participant-directed individual account plans") stating that the Defendants' comparisons are required to be made to "an appropriate broad-based securities market index."

136. This July 1, 2012, 29 CFR § 2550.404a-5 requirement actually was rooted in two other earlier sources: (1) SEC Form N-1A; N-3; "Disclosure of Mutual Fund Performance and Portfolio Managers" SEC Rel. # IC-19832 (April 6, 1993) and (2) RESTATEMENT (THIRD) OF TRUSTS § 100 (1992 & 2003-2012).

   a. SEC requires mutual funds to use a "broad-based index" to provide investors with a benchmark for evaluating fund performance. . . ." In rejecting the use of peer group comparisons, the SEC stated "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market...."

   b. The appropriate comparator for loss calculation purposes "return rates of one or more ... suitable index mutual funds or market indexes " Restatement Trust 3rd § 100.

    c. All plan fiduciaries are responsible to send accurate annual 404a-5 fund fee and performance notices with only "benchmark index" comparisons (not peers) for all participants. It states: "For each investment with a variable return, the overview also provides a benchmark which enables you to compare the performance of the investment with a broad based securities market index."

    d. 29 CFR § 2550.404a-5: "(iii) Benchmarks. For designated investment alternatives with respect to which the return is not fixed, the name and returns of *an appropriate broad-based securities market index* over the 1-, 5-, and 10-calendar year periods (or for the life of the alternative, if shorter) comparable to the performance data periods provided under paragraph (d)(1)(ii)(A) of this section, and which is not administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used."

137. The IPS covers four main areas: (1) past performance for selection criteria (which violates SEC Rule SEC Rule 156 that requires mutual funds to tell investors not to base their expectations of future results on past performance before they invest); (2) three very limited areas of "Risk," (3) "Expenses" and (4) "Operations":

//

//

//

//

//

| Performance | Criteria |
|---|---|
| 1 Year Return | Top 50% of Peer Group |
| 3 Year Return | Top 50% of Peer Group |
| 5 Year Return | Top 50% of Peer Group |
| Risk | |
| Alpha | Alpha 3 year 50% of Peer Group |
| Sharpe | Sharpe Ratio 3 year 50% of Peer Group. Sharpe Ratio 5 year 50% of Peer Group |
| Standard Deviation | The Standard Deviation score should be in the top 50% of the peer group, for at least a three-year period. |
| Expenses | |
| Prospectus Net Expense | Net Expense ratio 50% of peer |
| Operations | |
| Assets | Assets >= $100 mil |
| Manager Tenure | Manager Tenure > 3 years |

138.    Plaintiffs used the list of funds on the Defendants' first year when they described the classes of funds (the 2018 Annual Return/Report of Employee Benefit Plan www.efast.dol.gov; these were the same funds (with the exception of the technology fund) as those on the 2017 Annual Return/Report of Employee Benefit Plan). This analysis here covers over 70% of the funds on the Defendants' Forms 5500—some funds were disregarded when Plaintiffs could not obtain revenue-sharing information; revenue-sharing selling agreements were requested but not provided).

**1) Fund number one, the Transamerica high yield bond fund**

139.    Amy's kitchen fund number one, the Transamerica high yield bond fund had a yield of 2.24% per annum. The yield for the cheaper share class was 2.39%. The reason is very simple—the expense ratio for the Defendants' class was 0.65% versus the cheaper 0.4%. Plaintiffs infer the Defendants went off the grid of their own Investment Policy Statement (IPS) with unwritten selections/retentions criteria to see the SEC Rule 12b-1 "kickback" to themselves of 25 basis points every year ($25 for

each investor's $10k wage investments). This is a common thread woven throughout the facts and circumstances of retentions of funds in the first year of the limitations period.

140.   The investment policy states: "[t]he selection of the Plan's investment options is among the most important responsibilities of the Committee" and " . . . the Committee shall be responsible for the Plan-level investment selection process . . ." Plaintiffs find that the actions of the Defendants' were contrary to their own policy based on facts and circumstances prevailing at the time of their conduct in 2017.

141.   The Sharpe ratio helps determine how the portfolio managers for the bond fund have come in at 0.8% for the more expensive version they chose and 0.81% for the Sharpe five year for the cheaper class. However, the Corporate Bond Average was 0.84 meaning the fund chosen and retained did not possess the metrics to be in the Plan then and after.

142.   The average bond quality was junk bond (BB) for the Defendants' choice, while the average bond rating was BBB for the Corporate Bond Average.

143.   The alphas for three year period are the same versus the Corporate Bond Average at 0.25% but the Bloomberg US Agg index was higher at 0.27%. Alpha is a metric that can help determine whether the managers' skills exist. The Sharpe ratio for three years for the Corporate Bond Average was 0.97%, while the Defendants' choice's Sharpe ratio was less, 0.89%. The manager started on May 1, 2014. That might explain some of the deficiencies versus its peer average as well as the benchmark.

144.   Restatements Third of Trusts discusses the value of seeking probable income, which was not mentioned in the Defendants' policy. The Defendants' fund choices expenses diminished the yield to 2.24%. The Intermediate Term Bond category's average yield was 2.49% and the Corporate Bond Average was 2.97%. Higher fees cause the returns to deviate more so it was not surprising that the annualized five year standard deviation for the Defendants' choice was 2.9%, while

the Barclays Aggregate Bond index was less at 2.84%, along with the Intermediate Term Bond Average at 2.84%.

**2) Fund Number Two, The Transamerica Mid Cap Value Opportunity**

145.  The Defendants' second fund had an inception date based on Morningstar® in 2017 on March 24. Therefore, much of the data during that year regarding its performance cannot be ascertained by Plaintiffs so they are not certain how the Defendants applied their IPS criteria to this fund. However, we could see the expense ratio was 90 basis points, and it kicked back 25 basis points in revenue-sharing credits to the Defendants. Plaintiffs infer revenue-sharing was the reason the Defendants' acted in choosing funds over the cheaper, identical funds with less costs burdening participants like was available here for only 70 basis points. Nevertheless, the R6 version had an alpha over the prior three year years that was a negative -.35% for the class, which closely approximates the Defendants' choice (while the Morningstar US Mid Val TR USD index had a 0.1% positive alpha.

**3) Fund Number Three, The Transamerica High Yield Bond**

146.  Fund number three, the Transamerica high yield bond, had a Morningstar inception date of March 24 2017. Using the share class that closely approximates the Defendants' choice (Defendants' choice had a higher expense ratio), Plaintiffs find the Transamerica high yield bond R6 has a 63 basis point expense ratio versus the Defendants 85 basis points and the Corporate Bond High Yield Average had an expense ratio of 77 basis points.

147.  Plaintiffs again infer that the choice of the R4 version was because of the 25 basis points kicked back to the Defendants by forcing participants to save wages into the higher cost version.

148.  In 2017, the risk measurement, standard deviation, of the Corporate Bond, High Yield Average came in at 5.07% while the closest proximity share class was 5.95 percent annualized for three year standard deviation—well again worse and not in compliance with the Defendants' IPS. The Transamerica high yield bond fund showed

in 2017 that the standard deviation was higher than the Corporate Bond High Yield Average or its peers in the category.

149.   Looking at alpha for three years cheaper version, R6, six was 11 basis points per year for three years while the Barclays US corporate index for high yield at 0.14%. It also had a higher Sharpe for three years at 0.94% versus 0.85%. Risk under annualized standard deviation was, for the prior three years, 5.95% per year, while the index was 5.81% and the average in the category was 5.07%. Based on Morningstar, portfolio managers Miller Bakker Schaefer and Thoms started managing on 9/30/2017.

**4) Fund Number Four, The Oppenheimer Global**

150.   The Defendants chose another version of a mutual fund that pays them 25 basis points in revenue sharing called Oppenheimer global. The annualized standard deviation for three years was 12.79, while the World Large Stock Average was 10.47 and the World Stock Average was 11.16 (included not only large stocks but mid and small size market cap stocks).

151.   The five year annualized standard deviation risk measurement (higher is worse for participants) was 11.89 for the Oppenheimer global while the World Large Stock Average was 10.44 in the world stock average was 10.78. This trend continued past the 5 year period, noted by the IPS, in the annualized standard deviation over 10 years. The annualized standard deviation over three years was 12.79 versus 10.47 for the World Large Stock Average.

152.   Because probable income matters but was ignored here, Plaintiffs note in 2017 that yield for the Defendants' choice was 0.54% versus 1.26% for both averages, World Large Stock Average and World Stock Average.

153. An example of the math not used by the Defendants' is below. Often, because revenue-sharing usage can keep participants from seeing the true cost of their Amy's Kitchen Inc. 401(k) Retirement Plan, plan sponsors prefer to "hide" the cost in the gain/loss column where participants are unlikely to figure the costs. Because of the nature of revenue-sharing, a percentage of someone's investment (versus a flat fee

per participant) the costs rise as participants save more money. Investors in the fund below will pay $25 for every $10k invested in revenue-sharing costs. When they roll another $50,000 into this fund from another employer, they add another $125 to the total of $150 for the exact same recordkeeper services.

154. Equally important, the lost opportunity costs increase as time passes. Comparing the 5-Year Total of 87.78% less 83.67% equals 4.11%. The Defendants' choice of the A version (bold italics is the Defendants' choice) removes the chance for workers to own the exact same manager and holdings at 0.71% versus the 1.15% cost for the exact same services in violation of ERISA.

155. Mathematical reasoning shows that this data facing the Defendants in 2017 was ignored. The difference per year is 0.822% in lost opportunity costs caused by the Defendants' in their efforts to make 0.25% each year in revenue-sharing ("12b-1 Fees"). Thus, even if the Defendants' acted to credit every penny of revenue-sharing they benefited from of $25 per $10,000 invested, they caused participants to lose the chance to get the exact same fund that would have made them $82.20 more each year.

| 12b-1 Fees | Expense Ratio | Name | 5-Year Total |
|---|---|---|---|
| *0.25* | *1.15* | *Oppenheimer Global A* | *83.67* |
| | 0.71 | Oppenheimer Global I | 87.78 |

**5) Fund Number Five, The Loomis Sayles Investment Grade Bond**

156. Fund number five is the Loomis Sayles investment grade bond—this share class had an 80 basis point expense ratio each year. The fund's prospectus at www.sec.gov/edgar indicates the Defendants could have acted before 2017 or later to choose a cheaper share class with 47 basis points in cost. This task to "switch" share class could have been effectuated by calling 800-225-5478 at any time.

"A fiduciary would have no reason not to switch to an identical share class fund." See *Braden*, 588 F.3d at 596 (finding inference of flawed review process where specific identical institutional shares were available).

*Tibble v. Edison Int'l*, 07 cv 5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

157.    There was even a class with only 55 basis points (versus 80 basis points) in annual expenses. The Corporate Bond, High Yield High Quality Average cost less at 49 basis points. These actions by Defendants again violated their own policy in force and this choice was not in the "sole and exclusive" benefit for the participants under ERISA.

158.    The Defendants' fund's standard deviation risk for the prior five years was 4.47. The Intermediate Term Bond Average was much less at 2.84 in deviation risk. The Corporate Bond High Quality Average was only 2.46. The annualized standard deviation over three years was 4.11 for the Defendants' fund, while the Intermediate Term Bond Average was 2.74 and the Corporate Bond High Quality Average was 2.4. Because the fund's expenses affect the yield, the yield was only 2.25 when the Defendants' actions could have been to seek a higher yield of 2.49 in the Intermediate Term Bond Average—probable income in bonds is the only source of growth thus yield is a critical metric missing from the Defendants' IPS.

159.    The expenses also affected the Sharpe ratio for five years because they came in at 58 basis points instead of 72 basis points in Sharpe ratio (higher is better) for the Intermediate Term Bond Average each year.

160.    Another contributing factor in part to the high standard deviation is the triple B bond status that was held by the Defendants' Loomis investment grade bond when the Intermediate Term Bonds Average held a higher "A" bond rating and was safer than the Defendants' choice.

161.    The Alpha (higher is better) was a negative two basis points, while the Intermediate Term Bond Average was 22 basis points. Sharpe ratio for three years was affected by the high expense. It came in at 47 basis points—the Intermediate Term Bond Average came in at 86 basis points.

162. Plaintiffs provide a sample of this fund's SEC-prospectus at www.sec.gov/edgar relating to fees between classes. There is no need to scour the universe as Plaintiffs show all versions or classes of the same mutual fund are listed on the same page of the prospectus.

|  | Class A | Class N | Class Y |
|---|---|---|---|
| Management fees | 0.40% | 0.40% | 0.40% |
| Distribution and/or service (12b-1) fees | 0.25% | 0.00% | 0.00% |
| Other expenses | 0.14% | 0.07% | 0.14% |
| Total annual fund operating expenses | 0.79% | 0.47% | 0.54% |
| Fee waiver and/or expense reimbursement' | 0.05 % | 0.03 % | 0.05 % |
| Total annual fund operating expenses after fee waiver and/or expense reimbursement | 0.74% | 0.44% | 0.49% |

https://www.im.natixis.com/us/mutual-funds/loomis-sayles-investment-grade-bond-fund/LIGRX

163.    Plaintiffs demonstrate in the table above the inherent conflicts and self-interest of the Company while operating the participants' limited menu of choices over the years. This fund's unique higher-quality bond style was the only choice of bond fund the Company had offered in the past. It is tailored to older participants at the Company. Contents of the table were extracted from page 6 of the most recent SEC-prospectus.

164.    Plaintiffs noted that all share classes had the same management fees (forty basis points). However, of the fund versions or classes, Class N was the least expensive

at 0.44%.

165.    In the table below Plaintiffs note the Company's choice of "A" share class (row 1) has fewer assets because large institutional investors avoid an identical but more costly class. Large institutional investors do not want to invite litigation—they know cheaper is better for their pensions and shareholders.

166.    Other than inception dates, each share class is the same—same managers with the same holdings, same weightings of holdings, trading in aggregate across all share classes. The only material columns affecting participants' accounts are columns F and G. SEC rule 12b-1 fees in G cause the expense ratio to rise commensurately—thus, the Company's choice cannot be deemed "No Load" (H).

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Defs' = A Row 1 | Inception Date | Manager Name | Manager Start Date | Assets ($millions) | Expense Ratio | 12b-1 Fees | True No-Load |
| *Loomis Inv Grade A* | *12/31/1996* | *Fuss/Eagan/Stokes/Kennedy* | *12/31/1996* | *903* | *0.80* | *0.25* | *N* |
| Loomis Inv Grade N | 2/1/2013 | Fuss/Eagan/Stokes/Kennedy | 12/31/1996 | 1202.8 | 0.47 | - | Y |
| Loomis Inv Grade Y | 12/31/1996 | Fuss/Eagan/Stokes/Kennedy | 12/31/1996 | 3451.3 | 0.55 | - | Y |

## 6) Fund Number Six, Nuveen Real Estate

167.    The Defendants' Nuveen real estate securities fund had a yield of 2.6% while the Real Estate Average had a yield of 2.73% per annum. That may be because the expense ratio of the Defendants fund was 1.05% per year, versus the Real Estate Average at 86.9 basis points in 2017. There was a cheaper share class that the Defendants could have switched to with a telephone call to decrease the expenses on the participants at 87 basis points. That share class became available on April 30 of 2013. The five year Sharpe ratio was 68 basis points, while the Real Estate Average was 69 basis points. The Sharpe three year was 62 basis points, while the Sharpe three year for the Real Estate Average was 66 basis points. The annualized three year and

five year standard deviation risk metrics came in during 2017 at 14.06% and 13.32% per year, respectively, versus the Real Estate Average of 13.42% and 12.89% (lower is better). Again, the Defendants actions to retain the fund in 2017 violated their IPS terms.

**7) Fund Number Seven, The American Funds Washington Mutual**

168.   The Defendants' American funds Washington Mutual share class cost 35 basis points in 2017, but there was a cheaper share class at the time for only 30 basis points. The yield was 1.9 for the class they chose while 1.94 for the cheaper share class. The fund shared revenue between one and five basis points with the Defendants. Thus, the Plaintiffs infer that the choice, once again, of a revenue-sharing class (a non-pecuniary metric not found in the Defendants' IPS) formed the basis for selection and retention. Nonetheless, even if the Defendants' used the revenue-sharing to offset recordkeeper costs, the total return compounding effect to own the cheaper share class exceeded the maximum revenue sharing offered.

169.   Thus, the lost opportunity cost created by the Defendants' actions to not buy the cheaper share class "cost" more than the revenue sharing credits that the Defendants sought to receive. This is easily verified by comparing any period (3 year, 5 year, 10 years, etc.) compounded or "total returns" for each class.

170.   To illustrate the lunacy of buying the more expensive share class, Plaintiffs note that in 2017, investors chose to put 2,057 millions of dollars in the Defendants' choice of share class while other investors held 13,855.6 millions of dollars in the cheaper share class. Large institutions have already done the math to know that they should "switch immediately" to the cheaper share class.

171.   "Overall, revenue-sharing plans are more expensive as higher expense ratios are not offset by lower direct fees or by superior performance. Rebates increase with the market power of the recordkeeper suggesting that third-party funds may revenue share to gain access to retirement assets." Irina Stefanescu, Board of Governors of the Federal Reserve System; Veronika K. Pool, Vanderbilt University;

Clemens Sialm, University of Texas at Austin; "Mutual Fund Revenue-sharing in 401(k) Plans," National Bureau Of Economic Research, December 2022, 5, ABSTRACT, 19; www.nber.org/papers/w30721; 5, abstract, 19.

172. ERISA does not prohibit revenue-sharing, and courts have stated that revenue-sharing is not imprudent "per se." However, deciding on a method for compensating a provider is a fiduciary decision that requires plan fiduciaries to act prudently and in the best interest of plan participants. The U.S. Department of Labor explains this matter (emphasis added):

> When the plan documents are silent or ambiguous on this issue, fiduciaries must select the method or methods for allocating plan expenses. A plan fiduciary must be prudent in the selection of the method of allocation. Prudence in such instances would, at a minimum, require a process by which the fiduciary weighs the competing interests of various classes of the plan's participants and the effects of various allocation methods on those interests. In addition to a deliberative process, a fiduciary's decision must satisfy the "solely in the interest of participants" standard. In this regard, a method of allocating expenses would not fail to be "solely in the interest of participants" merely because the selected method disfavors one class of participants, provided that a rational basis exists for the selected method. On the other hand, if a method of allocation has no reasonable relationship to the services furnished or available to an individual account, a case might be made that the fiduciary breached his fiduciary duties to act prudently and "solely in the interest of participants" in selecting the allocation method.

173. Plaintiffs find that "While revenue-sharing itself is not illegal, it becomes extremely problematic when fund assets are used to pay for distribution." —Stan Wilson [2007], quoting SEC's Andrew Donohue (Andrew J. Donohue, https://www.sec.gov was named the Securities and Exchange Commission's Chief of Staff in May 2015).

174. Plaintiffs have information and believe that sub-transfer agency payments for the benefit of the Defendants coupled with SEC Rule 12b-1 revenue-sharing payments are distribution costs that caused the Defendants' interests to conflict with participants' interests and reduce mutual fund's returns since the inception of the Plan.

**8) Fund Number Eight, The Calvert Equity**

175.   The Defendants' Calvert equity fund failed again to avail the participants an opportunity to save their wages biweekly into a cheaper share class. The Calvert equity fund that they chose had 74 basis points in annual expenses, while the cheaper class was available for 67 basis points on or after October 3 of 2017. The yield 12 month as of the year later was 23 basis points, while the cheaper version was 35 basis points. The Large Growth Average yield was higher at 37 basis points. The Sharpe five year was 1.40, while its benchmark index in the fund's SEC-prospectus at www.sec.gov/edgar was 1.49 (higher is better). The alpha for three years prior was six basis points, while the Russell 1000 Growth Index was 13 basis points. The cheaper share class had 2,044 million dollars invested, while the Defendant's share class had only 550 million dollars invested. Some concerns with this fund's management may have stemmed from its manager's start date of June 16 of 2015. These untested managers may not have had a chance to demonstrate their performance and should have been avoided until they could establish a track record that the Defendants could measure on behalf of the participants.

176.   The portfolio managers' alpha over the prior 3 years lagged their SEC-prospectus index at six basis points versus thirteen basis points for the Russell 1000 Growth.

177.   Plaintiffs point out that returns in the past, as well as expected returns based on Warren Buffett's GDP plus Dividends expected returns, come in at 5% for stocks and 3% for bonds. So, ignoring a cost difference between two share classes of ten basis points could impact total returns for participants much more than limited risk data and limited return data might portray.

| Inception Date | Since Inception Average | Name |
|---|---|---|
| 12/29/1933 | 3.34 | USTREAS Stat US T-Bill 90 Day TR |
| 1/3/1928 | 5.96 | S&P 500 PR |
| 1/2/1900 | 5.17 | DJ Industrial Average PR USD |

**9) Fund Number Nine, The Invesco Small Cap Growth**

178.    Fund number nine is the Defendants' Invesco small cap growth. Once again, the Defendants could have availed the participants an opportunity to save expenses by switching into a cheaper share class at 74 basis points a year instead of 84 basis points each year. To demonstrate with a repeatable Excel exercise, Plaintiffs show how 10 basis points can affect their wage growth. Over six years, 10,000 invested in the Invesco small cap growth class chosen by the Defendants would grow (at an assumed rate of 5% less the fund's expense) to $12,770.

179.    The alternative share class growing faster by 10 basis points less in expenses equals $12,844. However, only paying four basis points for a mutual fund that mimics the Russell 2000 Growth Index would grow to $13,370.

**10) Fund Number Ten, The Neuberger Berman Socially Responsible Fund**

180.    Fund number 10, the Neuberger Berman Socially Responsible, had an expense ratio of 1.29% in on 9/30/2017. The Large Growth Average was 0.94% and there was a cheaper class or version of the Defendants' choice at 61 basis points. Clearly, an inference again of self-dealing and conflicts of interest can be made because in 2017, there were 50 basis points of revenue sharing offered to the Defendants.

181.    Another problem with choosing revenue-sharing funds is that it causes investors in this fund to shoulder an unequal cost burden for administration if the Defendants use these revenue-sharing credits to offset recordkeeper costs.

182.    The Company's 2020 Form 5500 (and others) had a header called "Schedule C, line 2(h))" that demonstrates a lack of uniformity that violates (1) the plan document and (2) what Congress intended when on August 22, 1974. The objectives of these provisions of uniform fiduciary standards were to ". . . make

applicable the law of trusts; . . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets, and to provide effective remedies for breaches of trust." Statement of the Honorable Harrison A. Williams, Jr., 120 Cong. Rec. S-15737, August 22, 1974, Reprinted [1974] U.S. Code Cong. Admin. News, pp. 5177, 5186.

183. One of the most prominent ERISA attorneys discussed this matter almost ten years ago:

> * * * not all recordkeepers can allocate revenue-sharing in an equitable, return of concessions, manner. As a result, committees and their advisors need to be aware of the capabilities of recordkeepers when selecting providers.

C. Frederick Reish, Drinker Biddle, "The Equitable Allocation of Revenue-sharing," https://benefitslink.com/news/index.cgi/view/20140414-113148 Apr 14, 2014.

184. He commented on the DOL's statements that the revenue-sharing credit back or "money should be allocated to the accounts of the participants who had suffered losses."

185. Mr. Reish said most plan documents do not specify how to use revenue-sharing and "committees must make prudent decisions about the allocation." Mr. Reish said the "first step in that process is for plan committees to consider the revenue-sharing paid to, and kept by, their plan recordkeepers . . and then to determine: if the recordkeeper's total compensation is reasonable; and if the arrangement for the recordkeeper to keep the revenue-sharing is acceptable." His comments below apply to Amy's Kitchen Inc. 401(k):

> The amount of revenue-sharing varies from fund to fund. Some investments - including company stock investments and self-directed brokerage accounts, and some mutual fund share classes — make no revenue-sharing payments at all. Thus, participants whose accounts are invested in funds that pay revenue-sharing are subsidizing the administrative costs for participants who have invested in the investments that pay little or no revenue-sharing. That raises the obvious question of whether it is fair - or even legal - to place the financial burden of a plan on some participants . . . while others pay little or nothing for the cost of

running the plan. Plan committees need to understand those facts and their consequences - and then make prudent decisions about them. (A "prudent" decision is one that is informed and reasoned. "Informed" means that the committee understood and evaluated the relevant information. "Reasoned" means that the committee reached a rational decision based on their analysis.)

186. Because of this higher revenue-sharing cost each year of fifty basis points, investors in this fund shouldered a larger proportion, per dollar invested, of revenue-sharing was likely directed by the Defendants to cover administrative fees. That meant that revenue-sharing funds like these with an arrow (figure 1) unequally and unfairly burdened participants with administrative costs in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D): the duty to act in accordance with the documents and instruments governing the plan.

**Amy's Kitchen, Inc. 401(k) Retirement Plan**
**EIN No.: 68-0154899, Plan No. 001**
**Plan Year Ending: 12/31/2018**

**Indirect Compensation in the form of revenue sharing was paid to the following Service Providers:**

| NATIONAL FINANCIAL SERVICES | 04-3523567 |
| MID ATLANTIC CAPITAL CORPORATION | 25-1409618 |

Revenue amounts are shown in annualized basis points of plan assets invested in applicable fund

| Fund Family | Fund Name | Start Date | End Date | Revenue to National Financial Services | Revenue to Mid Atlantic Capital Corporation |
|---|---|---|---|---|---|
| AMERICAN CENTURY | AMERICAN CENTURY GOVT BOND R5 | 1/1/2018 | 12/31/2018 | 0.128 | |
| AMERICAN FUNDS | AMERICAN FUNDS AMCAP R5 | 1/1/2018 | 12/31/2018 | 0.128 | |
| AMERICAN FUNDS | AMERICAN FUNDS GROWTH FUND OF AMERICA R2E | 1/1/2018 | 12/31/2018 | 2.040 | |
| AMERICAN FUNDS | AMERICAN WASHINGTON MUTUAL | 1/1/2018 | 12/31/2018 | 0.128 | |
| CALVERT | CALVERT EQUITY I | 1/1/2018 | 12/31/2018 | 0.255 | |
| CALVERT | CALVERT SMALL CAP I | 1/1/2018 | 12/31/2018 | 0.255 | |
| FRANKLIN | FRANKLIN UTILITIES ADV | 1/1/2018 | 12/31/2018 | | 0.938 |
| INVESCO | INVESCO SMALL CAP GROWTH FD | 1/1/2018 | 12/31/2018 | 0.893 | |
| IVY | IVY SCIENCE & TECHNOLOGY, Y | 1/1/2018 | 3/28/2018 | 1.275 | |
| JANUS | JANUS HENDERSON GLOBAL TECHNOLOGY T | 3/28/2018 | 12/31/2018 | 0.893 | |
| LOOMIS SAYLES | LOOMIS SAY INVEST GRADE BND, A | 1/1/2018 | 12/31/2018 | 1.148 | |
| NEUBERGER BERMAN | NEUBERGER BERMAN SUSTAINABLE EQUITY R3 | 1/1/2018 | 12/31/2018 | 1.913 | |
| NUVEEN | NUVEEN REAL EST SEC I | 1/1/2018 | 12/31/2018 | 0.638 | |
| OPPENHEIMER | OPPENHEIMER GLOBAL FUND | 1/1/2018 | 12/31/2018 | 1.275 | |
| FRANKLIN | TEMPLETON FOREIGN ADV | 1/1/2018 | 12/31/2018 | | 0.938 |

187. The alpha for three years for the Defendants' choice was a loss of 13 basis points each year, while the Russell 1000 Growth was 13 basis points positive. The Large Growth Average was less alpha loss at negative four basis points. The Sharpe ratio for three years was 82 basis points, while the Large Growth Average had at 90

basis point Sharpe ratio and the Russell 1000 Growth came in at 1.16. The assets invested in the more expensive version chosen by the Defendants was 42 million, which was sizably less than in the cheaper share class of the identical fund with the identical managers (start date of December 19 of 2003) buying the exact same stocks at 364 million dollars.

**11) Fund Number Eleven, The American Funds Amcap Fund**

188.   The Defendants' next fund that Plaintiffs used facts and "the circumstances . . . prevailing' at the time the fiduciary acts" (quoting 29 U.S.C. § 1104(a)(1)(B)) is the American funds AMCAP. The Defendants' class expense ratio of 0.41% was higher than the cheapest share class (with many more assets) at 0.36%.

189.   As we can see, there seems to be flawed decision-making across every fund in this Plan so the past decisions supported by evidence shows actions were reckless and systemic and they affected every participant in the plan.

190.   The alpha for three years for the fund that they chose was a negative four basis points. The alpha for the cheaper share class was three basis points loss. The Morningstar US Large Growth Index gained two basis points each year in alpha and the Russell 1000 growth index gained 13 basis points each year on average. The extra fees affected the yield and dragged it down to 60 basis points from 65 basis points. These metrics are directly proportional because these classes are part of identically ran mutual funds with the same "Management Company Name" and "Id."

191.   Investors' dollars invested in the more expensive class chosen by the Defendants in 2017 equaled 1,311 million while 8.8 times more dollars (11,540 million) were invested in the cheaper share class that the Defendants avoided. The Sharpe ratio came in at 94 basis points over three years, while the Russell 1000 Growth was 116 basis points (higher is better).

**12) Fund Number Twelve, The Franklin Utilities Fund**

192.   This fund's analysis and the results are very similar to other funds above. The Franklin utilities fund expense ratio for the class that the Defendants chose came

in at 58 basis points. There was a cheaper share class of the same fund that cost 47 basis points that they failed to avail the participants of the opportunity to buy. The Defendants' choice had an annualized risk or standard deviation over three years of 11.91, while the Utilities Average had a slightly lesser annualized risk for three years of 11.83. The five year standard deviation was 12.09 while the annualized standard deviation for five years for the Utilities Average was 12.01.

193. The Sharpe five year was 91 basis points but the class they avoided of the identical fund was higher at 94 basis points (for the cheapest version that they avoided). The alpha for three prior years was 67 basis points while the Utilities Index average for it peers was higher at 87 basis points. The Defendants' fund's Sharpe for three years was 83 basis points while the Morningstar US Utilities index was 90 basis points.

**13) Fund Number Thirteen, The American Funds Growth Fund Of America**

194. This fund, the American Funds Growth Fund of America, was directed to be on the limited menu for participants to direct wages into, and it had an expense ratio of 1.13%, while the cheapest share class of the exact same fund managed identically had a 33 basis points fee. Plaintiffs infer the decisions to add this fund earlier, and keep this fund, was likely the inducement of having 60 basis points in revenue-sharing credits every year to direct wherever the Defendants wanted the revenue-sharing credits directed.

195. However, seeking a benefit for themselves instead of a benefit for the participants violated ERISA. Fees affect everything, including the volatility or the standard deviation as seen in the annualized five year standard deviation at 10.52% per year for the Defendants share class, while only 10% per year for the cheapest version--the 10.52 exceeded the Russell 1000 Growth index at 10.08. The Sharpe ratio was also dragged down by the extra fees at a 1.37 Sharpe ratio for the Defendants class versus 1.52 for the cheapest version. The Russell 1000 Growth had a Sharpe ratio over five years of 1.49. The alpha over the prior three years in 2017 was a negligible four basis points per year, while the Russell 1000 growth came in much higher at 13 basis points

per year. The alpha for the share class that the Defendants avoided putting on the menu was nine basis points per year. The Sharpe ratio for three years was 1.02, while the cheapest share class cost had a Sharpe of 1.09. The Russell 1000 Growth came in at 1.16 (3 year Sharpe).

196.   Finally, only 130 million dollars were invested in this expensive version that the Defendants kept in the first limitations period and beyond, while 23,386 million was invested in the cheapest share class of this fund (with the same manager owning the same holdings).

**14) Fund Number Fourteen, The Calvert Small Cap**

197.   Plaintiffs are now using another measurement factor (called "an appropriate broad-based securities market index") endorsed by (1) the U.S. Securities and Exchange Commission (SEC), and (2) Prudent Investor Rule Restatement (Third) Trusts as well as (3) 29 CFR § 2550.404a-5. This illuminates the basis for 1990 Nobel Laureate William F. Sharpe's statements in "The Arithmetic of Active Management" excerpted below (emphasis added):

> An important corollary is the importance of appropriate performance measurement. "Peer group" comparisons are dangerous. Because the capitalization-weighted average performance of active managers will be inferior to that of a index/passive alternative, the former constitutes a poor measure for decision-making purposes. * * * The best way to measure a manager's performance is to compare his or her return with that of a comparable passive alternative. The latter -- often termed a "benchmark" or "normal portfolio" -- should be a feasible alternative identified in advance of the period over which performance is measured. Only when this type of measurement is in place can an active manager (or one who hires active managers) know whether he or she is in the minority of those who have beaten viable passive alternatives.

198.   Offering multiple funds like the Defendants did and does not shield from liability under ERISA § 404(c). The Fourth Circuit discussed this matter in *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n. 3 (4th Cir. 2007) stating the fiduciary's responsibility, as the Secretary puts it, to screen investment alternatives and to ensure that imprudent options are not offered to plan participants. The regulation implementing section 404(c) says that the fiduciaries may not be held liable for any loss or fiduciary breach "that is the *direct and necessary result of that participant's or beneficiary's exercise of control*." 29 C.F.R. § 2550.404c-l(d)(2)(i). However, here Plaintiffs illuminate how the Defendants' acted to build and maintain a limited menu of offerings for their employees—participants can only choose from the funds the Defendants' acted to add and retain.

199.   Restatement 3d of Trusts, § 90 (2012) states in devising and implementing strategies for the investment and management of trust assets, plan fiduciaries had and have a duty to minimize costs. Trustees/fiduciaries have a duty to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Id. Adherence to this duty required the regular performance of an "adequate investigation" of existing investments in the Plan to determine whether any of the Plan's investments were "improvident" or if there was a "superior alternative investment" to any of the Plan's holdings. Id.

200.   Thus, the Defendants must not ignore newer, cheaper classes of funds. Either the Defendants' acted to intentionally avoid the cheaper classes or they failed to note the changes in circumstances where cheaper classes of funds became available. Due to past ERISA litigation since the early 2000s, cheaper share classes have emerged and there is a duty to monitor systematically and regularly to ensure the participants pay less for the exact same manager.

201.   The Defendants never used the cheaper class based on all the Forms 5500 available at the DOL. This information to the government forms the basis for these

assertions. Restatement Third, § 100 cmt. f notes that the general rule placing on the plaintiff the burden of proving his claim "is moderated in order to take account of …the trustee's superior (often, unique) access to information about the trust and its activities."

202.   That is the situation with the Calvert small cap fund. This fund had a sister share class that became available on February 1 of 2019. The expense ratio was six basis points less in the first year out. Currently, as of June of 2023, the Defendants' share class costs 94 basis points per year, while the cheaper identical funds share class cost is only 85 basis points. Another problem apparently not noted by the Defendants, but required to be noted by their IPS, is based on Morningstar®; the manager had a start date of November 3 of 2015. During the monitoring in 2017, the Defendants should have factored in another untested manager that the participants might save their hard earned wages into and thus, either warned participants in writing of the risk or gave the fund more due diligence before including it on the participants' menu.

203.   Fiduciaries should have known that the risks were high for this trust fund due to its variance or standard deviation before offering the Calvert Small-Cap Fund. In 2017, the data at www.sec.gov/edgar state that this fund manager only bought 73 stocks. This fund first appeared in the Defendants' 2014 Form 5500 filed with DOL/IRS—it held 71 stocks then, with ten of the stocks constituting 31% of the total of investors' assets (this metric called "Top-10 Holdings Percent" is calculated by the SEC to mean all dollars "across all share classes").

204.   In 2017, the Company had these and other prospectus facts in full view:

| | Name | 5-Year Total | 10-Year Total |
|---|---|---|---|
| 1 | S&P SmallCap 600 TR USD | 115.71 | 137.39 |
| 2 | Calvert Small Cap A | 106.26 | 88.07 |

205.   Since the median tenure for portfolio managers is only seven years, Plaintiffs' key question surrounds the process that would induce the Company to ignore

the disparity in the 10-year total return difference (49.32% above (137.39 minus 88.07)). Such long-term negative "alpha" calls into question why the benchmark (S&P SmallCap 600) had so much success over such a long period.

206.   The Company should have inferred that the benchmark (and a related index mutual fund) carried several favorable advantages such as: (1) lower expenses and (2) 600 stocks.

207.   A solid monitoring process must prevent (1) unproven portfolio managers from taking fees from Amy's workers' biweekly salary savings while (2) simultaneously concentrating these dollars into relatively few holdings.

**15) Fund Number Fifteen, The Janus Henderson Global Technology Fund**

208.   The Janus Henderson global technology fund was added in either the 2017 or the 2018 year. It replaced the IVY Science and Technology fund. We're looking at this fund's investment metrics as of the end of 17, which could actually be those same metrics used by the Defendants regardless of the Forms 5500 data at www.efast.dol.gov. Plaintiffs requested Committee meeting notes and minutes to better ascertain the actions and deliberations, or lack thereof, to better evaluate the prudence of the Defendants' decision making (these items were not provided).

209.   The expense ratio for the share class that the Defendants allowed participants to purchase cost 95 basis points per annum. There was an identical fund (different class) available for 71 basis points. That class was not chosen for the workers. It launched January 27 of 2017. Due to a lack of information about when this fund was added, Plaintiffs cannot dive much deeper into the metrics at this time.

**16) Fund Number Sixteen, American Century Government Bond**

210.   The American Century government bond had an annualized five year risk level or standard deviation of 2.6% per year while the Government Bond General Average was less risky at 2.34% per year (the Barclays US Agency Intermediate Trust was 1.3% per year). The Government Bond Mortgage Average was 2.1% and the same relative standard deviation metrics applied for the three year period.

211.    The Defendants' American Century government bond had a 0.35 Sharpe ratio over the prior five years, while the Government Bond Mortgage averaged 0.61 and the Intermediate Government averaged a slightly more beneficial 0.37. Sharpe ratio for three years was 0.56, while the Government Bond Mortgage Average was 0.91 and the Intermediate Government peers came in at 0.62. Plaintiffs view noting the assets in the class as material because it can help decide (1) where and when cash flows are leaving the class which can force portfolio managers to sell and (2) to make expense ratios increase to cover costs. The Defendants' choice had only 197 million dollars invested while the Government Bond General Average or peers had 1,008 million invested.

**17) Fund Number Seventeen, The Oppenheimer Global**

212.    The Templeton foreign fund reflects more flawed decision-making that affected and still affects plan-level investment purchasing offered by Defendants for their participants to direct wages into where the Defendants' IPS did not help very much. Never mentioned in the Defendants' narron IPS' terms, unlike most IPS' terms, most committees are required by their IPS to buy the cheapest share class. Since the IPS criteria were so loosely adhered to by the Defendants' actions noted here, however, it may not have aided the participants to have more stringent criteria for selections/retentions.

213.    The expense ratio of the Defendants class was 97 basis points in 2017 while a cheaper class was available for participants to buy at 72 basis points (but they could not because they do not control the menu of funds). In violation of the IPS terms again, Plaintiffs note the Defendants version exceeded the average cost for the Foreign Large Value peers (82 basis points).

214.    The annualized standard deviation was a high 13.3% while the Foreign Large Value was only 11.8 annualized over five prior years. Following the IPS, for the prior three years Plaintiffs note a 13.91 risk or standard deviation (over 3 years) versus the Foreign Large Value Average at 11.89. The Defendants' fund's alpha was a loss or

negative alpha of -59 basis points each year for three years while the category average was 34 basis points positive. The Sharpe ratio was also 16 basis points for the Defendants' choice while the Sharpe ratio was almost twice as high for the category average at 29 basis points.

## F. Imprudent Selection of Fund Managers

215. Plaintiffs used the Defendants' standard deviations of alpha and calculated that funds chosen by the Defendants needed these number of years to determine skill of the portfolio managers before adding them to the participants menu:

**Fund required years of monitoring based on standard deviation**

Invesco Global Fund, 80.81 years; Delaware Ivy Science and Technology Fund, 371.32 years; Janus Henderson Global Technology and Innovation Fund, 73.39 years; BlackRock High Yield Bond Portfolio, 60.37 years; Nuveen Real Estate Securities Fund, 24.6 years; Invesco Small Cap Growth Fund, 129.95 years; American Funds Washington Mutual Investors Fund, 361.37 years; Loomis Sayles Investment Grade Bond Fund, 42.46 years; American Funds AMCAP Fund®, 123.52 years; Invesco Small Cap Growth Fund, 129.95 years; American Funds The Growth Fund of America®, 39.41 years; Western Asset Core Bond Fund, 113.65 years.

216. The duties of a trustee arising out of this fiduciary relationship flow from "the special nature of the relation between trustee and beneficiary" and not from contract law. Restatement (Second) of Trusts Section 169 cmt. c, "Although the trustee by accepting the office of trustee subjects himself to the duties of administration, his duties are not contractual in nature."

217. In regard to choosing or keeping revenue-sharing versions of mutual funds as in this case, the Supreme Court unanimously held in the context of ERISA retirement plans that such interests must be understood to refer to "financial" rather

than "nonpecuniary" benefits. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014).

**G. Imprudent and Disloyal Selection, Monitoring and Retention of Funds**

218.    The Department of Labor has stated that when assembling, choosing, or modifying an investment menu for participants' investment choices, a fiduciary must evaluate the investment alternatives on the menu based solely on pecuniary factors, not subordinate the interests of participants to unrelated objectives, and not sacrifice investment return or take on additional investment risk to promote non-pecuniary objectives or goals. This is exactly what Amy's Kitchen Inc. and its de facto plan fiduciaries in this case did—they repeatedly sought more expensive investment options when (1) higher yielding, (2) less costly identical share classes and (3) more tested and proven active managers were available at the time of their conduct based on their own "certified under penalties of perjury" submissions during the thirteen years of 2009 to 2021 (to the U.S. Departments of Treasury and Labor).

219.    If a fiduciary makes an investment decision based on non-pecuniary factors, the fiduciary always remains subject to ERISA's general loyalty obligation and must act in a manner that is consistent with the interests of participants and beneficiaries in their retirement income or financial benefits. Plaintiffs demonstrated here precisely when and what fund was added that had revenue-sharing, but that same fund's total return and yields were depleted by more than the revenue-sharing credits the Defendants' acted to obtain. That is, the lost opportunity costs were much greater than the short-term misguided goals of the Company. Mathematical reasoning was seldom used by the Company and its plan fiduciaries.

220.    Using facts presented in 2017, the Plaintiffs analyzed the Defendants' conduct in arriving at an investment decision, not its results. The results of these demonstrations prove the Defendants' failed to perform a thorough investigation that requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

221. Where ERISA is silent, courts look to trust law. A trustee is obligated not only to make prudent investment decisions but also to monitor and review those investments "in a manner that is reasonable and appropriate to the particular investment action, and strategies involved." Restatement (Third) of Trusts, § 90, Comment b, p. 295 (2007).

222. The Plaintiffs provide evidence here that the Defendants' actions violated:

    a. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A): the duty to act solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to them and defraying administrative costs.

    b. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) which is the duty of prudence and the duty to invest prudently and the duty to investigate and the duty to prudently select service providers.

    c. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D): the duty to act in accordance with the documents and instruments governing the plan.

223. The investment policy is considered a "plan document" which means the Defendants should follow its terms. "The court found that, like the plan and trust, the investment policy statement is a document governing the plan and failure to comply with its requirements may in itself be a breach of fiduciary duty. In this case ABB's failure to follow the investment policy statement resulted in more than $35 million in liability."[1]

224. The court observed: "We have often noted that an ERISA fiduciary's duty is 'derived from the common law of trusts…' In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." Loyalty is the most fundamental of rules borrowed from the common law of trusts, this duty is also known as the duty of care. Tibble v. Edison Int'l, 575 U.S. 523 (2015); Martinez v.

---

[1] https://www.psca.org/industry-intel/defined-contribution-insights/tussey-v-abb-inc-lesson-fiduciary-duties

Schlumberger, LTD., 338 F.3d 407, 411 (5th Cir. 2003). The standard is objective and therefore independent of a fiduciary's lack of bad faith. La Scala v. Scrufari, 479 F.3d 213, 219-20 (2d Cir. 2007).

225.   Under trust law, "when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100 cmt. f (2012) (Third Restatement); see, e.g., George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 871 (rev. 2d ed. 1995) (Bogert) ("If the beneficiary makes a prima facie case, the burden of contradicting it or showing a defense will shift to the trustee.").

226.   Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983). Therefore a defendant "cannot claim as a defense...that a great deal of time was spent reviewing" a decision when that decision was "tainted by the fact that he did not have all of the information he needed," rendering the decision "flawed from its inception." Chao v. Hall Holding Co., 285 F.3d 415, 431 n.10 (6th Cir. 2002).

227.   The fiduciary must determine whether the investment "is reasonably designed, as part of the portfolio...to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment." 29 C.F.R. § 2550.404a-1(b)(2)(i).

228.   Additionally, plan fiduciaries have a "duty to reevaluate the trust's investments periodically as conditions change." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, p. 146 (3d ed. 2009) (Bogert 3d).

> The duty to review trust investments should be performed by the collection of information currently as changes occur, and also by a systematic consideration of all the investments of the trust at regular intervals, for example, once every six months.

Bogert 3d § 684, at 147-48 (emphasis added).

229. The Defendants' IPS' terms discuss standard deviations with little context. Standard deviation is commonly associated with risk. The duty of prudence, therefore, requires "prudent management of risk." Restatement (Third) of Trusts § 90 cmt. e(1) (explaining that the prudent investor rule's "requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks"). This does not require outright avoidance of risk, but instead limiting risks to those that are *compensated through the improved potential for returns*."

230. The Defendants' terms are not tied in any way to the last sentence above.

**H. No "experience and expertise" was exhibited by the Defendants**

231. "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." Hughes v. Northwestern University, No. 19-1401 (U.S. Jan. 24, 2022).

232. Based on the Defendants' actions and certified reporting to the U.S. Departments of Treasury and Labor over the past decade the facts never supported that the plan fiduciaries' decision-making was akin to actions that "thoroughly investigate the merit of each decision affecting the plan." Sweda v. University of Pa., 923 F.3d 320, 329, 2019 EBC 158780 (3d Cir. 2019), cert. denied, 206 L. Ed.2d 496 (2020); Tatum, 761 F.3d 346; Allison v. Bank One–Denver, 289 F.3d 1223, 27 E BC 2746 (10th Cir. 2002); Donovan v. Cunningham, 716 F.2d 1455, 1467, 4 EBC 2329 (5th Cir. 1983).

**I. Defendants Failed To Inform and Select Lower-Cost, Higher-Yielding Classes Of The Same Funds**

233. Plaintiffs argue that the Company misrepresented material facts to participants that would have induced them (a reasonable person) to ultimately invest in and rely upon the less comprehensive and misleading information. Plaintiffs believe

the Company committed (1) failures to inform participants about identical investments at lesser costs (on their annual fee disclosures) and (2) purposefully hid potentially higher trust income from cheaper classes and (3) failed to disclose inherent risks of portfolio managers stock and bond selections and finally, (4) led participants to think portfolio managers added value when their extra costs actually simply decreased participants' terminal wealth. The Company repeatedly limited the menu so much it forced participants to invest their deferred wages biweekly into more costly, lower returning and lower yielding classes. Information about the cheaper, higher yielding share classes with identical stocks/bonds managed by identical managers caused participants' future contributions (and reinvested dividends/interest (referred to as "probable income" under Restatement (Third) of Trusts)) to be invested in identical but more costly investments. This is a material breach.

234. "A misrepresentation is only actionable if it is material. A misrepresentation is material if the statement would induce a reasonable person to rely upon it." *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–23 (2d Cir. 1997).

235. Plaintiffs note *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) stated that information is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled."

**J. The Company's Monitoring Processes Were Deficient Because Evidence Indicates They Used Only "Peer" Performance Measurements**

236. The periodic "performance hurdle" for the Company's retained funds was much lower when they compared to "peers" instead of the 29 CFR § 2550.404a-5 "appropriate broad-based securities market index." It can be explained because peers hold less than 100 stocks while benchmarks have hundreds or thousands. Thus, lower risk, standard deviation and variance ("risk" in common trust law) exists for "widely used broad-based indexes" but not so much when comparing to other risky peers.

237.    Peers are much more concentrated and have a much higher variance. The IPS was not based on the (1) SEC's "widely-used, broad-based benchmark" nor (2) Restatement of Trust nor (3) 29 CFR § 2550.404a-5 requirements.

238.    The Prudent Investor Rule (Restatement (Third) Trusts) states (emphasis added):

> The total return approach to damages […] can be carried out by referring to the performance of all or a relevant portion of the proper investments of the trust in question, to the performance of all or part of the portfolios of comparable trusts, or to the *performance of some suitable securities index* * * *.

Restatement (Third) Trusts: Prudent Investor Rule, Reporter's Notes to Sections 205 and 208-211 (1992); Restatement (Third) Trusts §100, cmt. b(1) (2012); see also Loring and Rounds, A Trustee's Handbook, § 7.2.3.2 (2012).

239.    New 29 CFR § 2550.404a-5 rules implemented on 7/1/2012 altered the "four corners" of most Investment Policy Statements (IPS) and often replaced the more desired but much less rigorous "peer comparison" standard. The DOL fought against Wall Street's requests for "peer comparisons" when seeking commentary about pending 29 CFR § 2550.404a-5 rules.

240.    In fact, regarding the new rules promulgated in 2012, the DOL followed the SEC's 1970s guidance verbatim about avoiding peer comparisons and applying "appropriate benchmark" requirements.

241.    Plaintiffs show why peer hurdles are easier to surpass. A similar inference can be drawn from each of the Company's chosen funds with portfolio managers:

//

//

//

| *Notes | Name | 5-Year Average | 5-Year Total |
|---|---|---|---|
| 1 ▶ A-1/1/17 | Transamerica High Yield Bond A | 6.95 | 39.93 |
| 2 ▶ Bmk | BBgBarc Global High Yield TR USD | 7.37 | 42.70 |
| 3 ▶ Bmk | BBgBarc US Corporate High Yield TR USD | 7.36 | 42.63 |
| 4 ▶ Peers | Corporate Bond - High Yield Average | 6.00 | 33.84 |
| 5 ▶ Peers | High Yield Bond Average | 6.33 | 35.89 |

242.  Row 1 fund is the Company's chosen high-yield bond that earned a five-year average of 6.95% from 1/1/2017 back 60 months—it also made 39.93% in total over the same period. The "broad-based securities market index" (from SEC, trust law, and 29 CFR § 2550.404a-5), rows 2 and 3, earned more than row 1.

243.  In the figure above, the "appropriate broad-based securities market index" is the BBg US Corporate High Yield (SEC-prospectus at www.sec.gov/edgar). It *had* a much higher 5-Year total return of 42.70% than the Company's fund (39.93%).

244.  An investor researching long-term negative alphas (against an unbiased widely-used, broad-based benchmark) is not using hindsight for future selections. It is doing what the SEC explained in their "Disclosure of Mutual Fund Performance and Portfolio Managers" (SEC Rel. No. IC-19832 (Apr. 6, 1993)). It chose to require funds to use a broad-based index in lieu of peer group comparisons "to provide investors with a benchmark for evaluating fund performance that affords a greater basis for compatibility than a narrow index would afford."

245.  However, returns for peers in rows 4 and 5 above prove the Plaintiffs' argument. The Company and it de facto plan fiduciaries preferred a lower bar—peers. They never communicated this fact to their plan participants.

246.  It should be self-evident why the Company wanted to monitor using a weaker standard. Especially if one views the impact of fund changes at a participant's level. The Company, Transamerica and Cetera wanted to compare "their thoroughly researched" investment choices to peers so they looked better and this alleviated

frequent investment changes that would have been seen by their participants (causing them to question the Defendants' processes and earlier decisions.

247.    Changing funds in a participant-directed 401k required Sarbanes Oxley disclosures after Enron's collapse. But too many fund changes will irritate participants who own or "owned" the replaced fund. Naturally, participants worry when someone sells their old mutual fund's shares and puts their cash into another investment. The more it happens, the more participants will question the Company's experience and expertise. The Company basically chose the "<u>Cleanest</u> shirt in the <u>dirty</u> laundry basket."

248.    This fund should never have been chosen. The Company's monitoring processes then and now convey very little proof of skill or "experience and expertise" (Hughes v. Northwestern University, No. 19-1401 (U.S. Jan. 24, 2022)).

**K. ERISA Plan Fiduciaries May Not Subordinate Investment Returns Or Increase Risks To Promote Non-Pecuniary Objectives**

249.    Trustees must focus solely on "financial" rather than "nonpecuniary" benefits. The "benefits" to be pursued by ERISA fiduciaries as their "exclusive purpose" does not include "nonpecuniary benefits." (see *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014)).

250.    The U.S. Department of Labor's (DOL) longstanding and consistent position is that when making decisions on investments and investment courses of action, plan fiduciaries must be focused solely on the plan's financial returns and the interests of plan participants and beneficiaries in their benefits must be paramount.

251.    Since 1994, the Department's emphasis on the primacy of plan participants' economic interests has stayed constant. The DOL has consistently stated that the paramount focus of plan fiduciaries must be the plan's financial returns and providing promised benefits to participants and beneficiaries. The DOL has explained that a fiduciary act prudently if she determines that an investment is appropriate based solely on economic considerations.

252. Pension plans and other benefit plans covered by ERISA, however, are bound by statute to a narrower objective: Prudent management with an "eye single" to maximizing the funds available to pay benefits under the plan. *Donovan v. Bierwirth*, 680 F.2d at 271.

253. ERISA plan fiduciaries may not subordinate investment returns or increase risks to promote non-pecuniary objectives. The duty of loyalty—a bedrock principle of ERISA with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries. See Unif. Prudent Inv. Act section 5 cmt. (1995) ("The duty of loyalty is perhaps the most characteristic rule of trust law."); see also Susan N. Gary, George G. Bogert, & George T. Bogert, The Law of Trusts and Trustees: A Treatise Covering the Law Relating to Trusts and Allied Subjects Affecting Trust Creation and Administration section 543 (3d ed. 2019).

> . . . [a] trustee is held to something stricter than morals of the market place. . . . Uncompromising rigidity has been the attitude of the courts of equity when petitioned to undermine the rule of undivided loyalty.

Justice Cardozo's classic statement in *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928).

254. The duty of prudence prevents a fiduciary from choosing an investment alternative that is financially less beneficial than reasonably available alternatives. These fiduciary standards are the same, no matter the investment vehicle or category.

255. The fundamental principle is that an ERISA fiduciary's evaluation of plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the plan's funding policy and investment policy objectives.

256. The corollary principle is that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

257. Investment course of action means any series or program of investments or actions related to a fiduciary's performance of the fiduciary's investment duties and includes the selection of an investment fund as a plan investment. ERISA Section 404(a)(1)(A) prohibits fiduciaries from subordinating the interests of participants to unrelated objectives and bars them from sacrificing investment return or taking on additional investment risk to promote non-pecuniary goals.

258. As many courts have required, Plaintiffs consistently compared the Defendants' fund's underperformance to a "meaningful benchmark" under the facts and "circumstances prevailing at the time of the conduct."

259. ERISA requires that a fiduciary "discharge his duties . . . in accordance with the documents and instrument governing the plan[.]" 29 U.S.C. § 1104(a)(1)(D). Plaintiffs allege that the Company and its de facto delegates and fiduciaries violated 29 U.S.C. § 1104(a)(1)(D) by failing to adhere to the terms of the Plan.

260. Prudent Investor Rule Restatement (Third) Trusts explained how any choice to "engage in active management must be justified by a cost-benefit analysis that incorporates risks."

261. Restatement (Third) of Trusts § 90 cmt. e(1) (emphasis added) explains that the prudent investor rule's "requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks. This Restatement does not require outright avoidance of risk, but "*limiting risks to those that are compensated through the improved potential for returns*."

262. Given all seventeen funds share one common denominator, revenue-sharing, Plaintiffs must infer a lack of care, skill and loyalty.

263. As the district court explained in Tussey v. ABB,

\* \* \* there [were] too many coincidences to make the beneficial outcome for ABB serendipitous, particularly considering the powerful draw of self-interest when transactions are occurring out of sight and are unlikely to ever be discovered. *Tussey v. ABB Inc.*, No. 2:06-cv-04305, 2017 WL 6343803 (W.D. Mo. Dec. 12, 2017).

264.   A fiduciary can abuse their discretion and breach their duties by acting on improper motives, even if one acting for the right reasons might have ended up in the same place. Cf. Metro. Life Ins. Co. v. Glenn, 554 U.S. 15, 117 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008); id. at 123 (Roberts, C.J., concurring in part and concurring in the judgment); id. at 131 (Scalia, J., dissenting).

265.   Richard Allen Posner is an American jurist and legal scholar who served as a federal appellate judge on the U.S. Court of Appeals for the Seventh Circuit from 1981 to 2017. When he was a law professor, Judge Posner wrote The Economic Analysis of the Law, the 1972 edition. Judge Posner spoke about the math above as "diminished earning capacity."

266.   Plaintiffs cite a 2007 SEC General Counsel speech referencing Judge Posner, called "The Future of Securities Regulation." Mr. Brian G. Cartwright, General Counsel, U.S. Securities and Exchange Commission, spoke at the University of Pennsylvania Law School Institute for Law and Economics in Philadelphia, Pennsylvania, on October 24, 2007 (emphasis added), saying:

> Judge Posner, in his lecture here last year, noted this and referred to <u>one failing in particular: the tendency to see patterns where they don't exist</u>. \* \* \* When evaluating a manager's past performance, however, this tendency to see patterns where none exist leads to the <u>irrational expectation that streaks will persist</u>. As Judge Posner pointed out, <u>people are very poor at intuiting probabilities</u>. We don't really need sturdy academic studies to tell us this; we know it from our own experience. But sturdy academic studies there are. And they inform us that, just as <u>many gamblers erroneously believe in "hot streaks" and "cold dice," many investors believe a mutual fund that shows past performance better than an appropriate benchmark index is much more likely to continue to outperform in the future.</u> Countless academic studies, however, have shown that <u>very often such outperformance fails to persist.</u>

## CLASS ACTION ALLEGATIONS

267.   Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows: All participants in or beneficiaries of the Amy's Kitchen Inc. 401(k) Retirement Plan from January 1, 2017 through the date of judgment, (the "Relevant Time Period or Class Period").

268.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

269.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

    a. The Class include over 3,000 members and are so large that joinder of all its members is impracticable.

    b. There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

    c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

    d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in

conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

270.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties logically to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

271.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial

benefits to the parties and the Court. As of December 31, 2020, the Plan had over 30,256 participants with account balances.

272. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, inter alia:

(a) whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached fiduciary duties of loyalty and prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plan;

(e) the proper form of equitable and injunctive relief; and

(f) the proper measure of monetary relief.

273. Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

274. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches.

275. Plaintiffs have no interests that conflict with those of the Class.

276. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

277. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions.

Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties conceivably to be encountered in the management of this matter as a class action.

278.   In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final, injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105

### Violation of Fiduciary Duty of Prudence

### (Liability for breach of co-fiduciary; Duty of Prudence)

279.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

280.   ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

281.   In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity....... ERISA requires fiduciaries to employ appropriate methods to investigate the merits of the investment and to structure the investment as well as to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). *Accord Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

282.   In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence

in selecting investments." *Tibble*, 575 U.S. 523. To satisfy its duties under ERISA, a fiduciary simply may not argue that other funds, in combination, theoretically create a prudent portfolio. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)."

283.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

284.    At all relevant times during the Class Period, The Company (and its delegates), along with Cetera, imprudently engaged in selecting and retaining the flawed investment lineup, deciding which funds to populate the limited Plan's menu of choices for workers, and retaining covered service providers, were ERISA fiduciaries.

285.    At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

286.    At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to Transamerica and Defendant Investment Fiduciaries, was an ERISA fiduciary.

287.    As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of prudence.

288. Defendants breached this fiduciary duty in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for administrative services. Moreover, Defendants failed to investigate the competence of and periodically monitor covered service providers which they had selected to provide services to the Plan and Plan participants.

289. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Plan Fiduciaries failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriately and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; (c) ensured all parties-in-interest were competent and free from self-interest; (d) and that Plan expenses were reasonable and necessary; and (e) they placed the interests of Plan participants and beneficiaries over the interests of hired covered service providers, and themselves.

290. At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

291. The United States Supreme Court held in Tibble that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." 575 U.S. at 529. "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." Id.

292. Thus, to discharge this duty, Plan Fiduciaries must have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective

investments for the Plan, and for removing imprudent investments. As set forth below, this the Plan Fiduciaries here did not have.

293.    Plan fiduciaries are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the of level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. See A Look at Fee, supra.

294.    Prudence requires plan fiduciaries to monitor both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

295.    Likewise, Plan Fiduciaries must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees from any plan service provider, including the plan fiduciaries themselves.

296.    Plan Fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select investment options for the plan which include a remittance of a fee to the Plan sponsor, administrator, or investment advisor, or another party otherwise affiliated with the Plan sponsor.

297.    Given the vulnerability of plan participants, who are dependent on the retirement income earned by their Defendants' chosen plan investment choices, Plan Fiduciaries also must be particularly vigilant about evaluating whether lower-expense share classes are available to participants.

298.    Plan Fiduciaries had a fiduciary duty to monitor and evaluate the performance of the Plan's investments they selected and retained, and to remove and replace imprudent investments.

299. Plan Fiduciaries did not have a prudent process for monitoring and evaluating the performance of the Plan's investments.

300. At all relevant times during the Class Period, the Plan's mutual funds significantly underperformed their meaningful benchmarks.

301. If Plan Fiduciaries had monitored and evaluated the performance of the Plan's mutual funds, it would have known that those funds were consistently underperforming both their SEC-prospectus benchmarks and benchmarks under 29 CFR § 2550.404a-5. Plan Fiduciaries did not know about, did not correct, and did not prevent, the resulting losses to Plan participants.

302. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

303. Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

304. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

305. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

306. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

307. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and

knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CAUSE OF ACTION

### Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105

### Violation of Fiduciary Duty of Loyalty

### (Liability for breach of Duty of Loyalty)

308. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

309. ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." Id. at 224 (quotation marks and citations omitted).

310. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

311. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

312. At all relevant times during the Class Period, the Defendants and the

Committees, and its individual members, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited menu of choices, and keeping covered service providers rather than soliciting requests for proposal, were ERISA fiduciaries.

313. At all relevant times during the Class Period, Cetera for valuable consideration, and in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

314. At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to covered service providers, was an ERISA fiduciary.

315. As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of loyalty.

316. Defendants breached their fiduciary duty of loyalty in multiple respects as discussed throughout. At all relevant times during the Class Period, Cetera made investment decisions and/or provided investment advice while tainted with self-interest.

317. At all relevant times during the Class Period, Plan Fiduciaries put their interests ahead of those of the Plan and Plan participants by choosing investment products and services which generated substantial revenues at great costs to the Plan and Plan participants.

318. Investment fund options chosen for a plan should not favor the fund provider and a party-in-interest over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries endorsed Transamerica's and Cetera's selling agreements with investment funds in the Plan,

revenue-sharing agreements between Transamerica, Cetera and Amy's Kitchen, in their own self interest. As a result, Plan participants were unaware of the excessive and unreasonable fees secretly charged to their accounts because of the Defendants.

319. As a result of their conflicts of interest, Plan Fiduciaries selected and retained in the Plan many investment funds that were more expensive than necessary and otherwise were not justified on the basis of their managers and historical performance. Plan Fiduciaries, moreover, hid these facts and the conflicts of interest from the DOL, IRS, and Plan participants and beneficiaries.

320. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

321. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the plan's providers.

322. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

323. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

324. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## THIRD CAUSE OF ACTION

### Failure to Monitor Other Plan Fiduciaries

325.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

326.    Amy's Kitchen had the authority to appoint and remove members of the Committees.

327.    Defendants also each had the authority to select service providers for the Plan. In light of this authority, Defendants each were a fiduciary of the Plan.

328.    As the appointing/selecting fiduciaries, Amy's Kitchen and its board had a duty to monitor their appointees and providers they selected to ensure that they were adequately performing their fiduciary and non-fiduciary obligations and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

329.    Amy's Kitchen also had a duty to ensure that their appointees and Plan service providers they selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

330.    Amy's Kitchen and its members breached their fiduciary monitoring duties by, among other things:

      a. Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions;

      b. Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate the availability of lower-cost separate account and collective trust vehicles; and

c. Failing to remove Committee members and service providers who were incompetent, who charged excessive fees, and/or whose performance was inadequate.

331. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

332. Had Amy's Kitchen and its members complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

333. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to monitor.

334. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

335. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

336. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty by Omission

337. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

338.　As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

339.　Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

340.　As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

341.　Each of them either knew (because they were parties to the transaction) or, through a proper review would have discovered that Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

342.　Defendants did not take any action, including any legal action, or exercise any other authority under the Plan or the Trust Agreement, to properly manage this choice in action.

343.　By failing to remedy these prohibited transactions on behalf of the Plan, including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

344.　Because their fiduciary duties included employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration of their specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

345. As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

346. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the other Defendants.

347. Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

348. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

349. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## ENTITLEMENT TO RELIEF

350. By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

351. By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to redress the wrongs described above.

352. Plaintiffs allege a "cumulative" harm which implicates the pure form of the continuing violations doctrine. The injury claimed by each plaintiff repeats daily when mutual fund pricing is calculated. Thus, resulting from the cumulative impact of daily negative compounding over months and years of the Defendants' repeated flawed selection and monitoring processes. Participants/beneficiaries charge precisely the sort of continuous conduct accreting retirement account injury that justifies characterization as a continuing violation.

353. The concept of "make-whole" relief under laws of equity are clear. Where a beneficiary claims to recover trust property, the fixed limitation period shall not apply. No limits of recovery of lost benefits to recover from the trustee apply if a timely claim is filed. The reason for this exception under laws of equity is that the possession of the property by a plan fiduciary or trustee is never by virtue of any right of his own but is acquired initially for and on behalf of the beneficiaries. The trustee's ownership or possession is representative of the beneficiary's interest.

354. The effect is that time does not run in the trustee's favor and against the property beneficiary. ERISA grants full damages and restitution to redress a fiduciary breach involving plan assets. Three remedies are the workhorses of ERISA litigation, although ERISA does grant less important remedies to enforce statutory penalties and the like. Together, they make up what the Supreme Court described as a "carefully integrated interlocking, interrelated, and interdependent remedial scheme, which is . . . part of a 'comprehensive and reticulated statute."

355. Professor Dobbs, "[j]udicial remedies usually fall in one of four major categories: (1) Damages remedies, (2) Restitutionary remedies, (3) Coercive remedies . . . or (4) Declaratory remedies."

356. ERISA clearly grants declaratory and coercive remedies, as an employee can bring an action "to clarify his rights to future benefits under the terms of the plan" and the court can "enjoin any act or practice which violates [ERISA] or the terms of the plan." The provisions also grant the ability to enforce the payment of promised benefits.

357. Limiting our Plaintiffs to harms "suffered within the limitations period prior to suit would render their claims unintelligible and nugatory" for the injuries inflicted upon the plaintiff within the limitations period could only be understood and evaluated by reference to activity occurring outside of the period. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43, p 289, Gonzaga Law Review (2008))

358. Injuries stemmed from the cumulative impact of years of breaches for (1) lack of loyalty and (2) lack of care or skill (1104). Lost opportunity costs to have their ten years of average tenure at Amy's Kitchen to accrue growth faster (from more interest, dividends, etc. as well as less burdens from fees such as manager fees and their related trading costs) is precisely the sort of continuous conduct accreting injuries that justifies characterization as a continuing violation. (See Highland Indus. Park, Inc. v. BEI Def. Sys. Co., 357 F.3d 794, 797 (8th Cir. 2004) ("[W]e know of no state whatever in which an injured party must know the full extent of the damages that it may recover before the statute of limitations begins to run on its claim."); WOOD, supra note 57, § 179 ("[i]n actions from injuries resulting from the negligence or unskillfulness of another, the statute [oflimitations] attaches and begins to run from the time when the injury was first inflicted, and.not from the time when the full extent of the damages sustained has been ascertained"). But see 54 C.J.S. Limitation of Actions § 204 (2005) ("Where a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last date of the tortious conduct.").

359.    "[W]hen the acts or conduct are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature, then prescription does not commence until the last act occurs or the conduct is abated." *Rodrique v. Olin Employees Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005); see also *Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir. 2002); *Landman v. Royster,* 354 F. Supp. 1302, 1315 (E.D. Va. 1973); *Bustamento v. Tucker*, 607 So. 2d 532, 542 (La. 1992)

360.    These claims build upon a factual foundation laid outside of the limitations period prior to suit. Courts have ruled that it would be unfair to allow the plaintiff to recover only for the incremental worsening of his condition (lack of growth of her salary savings) within the limitations period.

361.    Referring to the Supreme Court's *Amara v. Cigna* (2011) and *LaRue v. DeWolf* (2008) decisions, the Defendants' violations are supported by the Court's "make-whole" references. When combined with ERISA Section 409 requirements (ERISA section 409(a) imposes personal liability on fiduciaries that breach their fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails with the pure form of the continuing violations doctrine and each element here avoids giving the Defendants a "license" to perpetuate its misconduct.

362.    The Defendants' continuing violations we refer to here are "a continu[ous] series of events gives rise to a cumulative injury." That is the gravamen of our specific claims at issue—participants/beneficiaries seek the trustee/fiduciary to restore under the laws of equity all trust damages so that the Plaintiffs' accounts would reach the same levels as if the breaches never occurred. This is analogous to treating the claim as continuing in nature. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43 p 293, Gonzaga Law Review (2008)).

## **JURY TRIAL DEMANDED**

363.    Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## **PRAYER FOR RELIEF**

364.    Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Tower Legal Group, P.C. as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

- Impose a Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

- Order Actual damages in the monetary amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: August 14, 2023                    **TOWER LEGAL GROUP, P.C.**

By:    */s/ James A. Clark*_____
       JAMES A. CLARK
       RENEE P. ORTEGA
       Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I, James A. Clark, hereby certify that on August 14, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and service via transmittal of a Notice of Electronic Filing.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 14, 2023, at Sacramento, California.


*/s/ James A. Clark*